**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, | |
| AMERICAN COUNCIL ON EDUCATION, | |
| ASSOCIATION OF PUBLIC AND LAND-GRANT UNIVERSITIES, | |
| ARIZONA BOARD OF REGENTS ON BEHALF OF ARIZONA STATE UNIVERSITY, | Case No. _____ |
| BROWN UNIVERSITY, | **COMPLAINT** |
| CALIFORNIA INSTITUTE OF TECHNOLOGY, | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, | |
| BOARD OF GOVERNORS OF THE COLORADO STATE UNIVERSITY SYSTEM ACTING BY AND THROUGH COLORADO STATE UNIVERSITY, | |
| CORNELL UNIVERSITY, | |
| THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, | |
| THE JOHNS HOPKINS UNIVERSITY, | |
| UNIVERSITY OF MARYLAND, COLLEGE PARK, | |
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY, | |
| UNIVERSITY OF PITTSBURGH OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION, and | |

UNIVERSITY OF WASHINGTON,

Plaintiffs,

v.

DEPARTMENT OF DEFENSE, and

PETER HEGSETH, in his official capacity as
Secretary of the Department of Defense,

Defendants.

1. This suit challenges the latest unlawful effort by the government attempting to slash "indirect cost rates" for government-funded research. The Department of Defense ("DOD") policy is materially identical to policies issued in recent months by the National Institutes of Health ("NIH"), Department of Energy ("DOE"), and National Science Foundation ("NSF")—the first two of which were quickly enjoined by courts in this district and the third was voluntarily stayed by NSF after the plaintiffs filed a motion for a preliminary injunction. *Massachusetts v. Nat'l Insts. of Health ("NIH")*, No. 25-CV-10338, 2025 WL 702163, at *1 (D. Mass. Mar. 5, 2025), *judgment entered* (D. Mass. Apr. 4, 2025), *appeal filed* (D. Mass. Apr. 8, 2025); *Association of American Universities v. Dep't of Energy ("DOE")*, No. 25-cv-10912, 2025 WL 1414135 (D. Mass. May 15, 2025); Electronic Order, *AAU v. Nat'l Sci. Found. ("NSF")*, No. 25-cv-11231 (D. Mass. May 19, 2025), ECF No. 52.

2. Congress, by statute, has authorized DOD to fund science to advance its mission. Since 1965, DOD has done so by inducing America's universities to create the physical and human infrastructure necessary to do the world's best science and by committing to fund the costs of the research it supports, including "indirect costs" determined through a precise and elaborate system of negotiated indirect cost rates. Congress has repeatedly acted to protect that system, and today

that system is embedded in a detailed set of regulations designed to ensure reasonable and stable indirect cost rates and to protect the reliance interests of institutions that partner with DOD on this critical research.

3.      Some of the costs of DOD research are "direct," meaning they are readily attributable to specific projects. Others are "indirect"; these costs are just as necessary for the research to occur, but they are harder to attribute to individual projects. Specialized nuclear-rated facilities; computer systems to analyze enormous volumes of data; information-technology and utility systems providing the backbone for those efforts; and specialized researchers and administrative staff who keep the systems running—all are critical to cutting-edge research, but their costs typically cannot be allocated to any single project. Because of caps on administrative costs, moreover, universities contribute a significant amount of their own funds to cover such costs, thereby subsidizing the work funded by grants.

4.      The DOD policy affects both new and existing funding awards, and as to the former, is immediately effective. Like the policies enjoined in *NIH* and *DOE*, DOD's policy seeks to bypass the comprehensive regulatory scheme governing federal research funding to institutions of higher education by replacing the bespoke indirect cost rates negotiated between individual institutions and the government (which often fall between 50% and 65%) with an across-the-board rate of 15%. Like the already-enjoined NIH and DOE policies, and the NSF policy under review by a court in this district, the DOD policy contravenes applicable law and regulations multiple times over and does not come close to satisfying the Administrative Procedure Act's requirements for reasoned decisionmaking.

5.      While DOD's action is unlawful for most of the same reasons as the similar actions by other agencies, DOD has further acted arbitrarily in not even attempting to address many of the

flaws the district courts found with NIH's and DOE's unlawful policies. As with those policies, if DOD's policy is allowed to stand, it will stop critical research in its tracks, lead to layoffs and cutbacks at universities across the country, badly undermine scientific research at United States universities, and erode our nation's enviable status as a global leader in scientific research and innovation.

## JURISDICTION AND VENUE

6.      This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and regulations governing federal funding awards. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the APA.

7.      Venue is proper in this District under 28 U.S.C. § 1391(e)(1), because Defendants are agencies of the United States and officers of the United States acting in their official capacity, a substantial part of the events or omissions giving rise to the claims occurred in this District, and a Plaintiff resides in this district.

## PARTIES

8.      Plaintiff Association of American Universities ("AAU") is an association composed of 71 leading research universities with the goal of transforming lives through education, research, and innovation. AAU's member organizations are public and private research universities that are world-renowned centers of scientific and technological research and innovation. Much of their scientific work is supported by DOD grants and cooperative agreements.

9.      Plaintiff American Council on Education ("ACE") is a nonprofit association composed of more than 1,600 colleges, universities, and higher education-related associations, organizations, and corporations with the goal of enabling higher education institutions to flourish. ACE's member organizations are accredited, degree-granting colleges and universities, as well as

related associations, organizations, and corporations that also serve as world-renowned centers of scientific technological research and innovation. Much of their scientific work is supported by DOD grants and cooperative agreements.

10. Plaintiff Association of Public and Land-grant Universities ("APLU") is a membership organization that fosters a community of university leaders collectively working to advance the mission of public research universities. A core mission of the APLU is fostering research and innovation, specifically by "promoting pathbreaking scientific research."[1] The association's membership consists of over 200 research universities, land-grant institutions, and affiliated organizations across the United States. Much of their scientific work is supported by DOD grants and cooperative agreements.

11. Plaintiff Arizona Board of Regents on Behalf of Arizona State University ("ASU") is the governing body of Arizona State University, a public university with four campuses in Maricopa County, Arizona. ASU is a comprehensive research university committed to advancing research and discovery of public value and has one of the fastest-growing research enterprises in the United States. Its negotiated indirect cost rate is 57% for on-campus research. In the 2024 fiscal year, ASU received 71 awards from DOD, totaling over $180 million in anticipated funding. To illustrate the impact of the announced DOD rate reduction on ASU's research portfolio, imposing a rate cap of 15% on the university's current awards would result in a loss of approximately $9 million in funding available to pay for the indirect costs of the research the university is obligated to perform under its DOD agreements. ASU currently has funding proposals outstanding with DOD and intends to apply for new funding awards.

12. Plaintiff Brown University ("Brown") is a private university located in

---

[1] Ass'n of Pub. & Land-grant Univs., *About Us*, https://www.aplu.org/about-us/ (last visited June 15, 2025).

Providence, Rhode Island. Brown conducts fundamental and applied research directed at the forefront of national priorities. Through the 2027 fiscal year, Brown's predetermined indirect cost rate is 59.5% for on-campus research. In the 2024 fiscal year, Brown received $17.9 million in DOD funding. If the indirect cost reimbursement of Brown's DOD sponsored grants and contracts had been reduced to 15%, the loss for fiscal year 2024 would have exceeded $2.7 million. Brown estimates the loss for fiscal year 2025 would be approximately $3 million based on year-to-date expenditures. Brown currently has funding proposals pending with DOD and intends to apply for new funding awards.

13.    Plaintiff California Institute of Technology ("Caltech") is a private university located in Pasadena, California. Caltech leads research in areas such as neuroscience, biology and health, quantum science and engineering, advanced computing and artificial intelligence, and planetary and earth science. Caltech has 109 active DOD awards and subawards. In the 2024 fiscal year, Caltech expended $31.9 million in conducting research supported by DOD; of this total, $23.5 million was expended as direct costs, and $8.4 million as indirect costs. DOD's planned cap of 15% for indirect cost expenditures would result in an annual loss of approximately $6 million to Caltech's planned research budget. Caltech currently has funding proposals pending with DOD and intends to apply for new funding awards.

14.    Plaintiff the Regents of the University of California ("UC") is a public corporation that owns and operates the University of California system as a public trust, and is located in Oakland, California. In the 2023-2024 fiscal year, UC received $169.7 million in DOD grant awards, through 272 direct awards and 168 indirect awards. If—contrary to what UC has negotiated with the federal government—the indirect cost rate for DOD awards was reduced to 15%, UC calculates that would reduce the university's anticipated annual indirect cost recovery

by approximately $51.9 million. UC currently has funding proposals pending with DOD and intends to apply for new funding awards.

15.    Plaintiff Board of Governors of the Colorado State University System ("CSU") is the governing body of Colorado State University, a public land-grant university in Fort Collins, Colorado. In the 2024 fiscal year, CSU received $103.2 million in funding under DOD grants and cooperative agreements, including $17.4 million for indirect costs, across 245 unique awards. Through the 2026 fiscal year, CSU's predetermined indirect cost rate for on-campus organized research is 54%. CSU expects to receive approximately $17 million in indirect cost recovery on an annual basis based on its current rates; if—contrary to what CSU has negotiated with the federal government—the indirect cost rate was reduced to 15%, that would reduce CSU's anticipated annual indirect cost recovery by $5 million. CSU currently has funding proposals pending with DOD and intends to apply for new funding awards.

16.    Plaintiff Cornell University ("Cornell") is a private university located in Ithaca, New York. Cornell is a leading research institution that has been selected by the federal government to conduct a wide variety of vital forms of research on behalf of United States citizens, funded in part by agency awards, cooperative agreements, and contracts from across the federal government, including DOD. For the 2024 fiscal year, Cornell expended approximately $55 million on more than 225 grants and cooperative agreements from DOD and recovered approximately $16.5 million in reimbursement for indirect costs. Cornell has negotiated an indirect cost rate of up to 64% for its Ithaca campus and 69.5% for its medical school, Weill Cornell Medicine. Reducing the indirect cost recovery rate to 15%—instead of using the rate Cornell has negotiated with the federal government—would be devastating for achieving results in the type of research that DOD sponsors. Cornell's ability to conduct DOD-sponsored research

during its 2025 fiscal year under its DOD awards would be irreparably harmed by an immediate reduction in the committed indirect cost reimbursement by DOD, estimated as a shortfall of approximately $12.7 million in a typical fiscal year. Cornell currently has funding proposals pending with DOD and intends to apply for new funding awards.

17.    Plaintiff the Board of Trustees of the University of Illinois ("Illinois") is the governing body of the University of Illinois, a public university with its flagship campus in Urbana-Champaign, Illinois. Illinois receives substantial funding from DOD. Its predetermined indirect cost rate through the 2025 fiscal year is 58.6%. In the 2025 fiscal year, Illinois received approximately $64 million in DOD funding for direct costs and $17.7 million for indirect costs. The University expects to receive approximately $18 million in DOD funding for indirect costs associated with facilities and administration. If—contrary to what Illinois has negotiated with the federal government—the indirect cost rate was reduced to 15%, Illinois's anticipated annual indirect cost recovery would be reduced to approximately $5 million. Illinois currently has funding proposals pending with DOD and intends to apply for new funding awards.

18.    Plaintiff the Johns Hopkins University ("JHU") is a private university located in Baltimore, Maryland. Through highly competitive, peer-reviewed, and merit-based grant selection processes, JHU scientists, doctors, and engineers have been awarded substantial annual funding from DOD. Currently, there are 341 active DOD grants at JHU, totaling $436.5 million in funding. Through the 2026 fiscal year, JHU's negotiated indirect cost rate for on-campus organized research is 55%. Of the approximately $122 million in DOD funding that JHU received in the 2024 fiscal year, approximately $90 million was allocated to direct costs and approximately $32 million was allocated for DOD's share of indirect costs. If—contrary to what JHU has negotiated with the federal government and relied upon in making research-related investments—the indirect

cost rate is reduced to 15%, JHU's anticipated annual indirect cost recovery would be reduced by approximately $22 million based on data from the 2024 fiscal year. JHU currently has funding proposals pending with DOD and intends to apply for new funding awards.

19.     Plaintiff University of Maryland, College Park ("UMCP"), is the flagship campus of the University System of Maryland, the State of Maryland's public system of higher education. UMCP is a leader in several areas of advanced critical national security technologies and has established significant partnerships on national security matters with the Army Research Laboratory, the Naval Research Laboratory, and the Naval Air Warfare Center, among others. UMCP expends approximately $125 million on DOD-funded awards on an annual basis. Through the 2026 fiscal year, UMCP's predetermined indirect cost rate is 56%. If UMCP's indirect cost recovery were reduced from the negotiated rate to 15%, UMCP estimates that its reimbursement of indirect costs would be reduced by approximately $7 million. UMCP currently has funding proposals pending with DOD and intends to apply for new funding awards.

20.     Plaintiff Massachusetts Institute of Technology ("MIT") is a private land-grant university located in Cambridge, Massachusetts. Founded to accelerate the nation's industrial revolution, MIT faculty, researchers, and graduates have invented fundamental technologies, launched new industries, and advanced human understanding of science, technology, and other areas of scholarship. In the 2024 fiscal year, MIT received $107 million from DOD for performing campus sponsored research under grants and cooperative agreements, including approximately $26 million for reimbursement of indirect costs. MIT conducts research under 195 grants and 46 cooperative agreements from DOD that are currently active for the 2025 fiscal year. If DOD were to reduce the indirect cost reimbursement rate on its grants and cooperative agreements to 15%, MIT estimates it would lose approximately $21 million annually, assuming 2024 fiscal year levels

of DOD-funded campus modified total direct cost. MIT currently has funding proposals pending with DOD and intends to apply for new funding awards.

21.     Plaintiff University of Pittsburgh of the Commonwealth System of Higher Education ("Pitt") is a state-related university located in Pittsburgh, Pennsylvania. In the 2024 fiscal year, Pitt had over $53 million in active DOD financial assistance awards, including 34 new awards with total project costs of over $14 million. Pitt's predetermined indirect cost rate is 59%; based on that rate, Pitt expects to receive approximately $11 million annually over the next five years in indirect cost recovery. If—contrary to what Pitt negotiated with the federal government— its indirect cost rate was reduced to 15%, that would reduce substantially its anticipated annual indirect cost recovery. By way of illustration, if the reduction had been in effect for all of the 2025 fiscal year, the change would have reduced Pitt's annual indirect cost recovery by $7 million. Pitt currently has funding proposals pending with DOD and intends to apply for new funding awards.

22.     Plaintiff University of Washington ("UW") is a public university with its flagship campus in Seattle, Washington. In the 2024 fiscal year, UW's total expenditures on DOD-funded projects were $71.8 million, including $16.5 million in indirect costs. UW's predetermined indirect cost rate for on-campus research is 55.5%. Based on that rate, UW expects to receive approximately $16 million in indirect cost recovery on an annual basis moving forward. If— contrary to what UW has negotiated with the federal government—the indirect cost rate was reduced to 15% for new awards, that would reduce UW's indirect cost recovery by roughly $10.9 million. Application of such a rate to existing awards would decrease UW's recovery even more quickly UW currently has funding proposals pending with DOD and intends to apply for new funding awards.

23.     Defendant Department of Defense ("DOD") is an executive department of the federal government that is responsible for coordinating national defense.

24.     Defendant Peter Hegseth is Secretary of Defense. He is sued in his official capacity.

## FACTUAL BACKGROUND

### A.  DOD's Funding Awards.

25.     Congress has authorized DOD to use grants and cooperative agreements to advance American defense capabilities, protect national security, and meet DOD's other research needs. *See, e.g.*, 10 U.S.C. §§ 4001, 4010, 4141. In 10 U.S.C. § 4001, Congress authorized DOD to engage in research and development projects "necessary to the responsibilities" of DOD or one of the military branches that either "relate to weapon systems and other military needs" or "are of potential interest to [DOD]," and to do so via grants and cooperative agreements. *Id.* § 4001(a), (b).

26.     Before the 1940s, the United States often had to import scientific capability from other nations, but during World War II, the U.S. Government undertook significant efforts to fund, administer, and conduct research and development ("R&D") to support the war effort. *See* John F. Sargent Jr. & Marcy E. Gallo, Cong. Rsch. Serv., R45403, *The Global Research and Development Landscape and Implications for the Department of Defense*, at 1 (June 28, 2021). Because these initiatives were considered such a success, after the war ended, the federal government redoubled its efforts to support defense R&D as an investment in the nation's safety and progress. *See id.* at 2-3. By 1960, 81% of all federal R&D funding was earmarked specifically for defense. *Id.* at 3.

27.     Since its origins in the war effort, DOD research funding has become an engine for innovation that serves the public good in contexts far broader than weapons and military preparedness. DOD grants and cooperative agreements have funded scientific research leading to innumerable scientific breakthroughs, including the creation of the internet and GPS technology. More than 60 DOD-supported scientists have earned Nobel Prizes for their groundbreaking scientific work.[2]

28.     While DOD conducts some of this critical work internally, most DOD-funded research occurs at outside institutions, including universities. This approach allows DOD to fund a wide array of projects and institutions, promote competition for research awards, and facilitate the training of the next generation of scientists and researchers. The federal government today invests billions of dollars in awards to the research universities that can most effectively further DOD's goals. In fiscal year 2023, for example, DOD awarded more than $9 billion to over 470 different universities.

29.     Funding the critical scientific research of the organizational Plaintiffs' member universities and the university Plaintiffs is part of how DOD pursues its goals, some of which are Congressionally mandated. At any given time, individual research universities depend on numerous DOD grants and cooperative agreements that support independent research projects across multiple university departments and centers.

**B.  The Indirect Cost System Structure.**

30.     Federal grant recipients generally do not receive lump-sum grants. Instead, they use cost-based accounting systems under which they first incur expenses and then recover their actual, documented costs for conducting research.

---

[2]     Office of Naval Research, *All ONR-Sponsored Nobel Laureates,* https://www.onr.navy.mil/about-onr/history/nobels (last visited June 15, 2025).

31.     The costs of conducting DOD-funded research come in two types. The first is "direct costs"—costs that can be attributed to a specific research project. For example, the salary of a graduate student assigned to a particular research project, or the cost of a specialized piece of equipment purchased for a research project, are direct costs.

32.     The second is "indirect costs"—costs that are necessary for research and support multiple research projects. *See* 2 C.F.R. § 1108.230 ("Indirect costs means those costs incurred for a common or joint purpose benefitting more than one cost objective, and not readily assignable to the cost objectives specifically benefitted, without effort disproportionate to the results achieved.").

33.     "[I]ndirect costs" are also known as "[f]acilities and [a]dministrative" "costs" or "F&A[] costs." *Id.*; *see also id.* § 200.414(a). The "[f]acilities" category is "defined as depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses." 2 C.F.R. § 200.414(a). This category includes the costs of the physical infrastructure necessary for carrying out research, such as construction and maintenance of buildings, including specialized facilities and laboratories. Those costs are deemed "indirect" because a single building, such as a state-of-the-art materials-growth facility, might house numerous research groups engaged in multiple distinct projects. Facilities costs typically account for the largest share of indirect costs.

34.     The "[a]dministration" category is "defined as general administration and general expenses such as the director's office, accounting, personnel, and all other types of expenditures not listed specifically under one of the subcategories of 'Facilities.'" *Id.* This category includes costs related to the administrative and compliance activities required to conduct federally sponsored research, such as information technology professionals, experts on safety and security,

technical staff, and many others. These costs are indirect because a single employee or group of employees will handle these necessary administrative activities across multiple DOD awards. Because of caps on administrative costs, moreover, universities contribute a significant amount of their own funds to cover such costs, thereby subsidizing the work funded by grants and cooperative agreements. In the 2023 fiscal year, universities bore $6.8 billion in unrecovered indirect costs.[3]

35.    In 1947, early in the federal government's project of funding university research to drive innovation and progress, DOD's Office of Naval Research ("ONR") published an "Explanation of Principles for Determination of Costs Under Government Research and Development Contracts with Educational Institutions," also called "the Blue Book." The Blue Book contained guidelines for reimbursing indirect costs across DOD research awards based on average rates calculated using universities' financial reports and certain categories of expenses. The goal was for universities to be fully and (to the extent possible) precisely reimbursed for their research costs. From the beginning, rates varied by institution based on their actual indirect costs.

36.    In 1958, OMB's predecessor agency adopted the principles in ONR's Blue Book for use across all agencies in Circular A-21.

37.    Then, in 2005, OMB relocated Circular A-21 to Title 2 of the Code of Federal Regulations. In 2014, this became the "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards" in 2 C.F.R. Part 200, often referred to as the "Uniform Guidance." *See* 31 U.S.C. § 503(a), (b)(2)(C) (empowering OMB to "establish governmentwide financial management policies for executive agencies," including as to

---

[3] Nat'l Ctr. for Sci. & Eng'g Statistics, *Higher Education R&D Expenditures Increased 11.2%, Exceeded $108 Billion in FY 2023* (Nov. 25, 2024), https://web.archive.org/web/20250602134130 /https://ncses.nsf.gov/pubs/nsf25313.

"grant[s]"); 2 C.F.R. pt. 200 (setting forth "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards").

38.    Today, DOD's research awards are issued pursuant to a well-established legislative and regulatory framework: DOD has expressly adopted OMB's Uniform Guidance regarding indirect costs into its own regulations. *See* 2 C.F.R. pt. 1128, app. C(A)(1)(a) (for DOD grants to institutions of higher education, "the allowability of costs must be determined in accordance with provisions of Subpart E of OMB guidance in 2 CFR part 200 other than 2 CFR 200.400(g), supplemented by appendix III to that part"); *see also* 2 C.F.R. § 1128.300 (explaining that the "[p]urpose" of the cited appendix is, *inter alia*, to "implement[] OMB guidance in . . . Subpart E of 2 CFR part 200").

39.    These regulations require research institutions to express their indirect costs as a rate that is multiplied by the overhead-bearing direct costs of each individual research grant associated with those costs. *See* 2 C.F.R. pt. 200, app. III ("Indirect (F & A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs)"). This methodology ensures that indirect costs are allocated fairly across supported projects, with the more expensive and resource-intensive research projects being allocated a larger share of indirect costs. As a simplified example, suppose a single laboratory houses two research projects—one with $75,000 of annual overhead-bearing direct costs and one with $25,000 of annual overhead-bearing direct costs. Suppose, too, that the laboratory's sole indirect cost is the cost of utilities, which cost $10,000 per year. Because the cost of utilities ($10,000) is 10% of the overhead-bearing direct costs ($100,000), the indirect cost rate would be 10%. Thus, $7,500 of utilities costs would be allocated to the first project, and $2,500 of utilities costs would be allocated to the second project.

40.     Consistent with DOD's longstanding efforts to reimburse universities for the full cost of the research they conduct, federal regulations prescribe a detailed methodology for negotiating indirect cost rates. *See* 2 C.F.R. pt. 200, app. III. Typically, an institution negotiates a government-wide indirect cost rate with a single agency. For universities, rates are generally negotiated by either the Department of Health and Human Services ("HHS") or DOD's ONR, "normally depending on which of the two agencies (HHS or DOD) provide[d] more funds directly to the [relevant] educational institution for the most recent three years." 2 C.F.R. pt. 200, app. III(C)(11)(a)(1).

41.     The process begins when an institution submits a rate proposal, which must include detailed information about actual indirect costs and projected financial data, to the negotiating agency (referred to as the "cognizant" agency). When ONR is the cognizant agency, it requests an audit of the proposal from the Defense Contract Audit Agency ("DCAA"). DCAA auditors confirm the cost information, including via information requests and on-site visits. Once DCAA completes its audit to ONR's satisfaction, ONR conducts its own factfinding and initiates negotiations with the university and, ultimately, prepares an agreement for the university to sign.

42.     That agreed-upon indirect cost rate then applies to all of that institution's awards across the entire federal government. Federal regulations require institutions to conduct and submit to their federal agency comprehensive cost analyses that follow detailed federal cost accounting guidelines governing reasonable and allowable indirect costs. For example, if an institution seeks to recover the cost of building maintenance, it must document those costs and then allocate those maintenance costs across research and non-research programs.

43.     The federal agency then reviews and verifies these proposals and determines the institution's indirect cost rate. Again, this rate reflects actual, verified costs incurred by the institution.

44.     Typically, the negotiated rates remain in effect for two to four years, but some negotiated rates stay in place for as long as seven years.

45.     After the costs are incurred, federal agencies conduct audits to ensure that the negotiated indirect cost rate conforms to the actual indirect costs that were incurred. *See infra* ¶ 88. The indirect cost rate can be adjusted if the audit establishes that the institution has recovered excess costs.

46.     Negotiated rates vary significantly from institution to institution. One reason for this variation is that some institutions are more research intensive than others. Take an institution with one building. If it uses 50% of the building for teaching and 50% for research, the indirect cost rate for research will be lower than if the institution engaged only in research—because the teaching function (which DOD does not fund) absorbs some of the upkeep. Moreover, different institutions conduct different types of research. Scientific laboratories tend to be far more expensive to build and maintain than generic office buildings. As such, an institution engaging in cutting-edge physics research will likely have a higher indirect cost rate than an institution primarily engaged in social science research. Even in the context of scientific research, some types of research are more expensive than others. If a particular institution invests in an expensive piece of advanced lab equipment that supports multiple lines of research, that institution will have higher indirect cost rates than a different institution that does not use expensive lab equipment or uses such equipment for only one research project.

47.     Institutions with higher-than-average negotiated indirect cost rates are typically those that support facility-intensive types of research. State of the art materials, electronics, and computing research (including artificial intelligence and quantum computing), for example, often require higher indirect cost rates. Past studies show that indirect cost rates for university research are slightly less than those for other research entities, *i.e.*, universities had the lowest percentage of total research costs classified as indirect costs as compared to federal and industrial laboratories.[4]

48.     The "[n]egotiated indirect cost rates must be accepted by all Federal agencies" unless a deviation therefrom "for either a class of Federal awards or a single Federal award" is "required by Federal statute or regulation," or is "approved by the awarding Federal agency in accordance with [2 C.F.R. § 200.414](c)(3)." 2 C.F.R. § 200.414(c)(1).

49.     The cross-referenced provision, 2 C.F.R. § 200.414(c)(3), in turn makes clear that the negotiated rates remain the baseline and that it authorizes "deviations" for individual awards or classes of awards only when specified criteria are met. Moreover, that provision specifies that "[t]he Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." 2 C.F.R. § 200.414(c)(3).

50.     Such policies, procedures, and general decision-making criteria justifying deviations apply prospectively. Pursuant to 2 C.F.R. § 200.414(c)(4), "[t]he Federal agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement or cost share as approved." Moreover, "the Federal agency should incorporate

---

[4] Ass'n of Am. Univs., *Frequently Asked Questions About Facilities and Administrative (F&A) Costs of Federally Sponsored University Research* (Feb. 10, 2025), https://www.aau.edu/key-issues/frequently-asked-questions-about-facilities-and-administrative-costs.

discussion of these policies into its outreach activities with applicants before posting a notice of funding opportunity." *Id.* "If there is no funding opportunity announcement (e.g., if it is a noncompetitive program for which all recipients are known in advance), the [DOD] Component must provide the general terms and conditions to each recipient no later than the time of award." 2 C.F.R. § 1120.315(c)(2).

## C. Congress's Refinements of the Indirect Cost Structure and DOD's Response.

51.     Congress has been active in determining what proportion of research costs universities should bear and when agencies may use fixed rates to approximate indirect costs. In 1962, Congress authorized the use of "predetermined fixed-percentage rates" for "payment of reimbursable indirect costs" attributable to research agreements with educational institutions. Act of Sept. 5, 1962, Pub. L. No. 87-638, 76 Stat. 437, *codified at* 41 U.S.C. § 4708.

52.     Shortly thereafter, Congress imposed a 20% cap on the amount of indirect costs that agencies could reimburse. Department of Defense Appropriation Act, 1965, Pub. L. No. 88-447, § 538, 78 Stat. 465, 481 (1964); *see* Department of Defense Appropriation Act, 1963, Pub. L. No. 87-577, § 304, 76 Stat. 318, 334 (1962). But just a few years later, Congress lifted that cap and replaced it with more general language indicating that "[n]one of the funds provided herein shall be used to pay any recipient of a grant for the conduct of a research project an amount equal to as much as the entire cost of such project"—in short, requiring at least some cost sharing. Department of Defense Appropriation Act, 1966, Pub. L. No. 89-213, § 638, 79 Stat. 863, 879 (1965). In 2005, Congress eliminated even that requirement.

53.     From 2007 to 2009, Congress experimented with a DOD-specific policy that effectively limited DOD grantees to a maximum 53.8% indirect cost rate. It did so by limiting to 35% the proportion of an entire DOD award that could be used to cover indirect costs. *See* Gov't

Accountability Off., GAO-10-937, *University Research: Policies for the Reimbursement of Indirect Costs Need to Be Updated* 11-12 (Sept. 2010) ("GAO Report"); Department of Defense Appropriations Act, 2008, Pub. L. No. 110-116, § 8115, 121 Stat. 1295, 3645 (2007); *see also* Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009, Pub. L. No. 110-329, § 8109, 122 Stat. 3574, 3645 (2008) (containing same provision); Department of Defense Appropriations Act of 2010, Pub. L. No. 111-118, § 8101, 123 Stat. 3409, 3450-51 (2009) (same). In practice, grantees with negotiated rates of 53.8% or less—the vast majority of IHEs at the time—were unaffected by this policy. *See* GAO Report at 11-12. Congress abandoned even this effective 53.8% cap on indirect cost expenditures for DOD awards after 2009. S*ee generally* Department of Defense and Full-Year Continuing Appropriations Act, 2011, Pub. L. No. 112-10, 125 Stat. 38 (not containing cap).

**D.  Recent Attempts by the Executive Branch to Limit Indirect Cost Rates.**

54.     In 2017, the Administration released a budget proposal that would have slashed the indirect cost rate for NIH grants to 10%. *See* Office of Management & Budget, *Major Savings and Reforms: Budget of the U.S. Government Fiscal Year 2018*, at 43 (2017), https://www.gov info.gov/content/pkg/BUDGET-2018-MSV/pdf/BUDGET-2018-MSV.pdf.

55.     The proposal spurred widespread and bipartisan criticism and alarm. Congress then enacted, on a bipartisan basis, an appropriations rider preventing such a one-size-fits-all mandate by reinforcing the application of the regulatory regime, *i.e.*, providing that regulatory "provisions relating to indirect costs . . . including with respect to the approval of deviations from negotiated rates, shall continue to apply to the National Institutes of Health to the same extent and in the same manner as such provisions were applied in the third quarter of fiscal year 2017." Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 226, 132 Stat. 348, 740. The

appropriations rider also prohibits spending appropriated funds "to develop or implement a modified approach to" the reimbursement of "indirect costs" and "deviations from negotiated rates," or to "intentionally or substantially expand the fiscal effect of the approval of such deviations from negotiated rates beyond the proportional effect of such approvals in such quarter." *Id.*

56.    The House Report noted that, "[w]hile the Committee appreciates the Secretary's efforts to find efficiencies in NIH research spending, the Administration's proposal to dramatically reduce and cap reimbursement of facilities and administrative (F&A) costs to research institutions is misguided and would have a devastating impact on biomedical research across the country." H.R. Rep. No. 115-244, at 50 (2017). The Senate Report noted, "[t]he methodology for negotiating indirect costs has been in place since 1965, and rates have remained largely stable across NIH grantees for decades. The Administration's proposal would radically change the nature of the Federal Government's relationship with the research community, abandoning the Government's long-established responsibility for underwriting much of the Nation's research infrastructure, and jeopardizing biomedical research nationwide. The Committee has not seen any details of the proposal that might explain how it could be accomplished without throwing research programs across the country into disarray." S. Rep. No. 115-150, at 109 (2017).

57.    Congress has repeatedly reenacted the rider ever since. *See* Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, § 224, 132 Stat. 2981, 3094; Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, § 224, 133 Stat. 2534, 2582 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 224, 134 Stat. 1182, 1594 (2020); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, § 224, 136 Stat. 49, 470-71; Consolidated

Appropriations Act, 2023, Pub. L. No. 117-328, § 224, 136 Stat. 4459, 4883-84 (2022). And the rider remains in effect to this day, in the now-operative statute. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. II, § 224, 138 Stat. 460, 677.

58.    To Plaintiffs' knowledge, the Executive has never sought to cap the indirect cost rate for DOD grants at a fixed percentage as low—or even close to as low—as 10% or 15%. Congress therefore has not had occasion to adopt an analogous appropriations rider for DOD grants, though as noted, it has experimented with and then rejected a cap more than three times higher than the current proposal. *See supra* ¶ 53.

59.    After the Executive's failed attempt to change it in 2017, the system of negotiated indirect cost rates remained undisturbed at NIH until late on Friday, February 7, 2025, when NIH issued a notice stating that it was "imposing a standard indirect cost rate on all grants of 15%." NIH, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates*, NOT-OD-25-068 (Feb. 7, 2025), https://grants.nih.gov/grants/guide/notice-files/NOT-OD-25-068.html ("NIH Rate Change Notice"). Three groups—a group of 22 states, a group of five medical associations, and a group of 17 higher education associations and individual universities, including some of the plaintiffs in this case—filed complaints and motions for temporary restraining orders. Following briefing, a court in this district issued a nationwide preliminary injunction on March 5, 2025. *NIH*, 2025 WL 702163. The court held that the dispute was justiciable; that the plaintiffs were likely to succeed on their arguments that the NIH Rate Change Notice violated the applicable regulations, the appropriations rider, and the APA's reasoned-decisionmaking requirements; that the plaintiffs demonstrated irreparable harm; and that the balance of the equities and public interest favored an injunction. *Id.* The parties then jointly moved to convert the preliminary injunction to

a permanent injunction, which the court granted. *See* Electronic Order, *NIH*, No. 25-CV-10338 (D. Mass. Apr. 4, 2025), ECF No. 110. The government has not moved for a stay pending appeal.

60.    Despite the court's decision in *NIH*, on April 11, 2025, DOE announced its own almost identical policy, declaring that DOE "will no longer use the negotiated indirect cost rate" for universities, instead "setting a standardized 15 percent indirect cost rate for all grant awards." DOE, *Policy Flash 2025-22: Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)* (Apr. 11, 2025). DOE also stated that it was "undertaking action to terminate all grant awards to [universities] that do not conform with this updated policy." *Id.* Faced with losing either a significant portion or all their grant funding, nine universities and three associations representing universities, including some of the plaintiffs in this case, filed suit to challenge the DOE policy. The plaintiffs filed a motion for a temporary restraining order, which a court in this district granted on April 16, 2025, to prevent "immediate and irreparable" harm. *DOE*, No. 25-cv-10912, 2025 WL 1119791, at *1 (D. Mass. Apr. 16, 2025). On May 15, 2025, the court entered a preliminary injunction, finding that: the plaintiffs were likely to succeed on the merits of their claims that the policy violated the APA because DOE provided no reasoned explanation for its new policy, DOE failed to observe the requisite regulatory processes for altering indirect cost rates, and the policy was impermissibly retroactive; the plaintiffs would suffer irreparable harm absent an injunction; and the balance of equities and public interest weighed in favor of preliminary injunctive relief. *DOE*, No. 25-cv-10912, 2025 WL 1414135 (D. Mass. May 15, 2025).

61.    Meanwhile, on Friday, May 2, 2025, NSF issued its own rate cap policy, titled "Implementation of Standard 15% Indirect Cost Rate," in which NSF announced that, similar to NIH and DOE, it was "updating its policy regarding the reimbursement of indirect costs in federally funded financial assistance," and that "[e]ffective May 5, 2025, NSF will apply a

standard indirect cost rate not to exceed 15% to all grants and cooperative agreements awarded to IHEs for which indirect costs are allowable." NSF, *Policy Notice: Implementation of Standard 15% Indirect Cost Rate* (May 2, 2025), https://www.nsf.gov/policies/document/indirect-cost-rate. Once again facing the threat of hundreds of millions in lost funding, thirteen universities and three associations representing universities, including many of the plaintiffs in this case, challenged the NSF policy, seeking a preliminary injunction and expedited summary judgment. Complaint, *NSF*, No. 25-cv-11231 (D. Mass. May 5, 2025), ECF No. 1; Mot. for Prelim. Inj., *NSF*, No. 25-cv-11231 (D. Mass, May 8, 2025), ECF No. 40. In response to the lawsuit NSF agreed to stay implementation of its policy following the filing of the lawsuit through at least one week after the hearing on the parties' cross-motions for summary judgment, which took place on June 13, 2025. Defendants' Opp'n to Plaintiffs' Mot. for a Prelim. Inj. and for Summary Judgment [Doc No. 40] and Mem. In Supp. of Cross-Mot. for Summary Judgment [Doc No. 60], at 42 n.30, *NSF*, No. 25-cv-11231 (D. Mass. May 27, 2025), ECF No. 62.

**E.  DOD's Rate Cap Policy.**

62.    On May 14, 2025, Secretary Hegseth issued a memorandum to senior DOD Leadership, Commanders, and Field Activity Directors, entitled "Implementation of a 15% Indirect Cost Cap on Assistance Awards to Institutions of Higher Education." Pete Hegseth, Secretary of Defense, *Implementation of a 15% Indirect Cost Cap on Assistance Awards to Institutions of Higher Education* (May 14, 2025) (the "Hegseth Memo") (attached as Ex. A). The Hegseth Memo announced that "[e]ffective immediately," DOD "will pursue a lower cap on indirect cost rates for all new financial assistance awards to institutions of higher education." *Id.* at 1. It has two parts, one applying to "New Awards" and the other to "Existing Awards." *Id.* at 1-2.

63.    As to new awards, the Hegseth Memo invoked 2 C.F.R. § 200.414(c), and instructed the Under Secretary of Defense for Research and Engineering to do four things within 21 days, *i.e.*, by June 4, 2025:

    a.    "Notify the Office of Management and Budget of [DOD's] intent to cap indirect cost rates for all new financial assistance awards to institutions of higher education at 15% or lower," *id.* at 1;

    b.    "Develop and publish formal policy guidance—including procedures, decision criteria, and justifications—that will govern all DoD deviations from negotiated rates," *id.*;

    c.    Ensure that the "formal policy guidance" is made "public and integrated into all upcoming grant solicitations, including Notices of Funding Opportunity," *id.*; and

    d.    "Ensure new awards to institutions of higher education contain the newly established standard cap," *id.*

64.    As to existing awards, the Hegseth Memo directed DOD components that manage DOD-funded financial assistance awards to either "renegotiate indirect cost rates" for existing awards to institutions of higher education or, "[w]here bilateral agreement is not achieved," to "identify and recommend lawful paths to terminate and reissue the award under revised terms, provided this action aligns with agency priorities and is authorized under 2 C.F.R. § 200.340(a)." *Id.* at 2. The Hegseth Memo required that the "Department-wide effort" to renegotiate rates be "[i]nitiate[d]" within 30 days, *i.e.*, by June 13, 2025. And it required that all "renegotiations or terminations" must be completed within 180 days, *i.e.*, by November 10, 2025. *Id.*

65.    Even before the Under Secretary issued the "formal policy guidance" contemplated by the Hegseth Memo, some DOD officials began implementing the 15% rate cap.

As early as May 21, 2025, DOD grant program managers began notifying universities with proposals in progress that all new grant submissions were required to comply with the Hegseth Memo and that DOD would not process noncompliant proposals. In some cases, institutions were directed to revise and resubmit previously submitted proposals to reflect a 15% indirect cost rate. When institutions sought clarification from DOD about these communications, at least one DOD official communicated that all financial assistance awards and cooperative agreements were subject to the new guidance, including those in the solicitation phase, new awards, and currently active awards.

66.    Plaintiffs' counsel sought further clarification from Department of Justice litigation counsel in *NIH*, *DOE*, and *NSF*, who stated on May 26, 2025, that DOD had sent out a message instructing its grants community that the 15% rate was not effective immediately and that DOD components should not implement the Hegseth Memo prematurely. DOD grant program managers later confirmed the Hegseth Memo was not yet in effect.

67.    In the wake of the chaos of this premature implementation of the 15% rate cap outlined in the Hegseth Memo, the Under Secretary signed the promised "formal policy guidance" on June 12, 2025. Emil Michael, Under Secretary of Defense, *Implementation of a 15% Indirect Cost Cap on Assistance Awards to Institutions of Higher Education* (the "Michael Memo," and together with the Hegseth Memo, the "Rate Cap Policy") (attached as Ex. B). However, it was not until June 13 that institutions of higher education began receiving the memo from DOD, which still has not yet been made publicly available on DOD's websites (neither defense.gov nor cto.mil). The Michael Memo continued implementing the decision announced in the Hegseth Memo, stating that "[t]he Department is deviating from the indirect cost rates negotiated between the cognizant

Federal agencies and IHEs and will instead limit indirect cost rates to 15% for all Federal assistance awards to IHEs." *Id.* at 1.

68.    Echoing the Hegseth Memo, as to new awards, the Michael Memo requires DOD components "not to allow indirect cost rates above 15% in all new assistance awards to IHEs as of the date of publication of th[e Michael Memo]." *Id.* at 2.

69.    The Michael Memo also instructs DOD components to "apply the 15% cap on indirect cost[s]" to "all existing assistance awards to IHEs" by either "renegotiat[ing] indirect cost rates on existing DoD assistance awards with IHEs to comply with the 15% indirect cost rate cap" or, "[i]f a DoD Component is unable to reach an agreement with an IHE to limit the indirect cost rate under a DoD assistance award to 15%" before November 10, 2025, "terminat[ing] the assistance award." *Id.* at 1-2.

70.    The Michael Memo acknowledges that "[t]he academic community's work with the Department [is] essential for the development of transformative research concepts that drive our future capabilities," but then states that it is imposing a categorical limit on indirect cost rates of 15% in pursuit of "potential cost savings" without any further explanation of how those "potential cost savings" will affect universities' "transformative research." *Id.* The Michael Memo, following the Hegseth Memo, applies this limit on indirect cost rates only to universities, not other recipients of DOD grants.

71.    Moreover, while the Michael Memo claims that the aim of the Policy is "potential cost savings," Congress has appropriated a set amount of money for research and development, and thus DOD is not at liberty to spend it elsewhere. *See* Further Consolidated Appropriations Act, Pub. L. No. 118-47, 138 Stat. 460, 478 (2024); Full-Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, 139 Stat. 9, 11-12, 20 (2025). And the Policy does not and

cannot explain how reallocating a set amount of appropriated money to direct costs instead of indirect costs could result in overall "cost savings."

72.     As with the similar policies at NIH, DOE, and NSF, DOD's Rate Cap Policy is clearly unlawful and the harms it inflicts are irreparable. And as to new awards, where the rate cap is effective immediately, such harms are especially imminent (with existing awards poised to follow in just a few months). Simply put, if indirect cost rates are cut to 15%, Plaintiffs and their member universities will be unable to sustain their DOD-funded research programs. If the unlawful Rate Cap Policy is allowed to stand, the amount and scope of future research by universities will decline precipitously. Vital scientific work will come to a halt, and the pace of scientific discoveries will slow. Progress on national security objectives, such as maintaining strategic advantages in areas like artificial intelligence and quantum computing, will falter. And because of all this, America's standing as a world leader in scientific discovery will decline. DOD-funded projects currently underway, which the Hegseth Memo and the Michael Memo make clear will either be renegotiated to include the 15% cap or terminated, are in jeopardy of being stopped in their tracks. The proposals currently pending before DOD all built into their scopes of work and budgets that their home institutions' indirect cost rates would be used. These include projects pioneering cutting-edge innovations in artificial intelligence, quantum computing, cybersecurity, semiconductors, virtual reality, and other technology fields. Many of these proposals will no longer be viable at a 15% indirect cost rate.

73.     The Hegseth Memo and the Michael Memo are final agency action under the APA. *See* 5 U.S.C. § 704. They (1) "mark the consummation of the agency's decisionmaking process," and (2) are actions "by which rights or obligations have been determined, or from which

legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citations omitted).

### CLAIMS FOR RELIEF

### Count I

### Violation of Administrative Procedure Act—Contrary to Law

### (Illegal Departure from Negotiated Cost Rates in Violation of 2 C.F.R. §§ 200.414, 1128.305, and Appendix C to Part 1128)

74.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

75.     The APA directs courts to "hold unlawful and set aside agency action[s]," that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

76.     DOD's grant regulations incorporate by reference and require that awards are governed by OMB guidance on negotiated indirect cost rates found in 2 C.F.R. Part 200. *See* 2 C.F.R. § 1128.305; 2 C.F.R. pt. 1128, app. C(A)(1)(a) (for DOD grants to IHEs, "the allowability of costs must be determined in accordance with provisions of Subpart E of OMB guidance in 2 CFR part 200 other than 2 CFR 200.400(g), supplemented by appendix III to that part"); *see also* 2 C.F.R. § 1128.300 (explaining that the "[p]urpose" of Appendix C is, *inter alia*, to "implement[] OMB guidance in . . . Subpart E of 2 CFR part 200").

77.     Subpart E of 2 C.F.R. Part 200 governs "Cost Principles" and includes OMB's regulations governing indirect costs. *See* 2 C.F.R. § 200.414. According to those regulations, negotiated indirect cost rates "must be accepted by all Federal agencies." *Id.* § 200.414(c)(1). "A Federal agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award only when required by Federal statute or regulation, or when approved by the awarding Federal agency in accordance with paragraph (c)(3) of this section." *Id.*

78.     In turn, 2 C.F.R. § 200.414(c)(3) states: "The Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates."

79.     By pronouncing a single, uniform "policy" setting indirect cost rates for universities at 15% regardless of the otherwise applicable negotiated rate, DOD violated 2 C.F.R. § 200.414(c)(1) and (c)(3), as incorporated by 2 C.F.R. § 1128.305 and pt. 1128, app. C(A)(1)(a).

80.     Those provisions do not permit agencies to reject the decades-old, regulation-protected approach to individualized indirect costs rates based on a policy view that the agency would prefer to pay a lower, uniform rate. Rather, these provisions authorize agencies to announce *procedures* governing *subsequent* decisions to make *individualized* deviations from the baseline negotiated rate based on the specific features of an award or class of awards that render the negotiated rates inapt for that award or class of awards. The Rate Cap Policy does not create "procedures" or "general decisionmaking criteria" that DOD "will follow" but simply dictates a different rate by fiat in one stroke.  It does not "seek and justify deviations from negotiated rates" but rather jettisons them entirely for universities. And the authority the regulation confers to make "deviations" for a "class of Federal awards" does not encompass eliminating the use of negotiated indirect cost rates entirely for universities.

81.     The Rate Cap Policy is also inconsistent with 2 C.F.R. § 200.414(f). Section 200.414(f) allows grantees that do not have a current negotiated rate with the federal government to "elect to charge a de minimis rate of up to 15 percent," with the funding recipient being allowed to "determine the appropriate rate up to [that] limit." *Id*. But it provides that "[f]ederal agencies . . . may not require recipients and subrecipients to use a de minimis rate lower than the negotiated indirect cost rate or the rate elected pursuant to this subsection unless required by Federal statute

or regulation," and it states further that grant recipients "are not required to use the de minimis rate." *Id.* The Rate Cap Policy impermissibly forces universities to use the de minimis rate even though these universities have specific and carefully verified indirect costs, and Section 200.414(f) makes clear that agencies cannot "require" recipients to use the de minimis rate.

82.     For a subset of grants, the Rate Cap Policy also violates 2 C.F.R. § 200.414(c)(4). That provision specifies that the "agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement." 2 C.F.R. § 200.414(c)(4). To the extent that DOD attempts to impose a 15% rate cap on grants for which notices have already issued, whether new or existing, it violates this provision.

### Count II

### Violation of Administrative Procedure Act—Contrary to Law

### (Illegal Departure from Cost Recovery Regulations)

83.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

84.     The APA directs courts to "hold unlawful and set aside agency action[s]," that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

85.     Federal regulations and decades of Executive Branch practice establish substantive and procedural guidelines governing the recovery of indirect costs, which DOD's Rate Cap Policy blatantly violates.

86.     Substantively, the governing regulations dictate that grantees will recover the actual indirect costs that are reasonable and allocable to federal projects. The bedrock principle is: "The total cost of a Federal award is the sum of the allowable direct and allocable indirect costs minus any applicable credits." 2 C.F.R. § 200.402. The regulations establish detailed guidelines designed to ensure that grantees recover their actual allocable indirect costs. *See generally* 2 C.F.R.

§ 200.414; *accord* 2 C.F.R. pt. 200, app. III(A) ("Indirect (F&A) costs are those that are incurred for common or joint objectives and therefore cannot be identified readily and specifically with a particular sponsored project, an instructional activity, or any other institutional activity."); 2 C.F.R. pt. 200, app. III(A)(2)(e)(1) ("Indirect (F&A) costs are the broad categories of costs discussed in Section B.1."). By slashing indirect cost rates to 15% without regard to whether that percentage tracks actual indirect costs—and in fact with actual knowledge based on the existence of higher negotiated rates that 15% does *not* track actual indirect costs—DOD violated the regulations.

87.     Procedurally, federal regulations prescribe a complex process for negotiating an indirect cost recovery rate. Institutions must document and submit costs in detail to support that process. Subpart E of Part 200 of Title 2 "establishes principles for determining allowable costs incurred by recipients and subrecipients under Federal awards." 2 C.F.R. § 200.100(c). 2 C.F.R. § 200.414(e) stipulates that a set of appendices will set forth in detail "[r]equirements for development and submission of indirect cost rate proposals and cost allocation plans." Those appendices contain "the documentation prepared by a recipient to substantiate its request to establish an indirect cost rate." 2 C.F.R. § 200.1 (definition of "Indirect cost rate proposal"). For universities, Appendix III to Part 200 establishes the criteria for identifying and computing indirect facilities and administration costs for Institutions of Higher Education (IHEs). *See id.* § 200.414(e)(1). The Appendix details the processes for a grant recipient to document a significant range of costs and how those costs should be allocated among multiple government projects.

88.     Audits are the mechanism then used to determine what is charged to a federal award. DOD's grant regulations incorporate by reference and require that DOD awards to institutions of higher education "comply with the audit requirements specified in Subpart F of 2

CFR part 200, which is the OMB implementation of the Single Audit Act, as amended (31 U.S.C. Chapter 75)." 2 C.F.R. pt. 1128, app. E(A). 2 C.F.R. § 200.501(b) requires that a "non-Federal entity that expends $1,000,000 or more in Federal awards during the non-Federal entity's fiscal year must have a single audit conducted in accordance with § 200.514," except if it "elects to have a program-specific audit." This audit is "performed annually," and it must be "conducted in accordance with" articulated standards. *See* 2 C.F.R. §§ 200.504, 200.514. An auditor may identify any "questioned cost," which is defined as "an amount, expended or received from a Federal award, that in the auditor's judgment:" (1) "[i]s noncompliant or suspected noncompliant with Federal statutes, regulations, or the terms and conditions of the Federal award;" (2) "[a]t the time of the audit, lacked adequate documentation to support compliance;" or (3) "[a]ppeared unreasonable and did not reflect the actions a prudent person would take in the circumstances." 2 C.F.R. § 200.1 (definition of "Questioned cost"). The results of the audit and any questioned costs are factored into the negotiation of indirect cost rates. *See* Appendix III to Part 200.

89.     DOD ignored that detailed process. Instead, it arbitrarily determined that all universities would recover at a 15% rate, violating the regulations' substantive commands and rendering the entire regulatory process meaningless.

### Count III

### Violation of the Administrative Procedure Act—Arbitrary and Capricious

90.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

91.     The APA provides that courts shall "hold unlawful and set aside agency action," that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the APA, agencies must provide a reasoned basis for their actions,

which requires a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43, 48-49 (1983) (citation omitted). And agencies cannot fail to consider "important aspect[s] of the problem." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *State Farm*, 463 U.S. at 43).

92.    The Rate Cap Policy is arbitrary and capricious for many reasons, including the following.

93.    The Rate Cap Policy's cursory justifications fail to establish a rational connection between the facts found and the choice made.

94.    The Rate Cap Policy arbitrarily rests on the premise that indirect costs are less worthy and less effective than direct costs, with the Hegseth Memo implying that funding indirect costs is inconsistent with "discipline" and "accountability"; promotes "waste"; and reflects "bureaucratic fat" that must be "cut[]" so that we can build "muscle."  But indirect costs are by definition necessary for research to proceed, they often improve funding efficiency, and they are rigorously audited to prevent waste.

95.    The Rate Cap Policy irrationally relies on the accounting difference between direct and indirect costs to drastically slash research funding. Moreover, while DOD justifies the Policy as a "cost savings" measure and suggests it may redirect the savings to "operational capability," Congress separately appropriates DOD's research budget.  So again, the Policy's actual effect is to favor certain types of research over others—a choice that DOD does not explain or defend, and one that ignores the reality that much research simply cannot proceed at a 15% rate.

96.    The Rate Cap Policy rests on a specious comparison between federal grants supporting the national defense and private foundation funding awards to IHEs, Ex. B at 1, which differ in multiple ways that DOD failed to consider.

97.    The Rate Cap Policy also fails to consider myriad important aspects of the problem.

98.    The Rate Cap Policy ignores the harm that a categorical 15% rate cap will inflict on the research that DOD funds (and by statute must fund, *see, e.g.*, 10 U.S.C. § 4010) for the benefit of the national defense and the nation more broadly. Much of this research cannot proceed under a 15% cap, yet DOD has not even attempted to assess the effects of jettisoning the approach that has prevailed for six decades.

99.    The Rate Cap Policy ignores the reliance interests of universities that took up DOD's invitation to create the physical and human infrastructure necessary to do the science DOD funds, premised on receiving reimbursement for their indirect costs under the approach that has prevailed for decades. These long-term decisions are made, and must be made, over a years- and even decades-long basis and cannot be made grant-by-grant.  The Policy's disregard for reliance interests is arbitrary as to both new and existing grants, but it is doubly so insofar as the Policy effectively imposes a 15% cap on existing grants, which universities committed to undertake on the understanding that those specific grants would receive reimbursement at negotiated rates.

100.    The Rate Cap Policy arbitrarily imposes its new categorical 15% cap only on universities, and not on other DOD grant recipients, even though all compete for the same awards. Moreover, the Policy arbitrarily treats universities with documented and verified individualized indirect costs the same as recipients that have not documented any indirect costs and that proceed under the de minimis exception in 2 C.F.R. § 200.414(f).

101.    The Rate Cap Policy's arbitrariness and disregard for the entire regulatory regime is underscored by the Michael Memo's direction that DOD will continue to negotiate indirect cost rates with universities consistent with Appendix III to 2 C.F.R. Part 200 where it is the cognizant

agency, while simultaneously prohibiting DOD components from actually using that negotiated rate in awards to universities. *See* Ex. B at 2. A university's cognizant agency is generally the agency from which the university receives the most funding. *See* 2 C.F.R. pt. 200, app. III(C)(11)(a)(1). Under the regulatory scheme, the cognizant agency is assigned this responsibility because it has the greatest stake in its assigned universities' research portfolio. The irrationality of the Rate Cap Policy's policy—requiring DOD components to go to the cost and trouble of negotiating indirect cost rates that will effectively apply to every agency except DOD—underscores the Policy's arbitrariness and its disregard for the entire regulatory regime.

### Count IV

### Violation of Administrative Procedure Act—Contrary to Law

### (Agency Action Unauthorized by Statute)

102. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

103. The APA directs courts to "hold unlawful and set aside agency action[s]" that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

104. DOD has no statutory authority to issue an arbitrary cap that departs from the regime that has existed since 1965. The Rate Cap Policy replaces the tailored process Congress has created by statute with a categorical, one-size-fits-all cap. The Supreme Court has underscored that agencies may not enact sweeping rules of this sort without express congressional authorization. *E.g.*, *West Virginia v. EPA*, 597 U.S. 697, 721 (2022); *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994); *Biden v. Nebraska*, 600 U.S. 477, 506-07 (2023).

105. The Rate Cap Policy exceeds the authority conferred in the statute governing the use of fixed rates for grants to universities, 41 U.S.C. § 4708.   In Section 4708, Congress

authorized "predetermined fixed-percentage rates" for "payment of reimbursable indirect costs" attributable to research agreements with educational institutions like those contemplated by DOD's authorizing statutes. The Policy violates 41 U.S.C. § 4708 because it imposes a "predetermined fixed-percentage rate[]" that does not attempt to approximate actual "reimbursable indirect costs."

106.    Nor can DOD rely on more general statutory authorities to enact an arbitrary rate cap that does not comply with 41 U.S.C. § 4708. Because Section 4708 specifically addresses the used of fixed rates for grants at universities, it governs. And Congress's actions unequivocally rejecting similar caps leave no room DOD to enact its own cap by administrative fiat.

107.    Moreover, the Rate Cap Policy is inconsistent with the statutes in which Congress conferred general grantmaking authority on DOD, including 10 U.S.C. § 4001. That statute first authorizes DOD to engage in research and development projects that are "necessary to the responsibilities" of DOD or one of the military branches "in the field of research and development" and either: "relate to weapon systems and other military needs" or "are of potential interest to [DOD]." *Id.* § 4001(a). It then authorizes DOD to perform such projects "by contract, cooperative agreement, or grant in accordance with chapter 63 of title 31." *Id.* § 4001(b)(1). Those provisions in turn recognize that grants and cooperative agreements serve a "public purpose." *See* 31 U.S.C. §§ 6304, 6305. Nothing in these statutes authorizes DOD to use arbitrary across-the-board indirect cost rates that lack any relationship to actual indirect costs. To the contrary, by arbitrarily capping indirect cost rates at 15%, DOD is forcing IHEs to bear real costs in a manner that is at odds with the "public purpose" of the funding award and thus in violation of § 4001.

108.    Finally, in 10 U.S.C. § 4010, Congress specifically required DOD to carry out the Defense Established Program to Stimulate Competitive Research (known as DEPSCoR), which

authorizes "[c]ompetitive award of grants for research and instrumentation to support such research." 10 U.S.C. § 4010(c)(1). Among DOD's Congressionally mandated objectives for implementing this program are "increas[ing] the number of university researchers . . . capable of performing science and engineering research responsive to the needs of the Department" and "enhanc[ing] the capabilities of institutions of higher education . . . to develop, plan, and execute science and engineering research that is relevant to the mission of the Department." *Id.* § 4010(b). Here again, nothing in 10 U.S.C. § 4010 authorizes DOD to depart from negotiated indirect cost rates, and the Policy will have devastating effects on research institutions that are fundamentally incompatible these program goals.

109.    Because Congress did not authorize DOD to make a unilateral change slashing all indirect cost rates to 15%, the Rate Cap Policy is unlawful and invalid.

### Count V

### Violation of Administrative Procedure Act—Contrary to Law

### (Unlawful Termination of Existing Grants and Cooperative Agreements in Violation of Governing Regulations)

110.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

111.    The APA directs courts to "hold unlawful and set aside agency action[s]," that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

112.    The Rate Cap Policy effectively imposes a 15% cap on existing grants by requiring the termination of all existing grants that have not been renegotiated within 180 days of the Hegseth Memo's issuance. Ex. A at 2.

113.    First, the terminations that the Policy compels violate the regulatory limitations on DOD's termination authority. The applicable regulations provide that DOD may only terminate a grant "unilaterally" "in whole or in part," for one of two enumerated reasons: (1) for a grantee's "material failure to comply with the award terms and conditions," or (2) in the case of incrementally funded grants, if "[t]he program office does not have funding for an upcoming increment." 2 C.F.R. pt. 1136, app. C(C)(1)(a); *see also* 2 C.F.R. § 1136.305. Neither of these enumerated grounds permits DOD to terminate grants and cooperative agreements on the ground that the agencies would prefer to use a different indirect cost rate.

114.    The Hegseth Memo and the Michael Memo both cite 2 C.F.R. § 200.340(a)(4), which provides that a federal award "may be terminated" "to the extent authorized by law[] if an award no longer effectuates the program goals or agency priorities." Ex. A at 2; Ex. B at 2. But because DOD has not adopted § 200.340(a)(4), it cannot invoke it to terminate DOD awards. *See* 2 C.F.R. § 200.340(b); 2 C.F.R. § 1128.300 (explaining that the "[p]urpose" of the DOD regulations is to "implement[]" certain sections, but not all sections, of OMB's Uniform Guidance in 2 C.F.R. Part 200).

115.    Second, the terminations required by the Rate Cap Policy violate 2 C.F.R. § 200.414 and Section C(7)(A) of Appendix III to Part 200. *See* 2 C.F.R. pt. 1128, app. C(A)(1)(a) (incorporating by reference for DOD grants and cooperative agreements appendix III to 2 CFR Part 200). Under 2 C.F.R. § 200.414(c)(4), an "agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement." Hence, even where an agency may lawfully deviate from negotiated indirect cost rates, it must do so in advance in the notice of funding opportunity.

116.    Moreover, Section C(7)(A) of Appendix III states in relevant part:

> Except as provided in paragraph (c)(1) of § 200.414, Federal agencies must
> use the negotiated rates in effect at the time of the initial award throughout
> the life of the Federal award. Award levels for Federal awards may not be
> adjusted in future years as a result of changes in negotiated rates.

2 C.F.R. pt. 200, app. III C(7)(a). Hence, the government-wide negotiated rate for a particular grantee that is in effect at the beginning of an award applies throughout the life of the award, even if that government-wide negotiated rate is renegotiated by a cognizant agency during the life of the award. The "except[ion]" is when a different rate from the government-wide negotiated rate is set via the procedures established in Section 200.414(c)(1)—deviations that, as explained above, must occur before the notice of funding opportunity pursuant to Section 200.414(c)(4). DOD cannot circumvent these requirements by terminating and then reissuing grants to include a lowered indirect cost rate.

## Count VI

### Violation of Administrative Procedure Act—In Excess of Statutory Authority

### (Retroactivity as to Existing Grants)

117.    Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

118.    The APA directs courts to "hold unlawful and set aside agency action[s]," that are "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(C).

119.    "[A] statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

120.    The Rate Cap Policy's mandate—to terminate existing grants and reissue them at a 15% indirect cost rate—is a "retroactive" action because it "impair[s] rights a party possessed when [it] acted, increase[s] a party's liability for past conduct, [and] impose[s] new duties with

respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994). Universities accepted these awards based on, and in reliance on, negotiated indirect cost rates that were substantially higher than 15%.

121.    Congress did not authorize DOD to retroactively modify indirect cost rates when it enacted DOD's grantmaking authority, or in any other statute, and DOD cannot circumvent that limitation by purporting to terminate and reissue grants.

122.    Because DOD's retroactive action is in excess of its statutory authority, the Rate Cap Policy is invalid.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a.   Expedited resolution of this action to prevent harm to Plaintiffs;

b.   Vacatur of the Hegseth Memo and the Michael Memo;

c.   Declaratory judgment finding the Hegseth Memo and the Michael Memo invalid, arbitrary and capricious, and contrary to law;

d.   An injunction preliminarily and permanently prohibiting Defendants, their agents, and anyone acting in concert or participation with Defendants from implementing, instituting, maintaining, or giving effect to the Hegseth Memo and the Michael Memo in any form; from otherwise modifying negotiated indirect cost rates except as permitted by statute and by the regulations of OMB, as incorporated by DOD; from rejecting or otherwise treating adversely proposals for DOD funding submitted at universities' negotiated rates rather than the 15% rate; and from terminating any grants or cooperative agreements pursuant to the Hegseth Memo or the Michael Memo or

based on a grantee's refusal to accept an indirect cost rate lower than their negotiated rate;

e.   An order awarding Plaintiffs' costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable law;

f.   Any such further relief as the Court deems equitable, just, and proper.

[*signatures on following page*]

Dated: June 16, 2025

JENNER & BLOCK LLP

By: */s/ Shoba Pillay*

Shoba Pillay, BBO No. 659739
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

Ishan K. Bhabha (*pro hac vice forthcoming*)
Lindsay C. Harrison (*pro hac vice forthcoming*)
Lauren J. Hartz (*pro hac vice forthcoming*)
Elizabeth Henthorne (*pro hac vice forthcoming*)
Zachary C. Schauf (*pro hac vice forthcoming*)
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
LHarrison@jenner.com
LHartz@jenner.com
BHenthorne@jenner.com
ZSchauf@jenner.com

*Attorneys for Association of American Universities, American Council on Education, Association of Public and Land-grant Universities, Arizona Board of Regents on Behalf of Arizona State University, Brown University, California Institute of Technology, The Regents of the University of California, Cornell University, The Board of Trustees of the University of Illinois, The Johns Hopkins University, Massachusetts Institute of Technology, and University of Pittsburgh of the Commonwealth System of Higher Education*

Respectfully submitted,

CLEMENT & MURPHY, PLLC

By: */s/ Paul D. Clement*

Paul D. Clement (*pro hac vice forthcoming*)
Erin E. Murphy (*pro hac vice forthcoming*)
James Y. Xi (*pro hac vice forthcoming*)
Kyle R. Eiswald (*pro hac vice forthcoming*)
706 Duke Street
Alexandria, VA 22314
Tel: (202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
kyle.eiswald@clementmurphy.com

*Attorneys for Association of American Universities, Association of Public and Land-grant Universities, and American Council on Education*

ANTHONY G. BROWN
Attorney General of Maryland

By: */s/ Michael Drezner*
Michael Drezner (*pro hac vice forthcoming*)
    *Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
Tel: (410) 576-6959
mdrezner@oag.state.md.us

*Attorney for University of Maryland, College Park*

NICHOLAS W. BROWN
Attorney General of Washington

By: */s/ Jessica L. Creighton*
Jessica L. Creighton (*pro hac vice forthcoming*)
 *Assistant Attorney General*
Office of the Attorney General of Washington
University of Washington Division
4333 Brooklyn Avenue NE, MS 359475
Seattle, WA 98195
Tel: (206) 543-4150
jessica.creighton@atg.wa.gov

*Attorney for University of Washington*

PHILIP J. WEISER
Attorney General of Colorado

By: */s/ Lauren Peach*
Lauren Peach (*pro hac vice forthcoming*)
 *First Assistant Attorney General*
Michael McMaster (*pro hac vice forthcoming*)
 *Assistant Solicitor General*
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, CO 80203
Tel: (720) 508-6484, (720) 508-6156
Lauren.peach@coag.gov
Michael.McMaster@coag.gov

*Attorneys for the Board of Governors of the
Colorado State University System Acting by
and through Colorado State University*