# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, *et al.*,<br><br>    *Plaintiffs*,<br><br>        v.<br><br>DEPARTMENT OF DEFENSE *et al.*,<br><br>    *Defendants*. | Case No.  25-cv-11740<br><br>**(Leave to File Granted June 17, 2025)** |

# MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION .......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 4

    A.    DOD Funding for Indirect Costs .................................................................... 4

    B.    Congressional Refinement of Indirect Cost Structure ............................. 10

    C.    Recent Executive Branch Attempts to Limit Indirect Cost Rates ........... 11

    D.    DOD's Rate Cap Policy ............................................................................ 14

    E.    Plaintiffs and Member Universities' Federally Funded Research ........... 18

LEGAL STANDARD .................................................................................................. 19

ARGUMENT .............................................................................................................. 20

I.    The Organizational Plaintiffs Have Standing. ..................................................... 20

II.    The Hegseth Memo and Michael Memo Are Final Agency Actions. ............... 21

III.    Plaintiffs Have a Strong Likelihood of Success on Their Claims. .................... 21

    A.    The Rate Cap Policy Is Contrary to the Regulations Governing Indirect
            Cost Rates. ............................................................................................... 22

    B.    The Rate Cap Policy Unlawfully Jettisons the Indirect Cost Recovery
            Scheme. .................................................................................................... 26

    C.    The Rate Cap Policy Is Arbitrary and Capricious. ................................. 28

          1.    DOD's justifications are a far cry from the "reasoned basis"
                required. ....................................................................................... 29

          2.    DOD failed to consider multiple "important aspects of the
                problem." ..................................................................................... 31

    D.    The Rate Cap Policy Is Contrary to Statute. ........................................... 24

IV.    The Other Factors Favor a Temporary Restraining Order. ............................... 37

    A.    The Rate Cap Policy Is Inflicting Irreparable Harm. ............................. 38

B.    The Balance of the Equities and Public Interest Overwhelmingly Favor
Relief.................................................................................................................44

CONCLUSION.....................................................................................................................45

# TABLE OF AUTHORITIES

**CASES**

*178 Lowell St. Operating Co., LLC v. Nichols*, 152 F. Supp. 3d 47 (D. Mass. 2016) .......................................................................................................................19

*Association of American Universities v. Department of Energy*, No. 25-cv-10912, 2025 WL 1414135 (D. Mass. May 15, 2025) ...............................................1, 5, 14, 20, 24, 25, 28, 32, 33, 38, 44

*Association of American Universities v. Department of Energy*, No. 25-cv-10912, 2025 WL 1119791 (D. Mass. Apr. 16, 2025) ...................................................14, 38

*Bennett v. Spear*, 520 U.S. 154 (1997) .........................................................................21

*Biden v. Nebraska*, 600 U.S. 477 (2023) ...........................................................4, 23, 35

*Boston Celtics Ltd. Partnership v. Shaw*, 908 F.2d 1041 (1st Cir. 1990)....................40

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020)....................................................45

*Camel Hair & Cashmere Institute of America, Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6 (1st Cir. 1986).......................................................................................21

*County of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017)....................40

*DHS v. Regents of the University of California*, 591 U.S. 1 (2020) .................28, 32, 33

*Does 1-6 v. Mills*, 16 F.4th 20 (1st Cir. 2021) .............................................................20

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)....................................22, 32

*Housatonic River Initiative v. United States Environmental Protection Agency, New England Region*, 75 F.4th 248 (1st Cir. 2023)..................................................20

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) ........20

*International Union, United Automobile, Aerospace & Agric. Implement Workers of America v. Brock*, 477 U.S. 274 (1986).............................................................21

*Kisor v. Wilkie*, 588 U.S. 558 (2019).........................................................................22

*Louisiana Public Service Commission v. FCC*, 476 U.S. 355 (1986) ..........................34

*Massachusetts v. National Institutes of Health*, No. 25-cv-10338, __ F. Supp. 3d __, 2025 WL 702163 (D. Mass. Mar. 05, 2025), *judgment entered*, 2025 WL 1063760 (D. Mass. Apr. 4, 2025), *appeal docketed*, No. 25-1344 (1st Cir. Apr. 9, 2025) ..................................................................................1, 13, 21, 22, 23, 24, 25, 26, 28, 31, 32, 38, 44

*MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218 (1994) ..................................................................................4, 23, 34

*Melone v. Coit*, 100 F.4th 21 (1st Cir. 2024) ..................................................29

*Motor Vehicle Manufacturers Ass'n of Untied States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)..................................28, 31

*National Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36 (D.D.C. 2025)..............................41

*National Environmental Development Association's Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014) ..................................................22

*New York v. Trump*, 133 F.4th 51 (1st Cir. 2025)..................................38

*New York v. Trump*, 764 F. Supp. 3d 46 (D.R.I. 2025), *appeal docketed*, No. 25-1138 (1st Cir. Feb. 10, 2025) ..................................................20

*Nken v. Holder*, 556 U.S. 418 (2009) ..................................................44-45

*Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) ..................................45

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8 (1st Cir. 2000) ..................................38

*Starlight Sugar, Inc. v. Soto*, 114 F.3d 330 (1st Cir. 1997) ..................................39-40

*West Virginia v. EPA*, 597 U.S. 697 (2022)..................................35, 36

**STATUTES**

5 U.S.C. § 706(2)(A)..................................................28

10 U.S.C. § 4001..................................................5, 31, 34

10 U.S.C. § 4001(a)(2)..................................................36, 42

10 U.S.C. § 4001(b)(1)..................................................37

10 U.S.C. § 4010..................................................5, 31, 34

10 U.S.C. § 4010(a)..................................................37

10 U.S.C. § 4010(b)..................................................37

10 U.S.C. § 4141 ................................................................................5, 31, 34

31 U.S.C. § 503(a) ...........................................................................................6

31 U.S.C. § 503(b)(2)(C) .................................................................................6

31 U.S.C. § 6304 ............................................................................................37

31 U.S.C. § 6305 ............................................................................................37

41 U.S.C. § 4708 ........................................................................................2, 35

Act of Sept. 5, 1962, Pub. L. No. 87-638, 76 Stat. 437, *codified at* 41 U.S.C.
§ 4708 ......................................................................................................10

Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 226, 132 Stat. 348,
740 ............................................................................................................12

Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 224, 134 Stat.
1182, 1594 (2020) ....................................................................................12

Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, § 224, 136 Stat. 49,
470-71 ......................................................................................................12

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 224, 136 Stat.
4459, 4883-84 (2022) ..............................................................................12

Consolidated Security, Disaster Assistance, and Continuing Appropriations Act,
2009, Pub. L. No. 110-329 § 8109, 122 Stat. 3574, 3645 (2008) ...........11

Department of Defense and Labor, Health and Human Services, and Education
Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L.
No. 115-245, § 224, 132 Stat. 2981, 3094 (2018) ..................................12

Department of Defense Appropriation Act, 1963, Pub. L. No. 87-577, § 540, 76
Stat. 318, 334 (1962) ...............................................................................10

Department of Defense Appropriation Act, 1965, Pub. L. No. 88-446, § 538, 78
Stat. 465, 481 (1964) ...............................................................................10

Department of Defense Appropriation Act, 1966, Pub. L. No. 89-213, § 638, 79
Stat. 863, 879 (1965) ..........................................................................10, 36

Department of Defense Appropriations Act, 2008, Pub. L. No. 110-116, § 8115,
121 Stat. 1295, 1340 (2007) ....................................................................11

Department of Defense Appropriations Act, 2010, Pub. L. No. 111-118, § 8101,
123 Stat. 3409, 3450-51 (2009) ..............................................................11

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101, 1405, 139 Stat. 9, 11-12, 20 .................................................................. 17

Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, § 224, 133 Stat. 2534, 2582 (2019) .......................................................................................... 12

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 478 ................................................................................................................................ 17

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. II, § 224, 138 Stat. 460, 677 ........................................................................................ 13

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 89-320 (1965) ............................................................................................ 33, 36

H.R. Rep. No. 115-244 (2017) ......................................................................................... 12, 32

*Independent Offices Appropriations, 1966: Hearings on H.R. 7997 Before the Subcomm. of the S. Comm. on Appropriations*, 89th Cong. (1965) ......................... 33

S. Rep. No. 87-1826 (1962) ..................................................................................................... 35

S. Rep. No. 115-150 (2017) ...................................................................................... 12, 32, 36

**OTHER AUTHORITIES**

2 C.F.R. pt. 200 ............................................................................................................................ 6

2 C.F.R. pt. 200, Appendix III .................................................................................. 7, 8, 10, 27

2 C.F.R. pt. 200, Appendix III(A) ........................................................................................ 26

2 C.F.R. pt. 200, Appendix III(A)(2)(e)(1) .......................................................................... 26

2 C.F.R. pt. 200, Appendix III(C)(11)(a)(1) .................................................................... 8, 28

2 C.F.R. pt. 200 Appendix IV(C)(1)(b) ................................................................................ 35

2 C.F.R. § 200.1 ................................................................................................................... 24, 27

2 C.F.R. § 200.100(c) ............................................................................................................... 26

2 C.F.R. § 200.402 ................................................................................................................... 26

2 C.F.R. § 200.414 ................................................................................................................... 26

2 C.F.R. § 200.414(a) ................................................................................................................ 7

2 C.F.R. § 200.414(c)(1) ..........................................................................3, 9, 23, 24

2 C.F.R. § 200.414(c)(3) .............................................................................9, 23, 24

2 C.F.R. § 200.414(c)(4) .............................................................................9, 10, 25

2 C.F.R. § 200.414(e)(1) .........................................................................................27

2 C.F.R. § 200.414(f) ........................................................................................25, 33

2 C.F.R. § 200.501(b) .............................................................................................27

2 C.F.R. § 200.504 ..................................................................................................27

2 C.F.R. § 200.514 ..................................................................................................27

2 C.F.R. § 1108.230 ..................................................................................................7

2 C.F.R. § 1120.315(c)(2) .......................................................................................10

2 C.F.R. pt. 1128 .....................................................................................................30

2 C.F.R. pt. 1128, Appendix C ................................................................................26

2 C.F.R. pt. 1128, Appendix C(A)(1)(a) ..............................................................6, 26

2 C.F.R. pt. 1128, Appendix E(A) ...........................................................................27

2 C.F.R. § 1128.300 ..................................................................................................6

Ass'n of Am. Univs., *Frequently Asked Questions About Facilities and Administrative (F&A) Costs of Federally Sponsored University Research* (Feb. 10, 2025), https://www.aau.edu/key-issues/frequently-asked-questions-about-facilities-and-administrative-costs .......................................................................9

Pierre Azoulay, Daniel P. Gross, Bhaven N. Sampat, *Indirect Cost Recovery in U.S. Innovation Policy: History, Evidence, and Avenues for Reform*, Nat'l Bureau Econ. Res. (revised June 2025).........................................................................6

Complaint, *Association of American Universities v. National Science Foundation*, No. 25-cv-11231 (D. Mass. May 5, 2025), ECF No. 1 .......................................14

*Criterion*, *Webster's Third New International Dictionary* (1986) ............................24

Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction and for Summary Judgment [Doc No. 40] and Memorandum in Support of Cross-Motion for Summary Judgment [Doc No. 60], *Association of American Universities v. National Science Foundation*, No. 25-cv-11231 (D. Mass. May 27, 2025), ECF No. 62 ....................................................................................14

*Deviation*, *Webster's Third New International Dictionary* (1986)................................23

DOE, *Policy Flash 2025-22: Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)* (Apr. 11, 2025) .................................... 13-14

Electronic Order, *Massachusetts v. National Institutes of Health*, No. 25-CV-10338 (D. Mass. Apr. 4, 2025), ECF No. 110 ...................................................13

Jocelyn Kaiser, *NIH Plan to Reduce Overhead Payments Draws Fire*, Science (June 2, 2017), https://www.science.org/content/article/nih-plan-reduce-overhead-payments-draws-fire .................................................................30

Motion for Extension of Time, *Association of American Universities v. Department of Energy*, No. 25-cv-10912 (D. Mass. June 12, 2025), ECF No. 63 .....................14

Motion for Preliminary Injunction, *Association of American Universities v. National Science Foundation*, No. 25-cv-11231 (D. Mass. May 8, 2025), ECF No. 40................................................................................................14

National Center for Science and Engineering Statistics, NSF 25-314, *Higher Education Research and Development (HERD) Survey: Fiscal Year 2023* (2024), https://web.archive.org/web/20250602134130/https://ncses.nsf.gov/pubs/nsf25313 .................................................................................6

National Center for Science and Engineering Statistics, NSF 25-328, *Survey of Federal Funds for Research and Development: Fiscal Years 2023–24* (2025), https://web.archive.org/web/20250508011530/https://ncses.nsf.gov/surveys/federal-funds-research-development/2023-2024#tableCtr13393 ...............5

NIH, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates*, NOT-OD-25-068 (Feb. 7, 2025), https://grants.nih.gov/grants/guide/notice-files/NOT-OD-25-068.html ................................................13

NSF, *Policy Notice: Implementation of Standard 15% Indirect Cost Rate* (May 2, 2025), https://www.nsf.gov/policies/document/indirect-cost-rate...........................14

Office of Management & Budget, *Major Savings and Reforms: Budget of the U.S. Government Fiscal Year 2018* (2017), https://www.govinfo.gov/content/pkg/BUDGET-2018-MSV/pdf/BUDGET-2018-MSV.pdf............................................11

Office of Naval Research, *All ONR-Sponsored Nobel Laureates*, https://www.onr.navy.mil/about-onr/history/nobels (last visited June 14, 2025)......................5

OMB Circular A-122, Cost Principles for Nonprofit Organizations, 45 Fed. Reg. 46,022 (July 8, 1980) ...........................................................................35

*Our Approach*, Carnegie Corporation of New York, https://www.carnegie.org/programs/ (last visited June 16, 2025) ...........................................31

*Our Mission and History*, Smith Richardson Foundation, https://www.srf.org/our-mission-history/ (last visited June 16, 2025) ........................................................31

*Principles for Determining Costs Applicable to Research and Development Under Grants and Contract With Educational Institutions*, 30 Fed. Reg. 9676 (Aug. 4, 1965) ...............................................................................................................35

*Procedure*, *American Heritage Dictionary of the English Language* (5th ed. 2011)....................24

Research Administration Office, University of California Office of the President, RAO-08-03, *Memo: Operating Guidance* (Feb. 22, 2008), https://researchmemosapi.ucop.edu/index.php/site/document?memo=UkFPL TA4LTAz&doc=933 ..............................................................................................11

John F. Sargent Jr. & Marcy E. Gallo, Cong. Rsch. Serv., R45403, *The Global Research and Development Landscape and Implications for the Department of Defense* (June 28, 2021)..................................................................................5, 31

*Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards*, 78 Fed. Reg. 78,590 (Dec. 26, 2013) .............................................22, 25

University of Utah, *Frequently Asked Questions (FAQ) about the Indirect Costs of Federally Sponsored Research* (Oct. 2013), https://osp.utah.edu/_pdf/FAQs %20on%20costs%20of%20research.pdf ..................................................................31

# INTRODUCTION

Decades ago, the United States invited universities to partner on critical research, and it created a system of institution-specific reimbursement to fund that research. The government negotiates reimbursement rates with each institution intended to approximate its actual costs, and in exchange, universities invest in the facilities and people carrying out the government's most critical research. Universities depend on this stable guarantee of reimbursement to decide what to build, who to hire, and much more. In the past four months, multiple agencies have attempted to slash those institution-specific rates and discard them in favor of a uniform 15% that is vastly below what is necessary to sustain the science that Congress has by statute directed the government to support. The three earlier efforts have been enjoined or voluntarily stayed. Now, the Department of Defense ("DOD") has pressed ahead with a fourth attempt without adding to its explanation or responding to the deficiencies identified in extensive opinions from multiple courts of this District.[1] The immediately effective portions of its new policy must be enjoined.

The government, by convention, sorts research funding into two types of costs. Some costs are "direct"—that is, they are readily attributable to specific projects. Other costs are "indirect"— an accounting term capturing costs that are essential for research but shared among multiple projects, like advanced servers supporting cutting-edge AI research or hazardous waste storage. Reimbursement of indirect costs is critical to universities' ability to carry out research: Research cannot take place without repairs to the buildings that host the laboratories, shared pieces of equipment like powerful computers, or the support staff that helps maintain laboratories and

---

[1] *Massachusetts v. Nat'l Insts. of Health ("NIH")*, No. 25-CV-10338, __ F. Supp. 3d __, 2025 WL 702163 (D. Mass. Mar. 5, 2025), *judgment entered*, 2025 WL 1063760 (D. Mass. Apr. 4, 2025), *appeal filed* (D. Mass. Apr. 8, 2025); *Ass'n of Am. Univs. v. Dep't of Energy ("DOE")*, No. 25-cv-10912, 2025 WL 1414135, at *19 (D. Mass. May 15, 2025).

1

equipment. Recognizing that reimbursement of indirect costs is critical for research, Congress since 1962 has authorized agencies to reimburse institutions of higher education ("IHEs" or "universities") for indirect costs using institution-wide "predetermined fixed-percentage rates" that approximate actual costs. 41 U.S.C. § 4708. For large research institutions like Plaintiffs and their members, such rates are regularly 50% or higher. These percentages reflect actual, verified costs of performing the research the government has asked universities to undertake.

On Friday June 13, DOD released an across-the-board 15% cap on indirect cost rates, carrying out a directive issued by Secretary Hegseth on May 14, 2025. *See* Pete Hegseth, Secretary of Defense, *Implementation of a 15% Indirect Cost Cap on Assistance Awards to Institutions of Higher Education* (May 14, 2025) (Compl., Ex. A, Doc. No. 1-1) (the "Hegseth Memo"); Emil Michael, Under Secretary of Defense, *Implementation of a 15% Indirect Cost Cap on Assistance Awards to Institutions of Higher Education* (June 12, 2025) (Compl., Ex. B, Doc. No. 1-2) (the "Michael Memo") (collectively, the "Rate Cap Policy" or the "Policy"). DOD's Rate Cap Policy is immediately effective for new grants,[2] and it requires changes to existing grants over the next five months. As with the three earlier efforts of its sister agencies, DOD's Policy flouts the regulatory regime governing indirect costs, disregards Congress's express directives, and is arbitrary and capricious to boot. Via this Motion, Plaintiffs seek an injunction against the Policy's immediately effective portions to prevent irreparable harm to universities nationwide while allowing expedited summary judgment briefing to address the defects with the Policy as a whole.

As in the prior cases challenging similar rate cut policies, Plaintiffs are likely to succeed on the merits. First, the Policy is at war with the regulations that the Office of Management and

---

[2] DOD's Rate Cap Policy applies to both grants and cooperative agreements. This brief uses "grants" as a shorthand throughout.

Budget ("OMB") promulgated, and DOD has incorporated, that are designed to provide necessary stability for recipients, protect their reliance interests, and ensure they can cover the *actual costs* of the research the government has requested. *See* 2 C.F.R. § 200.414(c)(1).

Second, DOD's paltry justification—overturning a decades-old framework based on just a few conclusory sentences—mocks the reasoned-decisionmaking requirements of the Administrative Procedure Act ("APA"). The Policy denigrates indirect costs as "bureaucratic fat" and "waste" that does not improve "outcomes," ignoring that indirect costs are essential for research and often improve efficiency. The Policy will wreak havoc on the science DOD must fund, yet DOD has not acknowledged, much less assessed, those consequences. The Policy upends the immense reliance interests of universities, which the Policy says nothing about. And the Policy treats universities worse than other funding recipients, again without explanation. Illustrating the absurdity of DOD's approach, DOD will continue to go to the time and expense to *negotiate* institution-specific indirect cost rates pegged to that institution's actual indirect costs (as the regulations expressly require DOD to do), but then it will not actually *use* those rates and instead will swap in an across-the-board 15% figure. That bizarre result underscores that DOD's arbitrary actions contradict the entire regulatory scheme.

Third, Congress has not authorized DOD to jettison the settled framework of institution-specific indirect costs or to legislate an across-the-board cap. After Congress itself briefly experimented with a much less severe limit on indirect costs at DOD in 2007, Congress lifted that cap just a few years later. And when the Administration in 2017 proposed that Congress adopt for NIH a draconian cap like the one here, Congress rejected it emphatically and in bipartisan fashion—precisely because of how it would devastate U.S. science and throw into disarray research at the universities that had relied on the settled framework. With Congress having so

3

clearly taken these issues in hand, DOD cannot now claim that Congress, without saying a word, impliedly authorized DOD to replace a tailored system with a sweeping, one-size-fits-all command. *See Biden v. Nebraska*, 600 U.S. 477, 507 (2023); *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 229 (1994).

A temporary restraining order ("TRO") is needed because the harms from DOD's unlawful Rate Cap Policy will be immediate, irreparable, and compounding. Plaintiffs have thousands of pending funding proposals. The Policy immediately forces Plaintiffs into a Hobson's choice: If they stick to negotiated rates, DOD will rely on the Policy to reject the proposals out of hand. If they decline to submit a proposal for the many grants that are uneconomic at a 15% rate (alone or in aggregate), they will permanently lose the chance to do the science they exist to undertake. And if Plaintiffs accept these grants at a 15% rate, they will receive an unlawful reimbursement rate that does not actually support the research. As the 25 declarations submitted with this Motion demonstrate, the Policy will have significant and immediate impacts on critical projects, necessitating deep and immediate cuts. Terminated staff will need to move on, and the research cannot simply be restarted. Progress in critical areas—artificial intelligence, quantum computing, cybersecurity, semiconductors, virtual reality, and other technology fields—will end in the United States (even as it continues abroad). To prevent these irreparable harms, this Court should issue a TRO preventing the DOD from implementing the immediately effective portions of the Policy.

## STATEMENT OF FACTS

### A. DOD Funding for Indirect Costs

For decades, DOD has supported research—investing billions annually—that has made the United States a leader in science and fortified our national security and competitiveness.

Congress has authorized DOD to use grants to advance American defense capabilities, protect national security, and meet DOD's other research needs. *See, e.g.* 10 U.S.C. §§ 4001, 4010, 4141.

Before the 1940s, the United States largely relied on other nations for their scientific capital, but during World War II, the U.S. government began funding research and development (R&D). John F. Sargent Jr. & Marcy E. Gallo, Cong. Rsch. Serv., R45403, *The Global Research and Development Landscape and Implications for the Department of Defense*, at 1 (June 28, 2021). These initiatives were so successful that, after the war, the government redoubled efforts to support defense R&D as an investment in the nation's safety and progress. *Id.* at 2. By 1960, 81% of all federal R&D funding was earmarked for defense. *Id.* at 2-3.

Ever since, DOD research funding has fueled innovation that serves the public good in contexts far broader than weapons and military preparedness. DOD grants have funded scientific research leading to innumerable scientific breakthroughs, including the creation of the internet and GPS technology. More than 60 DOD-supported scientists have earned Nobel Prizes.[3] Most of this research occurs at outside institutions, including universities.[4] Over decades, that funding has resulted in a "symbiotic, mutually beneficial relationship" between DOD and universities, "which is built on [DOD]'s need for cutting edge research and the IHEs' ability to provide it." *Ass'n of Am. Univs. v. Dep't of Energy ("DOE")*, No. 25-cv-10912, 2025 WL 1414135, at *19 (D. Mass. May 15, 2025). This approach allows DOD to fund the best science, fund a wide array

---

[3]    Office    of    Naval    Research,    *All    ONR-Sponsored    Nobel    Laureates*, https://www.onr.navy.mil/about-onr/history/nobels (last visited June 16, 2025).

[4] National Center for Science and Engineering Statistics, NSF 25-328, *Survey of Federal Funds for Research and Development: Fiscal Years 2023–24* (2025), https://web.archive.org/web /20250508011530/https://ncses.nsf.gov/surveys/federal-funds-research-development/2023-2024# tableCtr13393 (Table 7: "Federal obligations for research and experimental development, by agency and performer"); *see also id.* (Table 21: "Federal obligations for research, by agency and performer").

of institutions, promote competition, and facilitate the training of the next generation of researchers. In fiscal 2023, DOD awarded more than $9 billion to over 470 different universities.[5]

From the beginning, DOD has compensated outside institutions for the actual costs of conducting research. Between 1940 and 1945, the newly created Office of Scientific Research and Development ("OSRD") directed war-related research and development at U.S. businesses, universities, hospitals, and other institutions. Pierre Azoulay et al., *Indirect Cost Recovery in U.S. Innovation Policy: History, Evidence, and Avenues for Reform*, Nat'l Bureau Econ. Res., at 3 (revised June 2025). "OSRD's operating principle for ICR was 'no-profit, no-loss': that institutions should be fully reimbursed for participating in wartime work but should not financially benefit otherwise." *Id.* at 4.

Today, DOD awards are issued pursuant to a well-established legislative and regulatory framework that carries forward that principle. OMB has established uniform guidance for agencies to administer awards under the agencies' purview. 2 C.F.R. pt. 200 (setting forth "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"); *see* 31 U.S.C. § 503(a), (b)(2)(C). And DOD has expressly incorporated OMB's guidance regarding indirect costs into its own regulations. *See* 2 C.F.R. pt. 1128, app. C(A)(1)(a) (for DOD grants to institutions of higher education, "the allowability of costs must be determined in accordance with provisions of Subpart E of OMB guidance in 2 CFR part 200 other than 2 CFR 200.400(g), supplemented by appendix III to that part"); *see also* 2 C.F.R. § 1128.300.

Recipients generally do not receive lump-sum grants but instead use cost-based accounting

---

[5] National Center for Science and Engineering Statistics, NSF 25-314, *Higher Education Research and Development (HERD) Survey: Fiscal Year 2023* (2024), https://web.archive.org/web/20250602134130/https://ncses.nsf.gov/pubs/nsf25313 (Table 26: Federally financed higher education R&D expenditures, ranked by all federal R&D expenditures, by federal agency: FY 2023).

systems under which they first incur expenses and then recover their actual, documented costs for conducting research. The regulations divide the costs of conducting government-funded research into two types. The first is "direct costs"—costs that can be attributed to a specific research project, such as the salary of a graduate student assigned to a particular project, or the cost of a specialized piece of equipment purchased for that project. The second is "indirect costs"—costs that are necessary for research but that support multiple projects. *See* 2 C.F.R. § 1108.230.

"[I]ndirect costs" are also known as "[f]acilities and [a]dministrative" "costs" or "F&A[]" costs." *Id.*; *see id.* § 200.414(a). The "[f]acilities" category is "defined as depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses." 2 C.F.R. § 200.414(a). This category includes the costs of the physical infrastructure necessary for carrying out research, such as construction and maintenance of buildings, including specialized facilities and laboratories. Those costs are deemed "indirect" because a single building, such as a state-of-the-art materials growth facility, usually houses numerous research groups engaged in multiple projects. Facilities costs typically account for the largest share of indirect costs. The "[a]dministration" category is "defined as general administration and general expenses such as the director's office, accounting, personnel, and all other types of expenditures not listed specifically under one of the subcategories of 'Facilities.'" *Id.* This category includes costs related to the administrative and compliance activities required to conduct federally sponsored research, such as information technology professionals and staff to oversee safety and security.

The regulations require institutions to express indirect costs as a rate multiplied by the overhead-bearing direct costs of each research grant associated with those costs. *See* 2 C.F.R. pt. 200, app. III. This methodology ensures that indirect costs are allocated fairly across supported

7

projects, with the more expensive and resource-intensive research projects being allocated a larger share of indirect costs. As a simplified example, suppose a single laboratory houses two research projects—one with $75,000 of annual overhead-bearing direct costs and one with $25,000 of annual overhead-bearing direct costs. Suppose, too, that the laboratory's sole indirect cost is the cost of utilities, which cost $10,000 per year. Because the cost of utilities ($10,000) is 10% of the overhead-bearing direct costs ($100,000), the indirect cost rate would be 10%. Thus, $7,500 of utilities costs would be allocated to the first project, and $2,500 to the second.

The regulations prescribe a detailed methodology for negotiating indirect cost rates. *See* 2 C.F.R. pt. 200, app. III. Typically, a single agency (known as the "cognizant" agency) negotiates an indirect cost rate with an institution. For universities, rates are generally negotiated by either "the Department of Health and Human Services (HHS) or the Department of Defense's Office of Naval Research (DOD), normally depending on which of the two agencies (HHS or DOD) provide[d] more funds directly to the [relevant] educational institution for the most recent three years." 2 C.F.R. pt. 200, app. III(C)(11)(a)(1). That indirect cost rate then applies to all of that institution's federal awards.

Federal regulations require institutions to conduct and submit to their cognizant agency comprehensive cost analyses following detailed accounting guidelines. The agency then reviews and verifies these proposals and determines the institution's indirect cost rate. Typically, the negotiated rates remain in effect for two to four years, but some negotiated rates last longer. After the costs are incurred, federal agencies conduct audits to ensure that the negotiated indirect cost rate conforms to the actual indirect costs that were incurred. *See infra* Part III.B. The indirect cost rate can be adjusted if the audit establishes that the institution has recovered excess costs.

Negotiated rates vary significantly. The primary reason for this variation is that different

8

institutions conduct different types of research. Some institutions may have different mixes of research and non-research activities. Because the federal government does not fund non-research activities, a university that uses shared facilities and services more heavily for teaching will likewise have a lower rate. Studies have shown that indirect cost rates for university research are somewhat less than those for other research entities, *i.e.*, universities had the lowest percentage of total research costs classified as indirect costs as compared to federal and industrial laboratories. *See* Ass'n of Am. Univs., *Frequently Asked Questions About Facilities and Administrative (F&A) Costs of Federally Sponsored University Research* (Feb. 10, 2025), https://www.aau.edu/key-issues/frequently-asked-questions-about-facilities-and-administrative-costs.  The variation also reflects that scientific laboratories tend to be far more expensive to build and maintain than generic office buildings. So, an institution engaging in cutting-edge technology research will likely have a higher indirect cost rate than an institution primarily engaged in social science research.

The "[n]egotiated indirect cost rates" that have been set "must be accepted by all Federal agencies" unless a deviation therefrom "for either a class of Federal awards or a single Federal award" is "required by Federal statute or regulation," or is "approved by the awarding Federal agency in accordance with [2 C.F.R. § 200.414](c)(3)." 2 C.F.R. § 200.414(c)(1). The cross-referenced provision, 2 C.F.R. § 200.414(c)(3), in turn makes clear that the negotiated rates remain the baseline and that it authorizes only specific "deviations" for individual awards or classes of awards when specified criteria are met. Moreover, "[t]he Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." *Id*.

Such deviations, even when permissible, apply prospectively. Pursuant to 2 C.F.R. § 200.414(c)(4), "[t]he Federal agency must include, in the notice of funding opportunity, the

policies relating to indirect cost rate reimbursement or cost share as approved." And the "agency should incorporate discussion of these policies into its outreach activities with applicants before posting a notice of funding opportunity." *Id.* "If there is no funding opportunity announcement (e.g., if it is a noncompetitive program for which all recipients are known ...), the [DOD] Component must provide the general terms and conditions to each recipient no later than the time of award." 2 C.F.R. § 1120.315(c)(2). The framework further safeguards reliance by ensuring that, even if negotiated rates change, the original rate continues to apply. 2 C.F.R. pt. 200, app. III.

### B. Congressional Refinement of Indirect Cost Structure

Congress has been active in determining what proportion of research costs universities should bear and when agencies may use fixed rates to approximate indirect costs. In 1962, Congress authorized the use of "predetermined fixed-percentage rates" for "payment of reimbursable indirect costs" attributable to research agreements with educational institutions. Act of Sept. 5, 1962, Pub. L. No. 87-638, 76 Stat. 437, *codified at* 41 U.S.C. § 4708. Shortly thereafter, Congress imposed a 20% cap on the amount of indirect costs that agencies could reimburse. Department of Defense Appropriation Act, 1965, Pub. L. No. 88-446, § 538, 78 Stat. 465, 481 (1964); *see* Department of Defense Appropriation Act, 1963, Pub. L. No. 87-577, § 540, 76 Stat. 318, 334 (1962). But just a few years later, Congress lifted that cap and replaced it with more general language indicating that "[n]one of the funds provided herein shall be used to pay any recipient of a grant for the conduct of a research project an amount equal to as much as the entire cost of such project"—in short, requiring at least *some* cost sharing. Department of Defense Appropriation Act, 1966, Pub. L. No. 89-213, § 638, 79 Stat. 863, 879 (1965). In 2005, Congress eliminated even that more general requirement.

From 2007 to 2009, Congress experimented with a DOD-specific policy that effectively

10

limited DOD grantees to a maximum 53.8% indirect cost rate.[6] It did so by limiting to 35% the proportion of an entire DOD award that could be used to cover indirect costs. Department of Defense Appropriations Act, 2008, Pub. L. No. 110-116, § 8115, 121 Stat. 1295, 1340 (2007); *see* Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009, Pub. L. No. 110-329, § 8109, 122 Stat. 3574, 3645 (2008); Department of Defense Appropriations Act, 2010, Pub. L. No. 111-118, § 8101, 123 Stat. 3409, 3450-51 (2009). Stated differently, the 35% policy required that no more than 35 cents for every $1 expended under a DOD award be expended on indirect costs. In practice, grantees with negotiated rates of 53.8% or less were unaffected.[7] In 2009, after it passed the statute appropriating DOD's funds for the following year, Congress abandoned even this effective 53.8% cap.

### C. Recent Executive Branch Attempts to Limit Indirect Cost Rates

In 2017, the Administration released a budget proposal that would have slashed the indirect cost rate for NIH grants to 10%. *See* Office of Management & Budget, *Major Savings and Reforms: Budget of the U.S. Government Fiscal Year 2018*, at 43 (2017), https://www.gov info.gov/content/pkg/BUDGET-2018-MSV/pdf/BUDGET-2018-MSV.pdf.

The proposal spurred widespread and bipartisan criticism and alarm. Congress blocked it by enacting, on a bipartisan basis, an appropriations rider mandating compliance with the regulatory scheme, specifying that regulatory "provisions relating to indirect costs . . . including with respect to the approval of deviations from negotiated rates, shall continue to apply to the

---

[6] *See* Research Administration Office, University of California Office of the President, RAO-08-03, *Memo: Operating Guidance* at 1 (Feb. 22, 2008), https://researchmemosapi.ucop.edu/index. php/site/document?memo=UkFPLTA4LTAz&doc=933 ("[A] ratio of 35 cents of F&A to 65 cents of direct costs is the conversion ratio to the 'standard' F&A rate based on modified total direct costs.[] In situations where all direct costs on an award are F&A eligible, 53.8 percent is effectively the F&A rate cap.").

[7] *Id.*

National Institutes of Health to the same extent and in the same manner as such provisions were applied in the third quarter of fiscal year 2017." Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 226, 132 Stat. 348, 740. The rider also prohibits spending appropriated funds "to develop or implement a modified approach to" the reimbursement of "indirect costs" and "deviations from negotiated rates." *Id.*

Congress left no doubt about the calamitous consequences of the Administration's proposal. The House Report noted that "[w]hile the Committee appreciates the Secretary's efforts to find efficiencies in NIH research spending, the Administration's proposal to dramatically reduce and cap reimbursement of facilities and administrative (F&A) costs to research institutions is misguided and would have a devastating impact on biomedical research across the country." H.R. Rep. No. 115-244, at 50 (2017). The Senate Report noted, "[t]he methodology for negotiating indirect costs has been in place since 1965, and rates have remained largely stable across NIH grantees for decades. The Administration's proposal would radically change the nature of the Federal Government's relationship with the research community, abandoning the Government's long-established responsibility for underwriting much of the Nation's research infrastructure, and jeopardizing biomedical research nationwide. The Committee has not seen any details of the proposal that might explain how it could be accomplished without throwing research programs across the country into disarray." S. Rep. No. 115-150, at 109 (2017).

Congress has repeatedly reenacted the rider ever since,[8] and it remains in effect to this

---

[8]  *See* Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, § 224, 132 Stat. 2981, 3094 (2018); Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, § 224, 133 Stat. 2534, 2582 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 224, 134 Stat. 1182, 1594 (2020); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, § 224, 136 Stat. 49, 470-71; Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 224, 136 Stat. 4459, 4883-84 (2022).

day, in the now-operative statute.[9] *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. II, § 224, 138 Stat. 460, 677. The negotiated NIH indirect cost rates therefore remained undisturbed until February 7, 2025, when NIH issued a notice stating that it was "imposing a standard indirect cost rate on all grants of 15%." NIH, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates*, NOT-OD-25-068 (Feb. 7, 2025), https://grants.nih.gov/grants/guide/notice-files/NOT-OD-25-068.html. Three groups—a group of 22 states, a group of five medical associations, and a group of 17 higher education associations and individual universities, including some of the plaintiffs in this case—filed complaints and motions for temporary restraining orders. The district court granted a TRO the same day, and following briefing, the court issued a nationwide preliminary injunction. *Massachusetts v. Nat'l Insts. of Health ("NIH")*, No. 25-CV-10338, __ F. Supp. 3d __, 2025 WL 702163 (D. Mass. Mar. 5, 2025), *judgment entered*, 2025 WL 1063760 (D. Mass. Apr. 4, 2025), *appeal filed* (D. Mass. Apr. 8, 2025). The court held that the dispute was justiciable; that the plaintiffs were likely to succeed on their arguments that NIH's policy violated the applicable regulations, the appropriations rider, and the APA's reasoned-decisionmaking requirements; and that the plaintiffs were entitled to an injunction. *Id.* The parties jointly moved to convert the preliminary injunction to a permanent injunction, which the court granted. *See* Electronic Order, *NIH*, No. 25-CV-10338 (D. Mass. Apr. 4, 2025), ECF No. 110. The government has not moved for a stay pending appeal.

DOE announced a near-identical policy on April 11, 2025. DOE, *Policy Flash 2025-22:*

---

[9] To Plaintiffs' knowledge, the Executive has never sought to cap the indirect cost rate for DOD grants at a fixed percentage as low—or even close to as low—as 10% or 15%. Congress therefore has not had occasion to adopt an analogous appropriations rider for DOD grants, though as noted, it has experimented with and then rejected a cap that was more than three times higher than the current proposal. *See supra* Part B.

*Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)* (Apr. 11, 2025). Again, nine universities and three associations filed suit and moved for a temporary restraining order, which a court in this District granted on April 16. *Ass'n of Am. Univs. v. Dep't of Energy ("DOE")*, No. 25-cv-10912, 2025 WL 1119791, at *1 (D. Mass. Apr. 16, 2025). And again, the court entered a preliminary injunction, finding the plaintiffs were likely to succeed on their claims that the policy violated the APA and the regulations and was impermissibly retroactive, and emergency relief was required to protect the plaintiffs from the irreparable harm that loomed. *DOE*, 2025 WL 1414135. DOE has not appealed the preliminary injunction and has sought an extension of its answer deadline. Mot. for Extension of Time, *DOE*, No. 25-cv-10912 (D. Mass. June 12, 2025), ECF No. 63.

NSF issued a 15% cap on May 2. NSF, *Policy Notice: Implementation of Standard 15% Indirect Cost Rate* (May 2, 2025), https://www.nsf.gov/policies/document/indirect-cost-rate. This policy, unlike those at NIH, DOE, and now DOD, applied only to new grants but still threatened immense, immediate, and irreparable harm to universities and science itself. So again, thirteen universities and three associations sued and sought a preliminary injunction and expedited summary judgment. Compl., *AAU v. NSF*, No. 25-cv-11231 (D. Mass. May 5, 2025), ECF No. 1; Mot. for Prelim. Inj., *NSF*, No. 25-cv-11231 (D. Mass. May 8, 2025), ECF No. 40. In response, NSF agreed to stay implementation of its policy until a week after the summary judgment hearing, which Judge Talwani held Friday, June 13, 2025. Defs.' Opp'n to Pls.' Mot. for a Prelim. Inj. and for Summ. J. [Doc No. 40] and Memo. in Supp. of Cross-Mot. for Summ. J. [Doc No. 60], at 42 n.30, *NSF*, No. 25-cv-11231 (D. Mass. May 27, 2025), ECF No. 62.

**D.  DOD's Rate Cap Policy**

On May 14, 2025, Secretary Hegseth issued a memorandum to senior DOD Leadership,

Commanders, and Field Activity Directors, entitled "Implementation of a 15% Indirect Cost Cap on Assistance Awards to Institutions of Higher Education." Hegseth Memo. The Hegseth Memo announces that "[e]ffective immediately," DOD "will pursue a lower cap on indirect cost rates for all new financial assistance awards to institutions of higher education." *Id.* at 1. The Memo bases this policy on the view that indirect costs constitute "bureaucratic fat" that must be "cut[]" so that DOD can build "muscle," and it suggests that funding indirect costs is inconsistent with "discipline" and "accountability," and promotes "waste." *Id.* at 1-2. The Memo has two parts, one applying to "New Awards" and the other to "Existing Awards." *Id.*

As to new awards, the Hegseth Memo invoked 2 C.F.R. § 200.414(c), and instructed the Under Secretary of Defense for Research and Engineering to do four things within 21 days:

1. "Notify [OMB] of [DOD's] intent to cap indirect cost rates for all new financial assistance awards to institutions of higher education at 15% or lower," *id.* at 1;

2. "Develop and publish formal policy guidance—including procedures, decision criteria, and justifications—that will govern all DoD deviations from negotiated rates," *id.*;

3. Ensure that the "formal policy guidance" is made "public and integrated into all upcoming grant solicitations, including Notices of Funding Opportunity," *id.*; and

4. "Ensure new awards to institutions of higher education contain the newly established standard cap," *id.*

As to existing awards, the Hegseth Memo directed DOD components that manage DOD-funded financial assistance awards to either "renegotiate indirect cost rates" for existing awards to institutions of higher education or, "[w]here bilateral agreement is not achieved," to "identify and recommend lawful paths to terminate and reissue the award under revised terms, provided this action aligns with agency priorities and is authorized under 2 C.F.R. § 200.340(a)." *Id.* at 2.

The Hegseth Memo required that the "Department-wide effort" to renegotiate rates be "[i]nitiate[d]" within 30 days, *i.e.*, by June 13, 2025. And it required that all "renegotiations or terminations" must be completed within 180 days, *i.e.*, by November 10, 2025. *Id.*

Even before the Under Secretary issued the "formal policy guidance" contemplated by the Hegseth Memo, some DOD officials began implementing the 15% rate cap. As early as May 21, 2025, grant managers began notifying researchers with proposals in progress that "[e]ffective immediately[,] all new submissions must comply with [the Hegseth Memo]," and that DOD "cannot process your proposal unless it complies with the memo," *i.e.*, includes indirect cost reimbursement of no more than 15%. BU Decl., Doc. No. 13-5 at ¶ 18. In some cases, institutions were directed to resubmit previously submitted proposals after revising them to reflect a 15% indirect cost rate. JHU Decl., Doc. No. 13-14 at Ex. 1. When institutions sought clarification from DOD, one DOD official responded that "[a]ll assistance awards and cooperative agreements both whether in the solicitation phase, newly established[,] or currently active are subject to the new guidance. Any proposals that were previously submitted will need to be updated and resubmitted with the 15% indirect cost cap." Pitt Decl., Doc. No. 13-21 at Ex. 1. Plaintiffs' counsel sought clarification from Department of Justice litigation counsel, who stated on May 26, 2025, that DOD had sent out a message instructing its grants community that the 15% rate was not effective immediately and that DOD components should not implement the Hegseth Memo prematurely. DOD grant program managers later confirmed the Hegseth Memo was not yet in effect.

Following the chaos of this premature implementation of the 15% rate cap, the Under Secretary issued the promised "formal policy guidance" on June 12, 2025.[10] *See* Michael Memo.

---

[10] Although it is dated June 12, 2025, the Michael Memo was not provided to universities until June 13, 2025, and as of the date of filing still has not been published on www.defense.gov or www.cto.mil, the website of the Under Secretary of Defense for Research and Engineering.

The Michael Memo continued implementing the decision announced in the Hegseth Memo, stating: "The Department is deviating from the indirect cost rates negotiated between the cognizant Federal agencies and IHEs and will instead limit indirect cost rates to 15% for all Federal assistance awards to IHEs." *Id.* at 1. For new awards, the Michael Memo requires DOD components to implement the cap immediately: Components are "not to allow indirect cost rates above 15% in all new assistance awards to IHEs as of the date of publication of th[e Michael Memo]." *Id.* at 2. The Michael Memo also instructs DOD components to "apply the 15% cap on indirect cost rates" to "all existing assistance awards to IHEs" by either "renegotiat[ing] indirect cost rates . . . to comply with the 15% indirect cost rate cap" or, "[i]f a DoD Component is unable to reach an agreement with an IHE to limit the indirect cost rate under a DoD assistance award to 15%" before November 10, 2025, "terminat[ing] the assistance award." *Id.* at 2.

The Michael Memo acknowledges that "[t]he academic community's work with the Department [is] essential for the development of transformative research concepts that drive our future capabilities," but then imposes a categorical limit on indirect cost rates of 15% in pursuit of "potential cost savings," without any explanation of how those "potential cost savings" will affect universities' "transformative research." *Id.* at 1-2. And while the Hegseth and Michael Memos could be read to imply that DOD may redirect savings from its rate cap to *non-research* "operational capabilit[ies]," Hegseth Memo at 1; *see* Michael Memo at 1-2, DOD generally cannot do so—because Congress separately appropriates DOD's research funding.[11] The Policy thus reflects a preference not to fund indirect costs, a preference that DOD has not attempted to justify given its acknowledgment that such costs are essential for transformative research. Neither

---

[11] Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 478; Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101, 1405, 139 Stat. 9, 11-12, 20.

has DOD attempted to explain why it imposed its rate cap only on universities, not other recipients of DOD grants. Nor did DOD acknowledge or address the decisions finding similarly terse justifications for 15% rate caps to patently violate the APA.

### E. Plaintiffs and Member Universities' Federally Funded Research

Plaintiffs are several associations—the Association of American Universities ("AAU"), the Association of Public and Land-Grant Universities ("APLU"), and the American Council on Education ("ACE"; collectively, "Organizational Plaintiffs")—and 12 universities.

AAU is an association composed of 71 leading research universities with the goal of transforming lives through education, research, and innovation. AAU Decl., Doc. No. 13-1 at ¶ 3. Its members receive significant research funding from DOD grants. *Id.* ¶ 4. AAU members received approximately $5.4 billion in DOD research and development funds stretching across various fields, from "AI and quantum computing to chemical agent protection and decontamination to medicine." *Id.* Many of AAU's member universities have negotiated an indirect cost rate that is significantly higher than 15%, often in the 50%-60% range. *Id.* ¶ 13.

APLU is a membership organization that seeks to "foster[] a community of university leaders collectively working to advance the mission of public research universities," including "more than 230 public research universities, land-grant institutions, state university systems, and affiliated organizations spanning across all 50 U.S. states, the District of Columbia, and six U.S. territories." APLU Decl., Doc. No. 13-3 at ¶ 3. Members conduct a "wide variety of vital research projects on behalf of American citizens," including based on grant funding from DOD, with $4.8 billion in DOD grant funding in fiscal year 2023. *Id*. ¶ 5.

ACE is a membership organization composed of more than 1,600 colleges and universities, related associations, and other organizations in America and around the world. ACE Decl., Doc.

No. 13-2 at ¶ 3. Its members "conduct a wide variety of vital research on behalf of the United States and its citizens, funded in part by agency awards from across the federal government, including the Department of Defense." *Id.* ¶ 7. ACE members received over $8.2 billion in R&D funding from DOD in fiscal year 2023. *Id.* "ACE member universities rely on these funds to advance fundamental research and accelerate technology and innovation that ensure national security." *Id.*

Plaintiffs Arizona Board of Regents on behalf of Arizona State University ("ASU"); Brown University ("Brown"); California Institute of Technology ("Caltech"); the Regents of the University of California ("UC"); the Board of Governors of the Colorado State University System Acting by and through Colorado State University ("CSU"); Cornell University ("Cornell"); the Board of Trustees of the University of Illinois ("UIUC"); Johns Hopkins University ("Johns Hopkins"); the University of Maryland, College Park ("UMCP"); Massachusetts Institute of Technology ("MIT"); University of Pittsburgh of the Commonwealth System of Higher Education ("Pitt"); and University of Washington ("UW") are research universities that house significant scientific study and innovation supported by DOD grants. They receive hundreds of millions of dollars to support thousands of projects.[12]

## LEGAL STANDARD

The burden of proof for a temporary restraining order mirrors that for a preliminary injunction under Federal Rule of Civil Procedure 65. *178 Lowell St. Operating Co., LLC v. Nichols*, 152 F. Supp. 3d 47, 53 (D. Mass. 2016). The moving parties must show that the weight of the following factors favors granting preliminary relief: "[1] likelihood of success on the merits; [2]

---

[12] *See, e.g.*, JHU Decl., ¶ 3; ASU Decl., Doc. No. 13-4 at ¶ 8; UC Decl., Doc. No. 13-8 at ¶ 3; Caltech Decl., Doc. No. 13-7 at ¶ 3; CSU Decl., Doc. No. 13-10 at ¶ 3; MIT Decl., Doc. No. 13-18 at ¶ 9; Pitt Decl., ¶ 3.

potential for irreparable injury, [3] balance of the relevant equities; and [4] effect on the public interest if the Court grants or denies the TRO." *New York v. Trump*, 764 F. Supp. 3d 46, 49 (D.R.I. 2025) (citing *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981)), *appeal docketed*, No. 25-1138 (1st Cir. Feb. 10, 2025). When defendants are government entities or officials sued in their official capacities, the balance of equities and public interest factors merge. *See Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).

## ARGUMENT

### I.    The Organizational Plaintiffs Have Standing.

As other courts in this District have found in similar cases, the Organizational Plaintiffs—AAU, APLU, and ACE—have standing to sue on behalf of their members. *DOE*, 2025 WL 1414135, at *8 (same organizational plaintiffs had standing to challenge DOE's 15% rate cap policy). That is so because: (a) their members "would otherwise have standing to sue in their own right"; (b) the interests they seek to protect are "germane" to their organizational purposes; and (c) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The members have standing to sue in their own right: As detailed in the declarations accompanying this Motion, they face immediate and severe harm should the Rate Cap Policy take effect—imminent, concrete injuries that could be averted and redressed by the relief they seek. *Housatonic River Initiative v. U.S. Env't Prot. Agency, New Eng. Region*, 75 F.4th 248, 265 (1st Cir. 2023) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)); *see infra* Part IV.A. The interests at stake are not just "germane" to AAU, APLU, and ACE's purposes but intrinsically tied to their missions, which are aimed at obtaining public policy support for their members, including as to academic research and scholarship. *Housatonic River Initiative*, 75 F.4th at 264-

66; *see* AAU Decl., ¶ 3; APLU Decl., ¶¶ 3-4; ACE Decl., ¶ 4 Finally, members' participation is not required for the claims asserted or the relief requested by the organizations: Enjoining the Policy will equally redress the injuries of AAU, APLU, ACE, and their members and will provide the individual members complete relief. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 288 (1986); *see Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986) ("Actions for declaratory, injunctive and other forms of prospective relief have generally been held particularly suited to group representation.").

## II.    The Hegseth Memo and Michael Memo Are Final Agency Actions.

The Hegseth and Michael Memos are final agency actions under the APA. The Hegseth Memo requires, and the Michael Memo implements, the rate cap. Together, they are: (1) the "'consummation' of the agency's decisionmaking," not "merely tentative or interlocutory"; and (2) an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted). The Hegseth and Michael Memos represent the consummation of DOD's determination to implement the 15% cap as to new and existing funding. And as detailed in the accompanying declarations, the Rate Cap Policy has determined—indeed, has dramatically altered—Plaintiffs' rights.

## III.    Plaintiffs Have a Strong Likelihood of Success on Their Claims.

As explained above, Plaintiffs via this Motion are seeking a temporary restraining order only as to the immediately effective portions of the Rate Cap Policy, which concern new grants. Plaintiffs are likely to succeed on all of their claims concerning those grants.

**A. The Rate Cap Policy Is Contrary to the Regulations Governing Indirect Cost Rates.**

By pronouncing a single, uniform "policy" setting indirect cost rates for universities at 15% regardless of the negotiated rate, DOD violated 2 C.F.R. § 200.414(c)(1) and (c)(3). *See NIH*, 2025 WL 702163, at *9-10. "An agency may not . . . simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014). As the *NIH* and *DOE* courts found, those regulations do not permit agencies to reject the decades-old approach to individualized indirect costs rates based on a view that the agency would prefer to pay a lower, one-size-fits-all rate.

The regulations specify that negotiated rates "must be accepted by all Federal agencies." 2 C.F.R. § 200.414(c)(1). The fundamental problem with the Rate Cap Policy is that it reads Section 200.414(c)(3)'s limited exception—which allows agencies to "seek and justify" a "deviation[]" from this baseline—so broadly that the rule itself becomes meaningless. If the Rate Cap Policy is lawful, any agency may discard the decades-old framework of institution-specific indirect cost rates and by fiat substitute a new and different rate, simply by stating (as DOD has) that it would prefer to pay lower indirect cost rates. That transforms "must" into "may" and is an utterly unreasonable reading of the regulatory text. That reading is also, no surprise, wholly inconsistent with what OMB said when it promulgated the regulation. *See Kisor v. Wilkie*, 588 U.S. 558, 575 (2019) (courts must look to "history" of regulations). OMB explained that the exception in Section 200.414(c)(3) was "stringent enough to ensure that [deviations] do not occur without strong justification" and would ensure "consistent application" of negotiated rates. *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards*, 78 Fed. Reg. 78,590, 78,600 (Dec. 26, 2013). DOD's interpretation would render Section 200.414(c)(3) anything but "stringent." DOD's interpretation likewise contradicts Congress's

22

understanding that it could preclude a similar across-the-board cap by requiring compliance with an essentially identical regulatory regime.

The role of Section 200.414(c)'s exception is instead more modest, and wholly consistent with the regulatory scheme. That exception allows agencies to use rates different from the negotiated rate for a "class of Federal awards" only if they "implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." 2 C.F.R. § 200.414(c)(1), (c)(3). The regulation thus authorizes agencies to seek individualized deviations from the baseline negotiated rate, pursuant to a sequential process, based on a reasoned judgment that some specific feature of a grant or class of grants renders the negotiated rate—though generally controlling—inapt. In myriad ways, the text confirms that the Policy is flatly inconsistent with the regulations.

*First*, the Rate Cap Policy does not "seek and justify" a "deviation" from "negotiated rates." A "deviation" is a "departure" from something that is "established." *Deviation*, *Webster's Third New International Dictionary* (1986). And to *justify* a departure from an established norm is to explain why the norm, though generally applicable, does not fit the particular case. It does not encompass a blunderbuss Policy that wholly jettisons negotiated indirect cost rates for reasons having nothing to do with the features of any particular grant or class of grants. Indeed, the Supreme Court has repeatedly rejected attempts to stretch similar language—allowing agencies to "modify" particular provisions—to permit "fundamental changes" to a regulatory regime, like the wholesale elimination of negotiated rates for all universities. *Cf. MCI Telecomms. Corp.*, 512 U.S. at 228 (holding that statutory authority to "modify" a requirement "does not contemplate fundamental changes"); *Nebraska*, 600 U.S. at 494-95 (similar). As the *NIH* court observed, a "single [indirect cost rate] capped at 15% is certainly a different approach than" the approach

23

contemplated by the regulations—"negotiating [indirect cost rates] institution by institution with deviations allowed in limited, justified circumstances." 2025 WL 702163, at *13.

*Second*, the Rate Cap Policy is not reasonably understood as a "deviation" for "a class of Federal awards." 2 C.F.R. § 200.414(c)(1). A "class" of awards is defined, as relevant, as "a group of Federal awards . . . awarded . . . to a specific type of recipient or group of recipients *to which specific* provisions or exceptions may apply." 2 C.F.R. § 200.1 (emphasis added). While Judge Burroughs remarked that "Defendants' reading of that definition as permitting the DOE to classify all IHEs as a 'type of recipient' is not inherently antithetical to the English language," she correctly recognized that "such a broad-based classification is [not] what the regulations intended," and that DOE's similar "missive" "lack[ed] the specificity that the definition contemplates." *DOE*, 2025 WL 1414135, at *14 n.4. It stretches the English language beyond the breaking point to call DOD's blanket Policy a "specific provision[] or exception[]."

*Third*, the Rate Cap Policy's categorical 15% rate flouts the regulation's requirement that agencies promulgate "*policies, procedures and general decision-making criteria* that their programs *will follow* to seek and justify deviations from negotiated rates." 2 C.F.R. § 200.414(c)(3) (emphases added). An across-the-board 15% mandate applicable to IHEs leaves no room for any non-sham procedures or general decisionmaking criteria.[13] Like the prior enjoined policies, it "at best provides a summary explanation of [DOD]'s policy to cut all [indirect cost reimbursement] to a standard 15% rate for *all* existing and future Federal grants" to universities—and so "fails to fulfill the above regulatory mandates." *NIH*, 2025 WL 702163, at

---

[13] *See Procedure*, *American Heritage Dictionary of the English Language* (5th ed. 2011) (A "procedure" is a "series of steps taken to accomplish an end."); *Criterion*, *Webster's Third New International Dictionary* (1986) (Criteria are "standard[s] on which a decision or judgment may be based.").

*10. As in *NIH*, DOD has "ignore[d] the separate requirements" and failed to "comply with the step-by-step process mandated by the . . . regulation." *Id.*; *see DOE*, 2025 WL 1414135, at *15.

Section 200.414(f) underscores that agencies may not cram down a 15% cap on grant recipients. Subsection (f) allows grantees that do not have a current negotiated rate, which are typically new grantees, to "elect to charge a de minimis rate of up to 15 percent," with the funding recipient being allowed to "determine the appropriate rate up to th[at] limit." 2 C.F.R. § 200.414(f). But the regulation prevents agencies from *forcing* that *de minimis* rate on recipients: It provides that agencies "may not require recipients and subrecipients to use a de minimis rate lower than the negotiated indirect cost rate or the rate elected pursuant to this subsection unless required by Federal statute or regulation," and it states that grant recipients "are not required to use the de minimis rate." *Id.* This provision forbids exactly what DOD has attempted and (as well) underscores that the Rate Cap Policy is arbitrary at its core. When universities have actual and verified indirect costs of 40%, 50%, or 60%, it is utterly unreasonable to benchmark their rates using a de minimis amount intended for new recipients that have not yet documented costs.

For a subset of grants, the Policy violates the regulation in another way: It imposes its 15% cap on all new grants, including those for which notices of funding opportunity have already issued and universities are now awaiting decisions. (NSF implemented its similar policy the same way.) But the regulation specifies that the "agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement." 2 C.F.R. § 200.414(c)(4). The Federal Register notice promulgating this provision makes clear that any deviation from negotiated rates must first be "established" and then "inclu[ded] . . . in the announcement of funding opportunity." 78 Fed. Reg. at 78,600. The Policy violates this requirement.

**B.  The Rate Cap Policy Unlawfully Jettisons the Indirect Cost Recovery Scheme.**

More broadly, the Rate Cap Policy conflicts with the entire regulatory framework governing indirect cost rates—a comprehensive set of guidelines established by federal regulations that embedded in law decades of Executive Branch practice. The deviation process described above "operates within [this] larger regulatory structure," which "expound[s] upon the identification, negotiation, and administration of indirect costs" and requires agencies and recipients to follow detailed guidelines aimed at identifying actual indirect costs. *NIH*, 2025 WL 702163, at *9. The Policy renders that entire process meaningless and, indeed, nonsensical—underscoring that the regulations do not contemplate DOD's across-the-board cap.

As explained, the regulations create a detailed scheme for setting indirect cost rates, all geared towards ensuring that grantees can recover reasonable indirect costs attributable to federal projects. The core principle is that "[t]he total cost of a Federal award is the sum of the allowable direct and allocable indirect costs minus any applicable credits." 2 C.F.R. § 200.402; *see* 2 C.F.R. pt. 1128, app. C (incorporating 2 C.F.R. pt. 200, app. III). The regulations establish guidelines to ensure that grantees recover indirect costs through a detailed documentation and recovery system. 2 C.F.R. § 200.414; 2 C.F.R. pt. 200, app. III(A); 2 C.F.R. pt. 200, app. III(A)(2)(e)(1).

The regulations achieve that goal through a detailed process for negotiating indirect cost rates. Institutions must document and submit costs, in detail, to support recovery. Subpart E of part 200 of Title 2 "establishes principles for determining allowable costs incurred by recipients and subrecipients under Federal awards." 2 C.F.R. § 200.100(c); *see* 2 C.F.R. pt. 1128, app. C(A)(1)(a). Section 200.414(e) stipulates that appendices will detail "[r]equirements for development and submission of indirect cost rate proposals and cost allocation plans." Those appendices contain "the documentation prepared by a recipient to substantiate its request to establish an indirect cost

rate." 2 C.F.R. § 200.1 (definition of "Indirect cost rate proposal"). For universities, Appendix III establishes the criteria for identifying and computing indirect facilities and administration costs. *See id.* § 200.414(e)(1). The Appendix details the processes for a grant recipient to document a range of costs and how those costs should be allocated among projects.

The regulations also provide mechanisms to review and validate indirect cost allocations through regular auditing. DOD must engage in audits to determine what is charged to a federal award and to ensure that accounting is correct. 2 C.F.R. pt. 1128, app. E(A) (incorporating the audit requirements in Subpart F of 2 C.F.R. part 200). 2 C.F.R. § 200.501(b) requires that a "non-Federal entity that expends $1,000,000 or more in Federal awards during the non-Federal entity's fiscal year must have a single audit conducted in accordance with § 200.514," except if it "elects to have a program-specific audit." *Id.* This audit is performed "annually," and it must be conducted in accordance with standards. 2 C.F.R. §§ 200.504, 200.514. An auditor may identify any "[q]uestioned cost," which is defined as "an amount, expended or received from a Federal award, that in the auditor's judgment" (1) "[i]s noncompliant or suspected noncompliant with Federal statutes, regulations, or the terms and conditions of the Federal award"; (2) "[a]t the time of the audit, lacked adequate documentation to support compliance"; or (3) "[a]ppeared unreasonable and did not reflect the actions a prudent person would take in the circumstances." 2 C.F.R. § 200.1 (definition of "Questioned cost"). The results are factored into negotiation of indirect cost rates. *See* 2 C.F.R. pt. 200, app. III.

The Rate Cap Policy flouts this entire regulatory structure: It denies reimbursement for verified indirect costs, renders meaningless the entire detailed process for identifying indirect cost rates, and mocks the audits that verify these costs on the back end. Starkly illustrating the Rate Cap Policy's disregard for the regulatory regime, the Michael Memo appears to direct that

DOD must continue to negotiate indirect cost rates with universities consistent with Appendix III to 2 C.F.R. part 200 where it is the cognizant agency—but then prohibits DOD components from actually *using* that negotiated rate in awards. *See* Michael Memo at 2. To be clear, DOD by regulation *must* continue negotiating indirect cost rates with universities for which it is the cognizant agency, as the Michael Memo tacitly acknowledges. *See* 2 C.F.R. pt. 200, app. III(C)(11)(a)(1). The "cognizant" agency is determined based on which one "provides more funds" and so has the greatest stake in getting the costs right. *Id.* So it makes no sense for that agency to take those negotiated costs and then simply toss them in the trash. The irrationality of the Policy's result—requiring DOD components to negotiate indirect cost rates that will effectively apply to every agency *except* DOD—underscores that the regulations do not permit the wholesale abandonment of negotiated rates that the Rate Cap Policy attempts.

### C.    The Rate Cap Policy Is Arbitrary and Capricious.

Just as the regulations protect the settled approach to institution-specific indirect costs that dates to 1965, the Rate Cap Policy's wholesale abandonment of that framework in favor of a one-size-fits-all approach—based on just a few sentences of cursory explanation—violates the APA's reasoned-decisionmaking mandates, as the *NIH* and *DOE* courts found in enjoining similar policies. 5 U.S.C. § 706(2)(A); *NIH*, 2025 WL 702163, at *17-19; *DOE*, 2025 WL 1414135, at *11-13. Under the APA, agencies must provide a reasoned basis for their actions, which requires at least a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 48-49 (1983) (citation omitted). And agencies cannot fail to consider "important aspect[s] of the problem." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *State Farm*, 463 U.S. at 43). Moreover, "a court reviewing agency action may consider only the agency's explanation given at the time the

relevant decision was made, as opposed to [a] post hoc rationale." *Melone v. Coit*, 100 F.4th 21, 31 (1st Cir. 2024) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943)). DOD utterly failed to comply with the APA's reasoned decisionmaking requirements.

     *1.   DOD's justifications are a far cry from the "reasoned basis" required.*

DOD has offered three putative justifications for the Rate Cap Policy, none of which provides the reasoned explanation that the APA demands. First, DOD based its Rate Cap Policy on the incorrect (and, in any event, unexplained) premise that indirect costs are less worthy and less effective than direct costs. The Hegseth Memo calls indirect costs "bureaucratic fat" that must be "cut[]" so that DOD can build "muscle," and it claims that funding indirect costs is inconsistent with "discipline" and "accountability," and promotes "waste." But as DOD itself has recognized, indirect costs are by definition necessary for research to proceed and generally differ from direct costs only in that they fund multiple projects. Indeed, indirect costs often *promote* efficiency. For example, if a cutting-edge computer will be used entirely by a single DOD project, it may be a direct cost—but if it supports three DOD grants, one NSF grant, and one private grant, it might be accounted for as an indirect cost. Sharing the computer, however, is *more* efficient than requiring a different computer to be acquired for each project. Indirect costs also often help direct spending to go farther, as with AI computing that helps researchers do more work with less time and equipment. *See, e.g.*, OSU Decl., Doc. No. 13-19 at ¶ 10. And more still: indirect costs are often highest in facility-intensive cutting-edge research. If DOD believes that it should more fully fund the research of institutions whose research skews toward (say) social science over (say) advanced computing, it must at minimum say why. Finally, the distinction between direct and indirect costs is simply an accounting convention. The government could in theory account for all costs as direct costs, by requiring universities to allocate (say) imputed building rent and computing time to

individual grants. That is what many for-profit enterprises do. And it is utterly irrational for DOD to slash funding to universities by making a value judgment based on what is at bottom an accounting convention.

Second, DOD vaguely pitches the Policy as a "cost savings" measure. But this ignores that Congress has appropriated funding *for research*. *Supra* at 17. So DOD generally cannot cut indirect costs and redirect the funds to (say) buying additional military hardware or recruiting additional troops. Instead, DOD's Rate Cap Policy reflects the same sort of preference for funding direct over indirect costs as the NIH and DOE policies that courts have enjoined. That preference is irrational (and at minimum unexplained) for the same reasons just described. More than that, DOD has ignored that universities simply cannot sustain much of their current and proposed research under a 15% cap. *See infra* Part IV.A. So the Policy's effect will simply be to eliminate large swaths of research entirely. That result is itself at odds with the Michael Memo's acknowledgement that "[t]he academic community's work with the Department [is] essential for the development of transformative research concepts that drive our future capabilities."

Third, the Policy relies heavily, but irrationally, on the observation that some private foundations use lower indirect cost rates. But first, many foundations define and calculate indirect costs differently from the federal government. For example, the Gates Foundation is "more expansive" than federal agencies "in defining direct costs," treating as direct costs what would be indirect costs for DOD's purposes.[14] Second, DOD and other agencies impose on their grants strict compliance requirements, auditing obligations, and other administrative requirements that increase the indirect costs associated with those grants. *See* 2 C.F.R. pt. 1128. Third, while grants from

_____

[14] Jocelyn Kaiser, *NIH Plan to Reduce Overhead Payments Draws Fire*, Science (June 2, 2017), https://www.science.org/content/article/nih-plan-reduce-overhead-payments-draws-fire.

private foundations may focus on specific research areas or types of projects that can have more limited overheard costs,[15] DOD grants support the specific aim of fostering highly sophisticated research infrastructure. Finally, universities often can accept foundation funding with lower rates precisely because those grants are part of a broader funding portfolio that also covers indirect costs. Indeed, in many cases, private funders intend to *supplement* government funding.[16] Ignoring all these differences produces a classic apples-to-oranges mismatch that is by definition arbitrary. Although a court in this District has already debunked this comparison as inapt, the Policy does not even purport to wrestle with these differences. *See NIH*, 2025 WL 1414135, at *18.

### 2.   DOD failed to consider multiple "important aspects of the problem."

Also egregious are the myriad important aspects of the problem that DOD has failed to consider. *State Farm*, 463 U.S. at 48-49. First, neither the Hegseth Memo nor the Michael Memo even acknowledges, or grapples with, how the 15% cap will devastate the research DOD has historically supported. Congress has authorized—and instructed—DOD to promote research, including at universities, *see, e.g.* 10 U.S.C. §§ 4001, 4010, 4141; this is part of a long history of the federal government relying on universities for the innovations that keep our nation safe and competitive. *See* Cong. Rsch. Serv., R45403, at 1-2. A categorical 15% cap will badly undermine and diminish that research, as the declarations submitted with this Motion confirm. *Infra* Part IV.A. And as explained, that cap amounts simply to a unilateral agency decision to fund less research.

---

[15] *See, e.g.*, *Our Mission and History*, Smith Richardson Foundation, https://www.srf.org/our-mission-history/ (last visited June 16, 2025) (suggesting Smith Richardson Foundation does not fund lab-based research); *Our Approach*, Carnegie Corporation of New York, https://www.carnegie.org/programs/ (last visited June 16, 2025) (same for Carnegie Corporation of New York).

[16] *See* Univ. of Utah, *Frequently Asked Questions (FAQ) about the Indirect Costs of Federally Sponsored Research* (Oct. 2013), https://osp.utah.edu/_pdf/FAQs%20on%20costs%20of%20research.pdf.

31

The decision will hit the most advanced research the hardest—including cutting-edge science that relies heavily on unique, expensive facilities. Congress itself has called attention to these consequences, observing that a draconian cap like the one here would "radically change the nature of the Federal Government's relationship with the research community" and "throw[] research programs across the country into disarray." S. Rep. 115-150, at 109; *accord* H.R. Rep. 115-244, at 50. That DOD has said not *one word* about these obvious problems—and shown no evidence it is attempting to ascertain the Policy's effects on science—is the very essence of arbitrary agency action. Indeed, the Supreme Court has made clear that agencies' burden is especially heavy when they adopt a "new policy [that] rests upon factual findings that contradict those which underlay its prior policy." *Fox Television Stations, Inc.*, 556 U.S. at 515. That is the case here, as the entire premise of the government's longstanding approach has been that similarly draconian caps will not support (and induce universities to undertake) the science Congress wants.

Second, the Policy "fails in its entirety to recognize or consider" universities' "substantial reliance interests." *NIH*, 2025 WL 702163, at *19; *DOE*, 2025 WL 1414135, at *13; *see Regents of Univ. of Cal.*, 591 U.S. at 30-31. Plaintiffs and their members often have negotiated institution-specific indirect cost rates upwards of 50%, *e.g.*, CSU Decl., ¶ 14 (roughly 54%); Cornell Decl., Doc. No. 13-11 at ¶ 14 (up to 64%), and those rates are in place for multiple years, *supra* at 8. Plaintiffs and their members have structured their budgets and their planning—about what buildings to construct, which and how many employees to hire, and much more—in reliance on those rates, and more broadly, on the Executive Branch's decades-old practice of sticking to negotiated indirect cost rates with narrow and limited exceptions, as the statutes and regulations require. Those reliance interests are not new. They are rooted in the "symbiotic . . . relationship" between DOD and institutions of higher education that has persisted for decades. *DOE*, 2025 WL

1414135, at *19. And DOD has, for generations, used a funding formula aimed at approximating universities' actual costs of creating and maintaining that research-critical infrastructure. Neither the Hegseth Memo nor the Michael Memo so much as mention these reliance interests.

Nor is it any answer to say that universities have no legally enforceable right to particular grants. The Supreme Court in *Regents of the University of California* rejected the same type of argument: It explained that even if recipients of deferred immigration action had no "substantive rights" in that benefit, those features did not "automatically preclude reliance interests," and "consideration [of those interests] must be undertaken by the agency in the first instance"—by "assess[ing] whether there were reliance interests, determin[ing] whether they were significant, and weigh[ing] any such interests against competing policy concerns." 591 U.S. at 30-33.

Third, DOD has not attempted to explain why universities are singled out for the rate cap. The effect is that non-university recipients may compete for the same awards but receive reimbursement of all their research costs. Similar inconsistencies are precisely what Congress sought to avoid when it rejected a fixed cap in 1965 as not "equitable," H.R. Rep. No. 89-320, at 16 (1965), and those inequities are only greater today. *Cf. Independent Offices Appropriations, 1966: Hearings on H.R. 7997 Before the Subcomm. of the S. Comm. on Appropriations*, 89th Cong. at 578-79 (1965) (Statements of Dr. Haworth and Dr. Thieme). Moreover, this singling out effectively—and irrationally—zeroes out all the differences between individual institutions of higher education. This results in the Rate Cap Policy treating universities with wildly different documented costs the same, as well as treating universities with documented and verified individualized indirect costs the same as recipients that have not documented *any* indirect costs and that thus proceed under the de minimis exception in 2 C.F.R. § 200.414(f).

33

Indeed, the Rate Cap Policy is arbitrary at its core. The decades-old approach mandates a detailed negotiation process that ensures that indirect-cost reimbursement rates are tailored to the specific institution receiving a federal grant. To discard that institution-specific approach for a one-size-fits-all reimbursement rate that the regulations themselves recognize as *de minimis* is the essence of arbitrary and capricious government action. Once again, the fact that DOD must continue to go to the time and expense of negotiating institution-specific rates for use by other agencies, but not DOD itself, further underscores the absurdity of the Rate Cap Policy. And given that the Policy is justified entirely by reference to cost savings, it is deeply irrational—not to mention downright bizarre—that DOD does not at all acknowledge, let alone grapple with, that fact. As a final nail in the coffin, DOD has made zero effort to respond to the multiple judicial decisions elaborating on the deficiencies of the government's barebones explanation for this drastic change in policy. Simply put, across multiple dimensions, the Rate Cap Policy is paradigmatic arbitrary and capricious agency action.

### D.    The Rate Cap Policy Is Contrary to Statute.

The Rate Cap Policy, finally, exceeds DOD's statutory authority. An "agency literally has no power to act, . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). While Congress has authorized DOD to award research funds to universities, *e.g.*, 10 U.S.C. §§ 4001, 4010, 4141, it has never authorized DOD to use arbitrary indirect cost rates utterly unmoored from any estimate of actual indirect costs, in a stark departure from the system that has prevailed for decades. And as the Supreme Court has recently made clear, courts must look with skepticism on claims by the Executive Branch that it has newly discovered, in broadly worded statutes, authority to abandon a longstanding understanding that a more specific approach is necessary. *MCI Telecomms. Corp.*, 512 U.S. at 229. Just as the prior Administration

34

violated that principle when it used a tailored waiver authority to wipe out student loans wholesale and thereby "unilaterally alter large sections of the American economy," *Nebraska*, 600 U.S. at 507, DOD may not rewrite the tailored approach to indirect costs that has prevailed for decades with a one-size-fits-all rate that will upend research across higher education. *Supra* at 5; *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (the "'history and the breadth of the authority that [the agency] has asserted' and the 'economic and political significance of that assertion'" counsel in favor of "'hesitat[ing] before concluding that Congress' meant to confer such authority" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000))).

The Rate Cap Policy, first, exceeds the authority conferred in the statute governing the use of fixed rates for grants to universities, 41 U.S.C. § 4708. That section authorizes agencies to "provide for payment of reimbursable indirect costs" for grants to universities "on the basis of predetermined fixed-percentage rates." The phrase "predetermined fixed-percentage rates" is a term of art. And from the beginning, the Executive Branch's implementing guidance has always understood "[p]redetermined" rates as based on an "estimate of the costs to be incurred during the period."[17] This statute thus does not authorize agencies to pick a random number that does not

---

[17] OMB Circular A-122, Cost Principles for Nonprofit Organizations, 45 Fed. Reg. 46,022, 46,026 (July 8, 1980); *see* 2 C.F.R. pt. 200 Appendix IV(C)(1)(b) (same); *accord Principles for Determining Costs Applicable to Research and Development Under Grants and Contracts With Educational Institutions*, 30 Fed. Reg. 9676, 9681 (Aug. 4, 1965) (directing agencies to use predetermined rate procedure "where the cost experience and other pertinent facts available are deemed sufficient to enable the contracting parties to reach an informed judgment as to the probable level of indirect costs during the ensuing accounting period"); *cf.* S. Rep. No. 87-1826, at 3 (1962) (comms. of Gen. Counsel, Dep't of Def.) ("[I]ndirect costs must be reimbursed in fair degree when the Government agrees to pay the costs of the contract and cost-sharing is not contemplated."); *id.* at 5-6 (comms. of Asst. Dir. for Legis. Ref., Bur. of Budget) ("[I]t is important that the predetermined rates closely approximate the actual rates, and that provision be made for frequent reviews—say annually—of each institution's rate to assure that this objective is met."); *id.* at 8 (comms. of Gen. Counsel, Dep't of Treasury) ("The Department perceives no objection to the proposed legislation if some procedures are established, under which the rates can be kept in reasonably close conformity with actual overhead costs.").

even try to estimate the actual reimbursable indirect costs of any university or group of universities.

Nor can DOD rely on some more general statutory authority to enact an arbitrary rate cap that does not comply with 41 U.S.C. § 4708; rather, Congress for six decades has taken this issue in its hands and decided when reimbursement should be subject to a cap that does not reflect an estimate of actual indirect costs. In 1962 Congress briefly experimented with such a cap. *Supra* at 10. But because that approach quickly proved unworkable and not "equitable," Congress rejected it in 1965. Department of Defense Appropriation Act, 1966, Pub. L. No. 89-213, § 638, 79 Stat. 863, 879 (1965); *see* H.R. Rep. 89-320, at 16. In 2005, Congress did away with even the modest cost-sharing requirement it imposed in 1965. From 2007 to 2009, Congress again piloted a cap on indirect cost recovery for DOD awards—but it chose a cap that left the large majority of schools' recovery unaffected and merely impacted a small percentage of schools with the highest indirect costs. *See supra* at 10-11. Congress then rejected that cap, more than triple the cap DOD has now enacted, after just three years. And in 2017, Congress could not have been clearer in explaining that a similarly draconian cap would "radically change the nature of the Federal Government's relationship with the research community" and would "throw[] research programs across the country into disarray." S. Rep. 115-150, at 109. Courts "cannot ignore that the regulatory writ [DOD] newly uncovered conveniently enabled it to enact a program that . . . 'Congress considered and rejected' multiple times." *West Virginia*, 597 U.S. at 731 (citations omitted).

The Rate Cap Policy, moreover, flouts the statutes in which Congress conferred general grantmaking authority on DOD. DOD may rely on grants to support research that "relate[s] to weapon systems and other military needs" or that is "of potential interest to the [DOD]." 10 U.S.C. § 4001(a)(2). And DOD must undertake this research "in accordance with chapter 63 of title 31," which recognizes that grants and cooperative agreements serve a "public purpose." *Id.*

§ 4001(b)(1); *see* 31 U.S.C. §§ 6304, 6305. The Rate Cap Policy utterly ignores that the research DOD funds, including via indirect costs, supports DOD's own mission. The Policy ignores, too, the "public purpose" these grants serve and instead attempts to impose on universities a massive share of the burden of undertaking these public projects. With the Rate Cap Policy so at war with 10 U.S.C. § 4001, DOD cannot look to that provision for authorization.

Finally, the Rate Cap Policy violates 10 U.S.C. § 4010, which requires DOD to carry out the Defense Established Program to Stimulate Competitive Research, a set of competitive grants for universities. 10 U.S.C. § 4010(a). Plaintiffs and their member receive grants pursuant to that program. *See* AAU Decl., ¶ 4; ACE Decl., ¶ 7; APLU Decl., ¶ 6. The congressionally defined aims of this mandatory program include "increas[ing] the number of university researchers . . . capable of performing science and engineering research responsive to the needs of the Department" and "enhanc[ing] the capabilities of institutions of higher education . . . to develop, plan, and execute science and engineering research that is relevant to the mission of the Department." 10 U.S.C. § 4010(b). Yet, as discussed in Part IV.A, the Policy will have devastating effects on research institutions that are fundamentally incompatible with these goals: It will *decrease* the number of university researchers capable of performing research responsive to DOD's needs because it will stunt the development of early-career researchers and result in layoffs and will diminish universities' capabilities to conduct research relevant to DOD's mission by shutting down facilities and causing administrative and support staff terminations. *See* Part IV.A. Congress did not authorize this abrogation of DOD's mission.

## IV.    The Other Factors Favor a Temporary Restraining Order.

Plaintiffs meet all the requirements for a temporary restraining order as to the immediately effective portions of the Rate Cap Policy: The immediately effective portions are already inflicting

enormous irreparable harm, and the balance of hardships and the public interest emphatically favor enjoining patently unlawful Executive Branch actions, as two courts in this District have already recognized in enjoining materially identical policies adopted by NIH and DOE. *NIH*, 2025 WL 702163, at *27-32; *DOE*, 2025 WL 1119791, at *1; *DOE* 2025 WL 1414135, at *1.

    **A.  The Rate Cap Policy Is Inflicting Irreparable Harm.**

If the immediately effective portions of the Rate Cap Policy are allowed to remain in effect, Plaintiffs and their members will suffer immediate and irreparable harm to their educational missions, core facilities, research programs, critical personnel, and operating budgets. That harm is substantial, manifest, and not ascertainable or compensable by money damages. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000); *see NIH*, 2025 WL 702163, at *28 ("suspension of ongoing research" would constitute "irreparable harm"); *New York v. Trump*, 133 F.4th 51, 73 (1st Cir. 2025) (same with respect to "disruptions to research projects by state universities"). Harms from the Rate Cap Policy will be severe, causing immediate and ongoing irreparable damage to Plaintiffs' and hundreds of universities' educational and research missions.

*First*, Plaintiffs and declarants collectively have—right now—hundreds of millions of dollars' worth of proposals pending before DOD prepared in reliance on their individually negotiated indirect cost rates, and researchers and staff at these institutions are preparing and

submitting more every day.[18] Most of these projects could not proceed at a 15% indirect cost rate.[19] For Plaintiffs and declarants, then, the Rate Cap Policy has immediately placed them in an untenable position: If they submit proposals with their negotiated indirect cost rates, DOD will reject those proposals out of hand, putting Plaintiffs' ability to conduct critical research at risk. DOD's actions immediately following the issuance of the Hegseth Memo illustrate what is imminent: researchers being told they must either resubmit proposals they have been working on for months or years using the institutions' negotiated rates, or not be considered at all, JHU Decl., ¶ 27 & Ex. 1; proposals being automatically rejected if they use negotiated rates, BU Decl., ¶ 18; and researchers being forced to renegotiate currently active grants to accept a 15% indirect cost cap or face termination, Pitt Decl., Ex. 1. But institutions also cannot accept the 15% indirect cost rate, because it is financially unsustainable.[20] Forgoing the submission of research proposals means forgoing research, full stop. And the First Circuit has said the loss of similarly "unique or fleeting" opportunities is "irreparable" harm. *See Starlight Sugar, Inc. v. Soto*, 114 F.3d 330, 332

---

[18] *See, e.g.*, ASU Decl., ¶ 9 (123 pending proposals worth approximately $275 million); Brown Decl., ¶ 6 (37 pending proposals worth over $22 million); Caltech Decl., ¶ 5 (18 pending proposals worth $29 million); CU Boulder Decl., Doc. No. 13-9 at ¶ 5 (48 pending proposals worth $58 million); CSU Decl., Doc. No. 13-10 at ¶ 5 (73 pending proposals worth over $69 million); Duke Decl., Doc. No. 13-12 at ¶ 6 (91 pending proposals worth $92.9 million); UIUC Decl., Doc. No. 13-8 at ¶ 6 (161 pending proposals worth over $192,500); KUL Decl., Doc. No. 13-15 at ¶ 5 (27 pending proposals worth over $27 million); KUMC Decl., Doc. No. 13-16 at ¶ 5 (42 pending proposals worth $47.5 million); UMCP Decl. ¶ 6 (117 pending proposals worth over $170 million); MIT Decl., ¶ 11 (hundreds of DOD proposals submitted every year, with many currently under review); Penn Decl., Doc. No. 13-20 at ¶ 5 (77 pending proposals worth $101.2 million); Pitt Decl., ¶ 5 (102 pending proposals worth $92 million); USC Decl., Doc. No. 13-22 at ¶ 5 (270 pending proposals worth over $384 million); UW-Madison Decl., Doc. No. 13-25 at ¶ 5 (81 pending proposals worth over $70 million).

[19] *See, e.g.*, Brown Decl., ¶ 9; Caltech Decl., ¶ 6; CU Boulder Decl., ¶ 6; Cornell Decl., ¶ 5; OSU Decl., ¶ 6; Penn Decl., ¶ 6; Pitt Decl., ¶ 6; UW-Madison Decl., ¶ 6.

[20] *See, e.g.*, Caltech Decl., ¶ 6; Cornell Decl., ¶ 5; Duke Decl., ¶ 7; UIUC Decl., ¶ 7; UMCP Decl., ¶ 7; Penn Decl., ¶ 6; USC Decl., ¶ 6.

(1st Cir. 1997).

*Second*, due to the realities of budgeting and cost allocation for research programs, the myriad harms from slashing institutions' indirect cost rate to 15%—described below—will accrue immediately. A 15% rate cap imposes a massive budget shortfall, growing over time as new awards are issued, and hitting with its full force no later than November 10, 2025, when the Rate Cap Policy mandates implementation for all existing grants.[21] That is why, as Brown explains, "a reduction in the indirect cost rate to 15% for new awards, coupled with a requirement to accept a reduced indirect cost rate in renegotiation of existing grants," would require the university to "move very quickly to adjust its operations to absorb the loss of millions of dollars of expected revenue." Brown Decl., Doc. No. 13-6 at ¶ 21; *see also* UIUC Decl., ¶ 19 ("The process of identifying these cuts [to research] would need to begin immediately . . . ."); Duke Decl., ¶ 16 ("This means deciding *now* to cease projects, reduce head count, and stop operating facilities."); MIT Decl., ¶ 19 ("MIT is being forced to take immediate and contemporaneous action to reduce its financial exposure."); *accord Bos. Celtics Ltd. P'ship v. Shaw*, 908 F.2d 1041, 1048 (1st Cir. 1990) (finding that a "difficult[y] to plan intelligently" contributes to a showing of "irreparable harm"); *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (finding that "budget uncertainty" interfering with the "ability to budget" and "plan for the future" is irreparable harm).

---

[21] *See, e.g.*, BU Decl., ¶ 13 (anticipated annual loss of $5.1 million); Brown Decl., ¶ 19 ($3 million); UC Decl., ¶ 14 ($51.9 million); Caltech Decl., ¶ 5 ($6 million); CU Boulder Decl., ¶ 16 ($6.7 million); Cornell Decl., ¶ 16 ($12.7 million); Duke Decl., ¶ 16 ($13 million); UIUC Decl., ¶ 14 ($13 million); JHU Decl., ¶ 19 ($20 million); MIT Decl., ¶ 10 ($21 million); OSU Decl., ¶ 15 ($3 million); Penn Decl., ¶ 15 ($15 million); Pitt Decl., ¶ 16 ($7 million); USC Decl., ¶ 16 ($8.3 million); UW Decl., Doc. No. 13-24 at ¶ 16 ($10.9 million); UW-Madison Decl., ¶ 17 ($18.8 million loss in fiscal year 2026, growing to $29.4 million in fiscal year 2028); ASU Decl., ¶ 8 ($9 million loss).

For many Plaintiffs and their members, the Policy will "necessarily and immediately result in staffing reductions" across the board. CSU Decl., ¶ 18.[22] Even if funding is later restored, it is exceedingly difficult to recruit staff with the knowledge, experience, and tools to work on highly specialized projects, including security clearances and other approvals needed for sensitive DOD research. *See Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 56-57 (D.D.C. 2025) (inability to recruit replacements following layoffs is irreparable harm).[23]

The Policy also threatens institutions' ability to equip and maintain state-of-the-art facilities that house and support various high-tech and cutting-edge research fields. DOD-funded research is difficult and expensive work that seeks to "push[] the boundaries of scientific knowledge and technology," and it thus requires "infrastructure that is costly to create and maintain." MIT Decl., ¶ 25.[24] Without adequate funding for indirect costs—measured by institutions' negotiated rates—much of this equipment will be impossible to maintain and will fall into disrepair, even leading to the closure of entire laboratories or the stoppage of ongoing construction projects. CSU, for example, is currently developing a complex new facility designed specifically to advance research in high-power laser technology, the construction of which will be jeopardized at a 15% indirect cost rate. CSU Decl., ¶ 11. UMCP has made substantial investments in specialized IT systems designed to meet the highest standards—in addition to stringent DOD regulatory requirements—for storing and processing Controlled Unclassified Information for research purposes, which requires frequent hardware and software updates. A reduction in indirect

---

[22] UC Decl., ¶ 15; JHU Decl., ¶ 13; USC Decl., ¶ 17.

[23] *See also* Brown Decl., ¶ 21; OSU Decl., ¶¶ 11, 16; UC Decl., ¶ 15; Caltech Decl., ¶ 17; Pitt Decl., ¶ 10; UW Decl., ¶ 12.

[24] *See also, e.g.*, ASU Decl., ¶ 15; UC Decl., ¶¶ 8-9; CU Boulder Decl., ¶¶ 9-10; Duke Decl., ¶¶ 11-12; UW Decl., ¶ 9; UW-Madison Decl., ¶¶ 10-11.

costs will have an immediate and negative impact on UMCP's abilities to keep those cybersecurity resources intact, which would quickly threaten ongoing research efforts across the campus. UMCP Decl., ¶ 11.[25]

The Rate Cap Policy will disrupt or require stopping critical research programs altogether. *See, e.g.*, Caltech Decl., ¶ 17 ("Many of Caltech's current research projects will be forced to slow down or cease abruptly if we are required to apply for new awards or renewals at the 15% indirect cost cap . . . .").[26] Because of DOD's mission, the research at stake here is vital to U.S. national security and technological leadership. Indeed, Congress has authorized DOD to fund research that is either "related to weapon systems and other military needs" or "of potential interest to [DOD]." 10 U.S.C. § 4001(a)(2). Research conducted by universities for DOD thus includes high-priority fields such as artificial intelligence, bioengineering, computational modeling, cyber defense, fluid dynamics and propulsion systems, materials science, quantum technologies, secure microelectronics, space systems—and more.[27] The research under threat from the Policy also has broad applications for American businesses, health outcomes, workforce resilience, and overall quality of life. As the University of Southern California ("USC") puts it, undermining academic research "threatens the innovation, agility, and strategic capabilities essential to U.S. superiority in a time of growing global conflict," which is "not just a risk to the institution—it's a disservice to the country." USC Decl., ¶ 18.

Nor can these harms be redressed if funding is restored later. Many of these research

---

[25] *See also, e.g.*, Caltech Decl., ¶ 18; OSU Decl., ¶ 11.

[26] *See also, e.g.*, CU Boulder Decl., ¶ 17; UIUC Decl., ¶ 18; KUMC Decl., ¶ 17; MIT Decl., ¶ 20; Pitt Decl., ¶ 18; USC Decl., ¶ 17.

[27] *See, e.g.*, ASU Decl., ¶¶ 11-14; UC Decl., ¶¶ 5-6; JHU Decl., ¶¶ 7-8; UMCP Decl., ¶ 8; MIT Decl., ¶¶ 21-24; Pitt Decl., ¶ 7; UW-Madison Decl., ¶ 8.

projects, once stopped, cannot simply be restarted after the loss of human capital, degradation of physical infrastructure, and lack of continuous investment. *See, e.g.*, CSU Decl., ¶ 21 (inability to pay for maintenance and modernization of research infrastructure "would challenge CSU's ability to restart projects even if funding was restored"); UW Decl., ¶ 20 ("Even a short pause can lead to cascading delays, loss of samples, loss of rare experimental time at shared facilities, taking months to rebuild momentum, re-train new personnel, and re-establish the conditions under which the research can proceed."). A national brain drain is also difficult to reverse, as "[e]ven temporary uncertainty regarding the continuity of anticipated research funding from [DOD] and other federal agencies risks the permanent loss of talent" from American universities and the U.S. science community writ large. MIT Decl., ¶ 14 (some of MIT's top researchers are already "receiving increased outreach from colleagues at institutions in Europe and other nations that seek to take advantage of reductions in U.S. federal research funding"); *see also* Brown Decl., ¶ 29 (without reliable funding, "skilled faculty will opt to leave Brown, and likely the United States, in pursuit of viable work").

Universities will also have to cut graduate and post-graduate trainees—irreversibly damaging their academic communities and talent pipelines, the careers of these young researchers, and the national interest in training the next generation of scientists.[28] These costs will be felt not just at the Plaintiff universities, but in the surrounding communities that rely on the jobs and

---

[28] *See, e.g.*, Caltech Decl., ¶ 17 ("We would immediately begin a process of reducing the number of graduate student researchers at CalTech," totaling "a loss of 250 positions over the first year, with no prospect of new appointments to fill those positions"); Brown Decl., ¶ 23 ("[G]raduate students will have to stop their work, which would hinder their degree completion."); UW Decl., ¶ 20 ("Such disruptions also threaten the academic progress of graduate students and early-career researchers who perform hands-on experimental work for theses, dissertations, and postdoctoral work. Interrupting their work could mean permanent derailment from their academic paths and a loss of people with valuable skills needed for advancing critical emerging technologies . . . .").

spending these programs provide.[29] And in the longer term, slowdowns or halts in research by American universities will allow competitor nations that are maintaining their investments in research to surpass the United States on multiple fronts, including military readiness, economic strength, and technological innovation. The resulting risks to national security are plain and irreversible.[30]

Even if universities might prefer to continue conducting particular research or training programs without DOD support, the costs are often too great for universities to cover on their own, especially given their other mission-critical activities such as educational programs and financial aid for students.[31] And it is not feasible or sustainable for universities to use endowment funds— for those that have such funds—or other revenue sources to offset the shortfalls. *E.g.*, KUL Decl., ¶ 20 ("Nearly every dollar entrusted to the KU endowment contains donor restrictions."); KUMC Decl., ¶ 23 (same); CSU Decl., ¶ 24 (97% of CSU's endowment restricted to specific donor-designated purposes); UW Decl., ¶ 23 (99% of UW's endowment restricted to specific donor-designated purposes).[32]

### B. The Balance of the Equities and Public Interest Overwhelmingly Favor Relief.

As two courts have recognized in this context, the balance of the equities and public interest also favor an injunction. *NIH*, 2025 WL 702163, at *32; *DOE*, 2025 WL 1414135, at *20. These factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435

---

[29] *See, e.g.*, UC Decl., ¶ 17; UIUC Decl., ¶ 22; UMCP Decl., ¶ 25; MIT Decl., ¶¶ 26-27; Pitt Decl., ¶ 21; UW Decl., ¶ 21; UW-Madison Decl., ¶ 22.

[30] *See, e.g.*, CU Boulder Decl., ¶ 20; OSU Decl., ¶ 22; USC Decl., ¶ 23; UW-Madison Decl., ¶ 23.

[31] *See, e.g.*, ASU Decl., ¶ 21; UC Decl., ¶ 17; Caltech Decl., ¶ 25; CSU Decl., ¶ 25; JHU Decl., ¶ 25; MIT Decl., ¶ 32; OSU Decl., ¶ 24; Pitt Decl., ¶ 23; USC Decl., ¶ 25; UW Decl., ¶ 24.

[32] *See also, e.g.*, Brown Decl., ¶¶ 26-28; Duke Decl., ¶ 21; UMCP Decl., ¶ 28; MIT Decl., ¶ 31; OSU Decl., ¶ 23.

(2009). Here, the Rate Cap Policy has and will continue to burden Plaintiffs and impair the public interest. That is because the irreparable harm that the Policy inflicts on Plaintiffs' members and Plaintiffs' research programs also harms the public. The very purpose of these federal research partnerships is to advance national interests such as national security, technological advancements, health outcomes, and economic growth, as the declarations in this case amply reflect. Curtailing this research due to unexpected budget deficits will undermine the very aims promoted by DOD grants, and federal research funding more broadly.

By contrast, "the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (citations omitted). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA, as well as regulations . . . that govern their existence and operations." *Id.* (internal quotation marks and citations omitted). Moreover, the government incurs no cognizable harm from the continuation of the approach to indirect cost reimbursement that has endured for decades to the benefit of universities, the government, and the public.

## CONCLUSION

Plaintiffs respectfully urge this Court to enter an order temporarily restraining Defendants, their agents, and anyone acting in concert or participation with Defendants from implementing, instituting, maintaining, or giving effect to the immediately effective portions of the Rate Cap Policy, *i.e.*, those portions implementing a 15% cap for all awards issued on or after June 12, 2025, including but not limited to rejecting or treating adversely proposals for DOD funding submitted at universities' negotiated rates rather than the 15% rate.

Dated: June 17, 2025

JENNER & BLOCK LLP
By: */s/ Shoba Pillay*

Shoba Pillay, BBO No. 659739
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

Ishan K. Bhabha (*pro hac vice*)
Lindsay C. Harrison (*pro hac vice*)
Lauren J. Hartz (*pro hac vice*)
Elizabeth Henthorne (*pro hac vice*)
Zachary C. Schauf (*pro hac vice*)
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
LHarrison@jenner.com
LHartz@jenner.com
BHenthorne@jenner.com
ZSchauf@jenner.com

*Attorneys for Association of American*
*Universities, American Council on Education,*
*Association of Public and Land Grant*
*Universities, AZ Board of Regents on Behalf of*
*Arizona State University, Brown University,*
*California Institute of Technology, The Regents*
*of the University of California, Cornell*
*University, The Board of Trustees of the*
*University of Illinois, The Johns Hopkins*
*University, Massachusetts Institute of*
*Technology, and University of Pittsburgh of the*
*Commonwealth System of Higher Education*

Respectfully submitted,

CLEMENT & MURPHY, PLLC
By: */s/ Paul D. Clement*

Paul D. Clement (*pro hac vice*)
James Y. Xi (*pro hac vice*)
Kyle R. Eiswald (*pro hac vice*)
706 Duke Street
Alexandria, VA 22314
Tel: (202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
kyle.eiswald@clementmurphy.com

*Attorneys for Association of American Universities,*
*Association of Public and Land-grant Universities,*
*and American Council on Education*

ANTHONY G. BROWN
Attorney General of Maryland

By: */s/ Michael Drezner*
Michael Drezner (*pro hac vice*)
  *Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-6959
mdrezner@oag.state.md.us

*Attorney for University of Maryland, College Park*

NICHOLAS W. BROWN
Attorney General of Washington

By: */s/ Jessica L. Creighton*
Jessica L. Creighton (*pro hac vice*)
  *Assistant Attorney General*
Office of the Attorney General of Washington
University of Washington Division
4333 Brooklyn Avenue NE, MS 359475
Seattle, WA 98195
(206) 543-4150
jessica.creighton@atg.wa.gov

*Attorney for University of Washington*

PHILIP J. WEISER
Attorney General of Colorado

By: */s/ Lauren Peach*
Lauren Peach (*pro hac vice*)
  *First Assistant Attorney General*
Michael McMaster (*pro hac vice*)
  *Assistant Solicitor General*
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, CO 80203
(720) 508-6484, (720)-508-6156
Lauren.peach@coag.gov
Michael.McMaster@coag.gov

*Attorneys for the Board of Governors of the*
*Colorado State University System Acting by and*
*through Colorado State University*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of June, 2025, I provided this memorandum to the

following individuals at the United States Department of Justice by electronic mail:

Brett Shumate
Assistant Attorney General
brett.a.shumate@usdoj.gov

Brian Lea
Deputy Associate Attorney General
brian.lea@usdoj.gov

Rayford Farquhar
Chief, Defensive Litigation, Civil Division
U.S. Attorney's Office for the District of Massachusetts
rayford.farquhar@usdoj.gov

By: */s/ Shoba Pillay*
Shoba Pillay, BBO No. 659739
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

48