# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, *et al*. | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:25-cv-11740-BEM |
| DEPARTMENT OF DEFENSE, *et al*., | ) ) | Leave to File Granted |
| Defendants. | ) ) ) | June 20, 2025 |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A <u>TEMPORARY RESTRAINING ORDER [DOC. NO. 13]</u>

**Table of Contents**

Introduction ................................................................................................................ 1

Background ................................................................................................................ 4

Legal Standard ......................................................................................................... 12

Argument .................................................................................................................. 13

I.    The Court Lacks Jurisdiction Over Plaintiffs' Claims. ................................. 13

   A.   Plaintiffs have not established standing to sue. ........................................ 13

   B.   The APA does not waive sovereign immunity for actions committed to agency discretion. ............................................................................................... 15

   C.   The Hegseth Memo is not final agency action reviewable under the APA ................. 16

II.   Plaintiffs Have Failed to Show Likelihood of Success on the Merits. ......................... 17

   A.   The Policy follows 2 C.F.R. § 200.414(c). ................................................. 18

   B.   Plaintiffs' regulatory scheme argument fails ............................................... 21

   C.   The Policy is reasonable and reasonably explained ....................................... 23

   D.   The Policy is authorized by statute. ......................................................... 29

III.  Plaintiffs Have Not Satisfied the High Burden for a TRO. ............................. 34

   A.   Plaintiffs have not shown irreparable harm. ............................................... 35

   B.   Injunctive relief is not in the public interest. ............................................ 41

IV.   Any Injunction Should Be Narrowly Tailored to Plaintiffs—And, More Specifically, Apply Only To IHEs That Are Plaintiffs or Represented by Plaintiffs and that Have Shown Irreparable Harm. ....................................................................... 41

V.    The Court Should Order That Plaintiffs Post a Bond as a Condition of Extending the TRO ........................................................................................................ 42

Conclusion ................................................................................................................ 44

# Table of Authorities

Page(s)

## Cases

*50 Exch. Terrace LLC v. Mount Vernon Specialty Ins. Co.*,
   129 F.4th 1186 (9th Cir. 2025) ................................................................................ 14

*Acosta-Ramirez v. Banco Popular de P.R.*,
   712 F.3d 14 (1st Cir. 2013) ..................................................................................... 13

*Adams v. Freedom Forge Corp.*,
   204 F.3d 475 (3d Cir. 2000) .................................................................................... 35

*ALPO Petfoods v. Ralston Purina Co.*,
   913 F.2d 958 (D.C. Cir. 1990) ................................................................................ 42

*Amazon Web Servs., Inc. v. United States*,
   147 Fed. Cl. 146 (2020) .......................................................................................... 44

*Arbaugh v. Y & H Corp.*,
   546 U.S. 500 (2006) ................................................................................................ 13

*Associated Fisheries of Maine, Inc. v. Daley*,
   127 F.3d 104 (1st Cir. 1997) ................................................................................... 25

*Axia Net-Media Corp. v. Mass. Tech. Park Corp.*,
   889 F.3d 1 (1st Cir. 2018) ....................................................................................... 12

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................................ 17

*Blanchette v. Conn. Gen. Ins. Corps.*,
   419 U.S. 102 (1974) ................................................................................................ 31

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
   838 F.3d 42 (1st Cir. 2016) ............................................................................... 25, 26

*Califano v. Yamasaki*,
   442 U.S. 682, (1979) ............................................................................................... 41

*Carcieri v. Salazar*,
   555 U.S. 379 (2009) ................................................................................................ 31

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
   370 F.3d 151 (1st Cir. 2004) ......................................................................... 35, 37, 39

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ........................................................................................................ 14

*Cmty. Rels.-Soc. Dev. Comm'n v. United States*,
    8 Cl. Ct. 723 (1985) ........................................................................................................ 22

*County of Santa Clara v. Trump*,
    250 F. Supp. 3d 497 (N.D. Cal. 2017) ............................................................................ 38

*Craker v. DEA*,
    44 F.4th 48 (1st Cir. 2022) .............................................................................................. 27

*Crowley v. Loc. No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers*,
    679 F.2d 978 (1st Cir. 1982) ........................................................................................... 43

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
    698 F. Supp. 3d 39 (D.D.C. 2023) ................................................................................. 28

*Department of Commerce v. New York*,
    588 U.S. 752 (2019) ........................................................................................................ 15

*Department of Education v. California*,
    604 U.S. ----, 145 S. Ct. 966 (2025) .............................................................................. 41

*Dep't of the Navy v. Egan*,
    484 U.S. 518 (1988) ........................................................................................................ 41

*Dubois v. U.S. Dep't of Agric.*,
    102 F.3d 1273 (1st Cir. 1996) ......................................................................................... 13

*EEOC v. Astra USA, Inc.*,
    94 F.3d 738 (1st Cir. 1996) ............................................................................................. 34

*Env't Def. Fund v. EPA*,
    922 F.3d 446 (D.C. Cir. 2019) ....................................................................................... 27

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .................................................................................................. 24, 26

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ........................................................................................................ 24

*FDIC v. Meyer*,
    510 U.S. 471 (1994) ........................................................................................................ 15

*Free Speech Coal., Inc. v. Att'y Gen. U.S.*,
   974 F.3d 408 (3d Cir. 2020) ................................................................. 42

*Glob. Naps, Inc. v. Verizon New Eng., Inc.*,
   489 F.3d 13 (1st Cir. 2007) .................................................................. 43

*Gonzalez-Droz v. Gonzalez-Colon*,
   573 F.3d 75 (1st Cir. 2009) .................................................................. 12

*Harper v. Werfel*,
   118 F.4th 100 (1st Cir. 2025) ............................................................... 17

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ...................................................................... 15, 16

*Heckler v. Turner*,
   468 U.S. 1305 (1984) ........................................................................ 41

*Hollingsworth v. Perry*,
   570 U.S. 693 (2013) .......................................................................... 14

*Housatonic River Initiative v. EPA*,
   75 F.4th 248 (1st Cir. 2023) ................................................................ 26

*In re TelexFree Sec. Litig.*,
   No. 4:14-MD-02566, 2021 WL 11604879 (D. Mass. Apr. 21, 2021) ....................... 34

*Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines Inc.*,
   925 F.2d 6 (1st Cir. 1991) ................................................................... 43

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ...................................................................... 15, 16

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...................................................................... 13, 14

*Md. Dep't of Hum. Res. v. U.S. Dep't of Agric.*,
   976 F.2d 1462 (4th Cir. 1992) .............................................................. 43

*Micro Networks Corp. v. HIG Hightec, Inc.*,
   188 F. Supp. 2d 18 (D. Mass. 2002) ........................................................ 36

*Milk Train, Inc. v. Veneman*,
   310 F.3d 747 (D.C. Cir. 2002) .............................................................. 16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................................. 23

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ............................................................................................. 13

*Muschany v. United States*,
  324 U.S. 49 (1945) ............................................................................................... 9

*Myriddian, LLC v. United States*,
  165 Fed. Cl. 650 (2023) ..................................................................................... 43

*Narragansett Indian Tribe v. Guilbert*,
  934 F.2d 4 (1st Cir. 1991) .................................................................................. 39

*Nat'l Kidney Patients Ass'n v. Sullivan*,
  958 F.2d 1127 (D.C. Cir. 1992) ......................................................................... 43

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................................... 12

*Off. of Commc'n of United Church of Christ v. FCC*,
  707 F.2d 1413 (D.C. Cir. 1983) ......................................................................... 28

*Palantir USG, Inc. v. United States*,
  129 Fed. Cl. 218 (Fed. Cl. 2016) ....................................................................... 24

*Peoples Fed. Sav. Bank v. People's United Bank*,
  672 F.3d 1 (1st Cir. 2012) .................................................................................. 12

*Pol'y & Rsch., LLC v. HHS*,
  313 F. Supp. 3d 62 (D.D.C. 2018) ..................................................................... 16

*Pub. Serv. Co. of N.H. v. Town of W. Newbury*,
  835 F.2d 380 (1st Cir. 1987) ........................................................................ 35, 40

*Regents of the University of California*,
  591 U.S. 1 (2020) .......................................................................... 29, 31, 33, 34

*Roberts v. Progressive Preferred Ins. Co.*,
  No. 1:23 CV 1597, 2024 WL 2295482 (E.D. Ohio May 21, 2024) ........................ 14

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
  102 F.3d 12 (1st Cir. 1996) ................................................................................ 38

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
  217 F.3d 8 (1st Cir. 2000) ................................................................... 36

*Savantage Fin. Servs., Inc. v. United States*,
  595 F.3d 1282 (Fed. Cir. 2010) .......................................................... 24

*Sherley v. Sebelius*,
  610 F.3d 69 (D.C. Cir. 2010) ............................................................... 15

*Sierra Club v. Larson*,
  769 F. Supp. 420 (D. Mass. 1991) ....................................................... 35

*Sorreda Transp., LLC v. U.S. Dep't of Transp.*,
  980 F.3d 1 (1st Cir. 2020) ................................................................... 23

*St. Martin Evangelical Lutheran Church v. S. Dakota*,
  451 U.S. 772 (1981) ............................................................................ 33

*Tamko Roofing Prods., Inc. v. Ideal Roofing Co.*,
  282 F.3d 23 (1st Cir. 2002) ........................................................... 35, 41

*TransUnion LLC v. Ramirez.*,
  594 U.S. 413 (2021) ............................................................................ 13

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ................................................................. 26, 28, 42

*U.S. Telecom Ass'n v. FCC*,
  359 F.3d 554 (D.C. Cir. 2004) ............................................................. 27

*United States v. Michigan*,
  230 F.R.D. 492 (E.D. Mich. 2005) ....................................................... 37

*Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*,
  645 F.3d 26 (1st Cir. 2011) ........................................................... 13, 36

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
  5 F.4th 997 (9th Cir. 2021) .................................................................. 17

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ............................................................................ 14

*WildEarth Guardians v. EPA*,
  751 F.3d 649 (D.C. Cir. 2014) ............................................................. 27

*Winter v. Nat. Res. Def. Counsel, Inc.*,
   555 U.S. 7 (2008) ................................................................................ 12, 39

**Statutes**

5 U.S.C. § 701(a)(1) ................................................................................ 15

5 U.S.C. § 704 ......................................................................................... 16

10 U.S.C. § 4001 ............................................................................ 7, 16, 29

10 U.S.C. § 4001(a) ............................................................................. 3, 28

10 U.S.C. § 4010 ..................................................................................... 33

41 U.S.C. § 4708 ........................................................................ 8, 9, 21, 30

Armed Services Procurement Act of 1947, Pub. L. No. 80-413 (1948) ......................................... 9

Department of Defense Appropriation Act, 1963, Pub. L. No. 87-577 (1962) ............................. 8

Department of Defense Appropriations Act, 1966, Pub. L. No. 89-213, 79 Stat. 863 (1965) ........ 8

Department of Defense Authorization Act, 1982, Pub. L. 97-86, 95 Stat. 1099 (1981) ................ 7

Department of Defense Appropriations Act, Pub. L. No. 110-116, 121 Stat. 1295 (2007) .......... 12

Department of Defense Reorganization Act, Pub. L. No. 85-599, 72 Stat. 514, 520 (1958) ......... 7

Federal Grant and Cooperative Agreement Act of 1977, Pub. L. No. 95-225, 92 Stat. 3 (1978) ... 7

Federal Property and Administrative Services Act of 1949, Pub. L. No. 81-152, 63 Stat. 377 ...... 9

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460 (2024) ....... 16

Full-Year Continuing Appropriations & Extensions Act, Pub. L. No. 119-4 139 Stat. 9 (2025).. 16

Pub. L. No. 85-934, 72 Stat. 1793 (1958) .................................................................. 7

Pub. L. No. 87-638, 76 Stat. 437 (1962) .................................................................. 9

**Rules**

Fed. R. Civ. P. 65(b) .............................................................................. 12

**Regulations**

2 C.F.R. Pt. 200 ................................................................................................................ 11, 21, 22

2 C.F.R. § 200.1 ................................................................................................................ 8, 19, 23

2 C.F.R. § 200.100(c) ........................................................................................................ 22

2 C.F.R. § 200.402 ............................................................................................................ 22

2 C.F.R. § 200.412 ............................................................................................................ 4

2 C.F.R. § 200.414(a) ........................................................................................................ 4, 5, 6

2 C.F.R. § 200.414(c) ........................................................................................................ passim

2 C.F.R. § 1104.110(a) ...................................................................................................... 5

2 C.F.R. § 200.501(b) ........................................................................................................ 23

2 C.F.R. § 200.504 ............................................................................................................ 23

2 C.F.R. § 200.514 ............................................................................................................ 23

56 Fed. Reg. 50,224 (Oct. 3, 1991) .................................................................................. 11

58 Fed. Reg. 39,996 (July 26, 1993) ................................................................................ 11

**INTRODUCTION**

The Department of Defense ("DoD" or "Department") provides the military forces needed to deter and, when necessary, prosecute war and ensure our nation's security. In furtherance of that essential role, DoD provides billions of dollars to America's Institutions of Higher Education ("IHEs") for scientific research supporting the national security functions of DoD, led by the Office of the Under Secretary of Defense for Research and Engineering and including the Army Research Lab/Army Research Office, the Office of Naval Research, and the Air Force Office of Scientific Research. In Fiscal Year 2024, DoD provided more than $10 billion in research funding, more than all but one other United States agency (HHS).[1]

On May 14, 2025, discharging his duty as "the steward of the most critical budget in the Federal Government," the Secretary of Defense tasked his Department with developing and implementing a forward-looking policy to achieve a longstanding goal across Administrations: to establish new grant terms that curtail spending on administrative overhead, which hampers the government's ability to fund direct scientific research. *See* Compl. Ex. 1, Doc. No. 1-1 ("Hegseth Memo") at 2. The Secretary explained that DoD's budget, which "defends our Nation, equips our warfighters, and secures our future, . . .demands discipline [and] accountability." *Id.* Thus, in order to "repurpose [$900 million annually] toward applied innovation, operational capability, and strategic deterrence," the Secretary instructed DoD, acting consistent with federal regulations, to "pursue a lower cap on indirect cost rates for all new financial assistance awards to [IHEs] . . . on a go-forward basis." *Id.* This change to new awards is what Plaintiffs term the "immediately effective portions of" DoD's Policy and what they ask this Court to now restrain. Mem. in Supp. of Ps.' Mot. for Temp. Restraining Order, Doc. No. 39 at 55. Though not before the Court on

---

[1] https://ncses.nsf.gov/pubs/nsf25313 (Table 2).

Plaintiffs' Motion, the Secretary further asked his Department to "renegotiate indirect cost rates on existing financial assistance awards to [IHEs]." Doc. No. 1-1 at 3. In the event the parties cannot agree, the Secretary directed DoD to "identify and recommend lawful paths to terminate and reissue the award under revised terms." *Id.* The Secretary reiterated that these reasoned, lawful changes had a singular purpose: "Every dollar we redirect from overhead to outcomes strengthens the United States military. We are cutting bureaucratic fat so that we can build muscle. That is what leadership demands – and what national defense requires." *Id.*

A month later, the Under Secretary of Defense for Research and Engineering's June 12, 2025 memo established DoD policy (the "June 12, 2025 Policy" or "Policy") consistent with the Secretary's guidance, providing a 15 percent indirect cost rate limit for all new assistance awards to IHEs and requiring that outstanding notices of funding opportunities be updated to reflect this change. Compl. Ex. B, Doc. No. 1-2 ("Michael Memo") at 3. The June 12, 2025 Policy also mirrored the Secretary's memo regarding existing awards' indirect cost rates, setting a November 10, 2025 deadline to renegotiate. *Id.* Subsequently, DoD will, as permitted by law, terminate any awards that have not been renegotiated. *Id.*

The Under Secretary plainly explained the bases for the Department's strategic shift, including that "significant cost savings would result" from the new Policy and that the new 15 percent cap is comparable "to the indirect cost rates allowed by several non-profit foundations that provide financial assistance to IHEs." *Id.* at 2. The indirect cost rate shift will allow "[t]he academic community's work with the Department [to remain] essential for the development of transformative research concepts that drive our future capabilities." *Id.* at 3. Additionally, the Under Secretary explained the legal authorization for the Policy: "[A]s described in 2 CFR 200.414(c), an agency may use a rate different from the negotiated rate for . . . a class of Federal

awards . . . when approved by the awarding Federal agency in accordance with paragraph (c)(3)." *Id.* at 2. Thus, "[i]n accordance with 2 CFR 200.414(c), this memorandum implements the Department's policy deviating from the negotiated indirect cost rate for financial assistance awards to IHEs." *Id.*

Plaintiffs—IHEs and IHE associations—ask this Court to temporarily enjoin (issue a "TRO") DoD's Policy, claiming that it is merely a "fourth attempt" by the government to decrease indirect cost rate expenditures. *See* Doc. No. 39 at 11. But DoD, the United States' largest government agency, is sui generis, and its forward-looking policy, while similar, is not the same as those previously set aside, as discussed herein.[2] Plaintiffs overlook the significant differences between those other agency policies and their governing statutory schemes, and DoD's policy and its organic statutes. Congress has provided the Secretary of Defense with broad authority and discretion to fund research and development to accomplish the agency's national security objectives. The Secretary (or the Secretary of a military department) "may engage in basic research, applied research, advanced research, and development projects that . . . are necessary to the responsibilities of such Secretary's department in the field of research and development; and . . . relate to weapon systems and other military needs; or . . . are of potential interest to the Department of Defense." 10 U.S.C. § 4001(a). The Secretaries "may perform research and development projects . . . by contract, cooperative agreement, or grant." *Id.* § 4001(b).

This Court should deny Plaintiffs' Motion for at least four reasons. *First*, the Court does not have jurisdiction to decide Plaintiffs' claims, and thus should dismiss the complaint, both because Plaintiffs have not shown they have standing and because DoD's grant-related decisions

---

[2] Defendants respectfully maintain that those policies are valid and are challenging (NIH), or anticipate challenging pending Department approval (DOE and NSF), the district courts' conclusions to the contrary.

are committed to discretion by law under the Administrative Procedure Act ("APA"). Additionally, even if the Court has jurisdiction over Plaintiffs' APA claims regarding the Michael Memo, the Hegseth Memo is not final agency action, and, thus, the Court lacks jurisdiction under the APA to fashion a remedy for it. *Second*, even if Plaintiffs' claims are justiciable, Plaintiffs have failed to demonstrate a likelihood of success on the merits. The Policy properly exercises DoD's statutory discretion over grants, and is reasonable and provides a reasoned explanation. *Third*, a TRO, an extraordinary remedy, is not warranted because the only "harm" Plaintiffs can identify is speculation that their own budgetary constraints may lead them to turn down funding if they are offered grant awards at the indirect cost rate set forth in DoD's Policy. That speculative harm is far from irreparable. *Fourth*, a TRO forcing the Department to pay hundreds of millions of dollars in excess indirect costs that may be unrecoverable is not in the public interest.

## BACKGROUND

### A. DoD Grants: Direct and Indirect Costs.

DoD grants generally cover two types of expenses: direct costs and indirect costs. *See* 2 C.F.R. § 200.412. "Direct costs" are costs "identified specifically with" a particular research project or activity—*i.e.*, the specific research that DoD intends to support with the grant. *Id.* § 200.413(a). Direct costs include, for example, the "proportion of employee compensation" expended on the research, related "fringe benefits," and the costs of "supplies needed to achieve the award's objectives." *Id.* § 200.413(b). They may also include more general costs that are "directly related to a specific award," such as "extraordinary utility consumption," "integrated data systems," or certain "cost of materials." *Id.*

DoD grants may also cover certain "indirect costs," also known as "F&A" costs. 2 C.F.R. § 200.414(a). These costs support "more than one" research project or activity and are "not readily assignable" to specific research "without effort disproportionate to the results achieved." *Id.* §

200.1.    Indirect costs are "classified within two broad categories: 'Facilities' and 'Administration.'"    *Id.* § 200.414(a).    "Facilities" costs include "depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses."    *Id.*    "Administration" costs, in turn, include "general administration and general expenses such as the director's office, accounting, personnel and all other types of expenditures not listed" elsewhere.    *Id.*    Indirect costs generally are paid based on an "indirect cost rate."    The higher the indirect cost rate, the more DoD will reimburse.    For example, at Harvard University, which has an indirect-cost rate of 69 percent for on-campus research, DoD may pay up to $169,000 for a $100,000 grant: $100,000 in direct costs plus $69,000 in indirect costs.[3]

For determining the indirect cost rate that will apply to a particular grant, DoD has adopted the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards ("Guidance").    *See* 2 C.F.R. § 1104.110(a).    As a default, section 200.414(c)(1) of the Guidance generally requires DoD to pay indirect costs based on a rate periodically negotiated with each grantee institution, which is memorialized in a negotiated indirect cost rate agreement ("NICRA").    *Id.* § 200.414(c)(1); *see id.* pt. 200, subpart E & app. III.    But the Guidance also provides a path for DoD to depart from those rates.    The next sentence of section 200.414(c)(1) states that a "Federal agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award "when approved by the awarding Federal agency in accordance with paragraph (c)(3) of this section."    *Id.*

Paragraph (c)(3) provides that the "Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will

---

[3] *See* Harvard Univ., FAS Off. Rsch. Admin., Indirect Costs, https://perma.cc/NU2R-N6XB.

follow to seek and justify deviations from negotiated rates." *Id.* § 200.414(c)(3). Aside from that procedural requirement, the Guidance imposes no substantive constraint on the ability of DoD to deviate from negotiated indirect cost rates, whether "for a class of Federal awards or a single Federal award." *Id.* § 200.414(c)(1).

**B.    The Policy.**

These cases concern the Policy issued by DoD on June 12, 2025, addressing indirect-cost rates. Doc. No. 1-2. The Policy caps indirect cost rates at 15 percent in new grant awards issued by DoD after June 12, 2025. *Id.* at 3. The Policy is "motivated by the potential cost savings" that will be realized by bringing DoD in line with "the indirect cost rates allowed by several non-profit foundations that provide financial assistance to IHEs." *Id.* at 2. The Secretary of Defense previously determined those cost savings will total "up to $900M per year," allowing DoD "to repurpose those funds – toward applied innovation, operational capability, and strategic deterrence." Doc. No. 1-1 at 2.

DoD adopted the Policy pursuant to express authority granted in section 200.414(c)(3). The Policy makes public "the policies, procedures, and general decision-making criteria" justifying DoD program's deviations from the NICRA rates for a class of federal awards it administers. 2 C.F.R. § 200.414(c)(3).

**C.    Prior Efforts to Contain Indirect Costs in Grants to IHEs.**

The Policy is the latest volley in a long line of government-wide efforts to contain indirect costs in research grants to IHEs.[4] During World War II, the armed forces funded research through

---

[4] *See* Marcy E. Gallo & Laurie Harris, Cong. Rsch. Serv., R48540, Univs. & Indirect Costs for Federally Funded Rsch. 9 (2025) (hereinafter CRS Report); *see also, e.g.*, GAO, GAO-10-937, Univ. Rsch.: Policies for the Reimbursement of Indirect Costs Need to be Updated 1 (2010) (hereinafter 2010 GAO Report) (noting the "debate over what portion of indirect costs is the responsibility of the government and what portion is the responsibility of the research institution").

6

procurement contracts using a "fixed, uniform" indirect costs rate of 50 percent of salaries and wages.[5]  In August 1958, Congress authorized the Secretary of Defense to contract for "basic and applied research projects essential to the responsibilities of the Department . . . which pertain to weapons systems and other military requirements."[6]  A month later, Congress authorized grantmaking for the same purpose when the agency head "deemed" such grants "to be in furtherance of the objectives of the agency."[7]  This grant authority was intended to "provide greater flexibility and economy in the conduct and administration of such research."[8]  The two 1958 statutes comprise DoD's earliest grantmaking authority for research at IHEs.  This authority continues in effect substantially unchanged today.[9]  *See* 10 U.S.C. § 4001.

Following passage of the 1958 laws, DoD began to shift from the use of contracts to grants for funding basic research, issuing a policy generally favoring grants over contracts for that purpose.[10]  At that time, the three DoD services—the Army, Navy, and Air Force—agreed to cap reimbursement of indirect costs in grants at 20 percent of direct costs.[11]  Shortly thereafter, "the Secretary of Defense directed that this limitation be revised to allow up to the rate most recently

---

[5] CRS Report, *supra* note 4 at 7.

[6] Department of Defense Reorganization Act, Pub. L. No. 85-599, § 9(a), 72 Stat. 514, 520 (1958).

[7] Pub. L. No. 85-934, § 1, 72 Stat. 1793 (1958).

[8] Authorizing the Expenditure of Funds through Grants for Support of Scientific Research at 2, H.R. Rep. No. 85-2640 (Aug. 15, 1958).

[9] The 1958 statute authorizing use of grants for basic research was repealed in 1979.  Federal Grant and Cooperative Agreement Act of 1977, Pub. L. No. 95-225, § 10(a), 92 Stat. 3 (1978).  Shortly thereafter, Congress amended the 1958 basic research statute to directly authorize use of grants. Department of Defense Authorization Act, 1982, Pub. L. 97-86, § 910, 95 Stat. 1099 (1981).

[10] *See* Hearings Before the Subcommittee of the House Committee on Appropriations, 87th Cong. 192 (Apr. 20, 1961); Roy L. Schooling, *The Air Force Grant Program*, 10 A.F. L. Rev. 24, at 26 (1968).

[11] Hearings Before the Subcommittee of the House Committee on Appropriations, 87th Cong. 193 (April 20, 1961) (statement of General Ely).

established by audit for contracts."[12]  However, the services were still permitted to employ "any principle of cost sharing" on a case-by-case basis.[13]  Cost sharing refers to the portion of a research project the entity receiving a grant must fund through non-federal sources.[14]  Cost sharing employed by DoD could include "adjustment of overhead rates"[15] – meaning DoD would not fully reimburse indirect costs.

Congress, too, was concerned with controlling indirect costs in research grants.  From 1963 to 1965, Congress limited DoD's indirect costs reimbursement in research grants to 20 percent through appropriations riders.[16]  For fiscal year 1966, Congress instead instituted a cost sharing requirement, barring DoD from using funds to pay any research grant recipient "an amount equal to as much as the entire cost of such project."[17]  Such cost sharing requirements ensured the agency would "pay less than the full costs associated with the projects it supports" while giving agencies the flexibility to determine "an appropriate level of financial participation by the grantee."[18]

Around the same time Congress was focused on limiting cost reimbursement through indirect costs caps, Congress separately enacted 41 U.S.C. § 4708, allowing agencies to provide for "payment of reimbursable indirect costs on the basis of predetermined fixed-percentage rates applied to the total, or an element thereof, of the reimbursable direct costs incurred" in "cost-type

---

[12] *Id.*  The Air Force continued to limit indirect costs to 20 percent in its grants to educational institutions.  *Id.* at 45.

[13] Hearings Before the Subcommittee of the House Committee on Appropriations, 87th Cong. 194–95 (Apr. 20, 1961).

[14] *See, e.g.*, 2 C.F.R. § 200.1.

[15] Hearings Before the Subcommittee of the House Committee on Appropriations, 87th Cong. 195 (Apr. 20, 1961).

[16] *See, e.g.*, Department of Defense Appropriation Act, 1963, Pub. L. No. 87-577, § 540 (1962).

[17] Department of Defense Appropriations Act, 1966, Pub. L. No. 89-213, § 638, 79 Stat. 863, 879 (1965).

[18] Departments of Labor, and Health, Education, and Welfare, and Related Agencies Appropriate Bill, 1966, H.R. Rep. No. 89-242, at 52–53 (Aug. 29, 1965).

research and development contracts (including grants)" with IHEs.[19]  The law created an exception to statutory prohibitions on cost-plus-a-percentage-of-cost procurement contracts.[20]  As the name suggests, such cost-plus contracts required payment of both "costs, undetermined at the time the contract is made and to be incurred in the future, plus a commission based on a percentage of these future costs."  *Muschany v. United States*, 324 U.S. 49, 61 (1945).  By tying the contractor's fee to the amount of undetermined future costs, the contracts created a detrimental "incentive for the contractor to inflate his future costs to increase his profits."  *Id.* at 62–63.  In the mid-1950s, before DoD was authorized to use grants for research in 1958, the Comptroller General determined that research contracts providing for payment of indirect costs as a predetermined fixed percentage of costs, without post-performance recovery of overpayments, violated the cost-plus prohibitions.  *See, e.g.*, 35 Comp. Gen. 434, B-126794 (1956).  Contracting parties were therefore required to treat predetermined indirect cost rates as "fixing a ceiling" for indirect costs, "with the understanding that the amounts paid at the provisional rate would be adjusted so as not to exceed the actual overhead costs allocable to the contract work or the maximum stipulated, whichever was less."  35 Comp. Gen. 63, 70, B-120714 (1955).

In September 1962, Congress passed 41 U.S.C. § 4708 to create a limited exception to the prohibitions on cost-plus contracting.  Considering the distorted incentives that led Congress to prohibit cost-plus contracts in the first place, deliberations on the statute focused on whether agencies could reasonably estimate indirect costs in advance to ensure IHEs would not be

---

[19] Pub. L. No. 87-638, 76 Stat. 437 (1962).

[20] *See, e.g.*, Armed Services Procurement Act of 1947, Pub. L. No. 80-413, § 4 (1948); Federal Property and Administrative Services Act of 1949, Pub. L. No. 81-152, § 304, 63 Stat. 377.  The cost-plus contract prohibitions generally did not apply to grants.  *See* S. Rep. No. 87-1826 at 9 (conveying National Science Foundation's view that "the statutory prohibitions against cost-plus-a-percentage-of-cost arrangements are not applicable to grants").

overpaid.[21]  The statute was not understood to abolish or undermine caps on indirect costs in grants. To the contrary, Congress was contemporaneously imposing such caps, leading one executive department to note that the proposed authority "would have little effect" on it "since our appropriation acts for several years have imposed a limit of 15 percent" on indirect costs in research grants.[22]  And representatives of the Comptroller General's office agreed with the House subcommittee that the statutory authority would permit grants requiring cost sharing – i.e., grants not intended to cover the full cost of research.[23]

In the two decades after Congress removed the statutory ceiling on DoD grants in 1966, indirect cost rates "steadily increased" in federal government grants, with the average indirect cost rate more than 50 percent by the end of the 1980s.[24]  As a result, containing indirect costs received renewed government-wide attention in the 1980s and 1990s, with "Congress, OMB, and other federal agencies extensively discuss[ing] proposals to cap the administrative portions of indirect cost reimbursements"[25] and applying "consistent pressure to keep indirect cost rates lower, or to at least slow down the rate at which they increase."[26]  In 1986, OMB made the first of three notable changes to Circular A-21 ("Cost Principles for Educational Institutions") during that period to rein

---

[21] *See, e.g.*, S. Rep. No. 87-1826 at 9 (Aug. 6, 1962) (cmts. Of Dep't of Interior) ("While the profit factor is not present in research and development contracts with educational institutions, problems of cost control do exist," and therefore "the predetermined rate should be in reasonably close conformity with actual prior rates.").

[22] S. Rep. No. 87-1826 at 7 (Aug. 6, 1962).

[23] Payment of Indirect Costs of Research and Development by College & University Contractors, 87th Cong.14 (March 8, 1962).

[24] GAO, GAO/RCED-92-203, Fed. Rsch.: Sys. for Reimbursing Univs.' Indirect Costs Should Be Reevaluated 10, 13 (1992) (hereinafter 1992 GAO Report).

[25] CRS Report, *supra* note 7, at 8; *see also* 1992 GAO Report, *supra* note 15, at 13 (discussing limits on indirect cost reimbursement enacted by Congress in the early 1990s).

[26] Richard P. Seligman, *An Introduction to Cost Sharing: Why Good Deeds Do Not Go Unpunished*, Rsch. Mgmt. Rev., Spring/Summer 2000, at 4.

in costs, fixing reimbursement of faculty administrative costs at 3.6 percent.[27]

Disclosures in the early 1990s revealed that the government had been charged hundreds of millions of dollars in "unallowable, questionable, or improperly allocated indirect costs," leading the U.S. General Accounting Office (now the Government Accountability Office, or "GAO") to conclude "fundamental changes to the existing reimbursement system" were needed to address the "depth and persistence of the problems."[28]    Among possible solutions, GAO proposed caps on indirect cost rates, as they were "not new" and would result in "savings in government funds [that] might then be used to fund more research projects."[29]    As a result of the unallowable, questionable, or improperly allocated indirect costs GAO uncovered, OMB revised Circular A-21 in 1991 to cap all administrative indirect costs at 26 percent,[30] and then again in 1993 to clarify that administrative costs include all non-facilities costs and to give universities a fixed flat-rate reimbursement option.[31]    OMB's 26 percent cap on administrative indirect costs is still in effect today.  *See* 2 C.F.R. Pt. 200, App. III § C.8.

---

[27] CRS Report, *supra* note 7, at 8.  In 2005, OMB relocated Circular A-21 to Title 2 of the Code of Federal Regulations.  Administration-wide grant policies that previously would have been set out in Circular A-21 are now incorporated into the Guidance.

[28] 1992 GAO Report, *supra* note 15, at 3, 16.

[29] *Id.* at 31, 34.  This benefit has been widely recognized in debates over indirect costs and cost sharing over the last 75 years.  *See, e.g.*, CRS Report, *supra* note 7, at 9 (quoting President Clinton's 1994 proposal "to shift national spending from overhead to funding research" by limiting indirect costs).

[30] 56 Fed. Reg. 50,224, 50,228 (Oct. 3, 1991).  Administrative costs consist of "general administration expenses, such as the costs associated with executive functions like financial management; departmental administration expenses, including clerical staff and supplies for academic departments; sponsored projects administration expenses, that is the costs associated with the office responsible for administering projects and awards funded by external sources; and student administration and services expenses, such as the administration of the student health clinic."  2010 GAO Report, *supra* note 4 at 6.

[31] 58 Fed. Reg. 39,996, 39,998–99 (July 26, 1993).

From 2007 to 2009, Congress again through appropriations riders imposed a cap on indirect costs reimbursed through DoD basic research awards – this time at 35 percent of total costs.[32] Congress implemented the cap, effective fiscal years 2008 to 2010, because "overhead costs had grown to unwarranted levels."[33]  However, a 2010 GAO report found the cap likely had limited effect because it applied to a base consisting of the grant's total direct costs, whereas negotiated indirect cost rates apply to a more limited modified direct costs base.[34]  Congress has not since imposed any directive concerning indirect cost reimbursement in DoD grants.

## LEGAL STANDARD

Preliminary injunctive[35] relief "is an extraordinary and drastic remedy that is never awarded as of right."  *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012).  A movant may be awarded such an extraordinary remedy only "upon a clear showing" that it is "entitled to such relief."  *Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 22 (2008). Plaintiffs bear the burden of establishing (1) a likelihood of success on the merits, (2) irreparable harm in the absence of relief, (3) the balance of the equities favor the movant, and (4) an injunction is in the public interest.  *Axia Net-Media Corp. v. Mass. Tech. Park Corp.*, 889 F.3d 1, 6 (1st Cir. 2018).  The last two factors "merge when the Government is the party opposing the preliminary injunction."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Irreparable harm "constitutes a necessary threshold showing for an award of preliminary injunctive relief," *Gonzalez-Droz v. Gonzalez-*

---

[32] *See, e.g.*, Department of Defense Appropriations Act, 2008, Pub. L. No. 110-116 § 8115, 121 Stat. 1295, 1340 (2007).

[33] 2010 GAO Report, *supra* note 4 at 24.

[34] *See* 2010 GAO Report, *supra* note 4 at 24–25.

[35] On June 17, this Court entered a TRO without briefing from the Defendants.  *See* Fed. R. Civ. P. 65(b).  By the time this Court holds its hearing on July 2, Defendants will have been subject to a TRO for longer than the 14-day period contemplated in Rule 65(b)(2).  And this Court will have received a full round of briefing on the merits of the parties' dispute.  Regardless of the label Plaintiffs use, this matter is now effectively in a preliminary injunction posture.  *Cf.* Fed. R. Civ. P. 65(b)(3).

*Colon*, 573 F.3d 75, 79 (1st Cir. 2009), and is "the basis for injunctive relief." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011).

## ARGUMENT

### I.    The Court Lacks Jurisdiction Over Plaintiffs' Claims.

Before considering the merits of Plaintiffs' motion, the Court must assess whether it has jurisdiction over this dispute in the first instance. *See Acosta-Ramirez v. Banco Popular de P.R.*, 712 F.3d 14, 18 (1st Cir. 2013); *accord Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). Plaintiffs bear the burden of demonstrating subject-matter jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Here, the Court lacks jurisdiction over Plaintiffs' claims for two independent reasons: Plaintiffs have not shown they have standing to sue, and the APA does not waive sovereign immunity for these claims. Additionally, even if the Court has jurisdiction over Plaintiffs' APA claims regarding the Policy, the Hegseth Memo is not final agency action, and, thus, the Court lacks jurisdiction under the APA to fashion a remedy for it.

### A.    Plaintiffs have not established standing to sue.

The Court first lacks jurisdiction over this matter because Plaintiffs have not established standing. To establish Article III standing, a plaintiff must demonstrate (1) that it suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *See Lujan*, 504 U.S. at 560–61. Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation." *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1281–82 (1st Cir. 1996). And "standing is not dispensed in gross": each plaintiff must demonstrate standing for each claim that it presses . . ., and for each form of relief that it seeks. *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion LLC v. Ramirez.* 594 U.S. 413, 431 (2021)).

13

Here, Plaintiffs have not established an injury in fact.  First, no plaintiff has alleged that DoD has altered the terms of an existing grant by applying the 15 percent indirect cost rate, and Plaintiffs concede that the portion of the Policy applicable to existing grants is not "immediately effective."  Doc. No. 39 at 55.  Second, no plaintiff has alleged that it has received a new grant award at the 15 percent indirect cost rate.  Third, no plaintiff has alleged that it is guaranteed or entitled to receive a new grant after June 12, 2025.  Thus, the only "injury" a plaintiff can identify would stem from *potentially* being offered a grant award with a lower indirect cost rate than contained in that plaintiff's NICRA—an award that the plaintiff would then have discretion to accept or reject—or having to submit (or decide not to submit) grant proposals using the new 15 percent indirect cost rate.  An opportunity to accept or reject a federal grant on terms other than those requested by the offeree is not "an invasion of a legally protected interest."  *Lujan*, 504 U.S. at 560.  Regardless, claims concerning "hypothetical, future grants—that Plaintiffs may or may not be eligible for" are "nothing more than a generalized grievance about Defendants' programs." *Roberts v. Progressive Preferred Ins. Co.*, No. 1:23 CV 1597, 2024 WL 2295482 at *8 (E.D. Ohio May 21, 2024).  "The Supreme Court has 'repeatedly held that such a "generalized grievance," no matter how sincere, is insufficient to confer standing.'"  *Id.* (citing *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013)). The Plaintiffs' alleged injury is also speculative and fails to establish standing for that independent reason.  *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *cf. 50 Exch. Terrace LLC v. Mount Vernon Specialty Ins. Co.*, 129 F.4th 1186, 1188 (9th Cir. 2025) (a plaintiff "has not sustained an actionable injury before the extent of any disputed loss has been determined").[36]

---

[36] We respectfully disagree with the court's determination in the NSF case that the plaintiffs, who are the same plaintiffs before this Court, had standing.  *See AAU v. NSF*, No. 1:25-cv-11231-IT, Doc. No. 77 at 14-21.  In determining that the plaintiffs showed "imminent and substantial future

**B.    The APA does not waive sovereign immunity for actions committed to agency discretion.**

The Court additionally lacks jurisdiction to entertain this lawsuit because Plaintiffs have not identified an applicable waiver of sovereign immunity.  Without a waiver, "sovereign immunity shields the Federal Government and its agencies from suit," depriving the court of jurisdiction over the matter.  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  Plaintiffs' APA claims fail because the actions at issue are "committed to agency discretion by law."  5 U.S.C. § 701(a)(1).  An action is committed to agency discretion when a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  That is the case here.

In *Lincoln v. Vigil*, the Supreme Court held that the Indian Health Service's decision to reallocate funds among programs was committed to agency discretion by law.  *See id.* at 508 U.S. 182, 185–88, 191–2 (1993).  The Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what *it sees as the most effective or desirable way*."  *Id.* at 192 (emphasis added).  Thus, "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or

---

injury," the court relied upon authorities that fail to support that conclusion.  For example, in *Department of Commerce v. New York*, plaintiffs demonstrated "sufficiently concrete and imminent injury" because census undercount of noncitizen households would result in them "los[ing] out on federal funds" they otherwise were certain to receive.  588 U.S. 752, 767 (2019).  Here, Plaintiffs are not certain to receive any specific grant award.  And *Sherley v. Sebelius* found standing based upon the doctrine of competitor standing, which is inapplicable here.  610 F.3d 69, 72-75 (D.C. Cir. 2010).

another; whether it 'is likely to succeed' in fulfilling its statutory mandate; [and] whether a particular program 'best fits the agency's overall policies.'" *Id.* at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).  Although *Lincoln* addressed lump-sum appropriations, courts have made clear that its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute.  *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002); *see also Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 75–76 (D.D.C. 2018).

As in *Lincoln* and *Milk Train*, Congress allocates funding to DoD for research through lump-sum appropriations, and the statutes authorizing DoD to fund research programs through grants provide no guidance on how DoD should allocate money among research projects that align with statutory goals.  *See, e.g.*, Full-Year Continuing Appropriations & Extensions Act, Pub. L. No. 119-4 § 1405, 139 Stat. 9, 20 (2025); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Title IV, 138 Stat. 460, 478 (2024); 10 U.S.C. §§ 4001, 4010.  Similarly, the only regulation at issue—2 C.F.R. § 200.414(c)—does not interpret or establish standards that tell DoD which projects to fund and how to fund them.  Instead, that government-wide provision—which was authored by OMB—establishes *procedures*.  There is thus no statute or regulation constraining DoD's decisions about how to allocate money within or among grants issued by DoD to IHEs.  Whether and how to reimburse for indirect costs is thus committed to DoD's discretion by law, and the APA's waiver of sovereign immunity therefore does not apply.

C.    **The Hegseth Memo is not final agency action reviewable under the APA.**

This Court lacks jurisdiction to issue any remedy regarding the Hegseth Memo.  The Hegseth Memo is not a final agency action subject to judicial review under the APA because it does not have a legal effect or consequence.  APA review is available only for "*final* agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704 (emphasis added).

Under the test first laid out in *Bennett v. Spear*, an agency action is considered "final" if two conditions are met:  first, it marks the "consummation" of the agency's decisionmaking process; and second, the action determines rights or obligations or creates legal consequences.  *See Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2025) (citing *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

The Hegseth Memo is not final agency action.  It is an internal DoD memorandum from the Secretary of Defense that directs the Under Secretary of Defense for Research and Engineering to "[d]evelop and publish formal policy guidance" for capping indirect cost rates in grants to IHEs at 15 percent or lower.  *See* Doc. No. 1-1 at 2.  The Under Secretary carried out that directive in the Policy.  *See* Doc. No. 1-2.  Thus, the Hegseth Memo does not itself have the force or effect of law, mark the consummation of the agency's decisionmaking process, or create concrete consequences.  *See Harper*, 118 F.4th at 116.  It therefore is not final agency action for which the Court may fashion a remedy under the APA.  *See Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1008 (9th Cir. 2021) (Department of Homeland Security manual was not final agency action because "[a]ny guidance that could be attributed to the Manual would be subsumed" in the subsequent action).

## II.    Plaintiffs Have Failed to Show Likelihood of Success on the Merits.

Even if the Court finds it has jurisdiction and Plaintiffs have established standing, the Policy is lawful.  Plaintiffs argue that the Policy violates the Guidance expressly allowing DoD to set class indirect cost rates, is inconsistent with the Executive's indirect costs scheme as a whole, is arbitrary and capricious, and is contrary to authorizing statute.  However, none of these arguments is likely to succeed on the merits.  Plaintiffs' Motion therefore should be denied.

### A.    The Policy follows 2 C.F.R. § 200.414(c).

The Policy is consistent with, and indeed was promulgated expressly pursuant to, the Guidance on indirect costs.  That Guidance provides that agencies generally will adhere to "negotiated rate[s]" for indirect costs.  2 C.F.R. § 200.414(c)(1).  But it also provides an express path for DoD to depart from that approach.  *See* 2 C.F.R. § 200.414(c)(1).  As relevant here, "[a] Federal agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award . . . when approved by the awarding Federal agency [*i.e.*, DoD] in accordance with paragraph (c)(3) of this section."  2 C.F.R. § 200.414(c)(1).  Paragraph (c)(3), in turn, requires only that "[t]he Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates."  *Id.* § 200.414(c)(3).  Thus, the Guidance expressly contemplates that DoD may deviate from negotiated indirect-cost rates for a "class of Federal awards" provided that DoD "make[s] publicly available[]" the "policies, procedures and general decision-making criteria" that "justify deviations from negotiated rates."  *Id.* § 200.414(c)(1), (3).  Aside from that procedural requirement, the Guidance imposes no substantive constraint on the ability of DoD to depart from negotiated rates.

DoD followed that path.  The Policy specifies that it is deviating from negotiated indirect-cost rates for the class of awards issued to IHEs.  Doc. No. 1-2 at 2.  It publicly sets out "the policies, procedures and general decision-making criteria" that DoD will follow.  *Id.*  And it specifically sets forth a "documented justification" for adopting that updated policy—cost savings that have the potential "to save up to $900 [million] per year."  *See id.* at 2; Doc. No. 1-1 at 2.

Plaintiffs' attempts to distinguish between a class of awards and class of recipients and to re-characterize this class deviation as an unauthorized elimination of negotiated rates for all universities, Doc. No. 39 at 32–35, are untenable.  The Guidance expressly states that an "awarding

agency" may deviate from negotiated rates for "a single Federal award" or, at its option, for "a class of Federal awards." 2 C.F.R. § 200.414(c)(1). That phrasing readily encompasses the grants addressed by the Policy. A "[c]lass of Federal [a]wards," as defined in the Guidance, includes "a group of Federal awards either awarded under a specific program or group of programs or to a specific type of recipient or group of recipients to which specific provisions or exceptions may apply." 2 C.F.R. § 200.1. Here, the Policy applies to a "group of Federal awards" for a "specific type of recipient"—specifically, to DoD research grants made to IHEs. And nothing in the Guidance limits the size of the group of awards that may be adjusted. But even accepting Plaintiffs' theory that a "class" must be a subset of DoD awards, that is true here: the Policy applies only to research grants made to IHEs.

Moreover, despite Plaintiffs' assertion to the contrary, nothing in the text of subsections 200.414(c)(1) and (3) expressly calls for a multi-stage adjudicative process. The focus is instead on making publicly available DoD's explanation for any departure from negotiated rates. Section 200.414(c)(1) authorizes a deviation when approved by DoD, and section 200.414(c)(3) requires that the deviation's policy be implemented and made public. Although DoD could certainly choose to provide for a step-by-step rate redetermination process, nothing in the Guidance guarantees recipients any opportunity to litigate individual deviations.

On the contrary, the Guidance's text contemplates that DoD may announce generally applicable "polic[y]." 2 C.F.R. § 200.414(c)(3). And the Policy need not set forth further "procedures and decision-making criteria" because the Policy does not contemplate any individualized redetermination of indirect cost rates beyond those set forth in the Policy. Rather, as the Policy states, "DoD Components that make financial assistance awards to IHEs are directed not to allow indirect cost rates above 15% in all new assistance awards to IHEs." Doc. No. 1-2 at

3.  No further procedures or criteria—beyond the IHE recipient's selection of a rate within the new range and application of that rate to the particular award—are necessary.

Plaintiffs likewise misplace their reliance on section 200.414(f).  That provision allows grantees "that do not have a current Federal negotiated rate" to elect a de minimis rate of up to 15% and, when they do, prohibits Federal agencies from "requir[ing]" them "to use a de minimis rate lower than the negotiated indirect cost rate or the" de minimis rate "unless required by Federal statute or regulation."  Section 200.414(f) does not displace subsection (c).  Rather, the two subsections address different issues:  Subsection (f) empowers *grantees* to opt out of negotiated rates and into the de minimis rate as defined by subsection (f), while subsection (c) empowers *Federal agencies* to "deviate" from negotiated rates so long as they satisfy its procedural requirements—as the Department did here.  Subsection (f) is thus irrelevant here.  And, in any event, the Department has not required grantees "to use a de minimis rate lower than" subsection (f)'s 15% rate, and has acted pursuant to a "regulation"—section 200.414(c)—to "require" the Policy rate.  In other words, section 200.414(f) does not apply here at all, but even if it did, the Policy satisfies it.

Finally, section 200.414(c)(4) does not help Plaintiffs.  That provision provides that "[t]he Federal agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement."  The new Policy expressly provides that it will be included in new notices of funding opportunity moving forward, and that existing "notices of funding opportunity . . . must be updated to include information about the 15% indirect cost rate cap."  Doc. 1-2 at 3.  The Policy thus ensures that section 200.414(c)(4) is satisfied.  Moreover, subsection (c)(4) does not displace what subsections (c)(1) and (c)(3) expressly authorize: an agency can "use a rate different from the negotiated rate," without temporal limitation, so long as the agency "make[s]

publicly available[]" the "policies, procedures and general decision-making criteria" that "justify

deviations from negotiated rates." 2 C.F.R. § 200.414(c)(1), (3); *see also* 2 C.F.R., Pt. 200, App.

III § C(7)(a) (noting that an agency may decline to "use the negotiated rates in effect at the time

of the initial award throughout the life of the Federal award" so long as it complies with 2 C.F.R.

§ 200.414(c)(1)). DoD has done so here.

### B.    Plaintiffs' regulatory scheme argument fails.

Plaintiffs next attempt a more wide-ranging argument that the DoD's planned deviation

from negotiated rates violates the larger regulatory framework governing recovery of indirect

costs. Doc. No. 39 at 36–38. As a preliminary matter, the Guidance "framework" cannot prohibit

what it expressly permits: deviations expressly allowed by section 200.414(c). Plaintiffs rest their

argument on a mistaken assertion that the law imposes a requirement that grantees recover in full

some objective, knowable amount of *actual* indirect costs. The law imposes no such

requirement—and in fact confirms that there is no such requirement. For example, 41 U.S.C.

§ 4708 expressly allows "payment of reimbursable indirect costs on the basis of predetermined

fixed percentage rates applied to the total of the reimbursable direct costs incurred." That is a blunt

measure: application of a predetermined fixed rate to the reimbursable direct costs will yield a

number, but that number will not reflect—and certainly will not necessarily reflect—the actual

amount of indirect costs that are associated with any specific federal award (a concept that is itself

fuzzy and leaves ample room for disagreement). The Guidance has capped recovery of the

administrative portion of F&A costs for more than three decades. *See* 2 C.F.R. Pt. 200, App. III §

C.8; *supra* at 11-12. And the default negotiated rate method underscores the point: a rate arrived

at through negotiation will not guarantee recovery of *actual* indirect costs. *Id.* And even if it

would, the fact remains that subsection (c)(3) explicitly allows for "deviation[s]" from the

negotiated rate. In any event, the Guidance itself directly provides that the provisions setting out

"cost principles . . . do not address the circumstances nor dictate the extent of Federal Government funding of a particular program or project." 2 C.F.R. § 200.100(c). Plaintiffs thus have no right to recover some allegedly "true" amount of actual indirect costs.

The provisions cited by Plaintiffs are not to the contrary. Plaintiffs rely primarily on 2 C.F.R. § 200.402—itself one of the "cost principles" that expressly does not dictate the extent of funding—which, provides that "[t]he total cost of a Federal award is the sum of the allowable direct and allocable indirect costs minus any applicable credits." Section 200.402 speaks only to the "total cost," making clear that allocable indirect costs are part of the "total costs" that generally may be charged against a grant (up to the amount of the grant), without purporting to set an indirect cost rate to be used in setting the amount of the grant—much less requiring the Government to pay for the entirety of a recipient's indirect costs. *See Cmty. Rels.-Soc. Dev. Comm'n v. United States*, 8 Cl. Ct. 723, 726 (1985) (explaining in similar context that "fixed percentage of direct cost rates," as opposed to "actual allocations" or "lump sums," is simply one method of "determining allocable indirect costs"). Were it otherwise, section 200.402 would be at war with not only sections 200.100 and 414(c)(1) and (3), but also the default use of negotiated rates.

The Policy likewise does not contravene Appendix III to Part 200. That Appendix "provides criteria for identifying and computing indirect . . . rates at IHEs (institutions)." 2 C.F.R. Pt. 200, App. III § A. As noted above, it caps recovery of the administrative portion of F&A costs, undermining Plaintiffs' premise that the Guidance requires recovery of actual costs. *See* 2 C.F.R. Pt. 200, App. III § C.8; *supra* at 11-12. Moreover, the Appendix simply (i) defines categories of indirect costs, such as "Depreciation," "Interest," and "Operation and Maintenance Expenses," 2 C.F.R. Pt. 200, App. III §§ B.2–B.4; (ii) requires those costs to be "distributed to the major functions of the institution," *id.* § A.2; and (iii) further defines each of the "major functions of the

institution," *id.* § A.1.  It does not purport to require an agency to pay for all of a grantee's costs, or even to adhere to the "negotiated rate" for indirect costs.  In fact, it expressly notes that the grantor may deviate from the negotiated rate under Subsection (c)(1)—precisely as DoD proposes in the Policy.  *Id.* § C.7.

Nor does the Policy somehow contravene the guidelines relating to audits and the negotiation of indirect cost rates.  Nothing about a change in indirect cost rates precludes an agency from auditing a grant recipient to ensure that the recipient is properly using federal funds.  *See* 2 C.F.R. §§ 200.501(b), 200.504, 200.514.  And to invalidate the Policy's "deviation from negotiated rates" on the ground that it is inconsistent with the provisions governing negotiations of indirect cost rates would be to read Section 200.414(c) into nonexistence.  *See* 2 C.F.R § 200.1 (defining "Indirect cost rate proposal"), § 200.100(c) (noting that "Subpart E establishes principles for determining allowable costs incurred by recipients . . . under Federal awards," but that they "do not address the circumstances nor dictate the extent of Federal Government funding of a particular program or project"), § 200.414(e) (listing Appendices "for development and submission of indirect (F&A) cost rate proposals and cost allocation plans").  Those provisions will continue to apply whenever an agency uses negotiated indirect cost rates—but under the plain terms of section 200.414(c) an agency is not bound to do so.

### C.      The Policy is reasonable and reasonably explained.

The Policy is neither arbitrary nor capricious.  Section 706(2)(A) of the APA allows courts to set aside agency actions when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," but the "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Sorreda Transp., LLC v. U.S. Dep't of Transp.*, 980 F.3d 1, 3 (1st Cir. 2020) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Indeed, a court must "uphold [even] a

decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (quotation marks omitted). At bottom, the APA requires only that agency action be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

An agency's change in policy is entitled to the same deference. An agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Fox Television Stations*, 556 U.S. at 515. Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.* To the extent that the agency's change in course unsettles any "serious reliance interests," the agency need only acknowledge and address those interests and explain why it nonetheless changes its policy. *Id.*

Further, the judiciary affords a particularly lenient standard of review to agency action in the contracting context. "Effective contracting demands broad discretion." *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 260 (Fed. Cl. 2016). As such, contracting decisions are subject to a "highly deferential rational basis review," *id.* at 261, because, at bottom, "competitors do not dictate an agency's minimum needs, the agency does," *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010). "Determining an agency's minimum needs is a matter within the broad discretion of agency officials ... and is not for the court to second guess." *Id.* (citation omitted).

Measured against these standards, the Policy is unquestionably reasonable. The Policy acknowledges that it makes "changes" and "deviat[es]" from DoD's preexisting policy. Doc. No. 1-2 at 2. It explains the change: "the potential cost savings highlighted in Secretary Hegseth's memorandum," which the Secretary explained would be "repurpose[d] . . . toward applied

innovation, operational capability, and strategic deterrence."   *Id.* at 2; Doc. No. 1-1 at 2.  As the

Secretary made clear: "We owe it to our Service members, and we owe it to the American people."

Doc. No. 1-1 at 2.  All of this from the agency that "defends our Nation, equips our warfighters,

and secures our future," to address an important problem – that the Department could save up to

$900 million annually on indirect costs that could fund direct research that could benefit the armed

forces and, by extension, the United States.  *Id.*

Plaintiffs' counterarguments, at bottom, improperly ask the Court to replace Plaintiffs' self-

interested judgment about how DoD should optimize its research spending for the reasoned

determination of the agency responsible for defending the nation.  *See Bos. Redevelopment Auth.*

*v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (even if it disagrees with an agency's

conclusions, a court "'cannot substitute its judgment for that of the agency.'") (quoting *Associated*

*Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997) (noting that "policy choices

are for the agency, not the court, to make")).  None succeeds.

First, Plaintiffs claim that DoD's Policy depends on the "premise that indirect costs are less

worthy and less effective than direct costs."  Doc. No. 39 at 39.  But that is incorrect.  DoD's policy

depends on the premise that indirect costs have grown too large—a fact Plaintiffs could hardly

contest given decades of government-wide efforts to rein in such costs.  In any event, to the extent

that DoD has determined that decreasing indirect costs will result in increased direct costs and

more effective research outcomes, that is a good reason for the Policy.  And DoD will repurpose

the funds saved from decreasing indirect costs for "applied innovation, operational capability, and

strategic deterrence."  Doc. No. 1-1 at 2.  DoD's strategic goals are reasonable, if not laudatory.

Plaintiffs disagree with DoD's decision but the APA does not require DoD to make choices

agreeable to Plaintiffs.  Instead, DoD "may change its existing position on an issue 'as long as [it]

provide[s] a reasoned explanation for the change.'" *Housatonic River Initiative v. EPA*, 75 F.4th 248, 270 (1st Cir. 2023).

Second, Plaintiffs assail DoD's anticipated "cost savings" – claiming, with zero support, that DoD may use those funds for "buying additional military hardware or recruiting additional troops." Plaintiffs have put the cart leagues before the horse. The Hegseth Memo does not suggest DoD will abandon research, but simply that the money will shift "from overhead to outcomes." Plaintiffs' speculation does not undermine the Department's reasoned explanation or the fact that "there are good reasons for" the Policy and that DoD "*believes* it to be better." *Fox Televisions Stations*, 556 U.S. at 515.

Finally, Plaintiffs challenge DoD's explanation that the Policy was decided upon after "the Department compared the indirect costs on existing financial assistance awards to IHEs to the indirect cost rates allowed by several non-profit foundations that provide financial assistance to IHEs." Plaintiffs again seek to impose their judgment on DoD, but DoD's judgment is entitled to deference. *Bos. Redevelopment Auth.*, 838 F.3d at 47. It is undisputed that many non-profit foundations indeed reimburse indirect costs at rates significantly lower that DoD. For example, the Gates Foundation reimburses a maximum of 10 percent indirect costs for United States universities.[37] And the Robert Wood Johnson Foundation reimburses up to 15 percent indirect costs for United States universities.[38] Plaintiffs call DoD's comparison "irrational[]" and assert it is "apples-to-oranges," but those protestations amount to mere disagreement with DoD's decision, insufficient to satisfy the arbitrary and capricious standard. *See Trump v. Hawaii*, 585 U.S. 667, 708 (2018). Contrary to Plaintiffs' assertions otherwise, DoD's policy will cause more resources

---

[37] https://docs.gatesfoundation.org/Documents/Indirect_Cost_Policy.pdf at 3.
[38] https://www.rwjf.org/content/granteeresources/legal-and-policy/Indirect_Cost_Rate.html.

to flow towards direct scientific research. Decreasing the indirect cost rate will force IHEs to fund greater shares of research themselves or from other sources—just as they did during earlier periods in which flat rates or cost-sharing were used. *See supra* at 6–12.

Similarly, Plaintiffs' assertion that "treating institutions with wildly different documented costs the same" is "irrational[]," Doc. No. 39 at 43, is semantics. Giving all IHEs the opportunity to use the same standard indirect costs rate treats them consistently in the most straightforward sense. The Policy treats "like cases alike." *Craker v. DEA*, 44 F.4th 48, 64 (1st Cir. 2022). Plaintiffs' argument amounts to no more than disagreement with DoD's policy choice, which is not sufficient under arbitrary-and-capricious review. Similar is Plaintiffs' contention that IHEs have been "singled out." Doc. No. 39 at 43. First, the Guidance permits deviation for a "class of Federal awards," 2 C.F.R. § 200.414(c)(1), which requires an agency to single out a class based on defined parameters – which is what DoD has done. Moreover, agencies need not address every potential issue "in one fell swoop." *Env't Def. Fund v. EPA*, 922 F.3d 446, 457 (D.C. Cir. 2019) (quoting *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 588 (D.C. Cir. 2004)). "It is not for [the court] to 'second-guess'" what the agency chooses to prioritize. *Id.* (quoting *WildEarth Guardians v. EPA*, 751 F.3d 649, 656 (D.C. Cir. 2014)). In any event, in FY 2024, DoD funded more than $10.0 billion of research at IHEs, so deviations focused on IHEs are a natural avenue to realize the Policy's goals.[39] And as Plaintiffs recognize, the Guidance already recognizes 15 percent as an appropriate flat rate—making it perfectly reasonable for DoD to rely on that figure. Doc. No. 39 at 43.

Next, the Policy does not "fail[] to consider multiple 'important aspects of the problem,'" as the Plaintiffs allege. Doc. No. 39 at 41. "Important aspects of the problem" are only "those

---

[39] *See supra* note 1.

Congress considered relevant," not what Plaintiffs would like to see considered. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 698 F. Supp. 3d 39, 58 (D.D.C. 2023) (appeal pending). Plaintiffs claim that the Policy will "devastate the research DoD has historically supported" and "will hit the most advanced research the hardest." But, first, these claims are purely conjectural, and as discussed further below in section III.A, more than anything else, they demonstrate Plaintiffs' unwillingness to marshal alternative resources such as their endowments. Second, DoD plainly concluded, to the contrary, that the Policy will foster the "development of transformative research concepts that drive [the Department's] future capabilities" and "strengthen[] the United States military." Doc. No. 1-2 at 3, Doc. No. 1-1 at 2. Plaintiffs are not in a better position than DoD to gauge DoD's research objectives and Plaintiffs' argument is an improper attempt to substitute their judgment for that of the agency. *See Hawaii*, 585 U.S. at 708 (The judiciary "cannot substitute [its] own assessment for the Executive's predictive judgments … all of which 'are delicate, complex, and involve large elements of prophecy." (citation omitted)); *see also Off. of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1437 (D.C. Cir. 1983) ("When the Commission reaches such predictive conclusions about what would best be in the public interest, it is entitled to substantial judicial deference"). DoD continues to fund "basic research, applied research, advanced research, and development projects," and the Policy furthers that goal by permitting allocation of more of DoD's budget toward research instead of expenses that can and should be borne by Plaintiffs, such as "tenured faculty salaries" and other costs. 10 U.S.C. § 4001(a); *see, e.g.*, Doc. No. 13-10 at 11 ¶ 20; Doc. No. 13-19 at 18 ¶ 20; Doc. No. 13-24 at 13 ¶ 19.

The specific terms of the Policy also demonstrate, contrary to Plaintiffs' contentions, that the Policy adequately considers reliance interests. *See* Doc. No. 39 at 42–43. For purposes of

Plaintiffs' TRO Motion, which seeks only to restrain DoD's application of the new indirect cost rate to *new awards*, what Plaintiffs term the "immediately effective portions of" DoD's Policy, *id.* at 55, the Policy considers reliance interests by applying only to "new assistance awards to IHEs . . . as of the date of publication of this memorandum [June 12, 2025]." Doc. No. 1-2 at 3. Moreover, because the Secretary's May 14, 2025, guidance publicly announced future implementation of the new indirect cost rate policy, IHEs had additional time to, as needed, adjust operations to account for the future change. Plaintiffs' reliance on *DHS v. Regents of the University of California*, 591 U.S. 1 (2020), is misplaced. While unauthorized aliens receiving forbearance of removal under DACA may have had "substantive rights" in the benefit *they were receiving*, Plaintiffs here have no "substantive rights" to grants that have not yet been awarded. *See* Doc. No. 39 at 43. To the extent that Plaintiffs *rely* on receiving grant awards that have not been made, and then *rely* on forever receiving reimbursement for indirect costs at their NICRA rates, those speculative interests are not protected by law.

    **D.**    **The Policy is authorized by statute.**

Plaintiffs have failed to show that the Policy does not properly exercise DoD's statutory authority. Plaintiffs direct the Court to several statutes that authorize DoD to issue grants. *See* Doc. No. 39 at 44 (citing 10 U.S.C. §§ 4001, 4010, 4141). None of those statutes prescribe any principles for determining the costs paid in grant awards. *See generally* 10 U.S.C. §§ 4001, 4010, 4141. DoD capped indirect costs reimbursement at 50 percent in the 1940s and 20 percent in the late 1950s and early 1960s, and has adhered to the 26 percent cap on administrative costs since 1991, *supra* at 11-12, evincing its long-standing understanding that grant-making authority

includes the power to cap indirect costs.[40]  DoD thus has broad authority to determine the monetary amounts of grants, including by capping indirect costs at 15 percent – authority that is patently not "newly discovered."  Doc. No. 39 at 44.

Plaintiffs' attempt to undermine that authority through 41 U.S.C. § 4708 confuses apples with oranges: § 4708 speaks only to whether and how reimbursement of indirect costs can be set, not to whether reimbursement of those costs can be capped.  This is clear on the statute's face. Section 4708 provides that a "cost-type research and development" grant issued to an IHE "may provide for payment of reimbursable indirect costs on the basis of predetermined fixed-percentage rates," which may be applied either "to the total of the reimbursable direct costs incurred" or "to an element of the total of the reimbursable direct costs incurred."  41 U.S.C. § 4708.  The text is, first, entirely discretionary, providing only that agencies "may" use predetermined fixed-percentage rates in grants.  Alternately, grants issued to IHEs may identify indirect costs through fixed with carry-forward or provisional rates.[41]  Since § 4708 does not apply to every grant awarded to IHEs, it cannot set a broad requirement that grants to IHEs must fully reimburse indirect costs.  This is underscored by the fact that the statute leaves to an agency whether to key the indirect cost rates to total reimbursable direct costs or only to some "element" thereof.  41 U.S.C. § 4708.

---

[40] This agency history, as well as Congress's history of statutorily capping rates in DoD grants, renders *West Virginia v. Environmental Protection Agency* inapposite.  *See* 597 US. 697, 724 (2022) ("major questions" doctrine only applies where agencies "discover in a long-extant statute an unheralded power . . . to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself") (quotations and citations omitted).

[41] GAO, GAO-10-937, University Research: Policies for the Reimbursement of Indirect Costs Need to be Updated (Sept. 2010).

Moreover, "predetermined fixed-percentage rates" is not a "term of art." Doc. No. 39 at 45. The term's plain meaning is that rates may be set in advance.[42] This statement of when rates may be set offers no instruction on what the rates should be, compelling the conclusion that any predetermined rates, including 15 percent, are authorized. Plaintiffs' argument to the contrary is belied by the Guidance's 15 percent default rate, which applies without regard to actual costs. *See* 2 C.F.R. § 200.414(f) ("The de minimis rate does not require documentation to justify its use.").

Because the statute is clear on its face, legislative and executive history are irrelevant. *See, e.g.*, *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009). Regardless, the legislative and executive history comport with the statute's plain meaning. As described above, § 4708 was intended to create an exception to statutory prohibitions on the cost-plus-a-percentage-of-cost contracting method, which prohibited pre-fixed rates that *overpaid* indirect costs. *See supra* at 8–10. But that had nothing to do with rate caps that required IHEs to absorb some portion of indirect costs, as is clear in the history Plaintiffs cite.[43] To the contrary, before § 4708 was passed, pre-fixed rates *had* to be treated as rate caps, to comply with the law. *See* 35 Comp. Gen. 63, 70, B-120714 (1955). Interpreting § 4708 as impliedly stripping agencies of that preexisting authority to cap costs would be improper. *See, e.g.*, *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 133 (1974) ("One canon of construction is that repeals by implication are disfavored."). Moreover, Congress passed statutory indirect rate caps through appropriations during and around the same time it enacted § 4708 in 1962. *See supra* at 10-12. Viewing § 4708 as impliedly prohibiting with one hand the

---

[42] *See, e.g.*, Predetermine, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/predetermine (last visited June 21, 2025) (defining "predetermine" as to "foreordain" or "determine beforehand").

[43] *See* Doc. No. 39 at 45 n.17 (quoting 1962 comments by DoD's General Counsel that "indirect costs must be reimbursed in fair degree *when . . . cost-sharing is not contemplated*") (emphasis added).

very cost containment measures Congress was favoring with the other is non-sensical.  And it fails to account for the long-standing 26 percent cap on administrative indirect costs.  *See* Doc. No. 39 at 45.  Given this history, Plaintiff's argument that a system of reimbursing an "estimate of actual indirect costs" has "prevailed for decades" is, at best, myopic.  Doc. No. 39 at 44–45.

Respectfully, the court's view in the NSF case that § 4708 prohibited NSF's imposition of a 15 percent indirect cost rate is not cohesive with the plain text of the statute or this history.  *See AAU v. NSF*, No. 1:25-cv-11231-IT, Doc. No. 77 at 25-30.  Ignoring the permissive plain language of § 4708, which states that an agency "may provide for payment of reimbursable indirect costs on the basis of predetermined fixed-percentage rates," the NSF court read "reimbursable" to mean all indirect costs, inserting into the statute a fictional (and practically impossible) requirement that predetermined rates must reimburse "actual indirect costs."  No. 1:25-cv-11231-IT, Doc. No. 77 at 27.  The more plausible explanation, which accords with the plain text and history, is that "reimbursable" means allowable indirect costs – i.e., the agency may only provide for payment of costs eligible for reimbursement.[44]  And to the extent "the Executive Branch has consistently read the language in Section 4708 to indicate that [agencies] should negotiate and set indirect cost rate with reference to an institution's actual costs," this is to prevent overpayment of indirect costs.  As is clear from the history discussed above, that agencies should take care not to *overpay* indirect costs has no bearing on whether cost reimbursement may be capped.  Finally, the court fails to

---

[44] For example, as of 2010, a cost was "allowable" if it was "reasonable, allocable to the agreement, . . . treated consistently with generally accepted accounting principles appropriate to the circumstances, and conform[ed] to principles in OMB Circular A-21 and the sponsoring agreement."  2010 GAO Report, *supra* note 4 at 5.

reconcile its interpretation of § 4708 with either the longstanding 26 percent cap on administrative costs or the flat de minimis rate set forth in 2 C.F.R. § 200.414(c).[45]

Moreover, Plaintiffs' attempt to obfuscate DoD's broad statutory authority by reading too much into the history of the appropriations riders fails. *See* Doc. No. 39 at 46. As described above, the riders relevant to DoD limited cost reimbursement in grants, highlighting a longstanding focus on grant cost containment. *See supra* at 6–12. As recently as 2007 to 2009, Congress capped indirect costs in DoD grants through appropriations riders. *See supra* at 12. That rate cap was ineffective, and Congress discontinued it. *See id.* However, when the appropriations riders limiting cost reimbursement were discontinued, the underlying authority given DoD through its statutes and § 4708 remained unaffected. In other words, Congress's decision to abandon *legislative* caps did not strip DoD of its authority to impose *its own* caps.[46] *See St. Martin Evangelical Lutheran Church v. S. Dakota*, 451 U.S. 772, 788 (1981) ("[I]ndefinite congressional expressions cannot negate plain statutory language and cannot work a repeal or amendment by implication.").

Last, Plaintiffs' argument that the Policy's attempt to contain costs violates DoD's mission, *see* Doc. No. 39 at 46–47, fails to appreciate that DoD appropriations are finite. The Defense Established Program to Stimulate Competitive Research ("DEPSCoR") does not require DoD to fully reimburse actual indirect costs. *See* 10 U.S.C. § 4010. To the contrary, that program focuses

---

[45] Similarly, though the 26 percent was proposed in 1986 based on the then-five-year average of the administrative cost reimbursement rates "for all major universities" taken together, 2010 GAO Report, *supra* note 4 at 21, the court failed to recognize that such an average is still a one-size-fits-all approach to capping indirect costs that has been in effect for 34 years. Moreover, the cap has not changed in the past 39 years despite increasing administrative costs, *id.* at 20-22, making any relation it once bore to actual costs anachronistic.

[46] The 2017 rider concerning the National Institutes of Health's use of predetermined indirect cost rates is simply irrelevant. If Congress wanted to make that rider applicable to DoD, it could have easily done so, and it did not.

on fostering "competitive" research and awards.  *See id.* § 4010(b)(2)–(3), (c)(1)–(2).  Setting aside Plaintiffs' speculative parade of horribles, *see* Doc. No. 39 at 47, Plaintiffs have offered no concrete reason to think the Policy's cost reimbursement limit will not spur more-competitively priced proposals and research.[47]  Regardless, the DEPSCoR statute authorizes only a subset of grants awarded by DoD; it does not provide a basis for broadly enjoining the Policy nationwide, as requested by Plaintiffs.

*    *    *

As explained above, this Court lacks jurisdiction and, even if that were not true, Plaintiffs have not shown a likelihood that the Policy fails to comply with all relevant statutes and regulations and is reasonable and reasonably explained.  The Court therefore should deny Plaintiffs' Motion.

## III.    Plaintiffs Have Not Satisfied the High Burden for a TRO.

Because Plaintiffs have not shown a likelihood of success on the merits, extension of the TRO is not warranted.  However, even if the Court concludes that Plaintiffs' claims have merit, the Court should nonetheless dissolve the TRO and deny Plaintiffs' Motion for the independently sufficient reason that Plaintiffs have not carried their high burden of demonstrating irreparable harm from the new indirect cost rate applicable to grants awarded after June 12, 2025, or showing injunctive relief is in the public interest.  *See EEOC v. Astra USA, Inc.*, 94 F.3d 738, 743 (1st Cir. 1996); *In re TelexFree Sec. Litig.*, No. 4:14-MD-02566, 2021 WL 11604879, at *7–8 (D. Mass. Apr. 21, 2021) (finding likelihood of success on the merits but denying emergency relief for failure to show irreparable harm).

---

[47] *See* 2010 GAO Report, *supra* note 4 at 21 (noting view that the 26 percent cap on administrative costs "has forced the schools to be more efficient with their administrative effort and to be more disciplined in spending").

A.       **Plaintiffs have not shown irreparable harm.**

"A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). The irreparable harm must be "actual and imminent," not remote or speculative. *See Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991). To warrant a temporary restraining order, the irreparable harm must occur before the Court can adjudicate the merits. *See Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 382–83 (1st Cir. 1987) (affirming denial of preliminary relief in the absence of indication that the merits of the case would not be decided before harms occurred).

In considering whether Plaintiffs have demonstrated that, absent preliminary relief, they are likely to suffer irreparable harm, the Court should not consider Plaintiffs in the collective. Instead, each Plaintiff—and each institution represented by a plaintiff—must, on its own, make a clear showing of irreparable harm. *See, e.g.*, *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 485–86 (3d Cir. 2000) (partially vacating a preliminary injunction because "the court dealt with the plaintiffs as a unit and concluded that because several of them probably risked irreparable harm, that was sufficient to satisfy that prong of the preliminary injunction test"). Plaintiffs' (and their member institutions') circumstances vary significantly, and the Court should require each Plaintiff (and member institution) to meet this burden. *See Tamko Roofing Prods., Inc. v. Ideal Roofing Co.*, 282 F.3d 23, 40 (1st Cir. 2002). Moreover, even as a collective, Plaintiffs cannot show irreparable harm warranting a TRO over the immediately effective portions of the Policy, which apply only to new awards issued after June 12, 2025. Such forward-looking portions of the Policy cannot justify the TRO.

Plaintiffs' alleged harm from the Policy is that they will receive less indirect cost reimbursements than they would have under negotiated indirect cost rates. But the immediately

effective portions of the Policy are forward-facing. The Policy directs "DoD Components that make financial assistance awards to IHEs" "not to allow indirect cost rates above 15% in all new assistance awards to IHEs as of the date of publication of" the Michael Memo (June 12, 2025). Doc. 1-2 at 3. Future, unissued grants cannot be the basis of irreparable harm. Speculative, unilateral anticipation is insufficient to prove irreparable harm. *See Arab World, Inc.*, 645 F.3d at 32.

Moreover, the general rule is that "the possibility of monetary injury does not constitute irreparable harm." *Micro Networks Corp. v. HIG Hightec, Inc.*, 188 F. Supp. 2d 18, 22 (D. Mass. 2002). Other than a reduction of anticipated indirect cost recovery, the "harms" alleged by Plaintiffs are all speculative downstream effects from receiving less money from DoD. Plaintiffs' voluminous declarations catastrophize the rate cap without contemplating any possibility of mitigation. In any event, as prestigious universities, Plaintiffs are uniquely placed to attract funding from alternative sources. For example, Caltech references a $140 million facility to be completed in 2026 that is "funded by generous private gifts to Caltech." Doc. No. 13-7 at 6, ¶ 11.

To the extent that any alleged harms by Plaintiffs would be "not ascertainable or compensable by money damages," they would be self-inflicted. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000). Examination of *Ross-Simons,* cited by Plaintiffs, illustrates why Plaintiffs' alleged harms fail to show irreparable harm. In *Ross-Simons,* the appellants distributed a "prestigious line of French lead crystal" whose "uniqueness and prestige" meant that if appellee retailer could no longer sell the crystal, it would suffer an "incalculable loss of reputation and prestige." *Id.* DoD funding is not like a unique product. Plaintiffs' "budgetary pressure" becomes irreparable only if Plaintiffs allow it to snowball. *See e.g.*, Doc. No. 13-2 at 8 ¶ 20. The declarations betray Plaintiffs' unwillingness to explore alternative temporary funding.

Instead of exploring ways to mitigate any potential budget shortfall, Plaintiffs threaten to "*immediately*" begin the process of identifying projects "to be terminated all together" or "be scaled down or pared back significantly." *See e.g.* Doc. No. 13-7 at 9 ¶ 19; Doc. No. 13-12 at 13 ¶ 17; Doc. No. 13-20 at 12 ¶ 16. Such "harms" are self-inflicted and do not justify either extension of the TRO or further injunctive relief.

For the immediately effective portion of the Policy, applying the new indirect cost rate to grants awarded after June 12, 2025, Plaintiffs' alleged harms are speculative. Plaintiffs complain of loss of anticipated indirect cost recovery from pending proposals and calculate their expected losses as if their past approval rates guarantee the same recovery going forward. *See e.g.* Doc. No. 39 at 50 n.21; Doc. No. 13-9 at 2-3, ¶ 5. But under the cloak of mathematical certainty, these alleged harms remain "conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store" and cannot justify injunctive relief. *Blinds To Go, Inc.*, 370 F.3d at 162. Plaintiffs asserted historical acceptance rates ranging from 20% to 53% in their declarations. *See* Doc. No. 13-16 at 3 ¶ 5 (providing 20% acceptance rate for DoD proposals by University of Kansas Medical Center); Doc. No. 13-22 at 2 ¶ 5 (providing 53% acceptance rate for USC's DoD proposals in FY2024). Plaintiffs have no entitlement to DoD funding merely because DoD accepts proposals and has previously issued a certain number of awards.

Independently, injunctive relief is inappropriate because Plaintiffs' alleged injury is redressable after final judgment. "The rule that equitable remedies cannot issue when the damages are monetary in nature has been ingrained in law for 'half a millennium or so,' and no judge within the English common law tradition has the luxury of ignoring it." *See United States v. Michigan*, 230 F.R.D. 492, 494 n.1 (E.D. Mich. 2005) (citations omitted); *see also Blinds To Go, Inc.*, 370 F.3d at 162. The immediately effective portions of the Policy affect only new grants and only seek

to limit indirect cost recovery.  Any effects from a lowered cap of indirect cost reimbursement will only accumulate gradually.

Plaintiffs rely on *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) to argue that budget uncertainty is irreparable harm.  Doc. No. 39 at 50.  But in *Santa Clara*, the "confusion and justified fear among states and local jurisdictions" resulted from the "broad directive and unclear terms" in an executive order that threatened to cut all federal funding for sanctuary jurisdictions.  *Santa Clara,* 250 F. Supp. 3d at 537.  The Policy, on the other hand, causes no budgetary uncertainty – it is a simple and clear reduction of overhead reimbursement.  Plaintiffs' unwillingness to budget for this reduction does not create "uncertainty" that would justify a finding of irreparable harm.  *See id*.

Finally, Plaintiffs rely on a variety of alleged harms that *could* happen if they receive less indirect cost reimbursement under grants they have not even received.  But *potential* downstream consequences of *speculative* harms cannot support injunctive relief.  *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) ("[A] preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm.").  In any event, Plaintiffs' claimed downstream harms fail on their own terms.

*First*, many of Plaintiffs' claimed harms categorically do not qualify as irreparable harm. For example, Plaintiffs assert the Policy "will allow competitor nations that are maintaining their investments in research to surpass the United States on [specialized research], threatening our nation's national security and its economic dominance."  Doc. No. 13-1 at 8 ¶ 16.  Similar recitations of these concerns over the United States' national security and economic dominance— which are not harms *to Plaintiffs* but rather alleged harms to the United States' interests—permeate Plaintiffs' declarations.  *See, e.g.*, Doc. No. 13-2 at 7 ¶ 17; Doc. No. 13-3 at 7 ¶ 15; Doc. No. 13-7

at 10 ¶ 23; Doc. No. 13-9 at 13 ¶ 22; Doc. No. 13-13 at 10 ¶ 23; Doc. No. 13-19 at 19 ¶ 22; Doc.

No. 13-20 at 14 ¶ 21.    Setting aside the multiple speculations contained in these assertions,

considerations regarding the United States' national security and economic well-being properly

belong to the democratically elected President and his Administration, not Plaintiffs seeking more

money from the public fisc.  *See, e.g.*, *Winter*, 555 U.S. at 26 (looking to what "the President—the

Commander in Chief—has determined" is in national security interests when evaluating injunctive

relief).    The Policy reflects the Administration's choice on how to best use taxpayer money to

enhance public interest and is entitled to deference by the Court.

*Second*, Plaintiffs describe numerous potential harms that might materialize if DoD were

to reduce their indirect cost funding, but the asserted harms are conjecture.  A plaintiff seeking

injunctive relief must demonstrate that irreparable injury is *likely* in the absence of an injunction.

*See Blinds To Go, Inc.*, 370 F.3d at 162; *Winter*, 555 U.S. at 22.  But the declarations are littered

with unsubstantiated fears.    For example, one declarant asserts that reducing indirect cost

reimbursements "would have profound and far-reaching national consequences" that "begin with

a weakened national security posture" and "[o]ver time, ... erode America's global leadership in

science, technology, and defense—compromising not only our competitiveness, but our ability to

shape the future on our own terms."  Doc. No. 13-22 at 20-21 ¶ 21.  This catastrophizing assumes

irreparable harm but does not demonstrate it.  *Contra Narragansett Indian Tribe v. Guilbert*, 934

F.2d 4, 6–7 (1st Cir. 1991).  And Plaintiffs' repeated speculations on the long-term effects of DoD's

action on the local economy or national security demonstrate that their alleged harms are

speculative and not imminent.  *See, e.g.*, Doc. No. 13-7 at 9 ¶ 19 (claiming "long-term implications

for national security and the American economy"); Doc. No. 13-9 at 13 ¶ 21 (harm "to the local

region"); Doc. No. 13-10 at 12 ¶ 22 ("local economy"); Doc. No. 13-16 at 7 ¶ 19 ("national health,

safety, and the American economy"); Doc. No. 13-18 at 16 ¶ 30 (" American security, scientific, technical, and economic priorities"); Doc. No. 13-25 at 23 ¶ 29 ("economic growth and national security").

Other speculations in the declarations similarly undermine Plaintiffs' request for the TRO. Numerous declarants assert that "current research projects will be forced to slow down or cease abruptly if we cannot apply for new awards or renewals at the 15% indirect cost cap." *See, e.g.,* Doc. No. 13-13 at 8 ¶ 18, Doc. No. 13-15 at 6 ¶ 15; Doc. No. 13-17 at 13 ¶ 20; Doc. No. 13-24 at 12 ¶ 17. But whether Plaintiffs will apply for future DoD grants is conjectural—meaning downstream effects of those decisions are both doubly conjectural and within Plaintiffs' control.[48]

*Third*, where declarants assert that reducing funding is likely to harm research, innovation, or retention, they generally do not assert that those harms are *imminent* as opposed to eventual reductions in their capacity that would occur from sustained diminished funding after a ruling on the merits. *See Pub. Serv. Co. of N.H.*, 835 F.2d at 382 (affirming denial of preliminary injunction in the absence of indication that the merits of the case would not be decided before harms occurred); *see also, e.g.*, Doc. No. 13-14 at 13 ¶ 12 ("Over time, without shared funding of these vital services, infrastructure, and equipment, JHU researchers will have no choice but to reduce the volume, scope, and/or scale of groundbreaking research."); Doc. No. 13-25 at 22 ¶ 21 ("UW-Madison's ability to train the next generation of researchers and educate students would likewise be significantly hindered"); Doc. No. 13-7 at 8 ¶ 17 ("Top scientists will not move to (or stay at) Caltech if we cannot provide the facilities necessary to conduct world-class research."). Likewise,

---

[48] IHEs' concerns that they would not be able to accept federal funding due to cost issues are not new, but "despite all the complaints and concerns universities raise about cost sharing, invariably universities appear to take the federal research money, regardless of the cost sharing 'strings' attached." Hardy, *supra* note 13, at 18.

Plaintiffs assert that even if they could absorb the cost of a lower indirect cost rate, doing so would create "long-term budget pressures."  *See, e.g.*, Doc. No. 13-8 at 9 ¶ 19; Doc. No. 13-11 at 11 ¶ 24; Doc. No. 13-17 at 19 ¶ 31; Doc. No. 13-20 at 15 ¶ 23; Doc. No. 13-22 at 23 ¶ 25.  But even if budget "pressures" can be considered a harm, they are "long-term" by Plaintiffs' own admissions and are not imminent.

### B.  Injunctive relief is not in the public interest.

The "balance of equities" and the "public interest" elements generally merge with the in cases where the Government is a party.  See Doc. No. 39 at 44.  Here, injunctive relief would prevent DOD from effectuating a policy that would further the democratically-accountable Executive Branch's assessment of the public interest. The Court should not substitute Plaintiffs' views concerning what would best serve the public interest for the views of the Executive Branch, particularly in this case concerning the defense budget and, thus, national defense.  *See Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988) ("[C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs.").

Moreover, as the Supreme Court recently held in *Department of Education v. California*, 604 U.S. ----, 145 S. Ct. 966, 968–69 (2025), the public interest is harmed when the United States is forced to pay out funds that it may not be able to recover.  *See Heckler v. Turner*, 468 U.S. 1305, 1307–08 (1984) (Rehnquist, J., in chambers) (prospect of the government being forced to make $1.3 million in improper payments per month supported a stay of injunction).

### IV.  Any Injunction Should Be Narrowly Tailored to Plaintiffs—And, More Specifically, Apply Only To IHEs That Are Plaintiffs or Represented by Plaintiffs and that Have Shown Irreparable Harm.

Any injunction should be properly tailored and "be no more burdensome to the defendant than necessary to provide complete relief to plaintiffs."  *Tamko Roofing Prods.*, 282 F.3d at 40 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).  Thus, "courts must 'closely tailor

injunctions to the harm that they address.'"  *Id.* (quoting *ALPO Petfoods v. Ralston Purina Co.*, 913 F.2d 958, 972 (D.C. Cir. 1990)).

Here, Plaintiffs seek universal injunctive relief.  Doc. Nos. 1, 13, 39.  But universal injunctive relief is an improper exercise of judicial authority: universal injunctions violate Article III, stretch traditional principles of equity past the breaking point, and "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch."  *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring); *see also Free Speech Coal., Inc. v. Att'y Gen. U.S.*, 974 F.3d 408, 431 (3d Cir. 2020) (vacating nationwide injunction and remanding for entry of relief limited to successful as-applied plaintiffs).[49]  And Plaintiffs in any event have not justified their request for universal relief.  This Court therefore should limit any remedy to those plaintiff IHEs, or IHEs represented by plaintiff associations, that the Court concludes have shown irreparable harm warranting injunctive relief.

## V.    The Court Should Order That Plaintiffs Post a Bond as a Condition of Extending the TRO.

If the Court extends the TRO or enters other preliminary injunctive relief, Defendants respectfully request that the Court order Plaintiffs to post a bond or other security in the amount of $6.25 million.  Federal Rule of Civil Procedure 65(c) mandates a bond: the Court may issue preliminary relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  "The bond, in effect, is the moving party's warranty that the law will uphold the issuance of the injunction," and the amount of the bond therefore must be "sufficient to protect his

---

[49] A challenge to the appropriateness of universal injunctive relief is currently pending at the Supreme Court.  *Trump v. Washington*, 24A885 (S. Ct., filed March 13, 2025).

adversary from loss in the event that future proceedings prove that the injunction issued wrongfully." *Glob. Naps, Inc. v. Verizon New Eng., Inc.*, 489 F.3d 13, 21 (1st Cir. 2007).

Moreover, a bond is appropriate under First Circuit authority because this case "involve[s] commercial or financial transactions," "both parties are . . . institutions," and this case does not involve "comprehensive federal health and welfare statutes" or "indigent plaintiffs." *Crowley v. Loc. No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers*, 679 F.2d 978, 1000 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984).[50] Indeed, courts routinely require security where, as here, one or more organizations challenge government funding or procurement decisions. *See, e.g.*, *Md. Dep't of Hum. Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1483 (4th Cir. 1992) (injunction exposed food stamps program "to substantial financial losses"); *Myriddian, LLC v. United States*, 165 Fed. Cl. 650, 659 (2023) (bid protest challenging contract award).

Based on the information contained in the Hegseth Memo, which Plaintiffs do not contest, $6.25 million reflects a reasonable estimate of the amount of damage that Defendants will sustain in the first month of being enjoined from implementing the 15 percent cost rate cap.[51] Courts have not hesitated to require much larger bonds in similar circumstances, when needed to protect the public fisc. *See Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1129 (D.C. Cir. 1992) (rejecting trial court's $1000 bond requirement where "Medicare had already paid over $18 million

---

[50] Although reversed on other grounds, the bond analysis in *Crowley* continues to be authoritative. *See, e.g.*, *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines Inc.*, 925 F.2d 6, 9 (1st Cir. 1991).

[51] Assuming the anticipated annual saving of $900M per the Hegseth Memo and that new DoD awards are for 12-month terms and spread out evenly in a year, the rate cap could save $6.25 million in its first month. The modest amount of the bond requested also highlights the limited nature of the alleged "harms" that Plaintiffs complain of under the Policy and demonstrates why injunctive relief is not warranted.

to vendors under the injunction"); *Amazon Web Servs., Inc. v. United States*, 147 Fed. Cl. 146, 160 (2020) (requiring $42 million in security to cover costs of potential six-month delay in awarding government contract).

## CONCLUSION

Defendants respectfully request that the Court deny Plaintiffs' Motion for a Temporary Restraining Order and dissolve the TRO entered at Doc. No. 48.


Dated: June 24, 2025                    Respectfully submitted:

                                        BRETT A. SHUMATE
                                        Assistant Attorney General

                                        LEAH B. FOLEY
                                        United States Attorney

                                        BRIAN C. LEA
                                        Deputy Associate Attorney General

                                        KIRK T. MANHARDT
                                        Director

                                        MARC S. SACKS
                                        Deputy Director

                                        By: /s/ *Bethany R. Theriot*
                                        BETHANY R. THERIOT (D.C. Bar 1022065)
                                        I-HENG HSU (NY Reg. No. 4904033)
                                        Trial Attorneys
                                        U.S. Department of Justice
                                        Civil Division
                                        Corporate/Financial Litigation Section
                                        P.O. Box 875
                                        Ben Franklin Station
                                        Washington, D.C. 20044-0875
                                        (202) 307-0244
                                        bethany.theriot@usdoj.gov
                                        i-heng.hsu@usdoj.gov

                                        *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: June 24, 2025                          /s/ *Bethany R. Theriot*
                                              BETHANY R. THERIOT
                                              Trial Attorney