**UNITED STATES DISTRICT COURT**
        **FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, *et al.*,<br><br>    *Plaintiffs*,<br><br>        v.<br><br>DEPARTMENT OF DEFENSE, *et al.*,<br><br>    *Defendants*. | Case No. 25-CV-11740<br><br>**(Leave to File Granted June 26, 2025)** |

**REPLY MEMORANDUM IN SUPPORT OF PLAINITFFS'**
**EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................................................................ ii

INTRODUCTION.................................................................................................... 1

ARGUMENT......................................................................................................... 1

I.   The Government's Threshold Arguments Fail............................................ 1

     A.  Plaintiffs Have Standing.................................................................... 1

     B.  Plaintiffs' Claims Are Justiciable Under the APA.............................. 2

     C.  The Hegseth Memo Is Final Agency Action...................................... 3

II.  Plaintiffs Are Likely to Succeed on the Merits......................................... 4

     A.  The Rate Cap Policy Violates the Regulations Governing Indirect Cost
         Rates................................................................................................. 4

     B.  The Rate Cap Policy Is Arbitrary and Capricious............................. 7

     C.  The Rate Cap Policy Is Not Authorized by Statute........................ 10

III. The Government's Remedial Arguments Fail............................................ 11

     A.  Plaintiffs Have Demonstrated Irreparable Harm.......................... 11

     B.  Other Factors Warrant Injunctive Relief........................................ 14

     C.  The Government's Miscellaneous Remedial Arguments Should Be
         Rejected............................................................................................ 14

CONCLUSION..................................................................................................... 15

# TABLE OF AUTHORITIES

CASES

*Adams v. Freedom Forge Corp.*, 204 F.3d 475 (3d Cir. 2000)................................................. 12

*Association of American Universities v. National Science Foundation*, No. 25-CV-11231, 2025 WL 1725857 (D. Mass. June 20, 2025)......................................1-3, 5-7, 10-14

*Association of American Universities v. Department of Energy*, No. 25-CV-10912, 2025 WL 1414135 (D. Mass. May 15, 2025) ................................. 1, 2, 5, 6, 11, 12, 14, 15

*Biden v. Nebraska*, 600 U.S. 477 (2023).................................................................................... 5

*Black Rock City LLC v. Haaland*, No. 19-CV-3729, 2022 WL 834070 (D.D.C. Mar. 21, 2022)................................................................................................................................ 3

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020) ................................................................ 14

*California v. United States Department of Education*, 132 F.4th 92 (1st Cir. 2025), *stay granted on other grounds*, 145 S. Ct. 966 (2025) (per curiam).................................... 2

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922 (Fed. Cir. 2012) .................................. 12

*Coalition of MISO Transmission Customers v. FERC*, 45 F.4th 1004 (D.C. Cir. 2022)........................................................................................................................................ 2

*County of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017)................................. 13

*Crowley v. Local No. 82*, 679 F.2d 978 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984)................................................................................................................... 15

*Department of Commerce v. New York*, 588 U.S. 752 (2019) .................................................... 2

*Department of Homeland Security v. Regents of California*, 591 U.S. 1 (2020)....................... 10

*Doe v. Noem*, No. 25-CV-10495, 2025 WL 1099602 (D. Mass. Apr. 14, 2025)....................... 15

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977)................. 11, 15

*International Association of Machinists & Aerospace Workers v. Eastern Airlines, Inc.*, 925 F.2d 6 (1st Cir. 1991)........................................................................................... 15

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ........................................................................................ 3

*Los Angeles v. Lyons*, 461 U.S. 95 (1983).................................................................................. 1

*Massachusetts v. National Institutes of Health*, 770 F. Supp. 3d 277 (D. Mass. 2025), *judgment entered*, 2025 WL 1063760 (D. Mass. Apr. 4, 2025)........ 1, 5, 6, 11, 12, 14

*McCuin v. Secretary of Health & Human Services*, 817 F.2d 161 (1st Cir. 1987) ...................... 5

*MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218 (1994) ............................................................................................................... 5

*Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002) ........................................ 3

*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ............................................. 9, 10

*New York v. Trump*, 133 F.4th 51 (1st Cir. 2025) .................................................... 13

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................................... 14

*Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218 (2016), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018) ............................................................................................... 7

*Penobscot Air Services, Ltd. v. FAA*, 164 F.3d 713 (1st Cir. 1999) ........................... 7

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020) ...................... 15

*Policy & Research, LLC v. United States Department of Health & Human Services*, 313 F. Supp. 3d 62 (D.D.C. 2018) ............................................................. 2

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) ................................. 12

*Robbins v. Reagan*, 780 F.2d 37 (D.C. Cir. 1985) .................................................... 3

*Savantage Financial Services, Inc. v. United States*, 595 F.3d 1282 (Fed. Cir. 2010) ............................................................................................................... 7

*Starlight Sugar, Inc. v. Soto*, 114 F.3d 330 (1st Cir. 1997) .................................... 12

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ....................................... 1

*Tamko Roofing Products, Inc. v. Ideal Roofing Co., Ltd.*, 282 F.3d 23 (1st Cir. 2002) ............................................................................................................... 15

*Teton Historic Aviation Found. v. United States Department of Defense*, 785 F.3d 719 (D.C. Cir. 2015) ......................................................................................... 2

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ................................................... 1

*Trump v. CASA*, No. 24A886, slip. op. (U.S. June 27, 2025) .................................... 15

*Union of Concerned Scientists v. Wheeler*, 954 F.3d 11 (1st Cir. 2020) ...................... 2

*Weyerhaeuser Co. v. United States Fish & Wildlife Service*, 586 U.S. 9 (2018) .......................... 2

*Woonasquatucket River Watershed Council v. United States Department of Agriculture*, No. 25-CV-97, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) .............................. 11

STATUTES

5 U.S.C. § 704 ............................................................................................................... 3

10 U.S.C. § 4001 ........................................................................................................... 3

31 U.S.C. § 503 ............................................................................................................ 11

31 U.S.C. § 503(a) ....................................................................................................... 11

31 U.S.C. § 503(b) ....................................................................................................... 11

41 U.S.C. § 4708 ......................................................................................................... 11

LEGISLATIVE MATERIALS

S. Rep. No. 115-150 (2017) .......................................................................................... 9

OTHER AUTHORITIES

2 C.F.R. § 200.1 ............................................................................................................. 5

2 C.F.R. § 200.414(c) .................................................................................................... 4

2 C.F.R. § 200.414(c)(1) ............................................................................................... 5

2 C.F.R. § 200.414(c)(3) ............................................................................................... 5

2 C.F.R. § 200.414(c)(4) ............................................................................................... 6

2 C.F.R. § 200.414(f) ..................................................................................................... 6

Pierre Azoulay, Daniel P. Gross, & Bhaven N. Sampat, *Indirect Cost Recovery in U.S. Innovation Policy: History, Evidence, and Avenues for Reform* (Nat'l Bureau Econ. Rsch., Working Paper No. w33627, revised June 2025), https://www.nber.org/system/files/chapters/c15158/c15158.pdf ............................................ 8

Summary Judgment Hearing Transcript, *Association of American Universities v. National Science Foundation*, No. 25-CV-11231 (D. Mass. June 13, 2025), ECF No. 79 ................................................................................................................ 4

*Uniform* Administrative *Requirements, Cost Principles, and Audit Requirements for Federal Awards*, 78 Fed. Reg. 78,590 (Dec. 26, 2013) ................................................ 4, 6

## INTRODUCTION

While the government says DOD is "sui generis," Opp. at 3, its grantmaking authorities and regulations follow the standard playbook, and the government just recycles arguments three courts have rejected as to three other agencies. *AAU v. NSF*, No. 25-CV-11231, 2025 WL 1725857 (D. Mass. June 20, 2025); *AAU v. DOE*, No. 25-CV-10912, 2025 WL 1414135 (D. Mass. May 15, 2025); *Massachusetts v. NIH*, 770 F. Supp. 3d 277 (D. Mass. 2025). The fourth time is not the charm, especially as DOD has made no effort to learn from the failures those opinions lay bare. Trumpeting the Rate Cap Policy as a "strategic shift" from the decades-old regime of negotiated, institution-specific indirect costs, Opp. at 2, the government all but confesses error. The regulations, as well as statutes, embed that regime in law and protect the reliance interests it has engendered. A "strategic shift" away from what the law requires is plainly *ultra vires*, and DOD's threadbare justification violates the Administrative Procedure Act ("APA") several times over. Discarding thousands of negotiated institution-specific rates for a one-size-fits-all policy is the epitome of arbitrary and capricious action. In short: The merits are not close, and the irreparable harm Plaintiffs face is large and imminent; injunctive relief should continue.

## ARGUMENT

### I.     The Government's Threshold Arguments Fail.

#### A.     Plaintiffs Have Standing.

The *NSF* court rejected the government's strained standing argument, 2025 WL 1725857, at *7-9, and rightly so. This argument—that Plaintiffs lack injury because they have no entitlement to specific grants—ignores that threatened injuries are cognizable if there is a substantial risk they will occur. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435-36 (2021); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). And it cannot be squared with cases recognizing that, when plaintiffs lose a chance to compete on lawful terms,

they need not show they would have been selected. *E.g.*, *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1026-27 (D.C. Cir. 2022); *Teton Historic Aviation Found. v. DOD*, 785 F.3d 719, 724 (D.C. Cir. 2015). The government's arguments are especially meritless given the facts in Plaintiffs' declarations, reflecting thousands of applications across the 1,600-plus schools Plaintiffs represent. For example, the University of Washington has 337 awards accounting for nearly $80 million annually, and 61 pending proposals worth $97 million, including to support long-term partnerships like the Applied Physics Lab, established in 1943 with the Navy, and the Naval Sea Systems Command and Air Force Research Laboratory. U. Wash. Decl. ¶¶ 3, 5, 7. The chances it receives *none* of these grants are zero. *Cf. id.* ¶ 5 (41% success rate). Indeed, some schools have been *told* they can expect specific grants. ASU Decl. ¶ 9.

**B.    Plaintiffs' Claims Are Justiciable Under the APA.**

The *NSF* and *DOE* courts also correctly rejected the argument that Congress has "committed to agency discretion" whether to impose an across-the-board cap. *NSF*, 2025 WL 1725857, at *9-11; *DOE*, 2025 WL 1414135, at *10 n.2. There is a "strong presumption favoring judicial review," *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018), and exceptions are "restrict[ed] . . . to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard'" to apply. *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019); *see Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17-18 (1st Cir. 2020).

First, regulations can provide law to apply, like those requiring DOD to use negotiated rates and authorize deviations only in specific circumstances. *DOE*, 2025 WL 1414135, at *10 n.2; *NSF*, 2025 WL 1725857, at *10; *see California v. U.S. Dep't of Educ.*, 132 F.4th 92, 98 (1st Cir. 2025), *stay granted on other grounds*, 145 S. Ct. 966 (2025) (per curiam); *NSF*, 2025 WL 1725857, at *13-15; *Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 82-83 (D.D.C. 2018) (Jackson, J.). Second, the statutes provide law to apply and do not commit the issue to agency discretion. The

"decision to stop awarding indirect costs based on [negotiated] rates . . . is not of the type 'traditionally regarded as committed to agency discretion.'" *NSF*, 2025 WL 1725857, at *10. And the guidance provided by DOD's statutes—directing DOD to make grants for particular purposes, 10 U.S.C. § 4001—amply suffices for reviewability. *See Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985). Nor can the government gain from *Lincoln v. Vigil*, 508 U.S. 182 (1993) and *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002), which are about attempts to litigate the allocation of appropriations from one use to another where the statutes provide no criteria. *NSF*, 2025 WL 1725857, at *10. That is not what Plaintiffs seek. When DOD spends on grants, it must follow the regulated pathway for doing so.

C.    **The Hegseth Memo Is Final Agency Action.**

The government's claim that the Hegseth Memo is not final, Opp. at 17, is irrelevant to likelihood of success. The government does not dispute that the Michael Memo is final. Nor does it dispute that enjoining the Michael Memo would prevent DOD from implementing the Policy for new grants. The government *cannot* dispute that point without conceding that the Hegseth Memo carries legal effect. Moreover, the Hegseth Memo is also fully reviewable—both because a final agency action (as the Michael Memo indisputably is) renders prior decisions reviewable, 5 U.S.C § 704; *see Black Rock City LLC v. Haaland*, No. 19-CV-3729, 2022 WL 834070, at *5 (D.D.C. Mar. 21, 2022), and because it is final in its own right. It announced DOD would pursue a 15% cap "[e]ffective immediately," Compl., Ex. A, at 1, described what would follow as merely "guidance," *id.*, and spurred immediate action from grant managers, TRO Memo at 16. Anyway, the key is that an injunction should make clear that DOD cannot implement a 15% cap in any form.

## II.    Plaintiffs Are Likely to Succeed on the Merits.

### A.    The Rate Cap Policy Violates the Regulations Governing Indirect Cost Rates.

The government has no answer to a core reason why three courts have held that similar policies violate the regulations: The regulations establish the baseline command that "[n]egotiated indirect cost rates must be accepted by all Federal agencies," 2 C.F.R. § 200.414(c), and the government reads the limited exception so broadly as to render the command meaningless. Indeed, the government concedes its argument has no limiting principle: It avers that the regulations impose no "substantive constraint," Opp. at 18, and told the *NSF* court that "there's no limit on the accepted justifications in these provisions," including if "[w]e just don't want to do indirect rates."[1] That is inconsistent with the text, rewriting "must be accepted" into "may be accepted." It is inconsistent with what OMB said when it promulgated the regulations, which it promised were "stringent enough to ensure that [deviations] do not occur without strong justification," in order to safeguard the "consistent application" of negotiated rates. *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards*, 78 Fed. Reg. 78,590, 78,600 (Dec. 26, 2013). And it is inconsistent with the judgment of Congress, which in 2017 barred NIH from imposing a similar cap in part *by requiring NIH to follow the regulations*. TRO Memo at 36.

The government fares no better with all the ways the text of Section 200.414(c) forecloses its position. That provision allows an exception from the use of negotiated rates for a "class of Federal awards" only if the agency "implement[s], and make[s] publicly available, the policies, procedures and general decision-making criteria" that an agency "will follow to seek and justify deviations from negotiated rates." 2 C.F.R. § 200.414(c). First, as courts have repeatedly found,

[1]  Summary Judgment Hearing Transcript at 37, *NSF*, No. 25-CV-11231 (D. Mass. June 13, 2025), ECF No. 79; *see id.* at 36-37 ("I'm not sure that there's a limit here other than the limit that would be imposed by the federal awarding agency head and whatever change might result from that. There would be political limits.").

imposing by fiat an across-the-board rate for all grants to universities is not sensibly understood as "seek[ing] and justify[ing]" a "deviation" for a "class of Federal awards." *NSF*, 2025 WL 1725857, at \*14; *see NIH*, 770 F. Supp. 3d at 298; *DOE*, 2025 WL 1414135, at \*15. The text requires a determination that the negotiated rate, though generally controlling, does not fit a particular set of awards. A blanket diktat does not "seek" or "justify" anything. And the government has no response to the ordinary meaning of "deviation" or the Supreme Court's cases rejecting agencies' attempts to rely on similar authorities to transform regulatory schemes. *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228-29 (1994); *Biden v. Nebraska*, 600 U.S. 477, 494-96 (2023). Indeed, the regulations define a "class of Federal awards" as a "group of Federal awards . . . to a specific type of recipient or group of recipients to which *specific* provisions or exceptions may apply." 2 C.F.R. § 200.414(c)(1); *id.* § 200.1. DOD's policy is anything but "specific," and the government's construction of the regulation to "encompass *all awards* to all [universities] would allow the exception to swallow the whole." *NSF*, 2025 WL 1725857, at \*14; *see McCuin v. Sec'y of Health & Hum. Servs.*, 817 F.2d 161, 168 (1st Cir. 1987).

Second, as to the requirement to implement "policies, procedures *and* general decision-making criteria," 2 C.F.R. § 400.414(c)(3), the government says it need not promulgate "procedures" or "decision-making criteria"—because it has decreed an across-the-board policy that renders irrelevant any procedures or criteria. Opp. at 19-20. But deleting words and phrases from a regulation is just as impermissible as doing so from a statute. And this response just underscores that the Policy's aim—wholesale elimination of negotiated rates for universities—flouts the regulations. Moreover, while the government insists that Section 200.414(c) does not call for a "multi-stage adjudicative process," Opp. at 19, it is hard to read it as doing anything but, particularly given the command that agencies promulgate policies, procedures, and criteria they

"will follow" in seeking and justifying deviations—a phrase conveniently omitted multiple times in the opposition, *see id.* at 18, 21. That is again why three courts have rejected the same argument. *NIH*, 770 F. Supp. 3d at 298; *DOE*, 2025 WL 1414135, at \*15; *NSF*, 2025 WL 1725857, at \*14.[2]

The government also fails to explain away the prohibition in Section 200.414(f), which permits grantees to use a de minimis rate of 15% but specifies that agencies "may not require recipients and subrecipients to use a de minimis rate lower than the negotiated indirect cost rate . . . unless required by Federal statute or regulation." 2 C.F.R. § 200.414(f). Although the government insists that this provision applies only when "*grantees* [] opt out of negotiated rates," Opp. at 20, the text contains no such limit. It instead reinforces that while agencies may seek to justify deviations, they may not "require" the 15% de minimis rate when a negotiated rate exists. The exception is where a de minimis rate is "required by" statute or regulation. The government's claim that it is acting "pursuant to" Section 200.414(c), Opp. at 20, gets it nowhere because that section plainly does not *require* the use of a lower rate.

The government, finally, fails to answer the Policy's incompatibility with the entire regulatory scheme. The point is not that this scheme "guarantee[s]" recovery of *actual* costs, Opp. at 21, but that it "imposes a detailed process in which agencies engage with individual institutions that includes steps designed to calculate negotiated rates that approximate actual indirect costs," *NSF*, 2025 WL 1725857, at \*15. The government would render superfluous all the many provisions governing this process, as well as the audit and accounting mechanisms, all working in tandem to tailor, calibrate, and prove-out negotiated rates. TRO Memo at 26-28.

---

[2] The Rate Cap Policy also violates Subsection (c)(4) as to new grants whose notices of funding opportunity did not include the 15% cap. That provision requires that "policies relating to indirect cost rate reimbursement" must be included in a notice of funding opportunity ("NOFO"). 2 C.F.R. § 200.414(c)(4). While the government claims it can skirt this requirement by retroactively updating NOFOs, Opp. at 20-21, it identifies no authority for that claim. Any deviation must first be "established" and *then* included in a NOFO. 78 Fed. Reg. at 78,600.

## B.    The Rate Cap Policy Is Arbitrary and Capricious.

The government's response also shows why three courts have rejected similar policies under the APA. The Policy jettisons, with barely a word of explanation, the entire framework of individually negotiated indirect costs that has governed since 1965—a framework that was intended to *and did* induce universities to build the physical and human infrastructure necessary to do the cutting-edge science that DOD's statutory mission requires. Indeed, the government entirely ignores a point that brings into particularly sharp relief the arbitrary mismatch between the Policy and this settled framework: DOD must still *negotiate* institution-specific rates for use by other agencies, TRO Memo at 27-28, but DOD will now simply toss out those rates for its own purposes. As much as DOD might like this Court to be "a rubber stamp," its task is to undertake "a thorough, probing, in-depth review" and a "searching and careful" inquiry. *Penobscot Air Servs., Ltd. v. FAA*, 164 F.3d 713, 720 (1st Cir. 1999). The Policy cannot survive.[3]

The government gets nowhere with its attempts to rehabilitate the Rate Cap Policy's "singular" justification—"cost savings." Opp. at 2. Belatedly, the government admits that the Policy will not actually *save* anything, but instead DOD intends to shift spending from indirect to "direct" costs. Opp. at 25. *But see* Hegseth Memo at 1 (suggesting DOD might redirect funds to "operational capabilities"). The point is not just that the Policy's principal justification is at best confused and at worst repudiated by the government's brief. It is, more fundamentally, that the entire Policy rests on the fiction that indirect costs are not real costs—the Hegseth Memo derides them as "waste" and "bureaucratic fat," Hegseth Memo at 1-2—and are in all events less worthy

---

[3] A "more lenient" standard, Opp. at 24, does not apply simply because this case relates to government money. *NSF*, 2025 WL 1725857, at *16 & n.7. The government's cited cases involve contracting officers' discretion to select bids—a very different context. *See Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 260-61 (2016), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018); *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010).

than direct costs (which the Hegseth Memo equates with "muscle," *id.*). The government does not engage with the many ways that this unexplained premise is false.

First, as Plaintiffs showed, TRO Memo at 29-30, indirect costs are just as necessary as direct costs; indeed, they often promote efficiency. If an instrument supports 10 projects (likely rendering its costs "indirect"), that may be more efficient than an instrument supporting only one project (whose costs may be "direct"). Or if universities use indirect costs to fund, for example, advanced AI systems, those systems can allow them to stretch direct costs farther. MIT Decl. ¶ 23. Moreover, these real costs differ across institutions based on their mix of teaching and research, the different types of research they conduct, and many other facts—underscoring the arbitrariness of assigning every institution a draconian one-size-fits-all rate. TRO Memo at 8-9.

Second, because many projects cannot proceed at 15%, the Policy's result will just be less research. DOD cannot reconcile this reality with its claim that the Policy "allow[s] 'the academic community's work with [DOD] [to remain] essential for the development of transformative research concepts that drive our future capabilities,'" as the Michael Memo says. Opp. at 2.

Third, the government ignores that the delineation of "direct" and "indirect" costs is merely an accounting convention: The government could require recipients to classify *all* costs as direct, by (for example) allocating building and computing time to particular projects—as private companies and some countries do.[4] If DOD takes the view that costs deemed indirect under the existing conventions are less worthy, it needs more than an accounting label.

The government only compounds the Policy's arbitrariness with its insistence that the Policy is justified because "indirect costs have grown too large," supposedly evidenced by

---

[4] Pierre Azoulay, Daniel P. Gross, & Bhaven N. Sampat, *Indirect Cost Recovery in U.S. Innovation Policy: History, Evidence, and Avenues for Reform* at 7-9 (Nat'l Bureau Econ. Rsch., Working Paper No. w33627, revised June 2025), https://www.nber.org/system/files/chapters/c15158/c15158.pdf.

"decades of government-wide efforts to rein in" indirect costs. Opp. at 25. The government's brief badly mischaracterizes the history. Spending is always debated in Washington, yet Congress has repeatedly declined to impose a uniform, across-the-board cap. Indeed, the government (tellingly) ignores Congress's reasons for rejecting a similar cap in 2017—it would "radically change the nature of the Federal Government's relationship with the research community" and "throw[] research programs across the country into disarray." S. Rep. No. 115-150, at 109 (2017); *see* Opp. at 33 n.46. For present purposes, moreover, the key point is this: Funding of government-sponsored research is an important policy question that has been debated for decades and studied by multiple government and private bodies. Yet the Policy acknowledges *none* of this debate, jettisoning a decades-old framework with barely a word.

The government's "private foundation" comparison is even more indefensible. It does not actually *dispute* that those foundations differ in fundamental ways. *See* TRO Memo at 30-31. And its attempt to shrug off this problem as "amount[ing] to mere disagreement with DoD's decision," Opp. at 26, again ignores its burden under the APA. If DOD believes that these foundations (which are so obviously different) provide an apt comparison, it must explain *why*.

That leaves the many important aspects of the problem DOD failed to consider. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48-49 (1983). First, the Rate Cap Policy does not grapple with the severe harms it poses to science. TRO Memo at 38-44. Second, it ignores reliance interests of universities that for decades have planned physical and human infrastructure around the settled approach to negotiated rates. The government's argument—that it can ignore reliance because the Policy applies only to "new" awards, Opp. at 28-29—is, to begin, false: The Hegseth Memo directs DOD to impose the 15% rate on existing grants (because that aspect of the Policy is not immediately effective, it is not part of this request

for emergency relief). More fundamentally, the government's argument—that DOD could ignore reliance on the theory that recipients have no "substantive rights" to future grants, Opp. at 29—is foreclosed by *DHS v. Regents of California*, 591 U.S. 1 (2020). *Regents* did not, as the government suggests, find that DHS had to consider noncitizens' reliance interests because they had "'substantive rights' in the benefit *they were receiving*." Opp. at 29. It held that DHS had to consider recipients' reliance interests *even though* they had no such rights. *See* 591 U.S. at 30-33. The government's arguments are particularly meritless given that negotiated rate agreements endure for 2-4 years or more. TRO Memo at 8; *NSF*, 2025 WL 1725857, at *3.

Finally, the government has no answer for the arbitrariness of treating every university the same *and yet* treating other funding recipients differently, allowing them to keep their individualized rates even as they compete for the same grants. The APA question again is not whether an agency can choose to proceed step-by-step or instead in "one fell swoop." Opp. at 27. It is whether the agency has *explained* its choices. *State Farm*, 463 U.S. at 48-49. DOD has not.

Compounding all of these defects is that when DOD issued the Policy, two courts had *already* invalidated similar policies. To say not *one word* about their concerns is the height of arbitrariness. DOD has not tried to answer those courts' concerns because it cannot. The unmistakable reality is that, with DOD having gone through the process of negotiating institution-specific rates, and with DOD continuing to negotiate such rates for use by other agencies, discarding them all in favor of a one-size-fits-all approach is wholly arbitrary.

### C.    The Rate Cap Policy Is Not Authorized by Statute.

The government fails to show that Congress authorized DOD to upend the decades-old negotiated costs framework and impose an arbitrary 15% cap with no relationship to actual costs. The *DOE* and *NSF* courts did not definitively resolve this issue, and this Court need not either. The *NSF* court, however, rejected the same arguments the government makes, first explaining that

10

the statute governing the use of fixed rates, 41 U.S.C. § 4708, does not authorize use of arbitrary rate caps untethered from any institution's actual costs. 2025 WL 1725857, at *12. Second, it recognized that because Section 4708 specifically governs fixed rates, agencies cannot impose arbitrary rates based on more general authorities—as it "is a commonplace of statutory construction that the specific governs the general." *Id.* at *11 (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)). The only question *NSF* left open—no party had briefed it—was whether 31 U.S.C. § 503 authorizes OMB to set across-the-board caps. *Id.* at *13. And the answer to that question is no. Section 503 authorizes OMB to create "governmentwide financial management policies" and "general management policies" to coordinate agencies' actions under their organic authorities. 31 U.S.C. § 503(a), (b); *see, e.g.*, *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 25-CV-97, 2025 WL 1116157, at *20 (D.R.I. Apr. 15, 2025). It does not *expand* agencies' powers under those authorities.

## III.    The Government's Remedial Arguments Fail.

### A.    Plaintiffs Have Demonstrated Irreparable Harm.

Plaintiffs and their members have submitted over two dozen declarations demonstrating that the Rate Cap Policy will cause significant, imminent and ongoing, irreparable harm, and that such harms flow from the immediately effective portions of the Policy. TRO Memo at 38-44. The court in *NSF* found irreparable harm with respect to a similar policy that applied only to new awards, and the *DOE* and *NIH* courts enjoined those policies as to new grants too. *NSF*, 2025 WL 1725857, at *21-22; *see DOE*, 2025 WL 1414135, at *3, *22; *NIH*, 770 F. Supp. 3d at 290, 330.

The government does not seriously respond to Plaintiffs' overwhelming showing. It demands evidence from each member of the associational Plaintiffs, Opp. at 35, but associations may assert harms to their members and obtain relief running to those members, *Hunt v. Wash.*

11

*State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Courts routinely issue relief against unlawful policies, including nationwide, on that basis. *E.g.*, *NIH*, 770 F. Supp. 3d at 327-30; *DOE*, 2025 WL 1414135, at *20; *NSF*, 2025 WL 1725857, at *23. The government cites an inapposite Third Circuit case finding no irreparable harm where "only a small percentage of the plaintiffs testified," and those who did failed to assert harms. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 485 (3d Cir. 2000). Here, the declarations show that whatever their differences, institutions with DOD grants will be seriously and immediately harmed by the Policy.

First, Plaintiffs collectively have hundreds of millions of dollars' worth of proposals pending before DOD—and more every day—many of which cannot be sustained at a 15% rate. *See* TRO Memo at 38-39 (citing declarations). The Policy immediately puts universities in an impossible position: If they submit proposals at their negotiated rates, or refuse to update previously submitted proposals to depart from those rates, their proposals will be rejected. *See id.* at 39. But they cannot accept the 15% rate, which is financially untenable. *Id.* at 39 n.20. Those lost opportunities *are* irreparable harm. *Starlight Sugar, Inc. v. Soto*, 114 F.3d 330, 332 (1st Cir. 1997); *see Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) ("loss of reputation, good will, and business opportunities" are irreparable harm); *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (similar). And as other courts have recognized, "the fact that Plaintiffs are not guaranteed any particular future [DOD] award does not render their claims of injury speculative" because research institutions and agencies "co-exist in a symbiotic, mutually beneficial relationship, fostered over decades, which is built on the [government's] need for cutting edge research and the [university]'s ability to provide it." *NSF*, 2025 WL 1725857, at *22 (quoting *DOE*, 2025 WL 1414135, at *19); *see DOE*, 2025 WL 1414135, at *19.

Second, universities must take immediate action to account for the sudden and enormous

financial shortfall wrought by the Policy's immediately effective portions. TRO Memo at 40 &
n.21. That shortfall stems from both anticipated awards universities can no longer accept at a 15%
rate, as well as any awards they *do* accept but which, under the Policy, DOD will no longer fully
fund. As the *NSF* court observed, universities' budgeting infrastructure reasonably relies on the
negotiated indirect cost rate system that has existed for decades—including the expectation of
negotiated rates applying to new awards. 2025 WL 1725857, at *22.[5] That is why, contrary to the
government's suggestion, Opp. at 37-38, the Policy's effects are far from "gradual[]" and
universities cannot simply wait and see. The necessity of immediate action—including by laying
off staff, curtailing capital investments, and stopping research—constitutes irreparable harm. TRO
Memo at 40-41; CSU Decl. ¶ 18 ("[A] reduction in the indirect cost rate will necessarily and
immediately result in staffing reductions . . . ."); Duke Decl. ¶ 16 ("This means deciding *now* to
cease projects, reduce head count, and stop operating facilities."); Caltech Decl. ¶ 17 ("We would
immediately begin a process of reducing the number of graduate student researchers at Caltech.");
*see, e.g.*, *New York v. Trump*, 133 F.4th 51, 73 (1st Cir. 2025) ("impediments to planning, hiring,
and operations[,] and disruptions to research projects by state universities" are irreparable harm);
*NSF*, 2025 WL 1725857, at *21 ("[T]he reallocation of existing resources disrupts University
budgeting processes, which is an irreparable injury itself.").[6]

　　　The other courts have rejected the government's rote invocation of principles that apply

---

[5] MIT, for example, engages in a "multi-year budgeting process" that "assumes the availability or possibility of new
awards and award renewals at roughly similar terms—and certainly at the negotiated indirect cost rate—as had
previously been available." MIT Decl. ¶ 17; *see also, e.g.*, ASU Decl. ¶ 21; Caltech Decl. ¶ 20; CSU Decl. ¶ 20; UIUC
Decl. ¶ 20; Pitt Decl. ¶ 17; USC Decl. ¶ 20; UW Decl. ¶ 19. That is why current projects will cease abruptly if schools
are required to apply for *new* awards at 15%. TRO Memo at 42 & n.26.

[6] The government tries to distinguish *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017), insisting
that the Policy "causes no budgetary uncertainty" because it is a "simple and clear reduction of overhead
reimbursement." Opp. at 38. As detailed in declarations, TRO Memo at 38-44, that is false. And as shown by the chaos
in DOD's premature implementation, *id.* at 16, this sudden departure from the settled regime is far from "simple."

when harms are redressable by "money damages," Opp. at 36-37, which are particularly meritless here. The government studiously refrains from saying Plaintiffs could recover if they (for example) had to reject grants that are unsustainable at 15%. Indeed, the *DOE* court recognized that a "temporary loss of funding . . . might in fact be the least of" Plaintiffs' harms compared to "inordinately delay[ing] in some instances and entirely abandon[ing] in others" their research. 2025 WL 1414135, at *18; *see* TRO Memo at 41-43. And the government is wrong to discount the ripple effects across communities, our economy, and national security, on the theory that they concern the public interest rather than Plaintiffs. Opp. at 38-39. They concern both. Undermining these goals harms Plaintiffs' missions to advance science and improve lives through education, research, and innovation. *E.g.*, AAU Decl. ¶¶ 3-4; *accord NIH*, 770 F. Supp. 3d at 325; *DOE*, 2025 WL 1414135, at *20; *NSF*, 2025 WL 1725857, at *22.

### B.    Other Factors Warrant Injunctive Relief.

The balance of the equities and public interest also favor an injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009). If the Rate Cap Policy goes into effect, it will inflict significant harm on research and development across the United States—from advancements in American defense capabilities, to new technologies with wide-ranging commercial applications—whose purpose is to benefit the public. *E.g.*, *NIH*, 770 F. Supp. 3d at 326. And "[i]t is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (citation omitted). As for the argument that the Court should simply defer to "the views of the Executive Branch," Opp. at 41, it is hard to imagine a proposition more at odds with our system of government.

### C.    The Government's Miscellaneous Remedial Arguments Should Be Rejected.

As three other courts have found, nationwide relief is proper. *NSF*, 2025 WL 1725857, at *23; *NIH*, 770 F. Supp. 3d at 327-30; *DOE*, 2025 WL 1414135, at *20. The government's

argument that every member of Plaintiffs AAU, APLU, and ACE must show irreparable harm, Opp. at 42, is just a backdoor attack on the settled rule that associations may sue and obtain relief for members. *Hunt*, 432 U.S. at 343. Nor do concerns about "universal injunctions," Opp. at 42, have force here. Between the associational and individual Plaintiffs, nearly every U.S. university is either a party or a member. Nationwide relief is necessary to provide "complete relief." *Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd.*, 282 F.3d 23, 40 (1st Cir. 2002) (citation omitted).[7]

Finally, no bond is warranted. Courts retain "substantial discretion" on this issue, *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991), including "to require no bonds," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020). Bonds may be appropriate in cases "involve[ing] commercial or financial transactions," while "no bond is required" in suits—like this—to "enforce important federal rights or 'public interest.'" *Crowley v. Loc. No. 82*, 679 F.2d 978, 1000 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984). Here, the bond request is plainly calculated to deter Plaintiffs from challenging unlawful agency action, which the Court should not countenance. *See DOE*, 2025 WL 1414135, at *21 (rejecting a bond because it "would necessarily have the same financial effect [as the challenged policy] and thus lead to the same harms"); *Doe v. Noem*, No. 25-CV-10495, 2025 WL 1099602, at *20 n.33 (D. Mass. Apr. 14, 2025) (rejecting a bond because of "a grave risk" it would "deter individuals from enforcing their procedural rights to challenge agency action").

## CONCLUSION

Plaintiffs respectfully urge this Court to maintain the temporary restraining order.

---

[7] The Supreme Court's decision in *Trump v. CASA, Inc.*, No. 24A886, issued today, does not change this conclusion because of the breadth of the Plaintiffs and member institutions that are parties *to this litigation*. *See* Slip. op. at 16 (June 27, 2025) (equitable concept of "complete relief" means courts may administer complete relief "*between the parties*" (emphasis added by the Court)); *id.* at 2 n.2 (declining to reach questions regarding organizational standing). The Court also noted that "[n]othing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Id.* at 11 n.10.

Dated: June 27, 2025

Respectfully submitted,

JENNER & BLOCK LLP
By: */s/ Lindsay C. Harrison*

Ishan K. Bhabha (*pro hac vice*)
Lindsay C. Harrison (*pro hac vice*)
Lauren J. Hartz (*pro hac vice*)
Elizabeth Henthorne (*pro hac vice*)
Zachary C. Schauf (*pro hac vice*)
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
LHarrison@jenner.com
LHartz@jenner.com
BHenthorne@jenner.com
ZSchauf@jenner.com

*Attorneys for Association of American*
*Universities, American Council on*
*Education, Association of Public and*
*Land Grant Universities, AZ Board of*
*Regents on Behalf of Arizona State*
*University, Brown University, California*
*Institute of Technology, The Regents of the*
*University of California, Cornell*
*University, The Board of Trustees of the*
*University of Illinois, The Johns Hopkins*
*University, Massachusetts Institute of*
*Technology, and University of Pittsburgh*
*of the Commonwealth System of Higher*
*Education*

CLEMENT & MURPHY, PLLC
By: */s/ Paul D. Clement*

Paul D. Clement (*pro hac vice*)
James Y. Xi (*pro hac vice*)
Kyle R. Eiswald (*pro hac vice*)
706 Duke Street
Alexandria, VA 22314
Tel: (202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
kyle.eiswald@clementmurphy.com

*Attorneys for Association of American Universities,*
*Association of Public and Land-grant Universities,*
*and American Council on Education*

ANTHONY G. BROWN
Attorney General of Maryland

By: */s/ Michael Drezner*
Michael Drezner (*pro hac vice*)
  *Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6959
mdrezner@oag.state.md.us

*Attorney for University of Maryland, College Park*

NICHOLAS W. BROWN
Attorney General of Washington

By: */s/ Jessica L. Creighton*
Jessica L. Creighton (*pro hac vice*)
  *Assistant Attorney General*
Office of the Attorney General of
Washington
University of Washington Division
4333 Brooklyn Avenue NE, MS 359475
Seattle, WA 98195
(206) 543-4150
jessica.creighton@atg.wa.gov

*Attorney for University of Washington*

PHILIP J. WEISER
Attorney General of Colorado

By: */s/ Lauren Peach*
Lauren Peach (*pro hac vice*)
  *First Assistant Attorney General*
Michael McMaster (*pro hac vice*)
  *Assistant Solicitor General*
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, CO 80203
(720) 508-6484, (720) 508-6156
Lauren.Peach@coag.gov
Michael.McMaster@coag.gov

*Attorneys for the Board of Governors of the
Colorado State University System Acting by and
through Colorado State University*

## CERTIFICATE OF SERVICE

Counsel for Plaintiffs certify that they have submitted the foregoing document with the clerk of court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Plaintiffs hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

/s/ *Paul D. Clement*
Paul D. Clement (*pro hac vice*)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314
Tel: (202) 742-8900
paul.clement@clementmurphy.com

Dated:  June 27, 2025