## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ASSOCIATION OF AMERICAN UNIVERSITIES,
*et al.*,

      *Plaintiffs*,

        v.

DEPARTMENT OF DEFENSE *et al.*,

      *Defendants*.

Case No. 1:25-CV-11740

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................... ii

INTRODUCTION............................................................................................... 1

BACKGROUND.................................................................................................. 2

LEGAL STANDARD .......................................................................................... 4

ARGUMENT....................................................................................................... 5

I.     Plaintiffs Are Entitled to Judgment on Their Claims...................................... 5

       A.     The Entire Policy Is Contrary to Regulation (Counts I, II, and V)....................... 5

       B.     The Policy Is Arbitrary and Capricious in Its Entirety (Count III). ..................... 9

       C.     The Rate Cap Policy as a Whole Exceeds DOD's Statutory Authority
              (Count IV)................................................................................................ 13

       D.     The Rate Cap Policy Is Impermissibly Retroactive (Count VI)......................... 15

II.    This Case Belongs in District Court, Not the Court of Federal Claims.......................... 16

CONCLUSION.................................................................................................... 20

## TABLE OF AUTHORITIES

CASES

*Aids Vaccine Advocacy Coalition v. United States Department of State*, 770 F. Supp. 3d 121 (D.D.C. 2025), *appeal docketed*, No. 25-5098 (D.C. Cir. Apr. 2, 2025) ............................................................................................................. 17

*Altamont Gas Transmission Co. v. FERC*, 92 F.3d 1239 (D.C. Cir. 1996) ................................. 7

*American Center for International Labor Solidarity v. Chavez-DeRemer*, No. CV 25-1128, 2025 WL 1795090 (D.D.C. June 30, 2025) ........................................... 17

*American Public Health Ass'n v. National Institutes of Health*, No. CV 25-10787, 2025 WL 1548611 (D. Mass. May 30, 2025), *appeal docketed*, No. 25-1611 (1st Cir. June 24, 2025) ........................................................................................ 8

*American Public Health Association v. National Institutes of Health*, No. 25-1611, 2025 WL 2017106 (1st Cir. July 18, 2025) ........................................ 17, 18, 20

*Association of American Universities v. Department of Defense*, No. 25-cv-11740, 2025 WL 2022628 (D. Mass. July 18, 2025) ...................... 1, 2, 3, 4, 5, 6, 9, 10, 11, 12, 13

*Association of American Universities v. Department of Energy*, No. 25-cv-10912, 2025 WL 1414135 (D. Mass. May 15, 2025) ................................... 3, 9, 10, 11,16, 18, 19

*Association of American Universities v. National Science Foundation*, No. 25-CV-11231, 2025 WL 1725857 (D. Mass. June 20, 2025) .......................... 3, 6, 9, 11, 13, 14, 20

*Biden v. Nebraska*, 600 U.S. 477 (2023) ................................................................................ 14

*Boston Redevelopment Authority v. National Park Service*, 838 F.3d 42 (1st Cir. 2016) ............................................................................................................................. 4

*Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988) ........................................... 15

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ........................................................... 16, 18, 20

*Brimstone Railroad & Canal Co. v. United States*, 276 U.S. 104 (1928) ................................. 15

*Climate United Fund v. Citibank, N.A.*, No. 25-CV-698, 2025 WL 1131412 (D.D.C. Apr. 16, 2025), *appeal docketed*, No. 25-5122 (D.C. Cir. Apr. 16, 2025) ............................................................................................................................. 17

*Colorado v. United States Department of Health & Human Services*, No. 25-CV-00121, 2025 WL 1426226 (D.R.I. May 16, 2025), *appeal docketed*, No. 25-1671 (1st Cir. July 16, 2025) ............................................................................. 17

*Community Legal Services in East Palo Alto v. United States Department of Health and Human Services*, 137 F.4th 932 (9th Cir. 2025).................................................. 17, 20

*Department of Education v. California*, 145 S. Ct. 966 (2025)........................................... 16, 19

*DHS v. Regents of the University of California*, 591 U.S. 1 (2020) ...................................... 9, 11

*Eastern Renovating Corp. v. Roman Catholic Bishop of Springfield*, 554 F.2d 4 (1st Cir. 1977)........................................................................................................... 7

*Elev8 Baltimore, Inc. v. Corporation for National and Community Service*, No. CV 25-1458, 2025 WL 1865971 (D. Md. July 7, 2025)............................................ 17

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)........................................... 5

*Federal Election Commission v. Cruz*, 596 U.S. 289 (2022)..................................... 13

Final Judgment, *Association of American Universities v. Department of Energy*, No. 25-cv-10912 (D. Mass. June 30, 2025), Dkt. No. 71 .................................. 20

*Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002)...................... 17-18

*Green & Healthy Home Initiatives, Inc. v. EPA*, No. 25-CV-1096, 2025 WL 1697463 (D. Md. June 17, 2025)...................................................................... 17

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994)............................................... 16

*Louisiana Delta Service Corps v. Corporation for National and Community Service*, No. CV 25-378, 2025 WL 1787429 (M.D. La. June 27, 2025)............................ 17

*Maine v. United States Department of Agriculture*, No. 1:25-CV-00131, 2025 WL 1088946 (D. Me. Apr. 11, 2025)........................................................................ 17

*Martin Luther King, Jr. County v. Turner*, No. 25-CV-814, 2025 WL 1582368 (W.D. Wash. June 3, 2025), *appeal docketed*, No. 25-3664 (9th Cir. June 10, 2025)................................................................................................................ 17

*Maryland v. Corporation for National & Community Service*, No. CV 25-1363, 2025 WL 1585051 (D. Md. June 5, 2025)......................................................... 17

*Massachusetts v. Kennedy*, No. CV 25-10814, 2025 WL 1371785 (D. Mass. May 12, 2025), *appeal docketed*, No. 25-1612 (1st Cir. June 24, 2025) ..................... 17

*Massachusetts v. National Institutes of Health*, 770 F. Supp. 3d 277 (D. Mass. 2025), *judgment entered*, 2025 WL 1063760 (D. Mass. Apr. 4, 2025), *appeal docketed*, No. 25-1344 (1st Cir. Apr. 09, 2025).........................2-3, 5, 9, 10, 11, 15, 16, 19

*Massachusetts v. National Institutes of Health*, 2025 WL 1063760 (D. Mass. Apr. 4, 2025), *appeal docketed*, No. 25-1344 (1st Cir. Apr. 09, 2025) ...................... 20

*MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218 (1994) ............................................................................................................... 14

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ........................................ 18

*Melone v. Coit*, 100 F.4th 21 (1st Cir. 2024) ............................................................ 9

*Metropolitan Transportation Authority v. Duffy*, No. 25-CV-1413, 2025 WL 1513369 (S.D.N.Y. May 28, 2025) ...................................................................... 17

*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ..................................................... 9

*National Environmental Development Association's Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014) ..................................................................................... 5

*New York v. United States Department of Education*, No. 25-1424, Motion Order (2d Cir. June 20, 2025), ECF No. 40 .................................................................... 17

*New York v. Kennedy*, No. 25-CV-196, 2025 WL 1803260 (D.R.I. July 1, 2025) .................... 17

*New York v. Trump*, No. 25-CV-39, 2025 WL 1098966 (D.R.I. Apr. 14, 2025), *appeal docketed*, No. 25-1413 (1st Cir. Apr. 28, 2025) ........................................ 17

*Rhode Island v. Trump*, No. 25-CV-128, 2025 WL 1303868 (D.R.I. May 6, 2025), *appeal docketed*, No. 25-1477 (1st Cir. May 20, 2025) ..................................... 17

*Roe v. Mayorkas*, No. 22-CV-10808, 2024 WL 5198705 (D. Mass. Oct. 2, 2024) .................... 4

*Rural Development Innovations Ltd. v. Marocco*, No. CV 25-1631, 2025 WL 1807818 (D.D.C. July 1, 2025) ........................................................................... 17

*San Francisco Unified School District v. AmeriCorps*, No. 25-CV-02425, 2025 WL 1180729 (N.D. Cal. Apr. 23, 2025) .................................................................. 17

*Southern Education Foundation v. United States Department of Education*, No. CV 25-1079, 2025 WL 1453047 (D.D.C. May 21, 2025), *appeal docketed*, No. 25-5262 (D.C. Cir. July 21, 2025) ............................................................................. 17

*Thakur v. Trump*, No. 25-CV-04737, 2025 WL 1734471 (N.D. Cal. June 23, 2025), *appeal docketed*, No. 25-4249 (9th Cir. July 10, 2025) .................................... 17

*Tootle v. Sec'y of Navy*, 446 F.3d 167 (D.C. Cir. 2006) .......................................... 20

*Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025) .......................................................... 3

*West Virginia v. EPA*, 597 U.S. 697 (2022) ............................................................ 14

*Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) (*en banc*) ............................................................................................ 17

*Woonasquatucket River Watershed Council v. United States Department of Agriculture*, No. 25-CV-00097, 2025 WL 1116157 (D.R.I. Apr. 15, 2025), *appeal docketed*, No. 25-1428 (1st Cir. May 1, 2025) ........................................ 17

STATUTES

5 U.S.C. § 702 ...................................................................................................... 16

5 U.S.C. § 706 ...................................................................................................... 20

5 U.S.C. § 706(2)(A) ....................................................................................... 9, 13

10 U.S.C. § 4001 ............................................................................................ 14, 15

10 U.S.C. § 4010 .................................................................................................. 15

10 U.S.C. § 4010(a) ............................................................................................. 15

10 U.S.C. § 4141 .................................................................................................. 15

41 U.S.C. § 4708 .......................................................................................... 13, 14, 15

OTHER AUTHORITIES

2 C.F.R. pt. 200, Appendix III(C)(7)(a) ......................................................... 7, 15

2 C.F.R. pt. 1128, Appendix C ............................................................................. 5

2 C.F.R. pt. 1128, Appendix C(A)(1)(a) .......................................................... 5, 7

2 C.F.R. pt. 1136, Appendix C(C)(1)(a) .............................................................. 8

2 C.F.R. § 200.100(c) ............................................................................................ 5

2 C.F.R. § 200.340(a) ............................................................................................ 8

2 C.F.R. § 200.340(a)(4) ....................................................................................... 8

2 C.F.R. § 200.402 ................................................................................................ 5

2 C.F.R. § 200.414(c)(1) .................................................................................... 6, 7

2 C.F.R. § 200.414(c)(3) ........................................................................................ 6

2 C.F.R. § 200.414(c)(4) ........................................................................................ 7

2 C.F.R. § 200.414(e) ................................................................................................ 5

2 C.F.R. § 200.504 ................................................................................................... 5

2 C.F.R. § 200.514 ................................................................................................... 5

2 C.F.R. § 1120.315(c)(2) ........................................................................................ 7

2 C.F.R. § 1136.305 .................................................................................................. 8

Application to Stay, *National Institutes of Health v. American Public Health
Association*, No. 25A103 (U.S. July 24, 2025) ................................................. 19

Application to Vacate and Stay, *Department of Education v. California*, 145 S. Ct.
966 (2025), 2025 WL 945313 ........................................................................... 19

*Guidance for Grants and Agreements*, 85 Fed. Reg. 49,506 (Aug. 13, 2020) ............................ 8

OMB Circular A-122, *Cost Principles for Nonprofit Organizations*, 45 Fed. Reg.
46,022 (July 8, 1980) ......................................................................................... 13

# INTRODUCTION

We are here because the Executive Branch "has, for the fourth time, purported to announce a policy that has consistently been deemed unlawful, without acknowledgment of its apparent illegality and without any attempt to structure the policy in a manner that fulfills the established requirements of law." *Ass'n of Am. Univs. v. Dep't of Defense* ("*DOD*"), No. 25-cv-11740, 2025 WL 2022628, at *1 (D. Mass. July 18, 2025). This Court has already joined three other courts in finding that Plaintiffs are likely to succeed on the merits of their claims that DOD unlawfully slashed and capped indirect cost rates at 15% for new awards.

Now, at summary judgment, only two things are different, both of which underscore the policy's illegality. First, the government has filed a fifteen-page administrative record—consisting only of the policies from DOD and other agencies and two charts—that confirms DOD's utter disregard for the APA's reasoned-decisionmaking requirements. Second, Plaintiffs at summary judgment seek relief against the policy as a whole, including its pretextual approach to existing grants. Although DOD says it will seek to "renegotiate" existing grants, that is a euphemism: If recipients do not accept a 15% rate, DOD will terminate their awards. That way of implementing DOD's rate cap is unlawful for all the same reasons this Court found the policy's treatment of new grants unlawful, and more besides.

Meanwhile, the new defense the government has previewed as to existing grants—that the Tucker Act divests this Court of jurisdiction—is meritless. Plaintiffs claim that DOD has violated the governing statutes and regulations via an across-the-board policy, applicable to existing and new grants alike. That is a quintessential suit under the Administrative Procedure Act ("APA"). Plaintiffs, too, seek the prototypical APA remedy of a declaratory judgment and vacatur. Congress has not required Plaintiffs to divide their challenge to this unified policy into thousands of breach-of-contract actions that they must then pursue in a forum that cannot grant the remedy they seek.

## BACKGROUND

As this Court detailed in its opinion granting preliminary relief, DOD has—for decades—invited institutions of higher education ("IHEs" or, here, "universities") to partner in investing in the infrastructure that has made the United States a leader in science, pursuant to a long-standing statutory and regulatory framework that compensates universities for the actual costs of conducting research. *DOD*, 2025 WL 2022628, at *2-8. Federal agencies, including DOD, reimburse universities' indirect costs—which by definition support multiple projects and are critical for research, *id.* at *3-4—at a rate negotiated with the university's cognizant agency through a carefully regulated process, *id.* at *4-5. This negotiated rate "must be accepted by all Federal agencies," *id.* at *5 (quoting 2 C.F.R. § 200.414(c)(1)), and an agency may only deviate from that rate under narrow circumstances and via procedures that provide notice and ensure that the basic terms of engagement are not changed precipitously and without warning, *id.* at *5-6.

DOD has attempted to sweep away that framework by issuing a policy (the "Policy" or "Rate Cap Policy") that purports to cap indirect cost rates for new and existing DOD grants at 15%. *Id.* at *8-9; Dkt. 72-5 ("Hegseth Memo"); Dkt. 72-6 ("Michael Memo"). For existing grants, the Policy requires DOD components, "[w]here possible," to "renegotiate indirect cost rates . . . to comply with the 15% indirect rate cap." Michael Memo at 2; *see* Hegseth Memo at 2. If universities do not comply with this diktat, the Policy directs that "DoD Components shall terminate" and potentially "reissue the award under revised terms," "in accordance with 2 CFR 200.340(a)." Michael Memo at 2; Hegseth Memo at 2. The Policy consists of only four pages total, and as this Court has already found, it contains little—and nonsensical—explanation for its seismic shift. *DOD*, 2025 WL 2022628, at *18-23. Indeed, the Policy completely ignores the fact that three similar policies had already been challenged—and two enjoined by courts in this District—when DOD's policy issued. *Id.* at *9 (citing *Massachusetts v. Nat'l Insts. of Health ("NIH")*, 770 F.

Supp. 3d 277 (D. Mass. 2025), *judgment entered*, 2025 WL 1063760 (D. Mass. Apr. 4, 2025),

*appeal docketed*, No. 25-1344 (1st Cir. Apr. 09, 2025); *Ass'n of Am. Univs. v. Dep't of Energy*

*("DOE")*, No. 25-cv-10912, 2025 WL 1414135 (D. Mass. May 15, 2025)). And shortly after DOD

issued its Policy, the third was also vacated. *Id.* at *10 (citing *Ass'n of Am. Univs. v. Nat'l Sci.*

*Found. ("NSF")*, No. 25-CV-11231, 2025 WL 1725857 (D. Mass. June 20, 2025)).

Plaintiffs are three associations—the Association of American Universities ("AAU"),

Association of Public and Land-grant Universities ("APLU"), and American Council on Education

("ACE"; collectively, "Organizational Plaintiffs")—and 12 universities, each of which conducts

significant research on behalf of DOD. *Id.* at *1. Plaintiffs filed their complaint on June 16, 2025,

and moved for an emergency temporary restraining order ("TRO") as to the portions of the Rate

Cap Policy that were set to take effect immediately, *i.e.*, those pertaining to new awards. Dkts. 1,

13. The Court granted a TRO on June 17 and extended it twice. Dkts. 48, 62, 70. After a hearing

on July 2, 2025, the Court ordered supplemental briefing regarding *Trump v. CASA, Inc.*, 145 S.

Ct. 2540 (2025). Dkt. 63.

On July 18, 2025, the Court issued a preliminary injunction prohibiting Defendants from

"implementing, instituting, maintaining, or giving effect to the immediately effective portions of

the Rate Cap Policy, *i.e.*, those portions implementing a 15% cap for all awards issued on or after

June 12, 2025," as to the university Plaintiffs and the Organizational Plaintiffs' member

institutions, "including but not limited to rejecting or treating adversely proposals for DOD

funding submitted at universities' negotiated rates rather than the 15% rate," and including where

a Plaintiff or member "is a sub-grantee or collaborator." *DOD*, 2025 WL 2022628, at *29.

DOD has now filed the administrative record, Dkt. 72, which underscores that this Court

got it right when it held that DOD failed to grapple with myriad important questions raised by its

decision to jettison the framework that has long governed indirect costs. The administrative record "must consist of all documents and materials directly or indirectly considered by [the] agency decision-makers." *Roe v. Mayorkas*, No. 22-CV-10808, 2024 WL 5198705, at *7 (D. Mass. Oct. 2, 2024). And the government has certified under penalty of perjury that its administrative record "constitute[s] the complete administrative record for the analysis and rationale that supported the 15 percent cap on indirect cost rates, as reflected in the Policy." Dkt. 72-1 ¶ 3. That record consists of six documents: (1) NIH's rate cap policy, which had already been vacated at the time DOD's Policy issued; (2) DOE's rate cap policy, which was enjoined when DOD's Policy issued and subsequently vacated; (3) the Hegseth Memo; (4) the Michael Memo; (5) a seven-line chart with a calculation purporting to show how much money DOD will save; and (6) a list of nine of the "Largest US Private Research Funding Providers" and their maximum indirect cost rates.

That's it. DOD considered nothing else before adopting an approach that would "radically change the nature of the Federal Government's relationship with the research community" by altering a methodology for indirect rates that "has been in place since 1965" and would "throw[] research programs across the country into disarray." *DOD*, 2025 WL 2022628, at *7, *21 (quoting S. Rep. No. 115-150, at 109 (2017)).

## LEGAL STANDARD

Under the APA, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious" or otherwise unlawful. *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). Because the Court recently issued its preliminary injunction decision, and because little has changed at summary judgment, Plaintiffs only briefly address the arguments they have already made and focus this memorandum on the modest new issues at summary judgment.

4

## ARGUMENT

### I.    Plaintiffs Are Entitled to Judgment on Their Claims.

This Court has concluded that Plaintiffs are likely to succeed on the merits of their challenge to the Rate Cap Policy as applied to future grants. *See DOD*, 2025 WL 2022628, at *14-23. The same core flaws the Court has already identified pervade the Policy as a whole. Indeed, as explained below, the Policy is even more egregiously unlawful insofar as it would retroactively impose a 15% rate cap on existing grants.[1]

#### A.    The Entire Policy Is Contrary to Regulation (Counts I, II, and V).

"An agency may not . . . simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014). As the Court held, the Policy's attempt to supplant individualized, negotiated rates with a single across-the-board 15% rate violates the regulations. *DOD*, 2025 WL 2022628, at *15-17 (citing 2 C.F.R. § 200.414(c)(1) and (c)(3)); *see NIH*, 770 F. Supp. 3d at 296-99. The Court's reasoning applies with equal—if not greater—force to the Policy as a whole, which also imposes the 15% cap on grants for which research is already in progress.

As the Court recognized, *see DOD*, 2025 WL 2022628, at *15-16, the entire regulatory scheme is geared toward ensuring that grantees recover a reasonable approximation of their indirect costs related to federal projects, *see* 2 C.F.R. § 200.402; *see also* 2 C.F.R. pt. 1128, app. C (incorporating 2 C.F.R. pt. 200, app. III). The regulations require a specific process for identifying and negotiating indirect costs. *See id.* §§ 200.100(c), 200.414(e), 200.504, 200.514; *id.* pt. 1128, app. C(A)(1)(a). The regulations then provide that these negotiated rates "must be accepted by all

---

[1] The Court has found that Plaintiffs have standing to challenge the Rate Cap Policy as applied to new grants. *DOD*, 2025 WL 2022628, at *10-12. Plaintiffs also have standing to challenge the Rate Cap Policy as applied to existing grants, as Plaintiffs will be injured by the Policy's directive that all existing awards be renegotiated to include the 15% indirect cost rate or terminated (and potentially reissued to include the revised rate). *See, e.g.*, MIT Decl., ¶ 12.

Federal agencies." *Id.* § 200.414(c)(1). Agencies may deviate from the baseline rule of negotiated rates in strictly limited circumstances and in strictly limited ways. To protect the significant reliance interests engendered by negotiated rates, the regulations require agencies considering deviations from such rates to provide institutions with ample notice of the planned deviation and to set forth the "policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." *Id.* § 200.414(c)(3).

Here, the Rate Cap Policy flouts the command that negotiated rates "must be accepted," and the government's basic theory—that it can simply *by fiat declare* that it no longer accepts negotiated rates—would render that command meaningless. *See DOD*, 2025 WL 2022628, at *17 (explaining that the government's reading is in significant "tension with [the] broader [regulatory] text" because it "converts strong, mandatory language ('must be accepted') into a mere presumption"). The Rate Cap Policy vastly exceeds anything that could be reasonably understood as a "deviation" that DOD has tried to "seek and justify." 2 C.F.R. § 200.414(c)(3); *see NSF*, 2025 WL 1725857, at *14. And the Policy's blanket diktat does not provide any sort of "procedure[]" or "general decisionmaking criteria." 2 C.F.R. § 200.414(c)(3). More than that: The government's reading would render meaningless another subsection of the regulations that "clearly establishes that grant recipients [with negotiated rates] 'are not required to use the de minimis [15%] rate,'" by leaving agencies "free to unilaterally impose an indirect cost rate that is its literal equivalent." *DOD*, 2025 WL 2022628, at *17 (quoting 2 C.F.R. § 200.414(f)). As the Court aptly summarized, the Policy "uses an improper tool (indirect cost rates) to accomplish an impermissible goal (implicit cost sharing)." *Id.* at *15.

All of the flaws the Court found apply equally to new and existing grants. And when DOD attempts to impose the Rate Cap Policy on existing grants, by inflicting termination on any grantee

that does not accept the 15% rate, it violates the governing regulations in two additional ways.

*First*, this is "a bold, and impermissible, attempt to accomplish indirectly what could not be done directly." *E. Renovating Corp. v. Roman Cath. Bishop of Springfield*, 554 F.2d 4, 7 (1st Cir. 1977). Even when, unlike here, an agency lawfully "deviates" from negotiated rates, it can apply such deviations only to *new grants*. That is clear from 2 C.F.R. § 200.414(c)(4), which specifies that the notice of funding opportunity must "include . . . the policies relating to indirect cost rate reimbursement." In circumstances where there is no such notice, DOD must still "provide the general terms and conditions to each recipient no later than the time of the award." 2 C.F.R. § 1120.315(c)(2). Then, once an award issues, "the negotiated rate[] in effect at the time of the initial award" must be used "throughout the life of the award." 2 C.F.R. pt. 200, app. III(C)(7)(a); *see* 2 C.F.R. pt. 1128, app. C(A)(1)(a) (incorporating by reference for DOD grants and cooperative agreements appendix III to 2 C.F.R. part 200).[2] Because the notices of funding opportunity for existing grants did not include a 15% rate cap, and because DOD did not provide that rate cap at the time of the award, DOD must use the negotiated rates for the life of the award. And DOD may not, under the guise of grant termination, "do indirectly what it could not do directly." *Altamont Gas Transmission Co. v. FERC*, 92 F.3d 1239, 1248 (D.C. Cir. 1996).

*Second*, even on their own terms, DOD's termination regulations do not authorize the Rate Cap Policy's 15%-or-terminate ultimatum. DOD regulations outline two and only two

---

[2] This provision provides in full that "*[e]xcept as provided in paragraph (c)(1) of § 200.414*, Federal agencies must use the negotiated rates in effect at the time of the initial award throughout the life of the Federal award." 2 C.F.R. pt. 200, app. III(C)(7)(a) (emphasis added). The italicized phrase merely confirms that this provision does not overcome the authority that 2 C.F.R. § 200.414(c)(1) otherwise confers to deviate from negotiated rates *up front* before awards issue; without this phrase, this provision could be read to categorically command agencies to use negotiated rates in all circumstances and so displace the exception. The italicized phrase does not, however, permit agencies to deviate from negotiated rates during the life of a particular federal award. That is the only reading that fits with the command in 2 C.F.R. § 200.414(c)(4) that agencies "must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement." Here is how the various provisions fit together: 2 C.F.R. § 200.414(c)(1) governs *whether and how* agencies can depart from negotiated rates; 2 C.F.R. § 200.414(c)(4) and 2 C.F.R. pt. 200, app. III(C)(7)(a) govern *the time at which* agencies can do so.

circumstances in which the agency can "unilaterally" terminate a grant "in whole or in part": (1) for

a grantee's "material failure to comply with the award terms and conditions," or (2) in the case of

incrementally funded grants, if "[t]he program office does not have funding for an upcoming

increment." 2 C.F.R. pt. 1136, app. C(C)(1)(a). Neither permits DOD to terminate awards because

it would prefer to use a different indirect cost rate.

The Policy instructs DOD components to terminate awards "in accordance with" a different

regulation: 2 C.F.R. § 200.340(a). Michael Memo at 2; *see* Hegseth Memo at 2. For agencies that

have adopted it, that regulation allows termination of federal awards "to the extent authorized by

law[] if an award no longer effectuates the program goals or agency priorities." 2 C.F.R.

§ 200.340(a)(4). But to begin, DOD has not adopted section 200.340(a)(4) as a basis for unilateral

termination.[3] So DOD cannot invoke that provision here. *See Am. Pub. Health Ass'n ("APHA")*

*v. NIH*, No. CV 25-10787, 2025 WL 1548611, at *11 (D. Mass. May 30, 2025) (noting that where

§ 200.340(a)(4) "has not yet been adopted by HHS, . . . the regulation is apparently inapplicable"),

*appeal docketed*, No. 25-1611 (1st Cir. June 24, 2025).

Even if that regulation applied to DOD, moreover, it would not authorize the terminations

contemplated by the Rate Cap Policy. Section 200.340(a)(4) allows termination only "if an award

no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). Whatever

the outer limits of that authority, it does not allow agencies to terminate awards simply because

they would like to pay less. An agency's desire to save money has nothing to do with whether a

particular award accords with "program goals or agency priorities." *Cf. Guidance for Grants and*

*Agreements*, 85 Fed. Reg. 49,506, 49,507 (Aug. 13, 2020) ("[I]f additional evidence reveals that a

---

[3] DOD's termination provisions are located in Appendix C to Part 1136. *See* 2 C.F.R. § 1136.305. Appendix C does not incorporate Section 200.340(a)(4) or include similar language in its enumerated grounds for unilateral termination. *See* 2 C.F.R. pt. 1136, app. C(C)(1)(a).

specific award objective is ineffective at achieving program goals, it may be in the government's interest to terminate the Federal award.").

**B.    The Policy Is Arbitrary and Capricious in Its Entirety (Count III).**

As this Court and each of the courts to have considered similar policies have found, DOD also violated the APA's reasoned-decisionmaking requirements with its sudden abandonment, based on a few paltry sentences, of a decades-old individualized framework in favor of an across-the-board cap. *DOD*, 2025 WL 2022628, at *19; *see* 5 U.S.C. § 706(2)(A); *NIH*, 770 F. Supp. 3d at 305-08; *DOE*, 2025 WL 1414135, at *11-13; *NSF*, 2025 WL 1725857, at *17. The APA requires a reasoned basis for agency actions, including a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 48-49 (1983) (citation omitted). And agencies cannot fail to consider "important aspect[s] of the problem." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *State Farm*, 463 U.S. at 43). Moreover, a reviewing court "may consider only the agency's explanation given at the time the relevant decision was made, as opposed to [a] post hoc rationale." *Melone v. Coit*, 100 F.4th 21, 31 (1st Cir. 2024) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)). This Court has already recognized that DOD failed to comply with those requirements. And DOD's failures are, if anything, *more* egregious as to existing grants.

*First*, DOD's explanation is woefully insufficient. To the extent the Rate Cap Policy offers a discernible rationale, it rests on the incorrect—and certainly unexplained—premise that indirect costs are less worthy than direct costs. As the Court observed, that assumption "is at least conceptually irrational and ignores the realities of research, as demonstrated by the record evidence." *DOD*, 2025 WL 2022628, at *20; *see, e.g.*, Ex. A, Dartmouth Decl. ¶¶ 8-10; BU Decl. ¶ 5; Brown Decl. ¶ 9; Caltech Decl. ¶ 6; UC Decl. ¶ 7; UMCP Decl. ¶ 9.

*Second*, DOD's invocations of "efficiency" do not help. As the Court observed, it is merely

"conclusory" to assert that "decreasing indirect costs will result in increased direct costs and more effective research outcomes[]." *DOD*, 2025 WL 2022628, at *20 (citations omitted); *see also NIH*, 770 F. Supp. 3d at 305; *DOE*, 2025 WL 1414135, at *12; *NSF*, 2025 WL 1725857, at *17-18. This justification is also nonsensical. Indirect costs, which are costs shared across multiple research projects, often increase efficiency, such as when institutions deploy the same facilities or equipment across multiple projects. *See* Pls. TRO Mem. at 29-30; *e.g.*, Dartmouth Decl. ¶ 11; Ex. B, Hawaii Decl. ¶¶ 12-13. The distinction between direct and indirect costs is also merely an accounting convention—rendering it irrational to simply assert that limiting indirect costs will improve efficiency. *DOD*, 2025 WL 2022628, at *15 n.51, *21. And DOD ignored entirely that universities cannot continue much of their currently ongoing and proposed research at a 15% rate, such that cutting indirect cost rates really just means ending large swaths of research. *See* Pls.' TRO Mem. at 31-32; *DOD*, 2025 WL 2022628, at *20 (citing BU Decl. ¶ 5; Brown Decl. ¶ 9; Caltech Decl. ¶ 6; UC Decl. ¶ 7; UMCP Decl. ¶ 9; OSU Decl. ¶ 8). That is not pro-efficiency; it just decreases research.

*Third*, DOD made no attempt to explain why it singled out universities. As the Court observed, "[w]hile there very well could be valid policy reasons to treat universities differently than other grant recipients, the Rate Cap Policy makes no attempt to provide even a single reason to do so." *DOD*, 2025 WL 2022628, at *20. "This failure to articulate *any* reason, let alone a 'satisfactory explanation for [the] action,' renders the Rate Cap Policy unlawful." *Id.* (citing *Penobscot v. Air Servs., Ltd. v. FAA*, 164 F.3d 713, 719 (1st Cir. 1999) and *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016)). And the Policy suffers from more than a failure to explain. Singling out universities is irrational at its core, and it means that non-university recipients may compete for the same awards but—unlike universities—receive reimbursement of all their

research costs. *See, e.g.*, Dartmouth Decl. ¶ 5; Hawaii Decl. ¶ 6. Moreover, it is especially irrational to treat universities *differently* from all other recipients when the Policy treats universities with wildly different costs *the same*.

*Fourth*, DOD "wholly fail[ed] to address" Plaintiffs' reliance interests. *DOD*, 2025 WL 2022628, at \*22. That failure pervades the Policy as a whole and is, if anything, even more egregious as to existing awards. *See NIH*, 770 F. Supp. 3d at 308; *DOE*, 2025 WL 1414135, at \*13; *NSF*, 2025 WL 1725857, at \*18-19; *accord Regents of Univ. of Cal.*, 591 U.S. at 30-31. Those reliance interests are rooted in the "symbiotic . . . relationship" between DOD and institutions of higher education that has existed for decades, and from DOD's decades-long use of a funding formula aimed at reimbursing actual costs for that research. *DOE*, 2025 WL 1414135, at \*19; *see NIH*, 770 F. Supp. 3d at 309-10. Those reliance interests are why the regulations strictly limit departures from negotiated rates and require a specific process that gives institutions ample notice. Yet without a word of justification or acknowledgment (and based on an administrative record that is a mere fifteen pages), DOD has attempted to jettison the entire system.  It has done so, moreover, even for grants that DOD has already awarded and research that Plaintiffs and their members are already conducting in reliance on reimbursement of their actual costs, which DOD specifically committed to provide. Dartmouth's declaration makes this point plain: Research on topics like high-frequency communication systems, solar energetic particles, efficient new battery technologies, and engineered tissue manufacturing is currently underway at Dartmouth, funded by DOD grants. Dartmouth Decl. ¶¶ 6-7. But "[i]t is unlikely [Dartmouth] would have embarked on [these projects] with a 15% indirect cost rate," because it could not afford to do so. *Id.* ¶ 8. The Policy "would seriously jeopardize or end research projects" like these. *Id.* ¶ 8; *see also, e.g.*, Hawaii Decl. ¶¶ 8-10; CU Boulder Decl. ¶ 6; Cornell Decl. ¶ 5; Penn Decl. ¶ 6; USC Decl. ¶ 7.

11

The bare-bones administrative record further underscores the Rate Cap Policy's failure to satisfy the APA's reasoned-decisionmaking requirements. At the preliminary-injunction stage, this Court knew that the Policy itself did not grapple with the myriad problems that would predictably result from reversing course on six decades of science policy to cap indirect cost rates at 15%. And now that DOD has produced the administrative record, which contains everything DOD directly or indirectly considered, it is beyond dispute that DOD never even thought about these myriad problems. Instead, it principally considered the copycat policies at NIH and DOE—remarkably, without considering the judicial decisions identifying numerous flaws in those policies.

The only thing of substance the administrative record adds is a half-page chart memorializing nonprofits' indirect cost rates. Dkt. 72-8. But neither that chart nor anything else in the record tries to justify *why* the comparison to nonprofits is appropriate. Nor does the government make any "effort to distinguish a recent decision from this District that rejected this same comparison when made without further explanation as to how that comparison makes sense and supports capping indirect costs." *DOD*, 2025 WL 2022628, at *21 (citing *NIH*, 770 F. Supp. 3d at 305). The comparison remains irrational: The government's faulty comparison "ignores key differences between funding from private foundations and the Government, including that many foundations define and calculate indirect costs differently from the federal government; DOD imposes various requirements that increase indirect costs that are not imposed by private foundations; and universities accept lower indirect cost rates from foundations in reliance on the grants they receive from the Government." *Id.*; *see* Dartmouth Decl. ¶ 17.

Simply put, the entire Rate Cap Policy remains arbitrary and capricious at its core. The decades-old approach mandates a detailed negotiation process that ensures that indirect cost rates are tailored to the specific institution. To discard that institution-specific approach for a one-size-

fits-all rate that the regulations themselves recognize as *de minimis* is the pinnacle of arbitrary and capricious government action. And again, the fact that DOD must continue to go to the time and expense of negotiating institution-specific rates for use by other agencies, *see* Michael Memo at 2, but not DOD itself, further underscores the Policy's incoherence. Especially given that the Policy is justified entirely by reference to cost savings, it is deeply irrational that DOD does not acknowledge, let alone grapple with, that fact.

### C.     The Rate Cap Policy as a Whole Exceeds DOD's Statutory Authority (Count IV).

"An agency . . . 'literally has no power to act'—including under its regulations—unless and until Congress authorizes it to do so by statute." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). As this Court has already concluded, "Congress has not authorized DOD to issue grants inconsistent with OMB's guidance." *DOD*, 2025 WL 2022628, at *17. As this Court found, *id.* at *15-17, and as discussed above in Part I.A.1, the Rate Cap Policy is inconsistent with those regulations. "DOD therefore acts ultra vires in disregarding those regulations." *DOD*, 2025 WL 2022628, at *17.

Although that is reason enough to show that the Rate Cap Policy exceeds DOD's statutory authority, 5 U.S.C. § 706(2)(A), there is more, including the additional statutory violations the *NSF* Court found, 2025 WL 1725857, at *12, which reinforce the Policy's unlawfulness.

*First*, the Policy is inconsistent with 41 U.S.C. § 4708, which authorizes agencies to use "predetermined fixed-percentage rates" to "provide for payment of reimbursable indirect costs." Such "predetermined rate[s]," according to OMB's longstanding interpretation, must be based on an "estimate of the costs to be incurred during the period," OMB Circular A-122, *Cost Principles for Nonprofit Organizations*, 45 Fed. Reg. 46,022, 46,026 (July 8, 1980), not based on an agency's free-floating policy preference to spend less money on indirect costs. *See* Pls.' TRO Mem. at 35-

36. So DOD's Rate Cap Policy does not comply with 41 U.S.C. § 4708.

Moreover, under the "commonplace of statutory construction that the specific governs the general," DOD cannot rely on its general grantmaking authorities to achieve results that 41 U.S.C. § 4708 does not authorize. *NSF*, 2025 WL 1725857, at *11 (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)). The statutory history—which shows that Congress has taken the indirect-cost issue into its own hands and has emphatically rejected similarly draconian caps—underscores that it has never contemplated DOD replacing a tailored system with a sweeping, one-size-fits-all command pursuant to its general grantmaking powers. Pls.' TRO Mem. at 36 (discussing history of congressional actions regarding indirect cost reimbursement); *see Biden v. Nebraska*, 600 U.S. 477, 507 (2023); *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 229 (1994); *accord West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (the "'history and the breadth of the authority that [the agency] has asserted' and the 'economic and political significance' of that assertion" counsel in favor of "'hesitat[ing] before concluding that Congress' meant to confer such authority" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000))).

*Second*, the Policy is incompatible with Congress's command that DOD's grantmaking activity support DOD's mission and serve "public purpose[s]." 10 U.S.C. § 4001 (citing 31 U.S.C. ch. 63). Decimating the very university-based research that DOD has relied on for decades is incompatible with both DOD's "needs" and "interest[s]" and the "public purposes" such research serves. *See id.*; Pls. TRO Mem. at 36-37.

*Third*, and similarly, the Policy violates DOD's obligation to carry out the Defense Established Program to Stimulate Competitive Research, a competitive grant program through which Plaintiffs and their members receive grants. By statute, that program must promote

universities' capacity to conduct research that serves DOD's needs and mission. 10 U.S.C. § 4010(a). A policy that stops research in its tracks diminishes, not promotes, that research capacity and hinders DOD's long-term interests. *See* Pls.' TRO Mem. at 37.

### D.    The Rate Cap Policy Is Impermissibly Retroactive (Count VI).

The Rate Cap Policy independently exceeds DOD's statutory authority because, as applied to existing grants, it is impermissibly retroactive. Agencies do not, absent express statutory authority, have the power to promulgate retroactive rules. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). That makes good sense, because retroactive rules are profoundly disruptive and raise significant fairness concerns. *See Brimstone R.R. & Canal Co. v. United States*, 276 U.S. 104, 122 (1928) ("The power to require readjustments for the past is drastic" and "ought not to be extended so as to permit unreasonably harsh action without very plain words.").

Here, no such express grant of authority exists. In fact, there is no indication whatsoever that DOD has the authority to make the Rate Cap Policy retroactive. Congress did not authorize DOD to retroactively modify indirect cost rates when it enacted DOD's grantmaking authority (or in any other statute). *See, e.g.*, 10 U.S.C. §§ 4001, 4010, 4141; 41 U.S.C. § 4708. Yet the Rate Cap Policy saddles universities with paying for indirect costs of ongoing research that DOD previously committed to reimbursing. When they applied for and received grants, universities understood that—under the governing regulations—they would be reimbursed for indirect costs at their negotiated rates for the entire, agreed-upon duration of the research project. *See* 2 C.F.R. pt. 200, app. III(C)(7)(a). Now, to the extent their research continues, universities must cover the difference between 15% and their negotiated rates. *NIH*, 770 F. Supp. 3d at 318 (finding similar NIH policy effectively "imposes a new, lower rate, displacing [universities'] right to the previously negotiated—and legally binding—[rate]"). As the *NIH* court found, *id.* at 317-18, the Rate Cap Policy's application to existing grants—via its mandate to terminate in-progress grants and reissue

them at a 15% indirect cost rate—is "retroactive" three times over, because it "impair[s] rights" universities "possessed when" they accepted awards; "increase[s] [universities'] liability for past conduct"; and "impose[s] new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994). Nor, again, does it matter that DOD is trying to impose a retroactive 15% cap through the expedient of terminating grants and reissuing them at 15%. Hegseth Memo at 2; Michael Memo at 2. The effect is the same, and no less unlawfully retroactive.

## II.    This Case Belongs in District Court, Not the Court of Federal Claims.

The APA authorizes district courts to provide "relief other than money damages" to persons suffering legal wrong, 5 U.S.C. § 702, including by "hold[ing] unlawful and set[ting] aside agency action," *id.* § 706. The APA thus empowers these Article III courts to perform a core constitutional duty—"enforc[ing] statutory [and regulatory] mandates." *Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988). And under the APA, courts may continue to provide declaratory or injunctive relief even when doing so "would require the payment of money"; indeed, as the Supreme Court has recognized, "[s]pecific relief" under the APA "will, of course, often result in the payment of money from the federal treasury." *Id.* at 894, 900 (quoting *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985) (Bork, J.)).

Here, the government does not dispute that Plaintiffs' claims concerning *new* grants fall within the jurisdiction the APA confers. But the government has previewed that it intends to re-run its oft-rejected argument that the Tucker Act divests this Court of jurisdiction over Plaintiffs' challenges concerning *existing* grants, relying on the stay decision in *Department of Education v. California*, 145 S. Ct. 966 (2025). The Court should reject this argument, as the *NIH* and *DOE* courts did before. *NIH*, 770 F. Supp. 3d at 295; *DOE*, 2025 WL 1414135, at *7. This is a prototypical APA suit. It challenges agency action as violating the governing regulations, statutes, and the APA's reasoned-decisionmaking mandates, and it seeks classic APA relief: vacatur of an

unlawful policy. Congress did not force Plaintiffs to shatter their unified challenge to DOD's across-the-board policy into countless pieces—with the claims concerning new grants proceeding in this Court and thousands of contract actions concerning existing grants languishing in a non-Article III forum, the Court of Federal Claims, that cannot provide Plaintiffs the relief they seek.

A solid wall of decisions have rejected similar attempts to use the Tucker Act to shield unlawful agency actions from judicial scrutiny, including the First Circuit in *APHA v. NIH*, No. 25-1611, 2025 WL 2017106, at *6 (1st Cir. July 18, 2025). *See also* Motion Order, *New York v. U.S. Dep't of Educ.* No. 25-1424, (2d Cir. June 20, 2025), ECF No. 40; *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't Health & Hum. Servs.*, 137 F.4th 932, 939 (9th Cir. 2025); *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (*en banc*).[4] In harmonizing *California* with other Supreme Court decisions, the First Circuit identified a "jurisdictional spectrum" running from *Bowen* to *Great-West Life & Annuity Insurance Co. v.*

---

[4] *See also, e.g., Elev8 Baltimore, Inc. v. Corp. Nat'l & Cmty. Serv.*, No. CV 25-1458, 2025 WL 1865971, at *13 (D. Md. July 7, 2025) (listing cases); *New York v. Kennedy*, No. 25-CV-196, 2025 WL 1803260, at *10 (D.R.I. July 1, 2025); *Rural Dev. Innovations Ltd. v. Marocco*, No. CV 25-1631, 2025 WL 1807818, at *3 (D.D.C. July 1, 2025); *Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*, No. CV 25-1128, 2025 WL 1795090, at *12-20 (D.D.C. June 30, 2025); *La. Delta Serv. Corps v. Corp. for Nat'l & Cmty. Serv.*, No. CV 25-378, 2025 WL 1787429, at *17-22 (M.D. La. June 27, 2025); *Thakur v. Trump*, No. 25-CV-04737, 2025 WL 1734471, at *19-21 (N.D. Cal. June 23, 2025), *appeal docketed*, No. 25-4249 (9th Cir. July 10, 2025); *Green & Healthy Home Initiatives, Inc. v. EPA*, No. 25-CV-1096, 2025 WL 1697463, at *12-15 (D. Md. June 17, 2025); *Martin Luther King, Jr. Cnty. v. Turner*, No. 25-CV-814, 2025 WL 1582368, at *8-12 (W.D. Wash. June 3, 2025), *appeal docketed*, No. 25-3664 (9th Cir. June 10, 2025); *Maryland v. Corp. for Nat'l & Cmty. Serv.*, No. CV 25-1363, 2025 WL 1585051, at *22-28 (D. Md. June 5, 2025); *Metro. Transp. Auth. v. Duffy*, No. 25-CV-1413, 2025 WL 1513369, at *24-26 (S.D.N.Y. May 28, 2025); *S. Educ. Found. v. U.S. Dep't of Educ.*, No. CV 25-1079, 2025 WL 1453047, at *5-7 (D.D.C. May 21, 2025), *appeal docketed*, No. 25-5262 (D.C. Cir. July 21, 2025); *Colorado v. U.S. Dep't of Health & Hum. Servs.*, No. 25-CV-00121, 2025 WL 1426226, at *6-9 (D.R.I. May 16, 2025), *appeal docketed*, No. 25-1671 (1st Cir. July 16, 2025); *Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 136-37 (D.D.C. 2025), *appeal docketed*, No. 25-5098 (D.C. Cir. Apr. 2, 2025); *Massachusetts v. Kennedy*, No. CV 25-10814, 2025 WL 1371785, at *3-9 (D. Mass. May 12, 2025), *appeal docketed*, No. 25-1612 (1st Cir. June 24, 2025); *Rhode Island v. Trump*, No. 25-CV-128, 2025 WL 1303868, at *5-7 (D.R.I. May 6, 2025), *appeal docketed*, No. 25-1477 (1st Cir. May 20, 2025); *San Francisco Unified Sch. Dist. v. AmeriCorps*, No. 25-CV-02425, 2025 WL 1180729, at *6-11 (N.D. Cal. Apr. 23, 2025); *New York v. Trump*, No. 25-CV-39, 2025 WL 1098966, at *2 (D.R.I. Apr. 14, 2025), *appeal docketed*, No. 25-1413 (1st Cir. Apr. 28, 2025); *Climate United Fund v. Citibank, N.A.*, No. 25-CV-698, 2025 WL 1131412, at *9-13 (D.D.C. Apr. 16, 2025), *appeal docketed*, No. 25-5122 (D.C. Cir. Apr. 16, 2025); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 25-CV-00097, 2025 WL 1116157, at *12-15 (D.R.I. Apr. 15, 2025), *appeal docketed*, No. 25-1428 (1st Cir. May 1, 2025); *Maine v. U.S. Dep't of Agric.*, No. 25-CV-00131, 2025 WL 1088946 (D. Me. Apr. 11, 2025).

*Knudson*, 534 U.S. 204, 212 (2002). *APHA*, 2025 WL 2017106, at *6. Under *Bowen*, when plaintiffs challenge "unlawful agency-wide policies" and seek "declaratory and equitable relief," suits may proceed in district court even if they may result in payment of money. *Id.* at *5, *7. *Great-West*, by contrast, teaches that when plaintiffs request "money past due under a contract," they seek money damages—not "equitable relief"—and must go to the Court of Federal Claims. *Id.* at *5 (quoting *Great-West*, 534 U.S. at 210-11). And *APHA* explained that some claims in *California* fell closer to *Great-West* because the "Court construed the district court as having ordered 'the Government to pay out past-due grant obligations'" based on claims the government had violated "the terms and conditions of the grant awards." *Id.* at *7-8. Applying these principles, *APHA* held that district courts may grant declaratory relief vacating "grant terminations" on the ground that they "violate various federal statutes and the Constitution." *Id*. at *7.[5]

As *APHA*—and more importantly, *Bowen*—make clear, this case straightforwardly belongs in district court. Plaintiffs seek vacatur and declaratory relief under the APA, the very kind of "specific relief" that *Bowen* held is not equivalent to money damages at contract. *Bowen*, 487 U.S. at 893; *see APHA*, 2025 WL 2017106, at *6. And Plaintiffs' challenge is not grounded on, and does not even reference, the "terms or conditions of any contract." *APHA*, 2025 WL 2017106, at *7. Rather, as in *Bowen*, Plaintiffs ask the Court to engage in its "primary function of reviewing [DOD's] . . . interpretation of federal law" and to require DOD to conform its actions to the governing statutes and regulations. *APHA*, 2025 WL 2017106, at *7 (quoting *Bowen*, 487 U.S. at 910). And, again as in *Bowen*, it is of no moment that a judgment for plaintiffs may eventually result in the payment of money; that is "often" true under the APA. *Bowen*, 487 U.S. at 894; *accord*

---

[5] The First Circuit's approach in *APHA* is similar to the widely adopted *Megapulse* test, which classifies actions for Tucker Act purposes by looking to the "source of the rights upon which the plaintiff bases its claims" and "upon the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *see, e.g.*, *DOE*, 2025 WL 1414135, at *7 (applying the *Megapulse* framework).

*California*, 145 S. Ct. at 968 (reaffirming that under *Bowen*, a district court's jurisdiction is not "'barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds" (citation omitted)).

Indeed, the government's Tucker Act argument here is a reversal from the *government's own position* in *California*. In its stay application in the Supreme Court in *California*, the government invoked the *NIH* case in distinguishing "challenge[s] to a single agency policy" (which can proceed in district court) from "individual funding terminations" like those at issue in *California* (which, in its view, cannot). Application to Vacate and Stay, *California*, 145 S. Ct. 966, 2025 WL 945313, at *15. Having correctly told the Supreme Court that *NIH* (and thus this case) was different from *California*, the government cannot credibly turn around and tell this Court the opposite.[6]

This conclusion is especially self-evident because Plaintiffs challenge an unlawful policy that applies to new and existing grants alike. When Plaintiffs sought preliminary relief against the Rate Cap Policy's application to new grants, the government did not even raise the Tucker Act. And of course not: It would be bizarre to claim that Plaintiffs must go to the Court of Federal Claims when no contracts even exist. But in truth, the government's arguments here are scarcely less bizarre: The Rate Cap Policy is unlawful as applied to existing grants for *the same reasons* as for new grants (and some other reasons besides), and neither the "source of the rights" asserted by Plaintiffs nor the relief they seek differs. *DOE*, 2025 WL 1414135, at *7; *NIH*, 770 F. Supp. 3d at 293 ("[T]he claims in this case turn on how the regulations govern the provision of these awards. This is further underscored by the Rate Change Notice's impact not just on current grants, but

---

[6] That was not a one-off: Just last week, the government filed a stay application in the Supreme Court in which it listed "nearly two dozen" examples of what it called "[d]istrict-court defiance of [the Supreme] Court's decision in *California*." Application to Stay at 4 & n.1, *NIH v. Am. Pub. Health Ass'n*, No. 25A103 (U.S. July 24, 2025). Notably absent from that list were any of the decisions involving challenges to agencies' indirect cost policies. *See id.*

future ones as well.").

The utter inability of the Court of Federal Claims to grant effective relief underscores that this suit belongs in district court. As *APHA* observed, Plaintiffs seek "declaratory relief that will guide an agency as it decides upon its future course of conduct, and such relief is available only in the district court, not in the Court of Federal Claims." *APHA*, 2025 WL 2017106, at *6 (citing *Bowen*, 487 U.S. at 905 ("The Claims Court does not have the general equitable powers of a district court to grant prospective relief.")). And "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006). Plaintiffs challenge "unlawful agency-wide policies because they violate various federal statutes [and regulations]—classic examples of claims that belong in federal district court." *APHA*, 2025 WL 2017106, at *7. The government's contrary view would result in no court having jurisdiction to hear Plaintiffs' claims, which not only is "contrary to common sense" but also "conflicts with the 'strong presumption favoring judicial review of administrative action' that is embodied in the APA." *Cmty. Legal Servs. in E. Palo Alto*, 137 F.4th at 939 (quoting *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015)).

## CONCLUSION

The Court should grant summary judgment to Plaintiffs; declare the Rate Cap Policy invalid, arbitrary and capricious, and contrary to law; and vacate the Rate Cap Policy in its entirety under 5 U.S.C. § 706, as the other courts have done when faced with similar policies at other agencies. *Massachusetts v. NIH*, No. 25-cv-10338, 2025 WL 1063760, at *1-2 (D. Mass. Apr. 4, 2025), *appeal docketed*, No. 25-1344 (1st Cir. Apr. 09, 2025); Final Judgment at 2, *DOE*, No. 25-cv-10912 (D. Mass. June 30, 2025), Dkt. No. 71; *NSF*, 2025 WL 1725857, at *21.

Dated: July 28, 2025

Respectfully submitted,

JENNER & BLOCK LLP
By: */s/ Ishan K. Bhabha*

Ishan K. Bhabha (*pro hac vice*)
Lindsay C. Harrison (*pro hac vice*)
Lauren J. Hartz (*pro hac vice*)
Elizabeth Henthorne (*pro hac vice*)
Zachary C. Schauf (*pro hac vice*)
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
LHarrison@jenner.com
LHartz@jenner.com
BHenthorne@jenner.com
ZSchauf@jenner.com

Shoba Pillay, BBO No. 659739
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

*Attorneys for Association of American
Universities, American Council on
Education, Association of Public and
Land-grant Universities, AZ Board of
Regents on Behalf of Arizona State
University, Brown University, California
Institute of Technology, The Regents of the
University of California, Cornell
University, The Board of Trustees of the
University of Illinois, The Johns Hopkins
University, Massachusetts Institute of
Technology, and University of Pittsburgh
of the Commonwealth System of Higher
Education*

CLEMENT & MURPHY, PLLC
By: */s/ Paul D. Clement*

Paul D. Clement (*pro hac vice*)
James Y. Xi (*pro hac vice*)
Kyle R. Eiswald (*pro hac vice*)
706 Duke Street
Alexandria, VA 22314
Tel: (202) 742-8900
paul.clement@clementmurphy.com
james.xi@clementmurphy.com
kyle.eiswald@clementmurphy.com

*Attorneys for Association of American Universities,
Association of Public and Land-grant Universities,
and American Council on Education*

ANTHONY G. BROWN
Attorney General of Maryland

By: */s/ Michael Drezner*
Michael Drezner (*pro hac vice*)
   *Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD 21202
Tel: (410) 576-6959
mdrezner@oag.state.md.us

*Attorney for University of Maryland, College Park*

NICHOLAS W. BROWN
Attorney General of Washington

By: */s/ Jessica L. Creighton*
Jessica L. Creighton (*pro hac vice*)
  *Assistant Attorney General*
Office of the Attorney General of
Washington
University of Washington Division
4333 Brooklyn Avenue NE, MS 359475
Seattle, WA 98195
(206) 543-4150
jessica.creighton@atg.wa.gov

*Attorney for University of Washington*

PHILIP J. WEISER
Attorney General of Colorado

By: */s/ Lauren Peach*
Lauren Peach (*pro hac vice*)
  *First Assistant Attorney General*
Michael McMaster (*pro hac vice*)
  *Assistant Solicitor General*
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, CO 80203
(720) 508-6484, (720) 508-6156
Lauren.Peach@coag.gov
Michael.McMaster@coag.gov

*Attorneys for the Board of Governors of the
Colorado State University System Acting by and
through Colorado State University*

## CERTIFICATE OF SERVICE

Counsel for Plaintiffs certify that they have submitted the foregoing document with the clerk of court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Plaintiffs hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

/s/ *Paul D. Clement*
Paul D. Clement (*pro hac vice*)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314
Tel: (202) 742-8900
paul.clement@clementmurphy.com

Dated: July 28, 2025