**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **ASSOCIATION OF AMERICAN UNIVERSITIES, et al.,** )<br><br>**Plaintiffs,** )<br><br>v. )<br><br>**DEPARTMENT OF DEFENSE, et al.,** )<br><br>**Defendants.** ) | **Civil Action No. 25-11740-BEM** |

**MEMORANDUM AND ORDER ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**MURPHY, J.**

Defendants call the academic community's work with the Department of Defense "essential for the development of transformative research concepts that drive our future capabilities."[1] Yet, with hardly any explanation at all, they have sought to upend nearly six decades of agency practice by announcing their refusal to reimburse wide swaths of research costs above a "de minimis" amount.

Defendants' obtuseness to the obvious effects of this policy, including on their own mission, renders it arbitrary and capricious. Even more, it is contrary to law already on the books. In so finding, the Court does not write upon a blank slate but instead follows three other courts in this District who have come to similar conclusions with respect to different federal agencies'

---

[1] Dkt. 72-6 (the "Michael Memo") at 2.

attempts to enact virtually identical policies.[2]   Notably, Defendants ignored these obviously

relevant—and at least *reasonable*—analyses before adopting this policy.

This case is about "indirect costs," an accounting term undoubtedly unfamiliar to most.

Defense Secretary Hegseth has seized on this knowledge gap to call them "waste" and

"bureaucratic fat."[3]   But that is entirely misleading.   Indirect costs are the buildings within which

new materials for life-saving armor are developed.   They are the supercomputers that find new

ways to defend our country against cyber-attacks.   Yes, they are also the assistants who keep things

running and the custodians who come in at night.   But these are not "waste."   Indeed, the

regulations treat them as both "necessary and reasonable."[4]

Admittedly, research grant funding is not the most riveting topic to come before this Court.

However, the Court has come to appreciate that, as Defendants readily admit, basic research is an

"essential" service that universities provide to the federal government and so to the American

people.   In exchange, universities submit themselves to a baroque and exacting regulatory system

that scrutinizes their costs and demands accountability.   Yet, Defendants would unravel that

partnership with less than a nod toward Congress's requirement that federal agencies make

reasonable choices and rationally explain them.

On July 18, 2025, this Court preliminary enjoined "the immediately effective portions" of

DOD's Rate Cap Policy, holding that those portions were unlawful and likely under-considered.

---

[2] *See Massachusetts v. Nat'l Insts. of Health*, 1:25-cv-10338-AK (preliminarily enjoining NIH; entered on March 5, 2025, and converted to a permanent injunction and final judgment; appeal pending); *Ass'n of Am. Univs. v. Dep't of Energy*, 1:25-cv-10912-ADB (preliminarily enjoining DOE; entered on May 15, 2025, and converted to a permanent injunction and final judgment; appeal pending); *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 1:25-cv-11231-IT (vacating the rate cap policy as to NSF; granting summary judgment and entering final judgment on June 20, 2025; appeal voluntarily dismissed).

[3] Dkt. 72-5 (the "Hegseth Memo") at 1–2.

[4] *See* 2 C.F.R. § 200.403.

*Ass'n of Am. Univs. v. Dep't of Def.* ("*DOD I*"), — F. Supp. 3d —, 2025 WL 2022628, at *29 (D. Mass. July 18, 2025).[5]  Today, faced with the parties' cross-motions for summary judgment, the Court confirms and expands on its initial analysis: the Rate Cap Policy is contrary to binding regulations, *id.* at *15–17; it exceeds Defendants' statutory authority, *id.* at *17–18; and its adoption was arbitrary and capricious, *id.* at *18–23.  While more challenging questions arise at summary judgment with respect to jurisdiction and remedy, the Supreme Court's recent decision in *National Institutes of Health v. American Public Health Ass'n* ("*APHA III*"), 606 U.S. —, 145 S. Ct. 2658 (mem.) (2025), confirms that "the District Court is the right forum for [a] challenge to [internal agency] guidance," even where such guidance "discusses internal policies related to grants," and that vacatur and declaratory relief remain appropriate and normal remedies under the Administrative Procedure Act ("APA").  *Id.* at 2661 (Barrett, J., concurring).  Accordingly, for these reasons and for those stated below, the Court will grant Plaintiffs' motion for summary judgment and deny Defendants' motion.

## I.    <u>Background</u>

The Court incorporates by reference the factual and legal background previously set forth in *DOD I*.  *See* 2025 WL 2022628, at *1–10.  In the most general terms, this case concerns two DOD memoranda: the first, issued May 14, 2025, by Defense Secretary Pete Hegseth, Dkt. 72-5 (the "Hegseth Memo"); the second, issued June 12, 2025, by Under Secretary of Defense for Research and Engineering Emil Michael, Dkt. 72-6 (the "Michael Memo").  The two are substantially similar in content and, collectively, set forth the Rate Cap Policy.  The Rate Cap Policy concerns indirect cost rates for research grants to institutions of higher education ("IHEs"

---

[5] Capitalized and collective terms not otherwise defined have the same definitions as used in *DOD I*.

or "universities").[6]  Specifically, the Rate Cap Policy directs DOD components "not to allow indirect cost rates above 15% in all new assistance awards to IHEs" and requires components to "apply the 15% cap" on "existing assistance awards to IHEs," whether by renegotiation or by termination and reissuance.  Michael Memo at 2; Hegseth Memo at 2.  On July 18, 2025, the Court preliminarily enjoined Defendants from implementing the Rate Cap Policy as it applied to new assistance awards with respect to University Plaintiffs and Organizational Plaintiffs' member universities.  *DOD I*, 2025 WL 2022628, at *29.

On July 28, 2025, Plaintiffs moved for summary judgment.  Dkt. 75.  Defendants cross-moved for summary judgment on August 7, 2025.  Dkt. 79.  On August 22, 2025, the Court invited the parties to submit additional briefing to address the Supreme Court's recent decision in *APHA III*.  Dkt. 83.  The parties submitted this additional briefing on August 29, 2025.  Dkts. 84–85.  The Court held a hearing on September 4, 2025, and took the matter under advisement.  Dkt. 86.

## II.    <u>Standard of Review</u>

"[I]n cases involving review of agency action under the APA, the traditional Rule 56 standard does not apply [at summary judgment] due to the limited role of a court in reviewing the administrative record."  *Minuteman Health, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 291 F. Supp. 3d 174, 189 (D. Mass. 2018) (citing *Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 106 (1st Cir. 2015)).  "In the administrative law context, a motion for summary judgment is 'simply a vehicle to tee up a case for judicial review.'"  *Ass'n of Am. Univs. v. Nat'l Sci. Found.* ("*NSF*"), — F. Supp. 3d —, 2025 WL 1725857, at *6 (D. Mass. June 20, 2025)

---

[6] The Court continues to use "grants" generally to refer to both grants and cooperative agreements.  *See DOD I*, 2025 WL 2022628, at *2 n.3.

(quoting *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016)), *appeal dismissed*, No. 25-1794 (Sept. 30, 2025). Thus, "an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious" or otherwise unlawful. *Bos. Redevelopment*, 838 F.3d at 47; *see also Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997) (explaining that a court's task on motion for summary judgment "is only to determine" whether the agency's action "was consonant with [its] statutory powers, reasoned, and supported by substantial evidence in the record").

## III.    Jurisdiction

The Court has previously addressed Defendants' jurisdictional arguments regarding Plaintiffs' standing to sue and the reviewability of agency action with respect to future grants. *DOD I*, 2025 WL 2022628, at *10–13. At summary judgment, Defendants raise new arguments concerning that portion of the Rate Cap Policy affecting existing grants.[7] Dkt. 80 at 14–20; Dkt. 82 at 7–9; Dkt. 85.

At the outset, the Court doubts the most basic premise of Defendants' argument—that, in this case, the distinction between "existing" and "future" grants is a meaningful one. The Rate Cap Policy provides that DOD will attempt to renegotiate indirect cost rates on "existing" grants and, if unsuccessful, "terminate and reissue" those grants. Hegseth Memo at 2. Thus, the Rate Cap Policy would convert all of Plaintiffs' "existing" grants into "future" grants, absent Plaintiffs' acquiescence.

Even accepting the distinction, however, it does not follow that the jurisdictional analysis changes based on whether the challenged guidance concerns existing or future grants. The

---

[7] *DOD I* concerned only future grants. 2025 WL 2022628, at *27–29.

Supreme Court's recent decision in *APHA III* did not draw that distinction.  Rather, in her controlling opinion, Justice Barrett, like the First Circuit and district court, treated the agency's "issuance of guidance" as a single, "distinct agency action[]" and concluded, along with four other justices, that challenges to such guidance "discuss[ing] internal policies related to grants" likely "belong in district court."[8]  145 S. Ct. at 2658–61 (Barrett, J., concurring).  So, too, in this litigation, Defendants have consistently characterized the action at issue as a singular "Policy," which they have only ever attempted to justify as a whole.[9]  *See also id.* at 2662–63 (Roberts, C.J., concurring in part and dissenting in part) ("'[V]acatur of the challenged directives']—which has prospective and generally applicable implications beyond the reinstatement of specific grants—falls well within the scope of the District Court's jurisdiction under the Administrative Procedure Act.").

Taking the wide view, the *APHA* line of cases strongly supports the overall conclusion that this Court has jurisdiction as review the whole guidance.  As here, the guidance at issue in *APHA* concerned both existing and future grants.  *See Am. Pub. Health Ass'n v. Nat'l Insts. of Health* ("*APHA I*"), — F. Supp. 3d —, 2025 WL 1822487, at *6–8 (D. Mass. July 2, 2025).  As here, the

---

[8] "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)).  The Court refers to Justice Barrett's opinion as "controlling" insofar as it matches that description, while also recognizing that *APHA III*'s 4-4-1 vote breakdown makes it, suffice it to say, epistemologically complex.

In addition, although Justice Barrett's conclusions are at times phrased probabilistically—*see, e.g.*, *APHA III*, 145 S. Ct. at 2661–62 (Barrett, J., concurring) (holding that "the District Court was ***likely*** correct to conclude that it had jurisdiction to entertain an APA challenge to the guidance" and that the "***preliminary*** judgment is that the plaintiffs' . . . APA challenges to the guidance belong in district court" (emphases added))—the Court is mindful that "even probabilistic holdings . . . must 'inform how a [lower] court' proceeds 'in like cases,'" *id.* at 2664 (Gorsuch, J., concurring in part and dissenting in part) (alteration in original) (quoting *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025)).

[9] *See, e.g.*, Dkt. 58 at 11 ("A month later, the Under Secretary of Defense for Research and Engineering's June 12, 2025 memo established DoD policy (the '***June 12, 2025 Policy***' or '***Policy***') consistent with the Secretary's guidance." (emphases added)); *see also* Michael Memo at 1 (noting that the Michael Memo "further detail[s]" Secretary Hegseth's "decision" and "outline[s] . . . [its] implementation"); Dkt. 64 at 33:13–14 ("[DEFENDANTS' COUNSEL:] [P]lease . . . consider both memos.").

guidance directed the evaluation and termination of existing grants based on a disfavored term contained in those grants. *Id.* As here, the district court found that guidance unlawful and vacated its directives. *Id.* at *15–19. In denying the Government's application for stay of that part of the judgment, the Supreme Court left undisturbed the First Circuit's assessment that "the district court clearly had jurisdiction to grant 'prospective relief' that [would] govern 'the rather complex ***ongoing*** relationships' between the Department and grant recipients." *Am. Pub. Health Ass'n v. Nat'l Insts. of Health* ("*APHA II*"), 145 F.4th 39, 50 (1st Cir. 2025) (emphasis added) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988)). To sum, neither the First Circuit nor the Supreme Court bifurcated its analysis as to existing versus future grants.[10] Rather, both courts considered the guidance a single, "distinct agency action[]," which the district court had jurisdiction to review under the APA. *APHA III*, 145 S. Ct. at 2661 (Barrett, J., concurring). The circumstances here are not meaningfully different.

Nevertheless, Defendants argue that Plaintiffs' challenge, insofar as it concerns existing grants, exceeds the APA's limited waiver of sovereign immunity. *See generally* Dkt. 85 (arguing that "*APHA* firmly establishes" that this Court "lacks jurisdiction over claims concerning the terms of grants already awarded by [DOD] to Plaintiffs"); *see also* Dkt. 80 at 15. But even focusing on that part of the guidance, Plaintiffs' challenge is well within the APA's limits.

"The [APA] waives federal sovereign immunity for suits alleging injury by agency action." *Cowels v. Fed. Bureau of Investigation*, 936 F.3d 62, 66 (1st Cir. 2019). However, "[t]he APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (quoting 5 U.S.C. § 702). "Nor does the waiver apply to claims seeking 'money

---

[10] A third category of already terminated grants is not at issue in this case. *Cf. APHA III*, 145 S. Ct. at 2658.

damages.'" *Id.* (quoting 5 U.S.C. § 702).  Thus, the Court must determine whether Plaintiffs seek "money damages" or other relief "impliedly forbid[den]" by another statute.[11]  *Id.*

### A.    Plaintiffs Seek Relief "Other Than Money Damages"

The Supreme Court has explained that the phrase "money damages," under section 702, refers to "compensatory, or substitute, relief," as opposed to "specific relief," which the APA does allow.  *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999).

> "We begin with the ordinary meaning of the words Congress employed.  The term 'money damages,' 5 U.S.C. § 702, we think, normally refers to a sum of money used as compensatory relief.  Damages are given to the plaintiff *to substitute* for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.'"

*Bowen*, 487 U.S. at 895 (quoting *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985) (Bork, J.) (emphasis in original)).

Relief that is "merely a means to the end of satisfying a claim for the recovery of money" can constitute "compensatory" money damages, even where the remedy employed may technically be characterized as equitable.  *Blue Fox*, 525 U.S. at 262 (holding that the APA's sovereign immunity waiver did not extend to a claim seeking an equitable lien on a past-due sum); *see also Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002) (stating that "an injunction to enforce a contractual obligation to pay money past due" was unavailable under section 702).  Thus, as it applies to research-related grants, the Court is without authority "to order relief designed to enforce any 'obligation to pay money' pursuant to those grants."  *APHA III*, 145 S. Ct. at 2658 (cleaned up) (quoting *California*, 604 U.S. at 651).

---

[11] Defendants blur the two limitations, and their analysis focuses almost exclusively on the "impliedly forbids" limit.  *See* Dkt. 80 at 15–18.  Arguably, Defendants have failed to develop, and so have waived, any argument as to the "money damages" limit.  Nevertheless, in the interest of completeness, the Court considers both.

Simply put, vacating the Rate Cap Policy cannot "compensat[e]" for a loss already "suffered," *Blue Fox*, 525 U.S. at 262 (quoting *Bowen*, 487 U.S. at 895), for the simple reason that Plaintiffs have not yet suffered any loss.[12]   Nothing about the grants is currently "past due." *Cf. Great-West*, 534 U.S. at 212.   There is therefore no way for an order in this case, directly or indirectly, to "satisfy[] a claim for the ***recovery*** of money."   *Cf. Blue Fox*, 525 U.S. at 262 (emphasis added); *see also Bowen*, 487 U.S. at 921–22 (Scalia, J., dissenting) ("I agree with the Court that sovereign immunity does not bar respondent's actions insofar as they seek injunctive or declaratory relief with prospective effect.   An action seeking an order that will prevent the wrongful disallowance of future claims is an action seeking specific relief and not damages, since no damage has yet occurred.").   Accordingly, the Court concludes that Plaintiffs' claims are not ones for money damages.

### B.    Relief Is Not "Impliedly Forbid[den]"

Even where a plaintiff does not seek money damages, the APA's sovereign immunity waiver excepts relief that is "impliedly forbid[den]" by "any other statute that grants consent to suit."   5 U.S.C. § 702.   Defendants suggest that the Tucker Act imposes such a barrier for all "'contract actions' against 'the government in a federal district court' under the APA," regardless of the relief sought.[13]   Dkt. 80 at 15 (quoting *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004)); *see also California*, 604 U.S. at 651

---

[12] Rather, for standing purposes, Plaintiffs have demonstrated the imminency of future injury.  *DOD I*, 2025 WL 2022628, at *10–12.

[13] Presented with the opportunity, the First Circuit did not readily endorse this proposition.  *APHA II*, 145 F.4th at 52 n.5.  Nevertheless, the Supreme Court has signaled its agreement.  *See APHA III*, 145 S. Ct. at 2661 (Barrett, J., concurring) (referring to claims "'founded . . . upon' contract that only the [Court of Federal Claims] can hear" (quoting 28 U.S.C. § 1491(a)(1))).

("Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" (quoting 28 U.S.C. § 1491(a)(1))).

The Court must therefore determine whether Plaintiffs' action is "at its essence a contract claim." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982).[14] As the Ninth Circuit well put it, "[t]his test imposes something akin to a well-pleaded complaint rule for Tucker Act-adjacent APA actions." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023). To ascertain the true nature of a claim, courts look both to "the source of the rights upon which the plaintiff bases its claims" and to "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968.

This case is notably lacking in the standard indicia for contract claims. Neither side has submitted a single grant agreement to this Court. Accordingly, the Court has not relied on any provision of any grant agreement for its analysis. *Cf. Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 61 (1st Cir. 1978) ("[T]he court of appeals concluded that because the claim that the Air Force had acted arbitrarily could not be resolved without reference to the contract, exclusive jurisdiction lay in the Court of Claims." (discussing *Int'l Eng'g Co., Div. of A-T-O v. Richardson*, 512 F.2d 573, 578 (D.C. Cir. 1975))). Nor are Plaintiffs' statutory and regulatory arguments "peripheral." *Cf. id.* As set out above, Plaintiffs do not seek money damages, the "quintessential[]" contract remedy, nor do they seek "specific performance of a contract to transfer funds." *Cf. Great-West*, 534 U.S. at 210–11; *see also Megapulse*, 672 F.2d at 969 ("[Plaintiff] seeks no monetary damages against the United States.").

Nevertheless, Defendants argue that Plaintiffs' grant agreements are the source of their rights in this part of the case because "Plaintiffs have no right to payments separate from their

---

[14] Both parties recognize that *Megapulse* provides the relevant framework. Dkt. 76 at 25 n.5; Dkt. 80 at 16.

respective grant awards." Dkt. 80 at 16. Momentarily setting aside the fact that Plaintiffs do not seek "payments," the fundamental problem with Defendants' argument is that it wrongly assumes that any claim between contracting parties arises in contract. As a matter of basic, common-law principles, this is obviously wrong. "[A] contract may," for example, "create a state of things which furnishes the occasion of a tort." 57A Am. Jur. 2d Negligence § 107.[15]

The same basic idea is widely recognized in the APA context, that not every "case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act." *Megapulse*, 672 F.2d at 967–68. Justice Barrett reaffirmed this principle mere weeks ago: "[t]hat . . . agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded . . . upon' contract." *APHA III*, 145 S. Ct. at 2661 (Barrett, J., concurring) (quoting 28 U.S.C. § 1491(a)(1)).

*Megapulse* is itself instructive. In that case, the plaintiff (Megapulse) entered into government contracts containing clauses protecting its commercial rights to data developed at private expense. 672 F.2d at 961–62. However, after delivery, the Government decided that certain data over which Megapulse claimed protection was not entirely self-funded and so advised Megapulse that it intended to share that data with other contractors. *Id.* at 962. Following an unsuccessful appeal to the General Accounting Office, Megapulse filed suit for injunctive relief in federal district court under the APA, claiming that the Government's release of its data would violate the Trade Secrets Act and deprive Megapulse of its property without due process of law. *Id.* at 962–63. Given that Megapulse had voluntarily disclosed its data to the Government, its

---

[15] Of course, the Court does not suggest that an APA challenge is a tort claim. Rather, the point is that the existence of a contract does not displace independent duties that may sound in other areas of the law. To take an uncharged example, a tenant may sue his landlord for nuisance, notwithstanding that his lease (with said landlord) is what gives him standing to sue, and notwithstanding that he might (or might not) separately have a contract claim for breach of his quiet enjoyment. *See generally*, *e.g.*, *Birke v. Oakwood Worldwide*, 169 Cal. App. 4th 1540 (2009).

alleged confidentiality agreement (with the Government) was necessarily an element of its trade secret and property claim.[16]    Nevertheless, the *Megapulse* court rejected the Government's argument "that the mere existence of such contract-related issues must convert this action to one based on the contract."    *Id.* at 969.    Put another way, the confidentiality agreement merely "create[d] a state of things" against which background the Government violated other independent legal duties, made reviewable by Congress under the APA.[17]

Plaintiffs' claims are even further attenuated from contract than those at stake in *Megapulse* (or *APHA III*) because, as discussed above, Plaintiffs can challenge the entire Rate Cap Policy based only on its threat of *future*, unlawful grants—whether wholly new or "reissue[d]" pursuant to that Policy.[18]    *See* Hegseth Memo at 2.

But even on their face, these are simply not contract claims.    At bottom, Plaintiffs charge Defendants with unreasonableness and with a failure to show their work, and they "seek[] judicial interpretation of . . . federal regulation[s]" and statutes.    *See Katz v. Cisneros*, 16 F.3d 1204, 1209 (Fed. Cir. 1994) (holding that there was no jurisdiction in the Court of Federal Claims to hear case that "challenge[d] the interpretation of law which control[led] payment," even though adjudication of the claim could result in "monetary consequences [that would] flow through [a] contractual

---

[16] *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished.").

[17] *Cf.* 57A Am. Jur. 2d Negligence § 107.

[18] The positive difference between this case and *APHA III*—marshaling further in the direction of this Court's having jurisdiction—is illustrated by Justice Gorsuch's separate opinion.    Justice Gorsuch stated that he would have stayed the entire judgment, including the guidance challenge, but distinguished a situation such as the one here where the judgment is also based on "*new* grant applications."    *APHA III*, 145 S. Ct. at 2665 n.2 (Gorsuch, J., concurring in part and dissenting in part) (emphasis in original).

scheme" (citing *Bowen*, 487 U.S. at 910)).[19]  The statutes and regulations that the Court considers are not "contained within the terms" of Plaintiffs' grant agreements.  *Cf. Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985).  Rather, "determining whether [DOD] infringed [Plaintiffs'] rights as alleged in the complaint requires primarily an examination of the statutes [and regulations] [DOD] has purportedly violated."  *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1108–09 (D.C. Cir. 2022).  To argue that the background existence of Plaintiffs' grant agreements defines Plaintiffs' regulatory and statutory claims is to let the tail wag the dog.  *See Lucas v. U.S. Army Corps of Eng'rs*, 990 F.2d 1377, 1993 WL 119459, at *2 n.1 (D.C. Cir. 1993) (per curiam) (holding that plaintiffs could state an arbitrary-and-capricious claim under the APA, notwithstanding the "separate" existence of a theoretical contract claim).  In short, these are not contract claims.

## IV.  Merits

The APA provides that courts must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; "arbitrary" or "capricious"; or "otherwise not in accordance with law."  5 U.S.C. § 706(2).  Plaintiffs contend that Defendants violated section 706(2) of the APA because the Rate Cap Policy: (i) conflicts with governing regulations; (ii) conflicts with duly enacted statutes; (iii) is arbitrary and capricious; and (iv) is impermissibly retroactive.  The Court previously held that Plaintiffs were likely to succeed on the merits of at least the first three of these arguments.[20]  *DOD I*, 2025 WL 2022628, at *15–23.

---

[19] The Court further repeats its previous point that "having to forgo a DOD grant means more than a loss of funds."  *DOD I*, 2025 WL 2022628, at *24 n.77.  Given the prestige, access to information, and opportunities that attend federal funding, loss goes far "beyond the[] bottom line."  *Id.*

[20] Whether the Rate Cap Policy is impermissibly retroactive was not at issue in *DOD I*.  *See* 2025 WL 2022628, at *10 n.35.  As noted below, the Court need not reach the retroactivity issue.

The Court has not substantially changed its position on the Rate Cap Policy, but addresses new and additional arguments below.[21]

## A.     <u>Final Agency Action</u>

Defendants do not dispute that the APA's finality requirement is met.[22]   However, Defendants do ask the Court to treat the Michael Memo, rather than the Hegseth Memo, as the relevant final agency action, so that they can benefit from its marginally more substantial record. *See* Dkt. 64 at 33:13–14 ("[P]lease . . . consider both memos.").  For all intents and purposes, this is an academic exercise because, although the Michael Memo purports to "further detail[]" the policy announced in the Hegseth Memo, its additions are slim.   *See* Michael Memo at 1. Nevertheless, preferring to err on the side of consideration, the Court has accepted Defendants' full proffer and performs its arbitrary-and-capricious analysis below based on Defendants' complete administrative record.   *See infra* Section IV(D).

Defendants are wrong, however, in claiming that this decision limits the Court's remedial power.   *See* Dkt. 80 at 14 n.6 (arguing that "the Court lacks jurisdiction to order a remedy with respect to the Hegseth Memo because it is not 'final agency action'").[23]   "[R]eview under the APA is not limited to the four corners of a final agency action."   *In re Vivint, Inc.*, 14 F.4th 1342, 1348 (Fed. Cir. 2021).  Rather, once finality is established, as Defendants concede it is here, courts "may also review 'preliminary, procedural, or intermediate agency action[s] or ruling[s]' that are 'not

---

[21] Where the parties have raised no new arguments, the Court relies on its reasoning as set forth in *DOD I*. *See generally* 2025 WL 2022628.

[22] *See* Dkt. 64 at 32:18–33:6 ("THE COURT: . . . We all agree that the Michael Memo is final agency action, right?  [DEFENDANTS' COUNSEL]: Yes, your honor.").

[23] Defendants' lone citation, *Whitewater Draw Natural Resource Conservation District v. Mayorkas*, 5 F.4th 997 (9th Cir. 2021) (cited Dkt. 58 at 26), is inapposite.  *Whitewater* considered whether an agency manual constituted final agency action, not whether that manual would have been reviewable alongside some other final agency action. *See id.* at 1008–09.

directly reviewable' before a final action."[24]  *Id.* (quoting 5 U.S.C. § 704).  Accordingly, even if the Court were to accept that the Hegseth Memo did not constitute final agency action, that would not make it "unreviewable forever"—"the APA says as much explicitly."  *See W. Va. Coal Workers' Pneumoconiosis Fund v. Bell*, 781 F. App'x 214, 222 (4th Cir. 2019).

In this case, the Court finds it most reasonable to talk about the Rate Cap Policy as one Policy, and so one action, embodied in the two memoranda: the Hegseth Memo laid out a plan, and fewer than thirty days later, the Michael Memo "outline[d] . . . [its] implementation," with no meaningful change to content.  *See* Michael Memo at 1.  Recently, another session of this court likewise reviewed at least five "Challenged Directives" collectively as a single, functional policy, without noted objection by either the First Circuit or Supreme Court.  *See APHA I*, 2025 WL 1822487, at *6–14 ("The Challenged Directives, as a whole, constitute final agency actions at the macro-level."); *APHA II*, 145 F.4th at 50 (denying stay as to the "Challenged Directives"); *APHA III*, 145 S. Ct. at 2658–61 (Barrett, J., concurring) (same).

Regardless of whether, semantically, one calls the Hegseth Memo "preliminary . . . action," 5 U.S.C. § 704, or a part of one big Rate Cap Policy, it makes sense for the Hegseth Memo to "stand or fall together" with the Michael Memo.  *See North Carolina v. Env't Prot. Agency*, 531 F.3d 896, 929 (D.C. Cir. 2008) (vacating entire rule where its parts constituted "one, integral action"), *on reh'g in part*, 550 F.3d 1176 (D.C. Cir. 2008).  Defendants have never explained what

---

[24] Moreover, technically speaking, finality is "not jurisdictional in nature."  *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 33 (1st Cir. 2007) (citing *R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 40 (1st Cir. 2002)); *see also Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 183–84 (D.C. Cir. 2006).  Notably, because finality is non-jurisdictional, it can be waived.  *See Jalbert v. U.S. Sec. & Exch. Comm'n*, 945 F.3d 587, 593 (1st Cir. 2019) ("[G]enerally, while jurisdictional issues can be raised at any time during the case and are never waived, non-jurisdictional issues are waivable."); *see also Bonumose, Inc. v. U.S. Food & Drug Admin.*, 747 F. Supp. 3d 211, 224 (D.D.C. 2024) ("[T]he absence of a final agency action constitutes a defense to an APA claim, but it is not a jurisdictional hurdle to review.  The defense, therefore, is waivable." (internal citation omitted) (citing *Trudeau*, 456 F.3d at 185–86)).

excluding the Hegseth Memo from the Court's remedy would actually look like.[25]    If their suggestion is that DOD should be allowed to just issue another "implementation" of the Hegseth Memo, Michael Memo at 1, that would be an absurd result.  The Hegseth Memo's "approach . . . is fundamentally flawed."  *See North Carolina*, 531 F.3d at 929.  Accordingly, DOD "must redo its analysis from the ground up."  *See id.*  It would make little sense to leave in place the Hegseth Memo, where it puts forth substantively the exact same unlawful policy as the Michael Memo.

### B.    <u>Accordance with Regulation</u>

In *DOD I*, the Court concluded that Defendants' plan to issue research grants subject to an across-the-board 15% indirect cost rate for IHEs was contrary to existing regulations, namely OMB's Uniform Guidance.  2025 WL 2022628, at *15–17.  In short, the Rate Cap Policy constitutes an unlawful workaround of the Uniform Guidance's prohibition on implicit cost sharing.  *Id.* at *15–16 (quoting Defendants' statement that the Policy "force[s] IHEs to fund greater shares of research themselves").  This fundamental disconnect makes inevitable the Policy's clear, procedural failures.  *Id.* at *16–17.  The Uniform Guidance establishes a baseline that "[n]egotiated indirect cost rates must be accepted by all Federal agencies."[26]  2 C.F.R. § 200.414(c)(1).  Unless a statute or regulation dictates otherwise, agencies can use a different rate only by following certain procedural requirements.  *Id.*  Those requirements include that the agency "must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates."  *Id.* § 200.414(c)(3).  Defendants readily admit that the Rate Cap Policy provides

---

[25] *See* Dkt. 58 at 26; Dkt. 80 at 14 n.6.

[26] The phrase "negotiated indirect cost rate" or "negotiated rate" refers to those rates determined through the formal accounting process prescribed in the regulations, embodied in what are called "NICRAs."  *See DOD I*, 2025 WL 2022628, at *5.

no "procedures" or "decision-making criteria" but contend that setting forth "policies" is sufficient.[27]

The incorrectness of Defendants' argument is perhaps best exemplified by the fact that the Uniform Guidance expressly disallows agencies from imposing "de minimis" indirect cost rates on recipients who already have a negotiated rate.[28]  *DOD I*, 2025 WL 2022628, at *17.  That limitation "would mean nothing if agencies were technically disallowed from imposing a de minimis [indirect cost] rate but nevertheless free to unilaterally impose an indirect cost rate that is its literal equivalent."[29]  *Id.*

At summary judgment, Plaintiffs raise two new regulation-based challenges relating to existing grants. Dkt. 76 at 13–16.  Before addressing those, it is worth repeating the Court's prior point that, under the Rate Cap Policy, all "existing grants" are just "future grants" waiting to be terminated and reissued.  *See supra* Section III.  Thus, the conclusions drawn in *DOD I* alone justify finding the entire Rate Cap Policy unlawful under the regulations, without differentiating between "existing" and "future" grants.  That said, the Court turns to the regulations in controversy.

---

[27] *See* Dkt. 58 at 28–29 ("[T]he Guidance's text contemplates that [DOD] may announce generally applicable 'polic[y].'  And the Policy need not set forth further 'procedures and decision-making criteria' because the Policy does not contemplate any individualized redetermination of indirect cost rates beyond those set forth in the Policy." (second alteration in original) (citation omitted)).

[28] 2 C.F.R. § 200.414(f) ("Federal agencies and pass-through entities may not require recipients and subrecipients to use a de minimis rate lower than the negotiated indirect cost rate or the rate elected pursuant to this subsection unless required by Federal statute or regulation.").

[29] Besides restating their original arguments, Defendants directly engage with the Court's analysis in little more than a footnote. *See* Dkt. 80 at 11 n.2. However, Defendants continue to confuse a cost's "allowability"—which is based on the nature of the cost, *i.e.*, is it the *type* of thing that gets reimbursed, *see, e.g.*, 2 C.F.R. § 200.427 ("Costs of bonding . . . are allowable.")—with whether that cost is ultimately "reimbursed." *See* Dkt. 80 at 11 n.2 ("Whether a cost is direct or indirect can inform its allowability—that is, whether it will be reimbursed.").  As the Court has already explained, whether a cost is *reimbursed* under a federal grant is based on more than that cost's allowability. For example, cost sharing can limit reimbursement of otherwise allowable costs. *See DOD I*, 2025 WL 2022628, at *5 (explaining that "allowability establishes *what* can be reimbursed" whereas "cost sharing fixes *how much* of the total will be reimbursed").  Another example is the 26% administrative cost limit, implemented as an evidence-based approximation of actual administrative costs (rather than as a means of shifting burden to IHEs). *See id.* at *7–8. Neither of these, however, changes the underlying allowability of the cost itself.

## 1.    <u>Modifying Indirect Cost Rates on Existing Grants</u>

The Uniform Guidance is clear that federal agencies may not change indirect cost rates on already-issued IHE research grants.  2 C.F.R. pt. 200, App. III(C)(7)(a) ("Federal agencies must use the negotiated rates in effect at the time of the initial award throughout the life of the Federal award.").  Defendants argue that the prefatory clause of that provision ("[e]xcept as provided in [2 C.F.R. § 200.414(c)(1)]") means that they *can* change rates on existing grants by following the requirements of that subsection.  Dkt. 80 at 23.

The first problem with Defendants' argument is, of course, that they have not followed the requirements of section 200.414(c)(1).  *See DOD I*, 2025 WL 2022628, at *15–17.

The bigger problem is that the argument does not make sense.  Section 200.414(c) clearly pertains to the *inception* of an award—it requires "includ[ing], in the **notice of funding opportunity**, the policies relating to indirect cost rate reimbursement or cost share" and encourages an agency to "incorporate discussion of these policies into its **outreach activities**."  2 C.F.R. § 200.414(c)(4) (emphases added).  Any reading of section 200.414(c)(1) that permits agencies to change indirect cost rates *during* the lifetime of an award would render those notice provisions meaningless.[30]

Turning back to the main clause of the earlier-cited sentence ("Federal agencies must use the negotiated rates in effect at the time of the initial award throughout the life of the Federal

---

[30] The reference to "policies relating to . . . cost shar[ing]" is further telling.  *See* 2 C.F.R. § 200.414(c)(4); *see also id.* § 200.414(c) (directly cross-referencing 2 C.F.R. § 200.306 ("Cost sharing")).  As mentioned above, the Court has previously explained the relationship between indirect cost rates and cost sharing and how the Rate Cap Policy is best understood as an impermissible attempt to use one to achieve the other.  *See DOD I*, 2025 WL 2022628, at *15 ("In short, the Rate Cap Policy uses an improper tool (indirect cost rates) to accomplish an impermissible goal (implicit cost sharing.").  The whole thrust of the cost-sharing regulation is that, if an agency is going to require cost sharing, it must say so explicitly in advance.  *Id.* at *6 ("[A]gencies are forbidden from even considering an applicant's voluntary cost sharing during grant application review, preventing the appearance of unspoken requirements.").  As with the indirect-cost-rate notice requirements, these cost-sharing notice requirements "would have little meaning or effect if they could be worked around so easily to achieve cost sharing by another name."  *Id.*

award," 2 C.F.R. pt. 200, App. III(C)(7)(a)), Defendants argue that means that, "as between two [negotiated] rates, the [negotiated] rate in effect at the time of the initial award is the one that governs during the entirety of the award, even if a new . . . rate is negotiated during the course of the award."[31]  Dkt. 80 at 23.  In other words, according to Defendants, agencies are not allowed to use a new negotiated rate for a grant already in progress, but they are allowed to negotiate a new rate for a grant already in progress.  That is nonsense.[32]

The regulation says what it says—federal agencies must continue with an IHE's negotiated indirect cost rate in effect "at the time of the initial award," except where the award was issued with a deviated rate under section 200.414(c)(1).  2 C.F.R. pt. 200, App. III(C)(7)(a).  Accordingly, Defendants' plan to "renegotiate" existing grants under the Rate Cap Policy is contrary to that part of the regulation.

## 2.    Terminating Existing Grants Based on Indirect Cost Rates

Can an agency avoid its obligation to honor indirect cost rates on existing grants simply by terminating (and then reissuing) those grants?  Defendants argue that they can because the awards would "no longer effectuate[] the program goals or agency priorities."  Dkt. 80 at 22 (quoting 2 C.F.R. § 200.340(a)).

---

[31] That is, indeed, what the *next* sentence of the regulation says.  2 C.F.R. pt. 200, App. III(C)(7)(a) ("Award levels for Federal awards may not be adjusted in future years as a result of changes in negotiated rates.").  Thus, on top of everything, Defendants' argument violates the rule against surplusage.  *See Morales v. Sociedad Española de Auxilio Mutuo y Beneficencia*, 524 F.3d 54, 57 (1st Cir. 2008) ("Determining a regulation's meaning requires application of the same principles that imbue exercises in statutory construction."), *cert. denied*, 555 U.S. 1097 (2009).

[32] It is yet more nonsensical when one remembers that DOD acts as the "cognizant agency" for many IHEs, *i.e.*, the agency charged with determining the IHE's negotiated indirect cost rate under the regulations.  *See DOD I*, 2025 WL 2022628, at *5.  In other words, in Defendants' telling, DOD has the responsibility to determine an IHE's new negotiated indirect cost rate, though it cannot apply that new negotiated indirect cost rate to an IHE's existing grant with DOD; however, DOD *could* just announce that, under section 200.414(c), it would apply that new negotiated indirect cost rate (or any other rate) to an existing DOD grant, and then that would be allowed.  In short, Defendants cannot reconcile the limitation that they must admit with the permissiveness that they claim is implied.

As a threshold matter, the parties dispute section 200.340's relevance. Plaintiffs argue that DOD never adopted that regulation. Dkt. 76 at 15 & n.3. Defendants disagree. Dkt. 80 at 22 n.9. Respectfully, the Court believes that both sides are off base. The competing DOD regulations cited by the parties concern what language DOD agencies must include in their grant agreements.[33] But whether DOD formalizes its grant agreements consistent with the Uniform Guidance is not at issue in this case.[34] Rather, the question is whether DOD violated (any applicable part of) the Uniform Guidance.

The Court finds that DOD is bound to the Uniform Guidance as a whole, including section 200.340. Defendants agree with the Court's overall conclusion on this point.[35] However, Defendants disagree with the Court's reasoning. Indeed, both parties argue that DOD is bound only insofar as it has adopted the Guidance, and a significant part of Plaintiffs' section 200.340 argument rests on that premise.[36] Defendants point to the fact that "OMB required individual agencies to adopt the relevant Guidance under the agencies' own authority" as proof that such "adopt[ion]" is required for the Guidance to have any effect on the agency. Dkt. 80 at 31–32 (citing 2 C.F.R. § 200.106). In so arguing, Defendants, in fact, paraphrase the relevant language, which notably speaks of agencies' "implement[ing]" the Guidance, rather than "adopt[ing]" it. *See*

---

[33] 2 C.F.R. § 1104.110(a) ("The [Uniform Guidance] governs *administrative requirements to be included in* any award-specific terms and conditions used to supplement the general terms and conditions of *a new grant* or cooperative agreement awarded to an institution of higher education." (emphases added)); *id.* § 1136.305(a) ("A [DOD] Component's *general terms and conditions must specify* remedies available for addressing noncompliance with award terms and conditions, *policies and procedures related to termination of awards*, and effects of suspension and termination on allowability of costs." (emphases added)).

[34] Even if the Court agreed with Plaintiffs, *arguendo*, the most it could conclude is that DOD would have violated its implementing regulations if it included section 200.340 in its grant agreements. Having never seen any of the relevant grant agreements, that theoretical possibility would accomplish little.

[35] Dkt. 64 at 33:20–25 ("THE COURT: . . . as a threshold question, there's no question that the OMB uniform guidance is binding on the DOD, right? [DEFENDANTS' COUNSEL]: That's correct, your honor.").

[36] *See* Dkt. 80 at 30 n.16; Dkt. 82 at 17–18.

2 C.F.R. § 200.106.  Adopting the Uniform Guidance's language wholesale would certainly be one way of implementing it, but not the only one.  *See id.* § 1.220.  More importantly, however, neither party addresses the fact that OMB could not possibly have "required" DOD to do anything without a congressional grant of authority to make OMB's rule-making power effective against DOD.  *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (holding that an agency must "stay[] within the bounds of its statutory authority" (emphasis removed)).

The Court reads the Uniform Guidance akin to a statute that calls for implementing regulations.  It is not uncommon, for example, for such a statute to delay its effectiveness until it can be implemented through regulation.[37]  Indeed, the initial promulgation of the Uniform Guidance provided a date certain by which "Federal agencies must [have] implement[ed] the policies and procedures applicable to Federal awards by promulgating a regulation."[38]  True, the introduction to the Uniform Guidance can appear to disclaim its own authority—"[p]ublication of the OMB guidance in the CFR does not change its nature—it is guidance, not regulation."  2 C.F.R. § 1.105(b).  But that admonition must be reconciled with other mandatory language that Defendants have already recognized obligates DOD and other agencies.  *See, e.g.*, *id.* § 200.106 ("Federal agencies making Federal awards to non-Federal entities ***must implement*** the language in subparts C through F of this part in codified regulations unless different provisions are required by Federal statute or are approved by OMB." (emphasis added)); *id.* § 200.107 ("Any exceptions

---

[37] *Compare, e.g.*, 31 U.S.C. § 5336(b)(5) ("The requirements of this subsection shall take effect on the effective date of the regulations prescribed by the Secretary of the Treasury under this subsection."), *with* 2 C.F.R. § 200.110(a) ("The standards set forth in this part affecting the administration of Federal awards by Federal agencies become effective once implemented by Federal agencies.").

[38] *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards*, 78 Fed. Reg. 78590-01, 2013 WL 6795572 (Dec. 26, 2013).  Indeed, subsequent modifications to the Uniform Guidance have provided similar deadlines.  *See, e.g.*, *Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30046-01, 2024 WL 1702101 (Apr. 22, 2024) ("The government-wide effective date of the final guidance is October 1, 2024, but Federal agencies may also elect to apply the final guidance to their Federal awards issued prior to October 1, 2024.").

will be **subject to approval by OMB** and only with **adequate justification** from the Federal agency." (emphases added)).[39]

The Court finds that the best way to reconcile this disclamatory and mandatory language is to treat OMB's implementation directive as "directly appli[cable] only to Federal agencies" but the overall Guidance as applicable against "other entities," including grant recipients, to the extent of "each Federal agency's implementation." *Id.* § 1.210.  In other words, the Uniform Guidance is binding on DOD *qua* regulation (or directive, if one prefers), but it is binding outside the Government only insofar as it is given effect through other authority.[40]  This reading makes sense of the statement, noted above, that "OMB guidance . . . is guidance, not regulation."  *See id.* § 1.105(b).  Given that the Uniform Guidance contemplates agency- and class-wide exceptions, not reflected in the Guidance itself, as well as the possibility of superseding statutes, it makes orderly sense that agencies should be responsible in the first instance for compiling the sum of those requirements as a matter of public reference.  *See Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards*, 78 Fed. Reg. 78590-01, 2013 WL 6795572 (Dec. 26, 2013) (stating that "agencies are responsible for implementing their programs under authorities provided specifically by statute" notwithstanding OMB's retained power to approve and deny exceptions).  As such, notwithstanding DOD's authority to issue implementing and supplementary regulations, the Court finds that DOD is not at liberty to depart from the Uniform Guidance, except insofar as an exception is made pursuant to the Guidance itself (or to

---

[39] *See also* 31 U.S.C. § 6307(2) (authorizing OMB to make such exceptions).

[40] Such a directive would be consistent with OMB's authority to "*direct*, coordinate, and assist Federal agencies in establishing . . . uniform administrative rules for Federal financial assistance programs across different Federal agencies."  *See* Federal Financial Assistance Management Improvement Act of 1999, Pub. L. No. 106-107, 113 Stat. 1486 (Nov. 20, 1999) (emphasis added) (codified as note to 31 U.S.C. § 6101).

higher authority).  Since neither side has suggested the existence of any such relevant exception, the Court finds that section 200.340 applies.

All that being said, section 200.340 does not permit grant termination and reissuance in the manner contemplated by the Rate Cap Policy.  Under that section, an agency may terminate a grant "pursuant to the terms and conditions of the Federal award . . . to the extent authorized by law." 2 C.F.R. § 200.340(a)(4).  The terms and conditions of Plaintiffs' grant terminations are not at issue in this case.[41]  However, the "extent authorized by law" component interposes an independent regulatory limit incorporating other authority.

Most obviously, terminations cannot violate the APA.  Of course, that is true whether a regulation says so or not.  Nevertheless, that the regulation independently recognizes its own subordinate status weakens any argument that grant recipients should have known that their awards could be terminated arbitrarily at any moment.

Moreover, it would be a mistake to think of any hypothetical terminations—or any part of the Rate Cap Policy—in isolation.  Rather, Defendants' plan is to "terminate and reissue" research grants, Hegseth Memo at 2, to include terms that this Court has found would be unlawful.  The threat of termination thus hangs over any institution asked to "renegotiate" its legitimate indirect cost rate.  It would contravene the entire regulatory scheme if Defendants could accomplish by extortion what they cannot lawfully effect in the first instance.  *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) ("[A] government official cannot do indirectly what she is barred from doing directly.").  Accordingly, the Court finds that the unlawfulness of the Rate Cap Policy compounds under section 200.340.

---

[41] Accordingly, the extent to which any grant award permits termination because the award "no longer effectuates the program goals or agency priorities," *see* 2 C.F.R. § 200.340(a)(4), as well as the meaning of any such provision, are not at issue in this case.

C.    **Accordance with Statute**

In *DOD I*, the Court concluded that the Rate Cap Policy violated the statute by which Congress granted DOD authority to issue grants.  2025 WL 2022628, at *17 (citing 10 U.S.C. § 4001(b)(1)).[42]  Notwithstanding Defendants' arguments to the contrary, Dkt. 80 at 28–30, the Court continues to read that statute to require DOD to issue such grants consistent with OMB's direction.[43]

Section 4001 authorizes the "Secretary of Defense or the Secretary of a military department [to] perform research and development projects . . . by contract, cooperative agreement, or grant, in accordance with chapter 63 of title 31" of the U.S. Code.  10 U.S.C. § 4001(b)(1).  That chapter, titled "Using Procurement Contracts and Grant and Cooperative Agreements," 31 U.S.C. §§ 6301–09, sets out a framework for government agencies' use of different agreement types, including grant agreements, and authorizes OMB to issue guidelines "to promote consistent and efficient use of . . . grant agreements," *id.* § 6307(1).

The question presented is thus one of statutory construction, whether DOD's authorization to "perform research . . . by . . . grant" includes the authority to issue the Rate Cap Policy.  The Court concludes that it does not.  The Rate Cap Policy entails more than mere use of grant agreements—it reforms the cost principles that underlie what a "grant agreement" even is and so usurps authority that Congress has either retained for itself or else delegated to OMB, a different

---

[42] Defendants honorably point out another apparently relevant statute that "requires agencies to 'develop and maintain an integrated agency accounting and financial management system, including financial reporting and internal controls' that, among other things, 'complies with such policies and requirements as may be prescribed by' OMB." Dkt. 80 at 31 n.17 (quoting 31 U.S.C. § 902(a)(3)).

[43] In *DOD I*, the Court also cited 31 U.S.C. §§ 503, 6307.  2025 WL 2022628, at *17.  As relevant here, those statutes authorize OMB to "establish governmentwide financial management policies."  *See* 31 U.S.C. § 503(a).  The Court did not intend to imply that an agency's violating such policies, including the Uniform Guidance, would necessarily constitute an independent violation of either of those statutes, separate from any regulatory violation of a rule promulgated under one of those statutes.

federal agency.  This conclusion follows not only from the plain text of the statute, which subjects DOD's use of grant agreements to that framework and to OMB's authority, but from the statute's history and the broader history of federal grants.

Defendants trace DOD's grant-making authority to 1958, when Congress first authorized federal agencies to issue grants for "basic scientific research."[44]  *See* Dkt. 58 at 16 & n.7.  At that time, DOD apparently enjoyed broad discretion in how it structured such agreements.[45]  Indeed, if the 1958 statute were the relevant grant of authority, Defendants would have a much better argument that Congress intended DOD to decide not only what grants it would issue but also what cost and accounting principles applied.

In their original conception, "grants" functioned like general endowments, as "support" for "basic scientific research."[46]  The 1958 statute's institutional author, the National Science Foundation ("NSF"), explained the idea of "basic research" in markedly cerebral terms, as being aimed at "a fuller knowledge or understanding of the subject under study, rather than a practical application thereof."[47]  According to NSF, grants were the preferred vehicle for funding this type of research, where "the perimeters of inquiry [are] limited only by the curiosity and creativity of the scientific investigator."[48]  Notably, NSF provided three reasons for why grants would be better than contracts—arguably none of which describes grant administration as we know it today:

---

[44] *See* An Act to Authorize the Expenditure of Funds Through Grants for Support of Scientific Research, and for Other Purposes, Pub. L. No. 85-934, 72 Stat. 1793 (1958).

[45] *See* Dkt. 58 at 16–17 & nn.10–15.

[46] *See* An Act to Authorize the Expenditure of Funds Through Grants for Support of Scientific Research, and for Other Purposes, Pub. L. No. 85-934, 72 Stat. 1793 (1958).

[47] Expenditure of Funds Through Grants for Support of Scientific Research, S. Rep. No. 2044, at 3 (1958), *available at* https://books.google.com/books?id=wLVGAQAAIAAJ [https://perma.cc/QBY3-5MGB] (report beginning on page 660 of the linked PDF).

[48] *Id.* at 4.

> First, the psychological relationship between the recipient institution or individual and the Government is more in keeping with the concept of maximum freedom of action for the scientific investigator. Second, the problem is avoided of endeavoring to adapt detailed contract regulations designed primarily for the procurement of hardware to the support of creative, fundamental research. Third, advance payment of the grant can be made without the vouchering of expenditures and accompanying "progress reports" or other "proof of work"—both of which exercise a deadening effect upon the initiative of the scientist.[49]

Given the free reign and lack of direct accountability typifying federal grants in this initial stage, it is unsurprising that Congress imposed overarching limits on its largesse.[50]

Within ten years, however, that notion of grants as charitable offerings no longer reflected agency practice. In 1968, the Chairman of the Procurement Committee of the Air Force Office of Scientific Research observed the disconnect:

> While, through grants by other Federal agencies, funds may be "bestowed without a return," this is far from the sense in which grants are made by the Air Force. Quite to the contrary, an Air Force grant is the physical embodiment of a bilaterial agreement. Grant support is given only in exchange for an agreement that a specific program of research at an agreed level of effort for a specific period will be undertaken, that the findings resulting therefrom will be fully disclosed to the Government, and that the Government may make such use of the findings as it deems appropriate.[51]

So, too, around this time, Congress was changing its attitude toward research grants, dispensing in 1966 with a statutory cap on indirect costs and with a DOD-specific cost-sharing requirement in 1969.[52]

---

[49] *Id.*

[50] *See DOD I*, 2025 WL 2022628, at *6 & nn.11–12 (describing limits on research-grant reimbursements during the 1960s).

[51] Roy L. Schooling, *The Air Force Grant Program*, 10 A.F. L. REV. 24, 25–26 (March–April 1968).

[52] *See* Marcy E. Gallo & Laurie Harris, Cong. Rsch. Serv., R48540, Univs. & Indirect Costs for Federally Funded Rsch. 10 (2025); *Statement Before the Subcomm. on Gov't Rsch. of the S. Comm. on Gov't Operations*, 91st Cong., at 1–2 (Apr. 22, 1969) (statement of Elmer B. Staats, Comptroller General of the United States), https://www.gao.gov/assets/094483.pdf [https://perma.cc/9ZWW-F3YL] [hereinafter, "GAO Report"].

The events leading up to and following the excision of that cost-sharing requirement are revealing. In 1968, the House of Representatives and Senate passed different versions of the DOD appropriations bill—the House bill contained the same non-specific cost-sharing requirement that had been included in the previous three years' appropriation; the Senate bill eliminated that cost-sharing requirement but added an indirect-expense cap at 25% of direct costs.[53] In conference, both the House's cost-sharing requirement and the Senate's indirect-expense cap were stricken and, instead, the conference committee called for "comprehensive studies . . . directed toward achieving a uniform formula for the ascertaining of indirect costs on research grants throughout the entire Government," finding that "[t]he Government should set the basis for indirect costs based upon sound accounting principles."[54]

The 1969 Government Accounting Office ("GAO") report that followed marks a turning point, as it validated and reinforced the foundational cost principles that would later evolve into the Uniform Guidance. Particularly relevant, GAO found that "a uniform percentage rate applied to direct cost or some element thereof, will not result in a realistic determination of indirect cost, based on sound accounting principles" but rather that "uniform principles and guidelines can be used for the determination of indirect cost, provided they have sufficient flexibility to be applicable to differing circumstances in an equitable manner."[55] The report further clarified the nature of indirect costs and dispelled notions that "institutions with higher rates are less efficient than those with lower rates":

---

[53] GAO Report at 1–2.

[54] *Id.* at 2.

[55] *Id.* at 4–5.

> The wide variation in existing overhead rates does not mean that institutions with higher rates are less efficient than those with lower rates nor does it mean that the total cost of research is greater at those universities with higher rates for indirect costs. The fact that higher overhead rates are reported by some institutions does not indicate that the Government is paying profit, fees, or subsidy to those institutions. Overhead rates do not measure, and should not be used to evaluate, research efforts.[56]

The report goes on to identify legitimate factors affecting indirect costs (such as the nature of the research and the sophistication of an institution's accounting system) and to warn that a limit on indirect costs would incentivize institutions to "treat as many costs as possible as direct charges even though this practice may be unnecessarily expensive."[57] The indirect-cost section of the report concludes by recommending further development and specific changes to the Bureau of the Budget Circular No. A-21, the direct ancestor of the Uniform Guidance.[58]

Under a separate heading, the report considers cost sharing.[59] This is itself telling, as it shows that the two concepts were diverging analytically. Whereas from 1958–68, the two mechanisms arguably functioned as interchangeable—such that the two houses of Congress introduced (and ultimately struck) them in parallel provisions of the same appropriations bill—by 1969, the two had become entirely discrete principles, serving different purposes, functioning differently, and requiring different considerations. As to the merits, the report found that "[b]oth Government agencies and educational institutions [were] opposed in general to mandatory cost sharing" but that the validity of cost-sharing on an as-applied basis varied case-to-case.[60] Here,

---

[56] *Id.* at 6.

[57] *Id.* at 6–13; *see also DOD I*, 2025 WL 2022628, at *4 & n.8 ("Likewise, it would obviously be inefficient for a lab to hire a different janitor to take out the trash for each of its government-funded research projects, though that might theoretically allow the institution to treat those janitors' salaries as direct costs.").

[58] GAO Report at 14–18; *see also DOD I*, 2025 WL 2022628, at *7 (discussing Circular A-21).

[59] GAO Report at 18.

[60] *Id.* at 24.

again, GAO concluded that there "need[ed] to be well-defined and uniform standards governing the use of . . . grants for research, on a Government-wide basis, to enable a more consistent application of cost sharing."[61]

Nearly a decade would pass before Congress's next major intervention. In 1978, Congress repealed its 1958 grant-authorization statute, finding that "uncertainty as to the meaning of such terms as 'contract', 'grant', and 'cooperative agreement' and the relationships they reflect causes operational inconsistencies, confusion, inefficiency, and waste for recipients of awards as well as for executive agencies."[62] A significant part of the confusion centered around what the then-Deputy Director of OMB called the "procurement-assistance distinction"—in other words, when to fund research with a grant versus with a contract.[63]

The 1978 statute responded to this problem with a formal solution, dispensing with grants' charitable characterization in favor of a more technical distinction—whether or not the relationship's "principal purpose" was the "acquisition . . . of property or services."[64] This clear-cut definition addressed concerns that a contract would be necessary to fund research whenever it bore "relevance to agency missions."[65] Notably, since licenses are not property, this change made clear that grants could be used whenever the Government required less than exclusive

---

[61] *Id.*; *see also DOD I*, 2025 WL 2022628, at *6 ("If an agency wishes to mandate cost sharing, the Uniform Guidance prescribes a certain way of doing that. . . . The Uniform Guidance[] [has a] clear presumption against (and specific procedures in the case of) mandatory cost sharing.").

[62] Federal Grant and Cooperative Agreement Act of 1977, Pub. L. No. 95-224, §§ 2(a)(2), 10(a), 92 Stat. 3 (1978). The Senate Report on the act noted how various agencies, including within DOD, differently used grant agreements versus procurement contracts to provide for similar research needs. *See* S. Rep. No. 95-449, at 24 (1977) (comparing the Navy's practice of using procurement contracts to the Air Force's majority use of grants).

[63] S. Rep. No. 95-449, at 35 (Statement of James McIntyre, Deputy Director, OMB).

[64] *See* Federal Grant and Cooperative Agreement Act of 1977, Pub. L. No. 95-224, §§ 4–5, 92 Stat. 3 (1978).

[65] *See* S. Rep. No. 95-449, at 35 (Statement of James McIntyre, Deputy Director, OMB).

control over intellectual property formed in a research partnership.[66]  The overall effect was one of standardization, trending toward the vision of grants conveyed by the Air Force Chairman in 1968, as the "physical embodiment of a bilaterial agreement."[67]

Not everyone supported the new legislation, particularly in the Executive.  Then-President Ford submitted a "Memorandum of Disapproval" on the bill, arguing that it would "limit[] the flexibility of federal agencies in administering their programs."[68]  He further wrote that "Congress should not legislate categories of federal assistance relationships, but leave the number and nature of such classifications to the Executive Branch to determine and implement."[69]  Notwithstanding these concerns, Congress evidently saw fit to limit the "flexibility of federal agencies" in favor of government-wide uniformity toward sound accounting principles.

This is the backdrop against which Congress passed the 1978 statute, instituting a government-wide framework for federal agencies' use of grants, cooperative agreements, and procurement contracts, and against which, in 1981, Congress re-authorized DOD directly to issue grants.[70]  The two decades following the 1958 statute's passage reflect a series of congressional moves away from agencies' individual autonomy over cost and accounting principles—with, of course, the notable and statutorily blessed exception of OMB.  Indeed, as relevant here, "except for OMB and its predecessor, no federal agency has taken any significant action impacting how indirect cost rates are calculated or applied since 1958."  *DOD I*, 2025 WL 2022628, at *7.  By

---

[66] *See DOD I*, 2025 WL 2022628, at *24 n.77 (citing 32 C.F.R. § 34.25(b)(1)).

[67] Roy L. Schooling, *The Air Force Grant Program*, 10 A.F. L. Rev. 24, 26 (March–April 1968).

[68] S. Rep. No. 95-449, at 37 (Statement of Gerald R. Ford, President of the United States).

[69] *Id.* at 38.

[70] *See* Department of Defense Authorization Act, 1982, Pub. L. No. 97-86, § 910, 95 Stat. 1099 (1981).

contrast, Congress has kept its finger on the pulse, repeatedly intervening to exercise its authority in the grant space.[71]

The Rate Cap Policy is more than a creative expression of DOD's power to issue grants. It announces new principles of accounting—for example, blasting the line between indirect costs and cost sharing.[72]  Congress has historically reserved such meaning-making efforts for itself, or else delegated that responsibility to OMB.  The Court remains mindful of the Supreme Court's teaching to "'typically greet' assertions of 'extravagant statutory power over the national economy' with 'skepticism.'"  *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 724 (2022) (quoting *Util. Air Regul. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 324 (2014)).  Here, where billions of dollars and the well-being of the nation's research apparatus is at stake, where neither DOD nor any similarly situated agency has any relevant history making these kinds of decisions, where Congress has repeatedly seen fit to address the issue itself directly through legislation, and where the statute's text clearly points the reader elsewhere for its cost and accounting principles, the Court finds that Congress has given DOD no such authority.[73]

### D.    Arbitrary and Capricious

In *DOD I*, the Court held that Plaintiffs were likely to succeed in showing that the Rate Cap Policy was arbitrary and capricious.  2025 WL 2022628, at *18–23.  Now, at summary judgment, Defendants again argue that Plaintiffs "ask the Court to substitute its judgment, or, more accurately, Plaintiffs' judgment (and preferences), for that of the agency."  Dkt. 80 at 24.  The

---

[71] *See DOD I*, 2025 WL 2022628, at *6–7 & nn.14–17 (describing Congress's lively participation in cost-principle debates over the past two decades).

[72] *See id.* at *15 ("In short, the Rate Cap Policy uses an improper tool (indirect cost rates) to accomplish an impermissible goal (implicit cost sharing).").

[73] As in *DOD I*, the Court finds it unnecessary to reach Plaintiffs' other arguments with respect to 10 U.S.C. §§ 4001, 4010 and 41 U.S.C. § 4708.  2025 WL 2022628, at *18; Dkt. 76 at 20–22.

reality is that, in issuing the Rate Cap Policy, Defendants exercised little "judgment" at all, at least insofar as that word contemplates "examin[ing] the pertinent evidence, consider[ing] the relevant factors, and 'articulat[ing] a satisfactory explanation.'" *Penobscot Air Servs., Ltd. v. FAA*, 164 F.3d 713, 719 (1st Cir. 1999) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The paucity of the administrative record—consisting of two press releases announcing other agencies' policies (without any acknowledgment that said policies had already been judged illegal); the Rate Cap Policy Memos; and two intern-level Excel charts—underscores the obviousness that this Policy was instituted without any real consideration of its effect. That is the finding of this Court.

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* Further, "if an agency's 'new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests' an agency's failure to consider such factors 'would be arbitrary or capricious.'" *Massachusetts v. Nat'l Insts. of Health* ("*NIH I*"), 770 F. Supp. 3d 277, 307 (D. Mass. 2025) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)), *judgment entered*, 2025 WL 1063760 (D. Mass. Apr. 4, 2025), *appeal docketed*, No. 25-1343 (1st Cir. Apr. 9, 2025); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020) (when agency is "not writing on a blank slate," it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns" (citation omitted)).

The deficiencies in the Rate Cap Policy are more than mere policy disputes, and Defendants overstate the deference afforded to an agency's policy choices. As the Fifth Circuit has explained:

> administrative actions cannot survive solely on an agency's demand for policy deference. Of course, if an agency satisfies the various requirements of judicial review, then we will not "substitute [our] own policy judgment for that of the agency." [*Prometheus*, 592 U.S. at 423]. But due deference to agencies does not make arbitrary and capricious review "toothless"; rather, it has "serious bite." *Data Mktg. P'ship v. [Dep't of Lab.*], 45 F.4th 846, 856 (5th Cir. 2022) (quotation omitted).

*Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 469–70 (5th Cir. 2024) (first alteration in original). For the reasons set forth in *DOD I* and for the additional reasons stated below, the Court finds that the issuance of the Rate Cap Policy was arbitrary and capricious.

### 1.    <u>Administrative Record</u>

When the Court held that Plaintiffs were likely to succeed in showing that the Rate Cap Policy was arbitrary and capricious, it did so without the benefit of the full administrative record. That turns out not to have been much of a delta. In filing the administrative record, Defendants certified under penalty of perjury that their administrative record "constitute[s] the complete administrative record for the analysis and rationale that supported the 15 percent cap on indirect cost rates, as reflected in the Policy." Dkt. 72-1 ¶ 3. That record consists of six documents, comprising only fifteen pages: (i) NIH's version of the rate cap policy; (ii) DOE's version of the rate cap policy and accompanying press release; (iii) the Hegseth Memo; (iv) the Michael Memo; (v) a seven-line chart with calculations purporting to show how much money DOD will save; and (vi) a list of nine of the "Largest US Private Research Funding Providers" and their "Max IDC Rate[s]." *See* Dkts. 72-3–8. Before turning to the sufficiency of Defendants' reasoning in the Hegseth and Michael Memos, it is first appropriate to note several shortcomings internal to the information on which they claim to have relied.

###### a.    **Enjoined Policies**

Defendants include in the administrative record two similar, recently announced policies from other agencies implementing a 15% rate cap on indirect costs for federal research grants. Dkts. 72-3–4. However, lacking is any acknowledgement (or even an apparent sign of awareness) that federal courts had already enjoined those policies, declaring each contrary to law and arbitrary and capricious. *See NIH I*, 770 F. Supp. 3d 277, *judgment entered*, 2025 WL 1063760 (D. Mass. Apr. 4, 2025); *Ass'n of Am. Univs. v. Dep't of Energy* ("*DOE*"), — F. Supp. 3d —, 2025 WL 1414135 (D. Mass. May 15, 2025), *judgment entered*, No. 25-cv-10912, Dkt. 71 (D. Mass. June 30, 2025), *appeal docketed*, No. 25-1727 (1st Cir. July 31, 2025).[74]

This absence constitutes a material shortcoming in Defendants' evaluation of the Rate Cap Policy. While "[c]ommon sense" dictates that it would be unfair to expect an agency to imagine and shadowbox against "every . . . thought conceivable by the mind of man," *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978), here, Defendants had the benefit of lengthy, reasoned opinions pointing out "the relevant factors [and] pertinent aspects" with which the prior agencies "fail[ed] to grapple," *NIH I*, 770 F. Supp. 3d at 306. Yet, Defendants instead chose to ignore these decisions entirely. Naturally, Defendants disagree with the conclusions of those judges, but that would be all the more reason to close the door on such arguments by confronting the apparent gap head on.[75] In relying on then-invalid policies, without

---

[74] The NIH policy was preliminarily and then permanently enjoined before the Hegseth Memo was issued. *See* 2025 WL 1063760. The DOE policy was restrained at the time the Hegseth Memo was issued, No. 25-cv-10912, Dkt. 34 (Apr. 16, 2025), and then enjoined before the Michael Memo was issued. 2025 WL 1414135.

[75] At oral argument, Defendants suggested that they did not need to acknowledge the prior rate cap decisions, in part, because they were being appealed. *See* Dkt. 88 at 25:24–26:25. But agencies are routinely required to address feedback with which they disagree. Indeed, it is a requirement of reasoned decision-making that agencies "consider and respond to significant comments received." *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). The Court recognizes that *Perez* concerned notice-and-comment rulemaking, *id.*, the procedures for which Plaintiffs do not argue apply to the Rate Cap Policy. Nevertheless, it remains an apt illustration for how agencies typically respond to serious and reasonable concerns once raised.

even acknowledging their adjudication, Defendants failed to consider relevant evidence. *See Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706." (first citing *Motor Vehicle*, 463 U.S. at 43; and then citing *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009))). This is true regardless of the ultimate outcome in those cases. Defendants' failure to acknowledge the courts' prior decisions, let alone account for their findings, is an independent breakdown all its own.

### b.    Quantitative Analysis

The remaining two documents—a chart demonstrating purported savings under the Rate Cap Policy and a list of the "Largest US Private Research Funding Providers" and their "Max[imum]" indirect cost rates—are of startlingly low evidentiary value.

The first, "Indirect Costs Calculation," Dkt. 72-7 (DOD_AR_000014), consists of a pivot table, appearing to reflect a data set query. However, exactly what it shows is unclear. The fourth column displays "Sum[s] of Sep.FPDS_NG_Total_Dollars_Obligated." There is no key for any of the value headings, so one can only assume that "Sum of Sep." means that the column reflects sums of values pertaining to a particular federal fiscal year—which year, who can tell?[76] "Total_Dollars_Obligated" is relatively clear. "FPDS_NG," however, is curious. In all likelihood, that stands for "Federal Procurement Data System - Next Generation," a government portal to

---

[76] Defendants state that the "award-level [DOD] financial assistance information used to make the calculations in DOD_AR_000014 is not included in the record because it contains non-public information and its disclosure in the aggregate would raise national security concerns." Dkt. 72-1 at 1 n.1. Defendants provide no explanation or justification for this unilateral exclusion, which renders their analysis entirely irreproducible. It is moreover facially suspect, given federal reporting requirements. *See generally* Federal Funding Accountability and Transparency Act of 2006, Pub. L. No. 109-282, 120 Stat. 1186 (codified as note to 31 U.S.C. § 6101).

which federal contract, but not grant, information is reported.[77]  Federal contracts are not only irrelevant to the Rate Cap Policy, they are governed by an entirely different regulatory system, with different cost principles.[78]  If the data reflected in the "Indirect Costs Calculation" table includes contracts, that would be a fatal methodological error, rendering unreliable the entire analysis upon which it is based.  To be clear, the references to "FPDS_NG" in the value headings and search parameters are not necessarily dispositive—the whole table is too unclear to say anything too certain.[79]  However, combined with other facts, it raises significant concern that this data—and therefore the analysis upon which it is based—is corrupted.

For example, another column's heading, "Count of Sep.Record_Count," is facially unclear but has two obvious contenders: it could reflect either total awards (whether contract, grant, or

---

[77] *See* 48 C.F.R. § 4.602(a) ("The FPDS provides a comprehensive web-based tool for agencies to report contract actions."); *id.* § 4.601 ("Contract action does not include grants [or] cooperative agreements."); *see also FPDS FAQ*, FEDERAL PROCUREMENT DATA SYSTEM, https://www.fpds.gov/wiki/index.php/FPDS_FAQ (last visited Oct. 10, 2025) [https://perma.cc/TF3R-CU9C] ("[Question:] Are grants and cooperative agreements reported to FPDS? [Answer:] No."). At this juncture, the Court also notes that it may consider extra-record materials, in an arbitrary-and-capricious analysis, for at least the limited purposes of "determin[ing] whether the agency considered all relevant factors in making its decision" and "when necessary to explain technical terms or complex subject matter." *WildWest Inst. v. Bull*, 547 F.3d 1162, 1176 (9th Cir. 2008) (quoted in *Housatonic Riv. Initiative v. U.S. Env't Prot. Agency*, 75 F.4th 248, 279 (1st Cir. 2023)).

[78] *See* 32 C.F.R. § 21.325 (explaining that the Federal Acquisition Regulation ("FAR") and Defense Federal Acquisition Regulation Supplement ("DFARS") apply to procurement contracts); *see also* 48 C.F.R. §§ 201.101, 201.104 (setting forth DFARS's purpose and applicability).

[79] Two search parameters combine "FPDS_NG" with another acronym, "FABS," which likely stands for "Financial Assistance Broker Submission," the form used to submit grant information to the Financial Assistance Award Data Collection ("FAADC").  *See Data Sources*, USASPENDING.GOV, https://www.usaspending.gov/data-sources (last visited Oct. 10, 2025) [https://perma.cc/RW46-G2PH]; *see also* Michael Memo at 2 ("In addition, all [DOD] Components that make financial assistance awards to IHEs are reminded that they must ensure all indirect costs on assistance awards are reported to the Financial Assistance Award Data Collection System, which is the Department's system of record for compliance with the Digital Accountability and Transparency Act of 2014.").  FPDS-NG and FAADC share certain technical architecture.  *See Financial Assistance Award Data Collection (FAADC) Help Guide V1.2*, FEDERAL PROCUREMENT DATA SYSTEM 56, https://www.fpds.gov/downloads/FAADC/FAADC_Help_Guide_V1.2.pdf (last updated July 19, 2025) [https://perma.cc/N26R-W683] (noting that the same portal can be used to access both).  This certainly could suggest a comingling of contract and grant data, at least at some level.  The appearance of both acronyms might indicate that the data set was queried using grant identifiers, which may or may not have had any effect on the award types yielded.

both) or total intra-award transactions.[80]   The former makes more sense because dollars are generally obligated when awarded, rather than when expended.   However, neither makes sense in relation to the table's listed values: they appear either too high to represent the number of IHE grants or too low to reflect the number of transactions under those grants, considering publicly available spending data.[81]

The best clue for what this data might represent (or against what it may have been benchmarked) is the "Grand Total" of "Dollars_Obligated": approximately $9.2 billion.   That number is reasonably close to the "$9 billion" figure cited in Defendants' brief.   Dkt. 80 at 27. That figure, in turn, is drawn from an NSF report on its Higher Education Research and Development (HERD) Survey.[82]   But that "$9 billion" HERD figure is not limited to grants—it includes all federally funded "research and development" spending by universities, including expenditure under government contracts.   It is thus eyebrow-raising to see that the HERD figure should match the "Grand Total" obtained for Defendants' "Indirect Costs Calculation," which theoretically should include only grants.   The $9 billion HERD figure includes, for example, Johns Hopkins University's Applied Physics Laboratory, which was awarded over $1.4 billion by DOD

---

[80] Transactions are individual purchases made under the authority of a given award.  2 C.F.R. § 1108.305.

[81] In 2025, DOD awarded 3,814 grants and processed 24,823 transactions; in 2024, it awarded 4,891 grants and processed 26,587 transactions; in 2023, it awarded 5,309 grants and processed 24,841 transactions.  *Department of Defense (DOD)*, USASPENDING.GOV, https://www.usaspending.gov/agency/department-of-defense (last visited Oct. 10, 2025) [https://perma.cc/FAN6-FHWT] (toggling fiscal year in the upper-right-hand corner and award type under "Award Spending").  These figures are not broken out for IHEs, however, meaning that the "Record_Count" numbers are necessarily too high to reflect IHE grants, being only a subset of the total.

[82] *See* Nat'l Ctr. for Sci. & Eng'g Stat., Nat'l Sci. Found., *Higher Education R&D Expenditures Increased 11.2%, Exceeded $108 Billion in FY 2023* (Nov. 25, 2024), https://ncses.nsf.gov/pubs/nsf25313 [https://perma.cc/6UU8-W65K] (cited Dkt. 80 at 27 n.13) [hereinafter, the "HERD Survey"].

via contracts, not grants, in fiscal year 2023.[83]  In other words, over 15% of the $9 billion figure

cited in Defendants' brief—which may or may not correlate with the unexplained figure on which

they based their entire cost-savings analysis—reflects a single entity's *contracts*, not grants.[84]

The lack of transparency in Defendants' "Indirect Costs Calculation" means that they have

presented a conclusion without premises, rendering their primary justification for the Rate Cap

Policy—cost savings of "up to $900M per year"[85]—without a rational basis in the record.  Of

course, the knife cuts both ways—if the reality is lower cost savings, resulting from a lower overall

grant total, that also means less of a reliance interest (at least in gross dollars) for IHEs.  But

---

[83] *See* HERD Survey at Table 4 n.a ("Johns Hopkins University includes the Applied Physics Laboratory, with $2,333 million in total R&D expenditures in FY 2023."); *Federal Awards Advanced Search*, USASPENDING.GOV, https://www.usaspending.gov/search/ (last visited Oct. 10, 2025) [https://perma.cc/F3ZY-T4QF] (filtering results by: Time Period – "FY 2023"; Award Type – "Contracts"; Awarding Agency – "Department of Defense (DOD)"; Recipient – "C1HBCJ9RMBV3", downloading data, considering "federal_action_obligation[s]").

[84] For illustrative purposes, the Court blurs a technically important distinction between obligations (*e.g.*, the Advanced Physics Laboratory's $1.4 billion in awards) and expenditures (*e.g.*, the $9 billion of DOD-funded university spending).  The HERD Survey looked at expenditures, rather than obligations.  Theoretically, one might expect expenditures to roughly mirror obligations, as new funds replace old.  However, another study released by NSF not long thereafter suggests that DOD obligated only $5.8 billion in "science and engineering" support (a category including "research and development," including by means of contracts) to IHEs in FY2023.  *See* Nat'l Ctr. for Sci. & Eng'g Stat., Nat'l Sci. Found., *In FY 2023, Federal Science and Engineering Support for Higher Education Totaled $49 Billion; Federal R&D to Nonprofits Totaled $12 Billion* (June 2, 2025), https://ncses.nsf.gov/pubs/nsf25341 [https://perma.cc/VG7V-NXNS].  The difference between expenditures and obligations in 2023 might be reconciled based on factors unique to FY2023, such as the expiration of COVID-19 funds.  *See* Nat'l Ctr. for Sci. & Eng'g Stat., Nat'l Sci. Found., *Federal R&D Obligations Declined 2.1% in FY 2023; Estimated to Increase in FY 2024* at 2, 6 (March 2025), https://ncses.nsf.gov/pubs/nsf25329/assets/nsf25329.pdf [https://perma.cc/AN26-ZDF2].  Of course, if the $5.8 billion figure more accurately reflects yearly obligations—in fact, overrepresenting obligations because it includes contracts—then Defendants' cost-savings math is wrong either way.

[85] Hegseth Memo at 1.

whatever the proper cost-benefit analysis may be, the Court cannot conclude that Defendants have done it.[86]

Defendants' second table, "Indirect Cost Rates of Largest U.S. Private Research Funding Providers," Dkt. 72-8 (DOD_AR_000015), is thankfully not as complicated. Defendants rely on the information therein to explain how they arrived specifically at a 15% indirect cost rate limit. *See* Dkt. 80 at 10. Previously, the Court has pointed out the general inappositeness of using this kind of private, institutional data as a reference point for indirect cost rates under the Uniform Guidance.[87] However, even taking Defendants' comparison at face value, their research document is notable for its misrepresentations and cherry-picked data.

The "Indirect Cost Rates" table lists nine "Org[s]" which it deems, without citation, the "Largest US Private Research Funding Providers"; the "Max IDC Rate" for each; and a URL "Source."[88] Several of those URLs point to project-specific guidance that may or may not reflect the organization's overall practice. For example, the table lists the Robert Wood Johnson

---

[86] Briefly, the Court notes a few other strangenesses in DOD_AR_000014. Figures are sub-divided as either "AFTER TODAY" or "BEFORE TODAY," making it even more frustrating that the analysis is not dated. Defendants (without explanation) use the "AFTER TODAY Total" row for their final cost-savings calculation, displayed just right of the pivot table. That row's "Average of Sep.IDC_Calculated" (presumably, an average of indirect cost rates) is listed as 28.7%. However, Defendants use a different "current rate," 25.8%, for their cost-savings arithmetic. This 25.8% rate can indeed be calculated by comparing the "Total_Dollars_Obligated" (approximately $8.265 billion) and "IDC_ESTIMATED" (approximately $2.135 billion) in the "AFTER TODAY Total" row, but this does not explain why the "Average of Sep.IDC_Calculated" for that row should be different. Curiously, "0.287" (28.7%) is entered in a seemingly stray digit, several cells above Defendants' calculation, as if someone considered using the query's average, jotted it in the margins, worked out the indirect cost rate by hand based on the dollar amounts, and then decided to go with the latter. Other stray marks include the number "2640," which might be the total of two "Record_Count" values marked "Provided"—though, that still does not tell us what "Provided" means or why those two numbers should be summed. Finally, there is a "32%" entered in the bottom right-hand corner, without any obvious referent. The point is not that one should feel compelled to draw any specific conclusion from these, if that is at all possible, but rather to illustrate the level of speculation required to draw any sort of meaning from Defendants' record—a kind of tea-leaf reading not normally associated with government decisions worth billions of dollars.

[87] *DOD I*, 2025 WL 2022628, at *21.

[88] Defendants do not explain how they determined that these institutions were the "Largest US Private Research Funding Providers," or what they mean by largest—whether that means by amount spent on research, number of grants awarded, or some other metric.

Foundation ("RWJF") as having a "Max IDC Rate" of 12%. The "Source" for this figure is an FAQ document for a single funding opportunity, dated February 17, 2016.[89] Nothing in the record clarifies that this 12% rate is not project-specific or at least has not changed sometime in the past nine years.[90] Likewise, the table lists the Gordon and Betty Moore Foundation and provides a non-working link to support its claim that the Foundation uses a 12% rate.[91] In fact, the program that the link at least appears to reference disburses funds in flat amounts, fundamentally unlike the reimbursement system applicable to federal grants, upon which the whole notion of predetermined indirect cost rates in the federal system is based.[92] If comparing federal indirect cost rates generally to private indirect cost rates is "apples to oranges," this is apples to a ham sandwich.[93]

Most notably, the table includes the Packard Foundation and states that it has a "Max IDC Rate" of 15%. The "Source" for this rate is an article on the Packard Foundation website, titled "Fostering Equitable Grantmaking through Indirect Cost Coverage."[94] That article explains the

---

[89] *See Policies for Action – Grants FAQs*, ROBERT WOOD JOHNSON FOUND., https://anr.rwjf.org/templates/external/P4A_FAQs.pdf (last updated Feb. 17, 2016) [https://perma.cc/D72Z-RHQG] (cited Dkt. 72-8 at 1).

[90] Indeed, the Court easily found another RWJF funding opportunity applying a higher, 15% indirect cost rate. *See Rapid Response: Reinvesting in Racial and Indigenous Health Equity Research*, EVIDENCE FOR ACTION, https://evidenceforaction.org/rapid-response-reinvesting-racial-and-indigenous-health-equity-research#faqs (last visited Oct. 10, 2025) [https://perma.cc/2EC4-C54P].

[91] Dkt. 72-8 at 1 ("https://www.moore.org/docs/default-source/moore-inventor-fellows/moore-inventor-fellows-faq.pdf" [https://perma.cc/K9TL-R7D4]).

[92] *See* Executive Committee on Research, *Moore Inventor Fellows*, MASS. GEN. HOSP., https://ecor.mgh.harvard.edu/Default.aspx?node_id=1826 (last visited Oct. 10, 2025) [https://perma.cc/7MKR-R7N4]; *cf.* 41 U.S.C. § 4708 (providing for payment of "reimbursable indirect costs" according to an indirect cost rate).

[93] Even setting that point aside, the Court notes that Defendants' math is wrong—the administrative disbursement is 12.5%, rather than 12%, of the researcher's disbursement. *See* Executive Committee on Research, *Moore Inventor Fellows*, MASS. GEN. HOSP., https://ecor.mgh.harvard.edu/Default.aspx?node_id=1826 (last visited Oct. 10, 2025) [https://perma.cc/7MKR-R7N4] ($25,000 / $200,000); *see also DOD I*, 2025 WL 2022628, at *6 n.14 (explaining how to calculate indirect cost rates).

[94] *See* Jennifer Adams, *Fostering Equitable Grantmaking through Indirect Cost Coverage*, THE DAVID & LUCILE PACKARD FOUND. (Jan. 18, 2024), https://www.packard.org/insights/perspective/fostering-equitable-grantmaking-through-indirect-cost-coverage/ [https://perma.cc/34ZL-K7HL] (cited Dkt. 72-8 at 1).

Foundation's decision to "provide[] a ***minimum*** [not maximum] indirect cost rate of 15-25% on project grants based on the grantee organization's budget size."[95]  How Defendants could have looked at even the title of this article and inverted its import is baffling and raises questions as to whether this reflects deliberate subterfuge, rather than just mere reckless incompetence.

The takeaway here is not that any one of these errors individually demonstrates that Defendants should have calculated a different figure or come to a different conclusion about what private funders' treatment of indirect costs tells us about how the Government should handle the same.  However, the shoddiness of the work product Defendants claim to have relied upon makes unavoidable the conclusion that no real consideration was ever given in the first place.

### 2.    <u>Inadequate Reasoning</u>

Defendants outline several reasons that, in their view, justify the Rate Cap Policy.  Dkt. 80 at 25–28.  While Defendants correctly explain that "a court must 'uphold [even] a decision of less than ideal clarity if the agency's path may reasonably be discerned,'" *id.* at 23 (quoting *Fox Television Stations*, 556 U.S. at 513–14), there must still be a "path" for a court to discern. *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1352 (D.C. Cir. 2014) (quoting *Motor Vehicle*, 463 U.S. at 43).  "At bottom, an agency must explain 'why it chose to do what it did.'"  *Id.* (quoting *Tourus Records, Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001)).  The Supreme Court has "frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner."  *Motor Vehicle*, 463 U.S. at 48.[96]  On this point, Defendants

---

[95] *Id.* (emphasis added).  As the article explains, this decision was based on the Foundation's "commitment to intentionally support indirect costs" and "end[] practices that inadequately cover the complete costs of project grants and inadvertently undermine the organizational health of [its] grantees."  *Id.*

[96] The Court again rejects Defendants' argument that a more lenient arbitrary-and-capricious standard applies here, as this case concerns DOD's decision to implement a standardized policy, rather than the "exercise of discretion in soliciting and selecting bids during a particular procurement process."  *DOD I*, 2025 WL 2022628, at *18 n.64 (quoting *NSF*, 2025 WL 1725857, at *16 n.7).

fundamentally miss the mark: even assuming there could exist some reasonable basis for *an* indirect cost policy, the record fails to explain how such supposed justifications connect to *this* Policy and fails to acknowledge or respond to IHEs' valid reliance interests in their negotiated rates for indirect costs.  Notably, this finding as to DOD's adoption process follows a trend.  *See, e.g.*, *NIH I*, 770 F. Supp. 3d at 305 (finding similar policy arbitrary and capricious where agency "failed to provide any reasoning, rationale, or justification at all"); *DOE*, 2025 WL 1414135, at *12 ("It provides no reasoned explanation for how or why the DOE concluded that indirect cost rates exceeding 15 percent do not constitute an appropriate or efficient use of DOE funds, nor does it explain how limiting funding for indirect costs would lead to that money being put to more appropriate and efficient uses."); *NSF*, 2025 WL 1725857, at *17 ("The 15% Indirect Cost Rate is arbitrary and capricious because it fails to explain how NSF concluded it will further the objectives it asserts.").  The Court addresses each of Defendants' purported explanations in turn.

### a.  Cost Savings

Defendants argue that the cost-savings benefits of the Rate Cap Policy are "self-evident" rather than "conclusory."  Dkt. 80 at 25.  But it has never been wholly clear what "cost savings" even means in this context.  It cannot mean keeping money in DOD's pocket, since Congress decides appropriations, not Defendants.  U.S. CONST. art. I, § 9, cl. 7.  It might theoretically mean more "bang" for DOD's buck.[97]  However, Defendants have failed to set forth any logical "path," *Amerijet*, 753 F.3d at 1352, to rationalize their claim that "increasing the proportion of [DOD's] spending on direct [versus indirect] research costs," Dkt. 80 at 26, will result in the actual accomplishment of more or better research.

---

[97] *But see* Hegseth Memo at 1 (treating cost savings as distinct from achieving greater value) ("Our objective is not only to save money, but to repurpose those funds.").

That Defendants believe the explanation behind the Policy is "self-evident" does not make it so, especially where this new Policy marks a change in DOD's prior practice.[98]  "Agencies," of course, "are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  "But the agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* (quoting *Fox Television Stations*, 556 U.S. at 515).  "[A]n '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Id.* (second alteration in original) (quoting *Nat'l Cable & Telecomms. Assn. v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

In *DOD I*, the Court identified what it believed to be the underlying assumption of the Rate Cap Policy—that indirect costs are "less worthy of funding than direct costs"—and found that premise "conceptionally irrational."  2025 WL 2022628, at *20.  This intuition followed not only from the Hegseth Memo's clear reference to indirect costs as "waste" and "bureaucratic fat," Hegseth Memo at 2, but from basic logic—it is only "self-evident[ly]" better to spend more on one type of thing versus another type of thing if the first type of thing is inherently and obviously better than the second.  For example, it might be "self-evident" to a child that diverting funds from broccoli to ice cream is beneficial.  However, most choices are not so easy and require at least some cost-benefit analysis.

Now, at summary judgment, Defendants apparently agree, renouncing the idea that they think "indirect costs are 'less worthy' than direct costs" and affirming DOD's commitment "to fund indirect costs."  Dkt. 80 at 26.  That is all well and good, but then what is left?  Why exactly

---

[98] And the fact that three other courts have ruled against similar attempts to impose caps on indirect cost rates certainly lends credence to this issue's not being "self-evident."

is it that, "[t]o accomplish its research objectives, it is reasonable for [DOD] to increase the amount [of] money spent on costs 'incurred specifically' for that research while capping funding" for indirect costs?  *See id.* at 25.  Defendants' full quote gives the game away—"To accomplish [DOD's] research objectives," Defendants argue, "it is reasonable for [DOD] to . . . cap[] funding for items like *depreciation* and *debt service*."  *Id.* (emphases added).  To be clear, by "depreciation," Defendants mean "the use of . . . buildings . . . [and] equipment."[99]  Defendants want to make indirect costs look like broccoli does to children by using actuarial terms rather than acknowledge the tangible benefits those indirect costs represent, but the fact remains that Defendants have never explained how they expect more or better research to happen without, for example, "buildings" or "equipment."

All that the Rate Cap Policy states is that DOD would establish "a lower cap on indirect cost rates for all . . . financial assistance awards" to IHEs in order to "save up to $900M per year" that can be "repurpose[d] toward applied innovation, operational capability, and strategic deterrence" to ensure the "development of transformative research concepts that drive [DOD's] future capabilities."  Hegseth Memo at 2; Michael Memo at 2.  However, nothing in this Policy or in the administrative record explains *what* this means or *how* it will work.[100]  *Cf. NIH I*, 770 F. Supp. 3d at 305 ("[The agency] claims that more funds will go to direct research but fails to address how the money will actually be directed to cover direct costs and how that research will

---

[99] *See* 2 C.F.R. § 200.436(a) ("Depreciation is the method for allocating the cost of fixed assets to periods benefitting from asset use.  The recipient or subrecipient may be compensated for the use of its buildings, capital improvements, equipment, and software projects capitalized in accordance with GAAP provided that they are needed and used in the recipient's or subrecipient's activities and correctly allocated to Federal awards.").  By "debt service," Defendants mean the capital costs associated with those buildings and that equipment.  *Id.* § 200.449(a).

[100] And as already discussed, the Court finds suspect Defendants' purported support for these "cost savings." *See supra* Section IV(D)(1)(b).

be conducted absent the necessary indirect cost reimbursements provided by the federal government.").  This is arbitrary and capricious in its purest essence.

### b.   **Private Funding**

Part of Defendants' answer may be that universities themselves will pick up the slack. Thus, the argument would seem to be, even insofar as indirect costs reflect real and necessary research costs, the Government need not be the one to pay for them.[101]  As support, Defendants point to "research conducted by NIH, which concluded that '[m]ost private foundations that fund research provide substantially lower indirect costs than the federal government, and universities readily accept grants from these foundations.'"  Dkt. 80 at 26 (alteration in original) (quoting Dkt. 72-3 at 2).

There is substantial reason to doubt Defendants' starting premise, that private foundations generally "provide substantially lower indirect costs than the federal government."  *Id.*  At the least, Defendants have provided no basis for that statement in the record.  One cannot speak of "indirect costs" in the abstract, without reference to the method by which they are calculated—it is like comparing the "adjusted gross incomes" of citizens in different nations, applying different tax laws.  The record does not reflect that Defendants have ever analyzed how any private foundation calculates what it calls "indirect costs" as compared to how the Uniform Guidance calculates what it calls "indirect costs."[102]  The *NIH I* court came to the same conclusion, and had

---

[101] To the extent this is Defendants' argument, it reveals the Rate Cap Policy to be a cost-sharing measure, rather than one directed appropriately at indirect costs.  The Court has previously demonstrated why this is an improper conflation.  *See DOD I*, 2025 WL 2022628, at *15.

[102] *See* Dkt. 72-8 at 1 (purporting to show the "Max IDC Rate[s]" of nine institutions, without any other analysis).  For example, Defendants cite the Gordon and Betty Moore Foundation as having a "Max IDC Rate" of 12%.  However, the Foundation excludes "Equipment and Capital Expenditures" (*i.e.*, buildings and equipment) from its definition of indirect costs, including them rather as direct costs.  *See Indirect Cost Policy*, GORDON AND BETTY MOORE FOUNDATION, https://www.moore.org/docs/default-source/Grantee-Resources/indirect-cost-policy.pdf (last visited Oct. 10, 2025) [https://perma.cc/SPX9-B6Y3].  This compounds the problems already identified by the Court with respect to this particular data point.  *See supra* notes 91–93 and accompanying text.

already done so when the Hegseth Memo was issued, finding that the defendants in that case "fail[ed] to consider . . . how private organizations calculate direct and indirect costs differently than the federal government." 770 F. Supp. 3d at 305. Defendants' reliance on that research thus carries little cachet.[103]

Even setting aside the calculation issue, however, there is nothing in the record to say whether private funding of indirect costs is "lower" because those foundations are less generous or because they are simply funding research with lower indirect costs. For example, first on Defendants' list of the "Largest US Private Research Funding Providers" is the Carnegie Corporation of New York. Following Defendants' "Source" link, one quickly learns that the organization funds (among other endeavors) the Andrew Carnegie Fellows Program, which supports "high-caliber scholarship and research in the social sciences and humanities."[104] Such humanities research does not generally require the kind of "elaborate facilities, sensitive equipment, and precise environmental control" known to drive indirect costs.[105]

But even going a step further and accepting Defendants' full premise that nonprofit institutions are getting away with underfunding IHEs' indirect costs, it does not follow that DOD's doing so would be inconsequential. Nonprofit funding accounted for only 6% of universities'

---

[103] At oral argument Defendants' counsel stated that "the only takeaway from the DOE and NIH policies being included in the record is that the agency considered those policies." *See* Dkt. 88 at 24:22–24. It seems logistically impossible that Defendants did not internally recognize and discuss that the relied-upon policies were enjoined. Nevertheless, it is apparently Defendants' position that they were laser-focused on the policies' mere existence, and the Court can only reason from that basis.

[104] *Andrew Carnegie Fellows Program*, CARNEGIE CORP. OF N.Y., https://www.carnegie.org/awards/award/andrew-carnegie-fellows/ (last visited Oct. 10, 2025) [https://perma.cc/789K-KD3K].

[105] *See* GAO Report at 8.

research and development expenditures in 2023.[106]  Federal funds accounted for 55%.[107]  The sheer

(unsupported) possibility that nonprofits are getting a better deal does not obviate Defendants'

responsibility to consider the ramifications of their actions, both internal to DOD's mission and

external to the overall research ecosystem.  *See Michigan v. Env't Prot. Agency*, 576 U.S. 743, 759

(2015) ("The Agency must consider cost—including, most importantly, cost of

compliance—before deciding whether regulation is appropriate and necessary.").  University

Plaintiffs have provided strong evidence that they would not be able to carry on as normal under

the Rate Cap Policy.[108]  The Michael Memo states that "[t]he academic community's work with

[DOD] remains essential for the development of transformative research concepts that drive

[DOD's] future capabilities."[109]  Yet, Defendants have "entirely failed to consider," *Regents*, 591

U.S. at 30, that their actions might destroy the very "community" they deem "essential."

### c.    <u>Singling Out IHEs</u>

Next, Defendants contend that IHEs' different treatment in some parts of the Uniform

Guidance, and their receipt of DOD grant money, justify applying a different rule to their indirect

costs as compared to other recipients.  Dkt. 80 at 27.

---

[106] HERD Survey (under "R&D Expenditures, by Source of Funding").

[107] *Id.*  As previously noted, the HERD Survey data does not disambiguate between grant and contract funding.

[108] *See DOD I*, 2025 WL 2022628, at *20 (citing declarations from IHEs); *see also NIH I*, 770 F. Supp. 3d at 306–07 ("In cutting indirect costs without identifying a countervailing funding stream for such costs of research, the only reasonable outcome will be the discontinuing of research supported by the slashed F&A rates.").  The Court notes a timely illustration: the day before this decision was published, Harvard's School of Engineering and Applied Sciences announced that it had to lay off 25% of its staff represented by the Harvard Union of Clerical and Technical Workers, citing, in part, issues regarding indirect cost reimbursement.  Hugo C. Chiasson & William C. Mao, *Harvard's School of Engineering and Applied Sciences Lays Off 25% of HUCTW Staff*, THE HARVARD CRIMSON (Oct. 9, 2025, at 8:19 p.m. ET), https://www.thecrimson.com/article/2025/10/10/seas-staff-25-percent-layoffs/ [https://perma.cc/G4SY-JM98].

[109] Michael Memo at 2.

However, these "explanations" are neither in the Rate Cap Policy nor anywhere else in the administrative record. *See generally* Dkt. 72. Defendants' post-hoc justifications cannot be the basis to uphold agency action under the APA. *See Melone v. Coit*, 100 F.4th 21, 31 (1st Cir. 2024) (explaining that a court "may consider only the agency's explanation given at the time the relevant decision was made, as opposed to [a] post hoc rationale." (citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943))); *see also Regents*, 591 U.S. at 22–23 (explaining the importance of considering only contemporaneous explanations).

Even assuming, *arguendo*, that the Court could consider this explanation, however, the bare-bones explanation provided by counsel still fails to adequately explain DOD's choice. As the Court previously stated:

> [T]hat universities are singled out for different treatment in other portions of the regulations . . . fails to provide "a 'rational connection between the facts found and the choice made,'" as the fact that in some situations universities are treated differently than other grant recipients does not explain why that distinction makes sense with regard to indirect cost reimbursement. *See Penobscot*, 164 F.3d at 719 (quoting *Motor Vehicle*, 463 U.S. at 43). Indeed, many of the relevant regulations single out not only IHEs but non-profit organizations generally. *See, e.g.*, 2 C.F.R. § 200.414.

*DOD I*, 2025 WL 2022628, at *20 n.65. The APA does not permit DOD to arbitrarily single out one group for different, harsher treatment and so requires Defendants to offer at least some meaningful explanation for that choice, particularly here where the regulations themselves make no such sweeping distinction.[110] *See, e.g.*, *Nat'l Fam. Farm Coal. v. Vilsack*, 758 F. Supp. 3d 1060, 1076 (N.D. Cal. 2024) (explaining that an agency's "'assertion that it has the . . . authority' to make such a decision 'does not address why' it chose to make or not make the decision" (quoting

---

[110] Notably, the only regulation Defendants muster at summary judgment to justify their class-wide distinction concerns standards for record-keeping, rather than reimbursement. *See* 2 C.F.R. § 200.419 (cited Dkt. 80 at 27).

*Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v. Fed. R.R. Admin.*, 988 F.3d 1170, 1183 (9th Cir. 2021))).

That IHEs receive a significant part of DOD's grant funding likewise does not explain why the Rate Cap Policy should disfavor their reimbursements as compared to other recipients. *See Amerijet*, 753 F.3d at 1350 ("At bottom, an agency must explain 'why it chose to do what it did.'" (quoting *Tourus Records*, 259 F.3d at 737)). IHEs still must compete for funding against non-university recipients, whom the Rate Cap Policy would place at an operational advantage, insofar as those non-university recipients are able to recover their full costs of research.[111] Of course, many legal distinctions are either under- or over-inclusive, but the question here is whether this particular classification is reasonable and reasonably explained. The Court finds that it is not.

### d.    Reliance Interests

Over Defendants' arguments to the contrary, the Court in *DOD I* recognized that universities have "valid reliance interests in the negotiated rates for indirect costs." 2025 WL 2022628, at *22; *see also NIH I*, 770 F. Supp. 3d at 308–10 (explaining that "[n]on-governmental organization[s] have relied on the Federal provision of indirect costs for decades" and noting that there are reliance interests even in future grants, "[a]t the very least, . . . for the length of the NICRA, which institutions negotiated with the cognizant agency for the purpose of consistency until the conclusion of the agreement" (first two alterations in original)); *NSF*, 2025 WL 1725857, at *18–19 (recognizing reliance interests stemming from use of negotiated indirect cost rates in pending and future grant proposals). Defendants now argue that the Rate Cap Policy "adequately considers [such] reliance interests." Dkt. 80 at 27. But, as in *DOE*:

---

[111] *See* Dkt. 76 at 17–18 (citing affidavits describing competition for grants).

[m]issing from the Rate Cap Policy's purported recognition of the indisputable reliance interest is a "reasoned explanation . . . for disregarding [that understanding, which was] engendered by the prior policy," and, notably, any acknowledgement of the potential consequences of the policy change. *Encino*, 579 U.S. at 222 (quoting *Fox Television Stations*, 556 U.S. at 515). As such, the Rate Cap Policy "f[alls] short of [an agency's] duty to explain why it deemed it necessary to overrule its previous position," *id.*

2025 WL 1414135, at *13 (second and third alterations in original); *see also NSF*, 2025 WL 1725857, at *19 (describing a similar policy as providing only "summary treatment" of the "decades of industry reliance," which "[falls] short of the agency's duty to explain why it deemed it necessary to overrule its previous position" (alteration in original) (quoting *Encino*, 579 U.S. at 223)).

Finally, Defendants boldly argue that the Rate Cap Policy *did* account for IHEs' reliance interests because the Hegseth Memo "publicly announced future implementation of the Policy, providing IHEs time to, as needed, adjust operations to account for the future change." Dkt. 80 at 27. Thus, according to Defendants, the 29 days between issuances of the Hegseth and Michael Memos was the time within which universities were supposed to upend and reconfigure their entire infrastructures to "account for the future change."[112] *Id.* This is either deliberate obtuseness or breathtaking obliviousness. Of course, it goes without saying that it is also absent from the administrative record. *See Encino*, 579 U.S. at 224 ("Whatever potential reasons the Department might have given, the agency in fact gave almost no reasons at all. In light of the serious reliance interests at stake, the Department's conclusory statements do not suffice to explain its decision.").

---

[112] Defendants may alternatively point to the November 10, 2025 date referenced in the Michael Memo. This was a deadline by which "renegotiations" were to be "completed." *See* Michael Memo at 2. Indeed, notwithstanding Plaintiffs' distinction between the "immediately effective portions of the Rate Cap Policy" and the remainder of the Policy, *see DOD I*, 2025 WL 2022628, at *13 (preliminarily enjoining only the former), the Michael Memo suggests no delay in its effectiveness. Moreover, record evidence suggests that attempts at implementing the Policy were swift, if not premature. *See DOD I*, 2025 WL 2022628, at *9 (first citing Dkt. 13-5 ¶ 18; and then citing Dkt. 13-14 ¶ 27 & Ex. 1) (describing how, even before the Michael Memo was issued, DOD employees began to implement the 15% cap on indirect rate costs).

The APA does not permit Defendants to "disregard [the] facts and circumstances that underlay or were engendered by the prior policy" without a "reasoned explanation." *Id.* at 222 (quoting *Fox Television Stations*, 556 U.S. at 515–16). This failure was arbitrary and capricious.[113]

For all of these reasons, the Court finds that DOD failed to consider and failed to explain significant aspects and impacts of the Rate Cap Policy, in violation of the APA.[114]

## V.    Nature and Scope of Relief

As previewed, the Court will vacate the Rate Cap Policy and grant declaratory judgment but will deny Plaintiffs' request for an injunction.

### A.    Vacatur

"When a reviewing court determines that agency ['actions'] are unlawful, the ordinary result is that the ['actions'] are vacated—not that their application to the individual petitioners is proscribed." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) (Kavanaugh, J., concurring) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)). Defendants argue, to the contrary, that any relief must be limited to Plaintiffs and their members, whether because the APA does not actually authorize vacatur as a remedy or because vacatur is limited by "[t]raditional equitable principles." Dkt. 80 at 35–36.

---

[113] The Court briefly touches on an additional problem with the Rate Cap Policy, which is that nowhere in the administrative record is any indication that Defendants considered the impact of inevitably having to terminate research that was already in progress. *Cf. President & Fellows of Harvard Coll. v. U.S. Dep't Health & Human Servs.*, 2025 WL 2528380, at *33 (D. Mass. Sept. 3, 2025) (highlighting the loss of "value and continuity" when research is terminated). This lack of consideration, problematic on its own, is compounded by the fact that Defendants consider such research "essential." *See* Michael Memo at 2.

[114] Accordingly, the Court need not reach Plaintiffs' argument that the Rate Cap Policy is impermissibly retroactive.

The first argument, which Defendants make in a single summary sentence, does not reflect the law of this Circuit, including as recently reviewed by the Supreme Court.[115]  *See APHA II*, 145 F.4th at 50 (recognizing the "remedy of vacatur" under section 706 of the APA (quoting *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25 (1994))); *APHA III*, 145 S. Ct. at 2661 (Barrett, J., concurring) ("Plaintiffs frequently seek vacatur of internal agency guidance.").[116]  Put simply, the APA requires this Court to "set aside" unlawful or inadequately reasoned agency action.  5 U.S.C. § 706(2).  To "set aside" agency action is "to annul or vacate" it.  *Set Aside*, Black's Law Dictionary (12th ed. 2024).[117]

Defendants' second argument fundamentally misunderstands vacatur as a remedy.  Vacatur acts directly on the "agency action."  *Corner Post*, 603 U.S. at 838 (Kavanaugh, J., concurring) ("[T]he APA . . . empower[s] the judiciary to act directly against the challenged agency action."

---

[115] *See* Dkt. 80 at 35 ("The APA does not authorize universal vacaturs.").  Defendants cite Justice Gorsuch's concurrence in *United States v. Texas*, 599 U.S. 670 (2023), as support.  *See id.* at 696–98 (Gorsuch, J., concurring in the judgment) ("[Section 703] is where the APA most clearly discusses remedies. . . . Conspicuously missing from [section 703] is vacatur.").  However, this is somewhat imprecise, as Justice Gorsuch himself purported only to "rais[e] questions" about the APA:

> In raising questions about the district court's claim that § 706(2) authorizes vacatur of agency action, I do not pretend that the matter is open and shut.  Thoughtful arguments and scholarship exist on both sides of the debate. . . .  [T]he questions here are serious ones.  And given the volume of litigation under the APA, this Court will have to address them sooner or later.  Until then, we would greatly benefit from the considered views of our lower court colleagues.

*Id.* at 701–02 (Gorsuch, J., concurring in the judgment).

[116] Indeed, at present, it appears to reflect the law of no circuit.  *See, e.g.*, *Zimmer Radio of Mid-Mo., Inc. v. Fed. Commc'ns Comm'n*, 145 F.4th 828, 862 (8th Cir. 2025); *Ins. Mktg. Coal. Ltd. v. Fed. Commc'ns Comm'n*, 127 F.4th 303, 317 & n.16 (11th Cir. 2025); *Grand Trunk Corp. v. Surface Transp. Bd.*, 143 F.4th 741, 756–57 (7th Cir. 2025); *State v. Su*, 121 F.4th 1, 17 (9th Cir. 2024); *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890–91 (D.C. Cir. 2024); *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1148 (6th Cir. 2022); *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859–60 (5th Cir. 2022); *Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 48 F.4th 1307, 1313 (Fed. Cir. 2022); *High Country Conservation Advocs. v. U.S. Forest Serv.*, 951 F.3d 1217, 1229 (10th Cir. 2020); *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018); *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 107–08, 115–16 (2d Cir. 2018); *Comité de Apoyo a los Trabajardores Agricolas v. Perez*, 774 F.3d 173, 191 (3d Cir. 2014).

[117] This is the same definition as "[w]hen Congress enacted the APA in 1946."  *Corner Post*, 603 U.S. at 829 (Kavanaugh, J., concurring) (citing three editions of dictionaries published between 1926 and 1951).

(quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 1012 (2018))). Thus, the "action" is vacatur's quantum and its limiting principle. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("The limitation to discrete agency action precludes . . . broad programmatic attack[s]."). Of course, government defendants frequently and rightly police whether a challenged "agency action" is impermissibly broad under the APA's definition. *See, e.g.*, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). For example, there are circumstances where only "part of an agency rule [or] order" constitutes the relevant discrete "agency action," making vacatur of which severable from its remainder. *See* 5 U.S.C. § 551(13). In this case, however, there is no obvious way to divvy up the Rate Cap Policy to vacate only that "part" that is applicable to Plaintiffs.[118] The scope of vacatur here is therefore not truly a product of the remedy, nor of the Court's prerogative, but of Defendants' own capacious undertaking. The bottom line is that the "agency action" is the irreducible *thing* over which this Court has authority under section 706 of the APA, and that *thing* here is undisputedly the Rate Cap Policy.

This "action"-centric nature of the APA follows not only from the statute's text but from its pedigree. The scholarship on the historical and theoretical underpinnings of the APA is too awesome for this Court to attempt its summary. Nevertheless, a brief detour is helpful to understand why vacatur works as it does. As Justice Scalia pointed out in *Norton*, "the APA carried forward the traditional practice prior to its passage, when judicial review was achieved through use of the so-called prerogative writs." 542 U.S. at 63. In particular, by the late-nineteenth and early-twentieth centuries, the writs of mandamus and certiorari were available in American courts to review administrative action and inaction, along lines conspicuously familiar to our

---

[118] And, in any event, Defendants have not disputed the discreteness of the challenged agency action in this case and have therefore waived that argument. *See Air Courier Conf. of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 523 n.3 (1991) ("The judicial review provisions of the APA are not jurisdictional.").

modern APA standard. *See, e.g.*, *People ex rel. Lodes v. Dep't of Health of N.Y.C.*, 189 N.Y. 187, 194 (1907) ("If, however, their action is arbitrary, tyrannical and unreasonable, or is based upon false information, the relator may have a remedy through mandamus to right the wrong which he has suffered.").[119]  These writs compelled either the doing or undoing of a "precise, definite act." *See Norton*, 542 U.S. at 63 (quoting *United States ex rel. Dunlap v. Black*, 128 U.S. 40, 46 (1888) (describing mandamus)).[120]  This "precise" targeting of a "definite act" forms the "traditional limitation[]" that the APA "carrie[s] forward" today. *Id.* at 63, 66.

This "act"-centric nature also shows why vacatur—"derived" from the common law writ system, *id.* at 66—is fundamentally unlike the equitable injunction with which Defendants incorrectly equate it.[121]  *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010) (distinguishing between the two and calling vacatur the "less drastic remedy").  "[A]n injunction is a judicial process or mandate operating *in personam* . . . directed at someone, and govern[ing] that party's conduct." *Nken v. Holder*, 556 U.S. 418, 428 (2009).  "By contrast, instead of directing

---

[119] *See also* Fred Halbhuber, *The State-Law Origins of the APA's "Set Aside" Power*, YALE J. ON REG. (June 11, 2025), https://www.yalejreg.com/nc/the-state-law-origins-of-the-apas-set-aside-power-by-fred-halbhuber/ [https://perma.cc/5YXW-URM6] (describing the historical influence of certiorari practice in state courts on modern administrative law).

[120] Courts are well familiar with the writ of certiorari as a vehicle "to bring up cases" for appellate review. *See Magnum Imp. Co. v. Coty*, 262 U.S. 159, 163 (1923).  The writ has a parallel history as to the review of "acts of administrative bodies created by statute." *Certiorari*, BLACK'S LAW DICTIONARY (12th ed. 2024) (quoting Daniel R. Coquillette, THE ANGLO-AMERICAN LEGAL HERITAGE 248 (1999)).  *But see Degge v. Hitchcock*, 229 U.S. 162, 172 (1913) (holding that certiorari was unavailable in federal court to review an administrative order).

Professor Thomas Merrill has laid out a foundational history of how an "appellate review model" was developed by the Supreme Court in the decades leading up to the APA's passage.  *See generally* Thomas W. Merrill, *Article III, Agency Adjudication, and the Origins of the Appellate Review Model of Administrative Law*, 111 COLUM. L. REV. 939 (2011).  Notably, this appellate review model emerged in response to a failed federal practice of "de novo" review upon bills of equity. *Id.* at 949–50.  Indeed, Professor Merrill observes that the first "glimmer of the appellate review model," which the APA came to embody, can be found in certiorari practice, rather than in equity. *Id.* at 949.

[121] *See* Dkt. 80 at 35 ("Even if the Court interprets the APA to authorize vacatur, it remains an equitable remedy subject to equitable principles.").

the conduct of a particular actor, [vacatur] operates upon the [agency action] itself."[122]  *See id.*
Vacatur is not "a coercive order against the Government, but rather . . . [a] setting aside of the
source of the Government's authority" to act.  *See id.* at 429.

Defendants' reliance on *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), is thus misguided on
several fronts.  Such reliance was already facially shaky, given that the *CASA* Court was explicit
that its decision concerned only "a federal court's equitable authority under the Judiciary Act" and
accordingly said "[n]othing" about "federal courts['] [authority] to vacate federal agency action"
under the APA.  *Id.* at 847 & n.10.  But even insofar as *CASA* might be read to speak more generally
to the history and practice of courts of equity (and their remedial progeny), the APA is simply not
part of that tradition.[123]  *Cf. Pulliam v. Allen*, 466 U.S. 522, 529 (1984) ("This limitation on the
use of the injunction, however, says nothing about [a remedy sounding historically in] the King's
prerogative writs.").

Given the APA's clear textual mandate, and these background legal principles, it is
unsurprising that federal courts are in overwhelming consensus on this issue.  The APA's remedies
are "not party-restricted and allow[] a court to 'set aside' an unlawful agency action."  *See, e.g.*,
*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024), *cert. denied
in relevant part sub nom U.S. Dep't of Educ. v. Career Colls. & Schs. of Tex.*, 145 S. Ct. 1039
(2025); *see also, e.g.*, *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409

---

[122] *Nken* concerned the stay of an immigration order of removal, *i.e.*, of agency action, and relied on
*Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4 (1942), which also dealt with stay of agency action.  *Nken*, 556 U.S.
at 421–22.  As the Fifth Circuit has observed in the APA context, "a stay is the temporary form of vacatur."  *All. for
Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 254 (5th Cir. 2023) (relying on *Nken*), *rev'd and
remanded on other grounds sub nom. Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024).  *Nken*'s
description of stay is thus apposite of vacatur.

[123] True, vacatur is sometimes referred to as an "equitable remedy."  *See, e.g.*, *APHA II*, 145 F.4th at 50
(quoting *U.S. Bancorp*, 513 U.S. at 25).  But that is necessarily an ahistoric usage of the term since law and equity
merged federally in 1938.  *See SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 333
& 334 n.3 (2017).

(D.C. Cir. 1998) ("[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." (quoting *Harmon*, 878 F.2d at 495 n.21)).[124]  Providing party-specific relief under the APA would be "fairly radical and inconsistent with" longstanding practice.  Transcript of Oral Argument at 35, *United States v. Texas*, 599 U.S. 670 (2023) (No. 22-58) (Roberts, C.J.) ("[For] those of us who were on the D.C. Circuit, you know, five times before breakfast, that's what you do in an APA case.").  For this and every other reason, it would also be wrong.

Finally, Defendants argue that the Court should remand the Rate Cap Policy for further explanation rather than vacate it.  Dkt. 80 at 35–36.  The Court finds the Policy too deficient for this result.  "Whether to vacate an agency's flawed decision or remand without vacatur is within [the discretion of] the reviewing court, and 'depends *inter alia* on the severity of the errors, the likelihood that they can be mended without altering the order, and on the balance of equities and public interest considerations.'"  *Town of Weymouth v. Mass. Dep't of Env't Prot.*, 961 F.3d 34, 58 (1st Cir. 2020) (quoting *Cent. Me. Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001)), *on reh'g*, 973 F.3d 143 (1st Cir. 2020).  Here, the Court has found that the Rate Cap Policy is contrary to law; accordingly, it cannot be implemented "without altering the order."  *Id.*; *see also Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) ("Because an agency can't 'cure' the fact that it lacks authority to take a certain action, remand-without-vacatur is unavailable here.").  Nor do the balance of equities or public interest in such circumstances weigh in favor of letting go into effect action that Congress has equated to "abandoning the Government's long-established responsibility for underwriting much of the Nation's research infrastructure."  *See DOD I*, 2025

---

[124] Even courts that have expressed "concern[]" about the effects of vacatur have nonetheless recognized that it is the "appropriate remedy" under the APA.  *See, e.g.*, *Kansas v. Kennedy*, 2025 WL 1702670, at *18–19 (N.D. Iowa June 18, 2025).

WL 2022628, at *7 (quoting S. Rep. No. 115-150, at 109 (2017)).  Accordingly, the proper remedy is to vacate the Rate Cap Policy in its entirety.

### B.    Declaratory Judgment

Plaintiffs also ask the Court to "declare[] the Rate Cap Policy invalid, arbitrary and capricious, and contrary to law."  Dkt. 75-3 at 1; Dkt. 87-1 at 1.  While Defendants obviously dispute the merits of Plaintiffs' claims, they offer no specific objection to declaratory judgment as an available or appropriate form of relief.  As such, the Court will issue declaratory judgment.

### C.    Permanent Injunction

Plaintiffs also seek a permanent injunction that "enjoins Defendants, their agents, and anyone acting in concert or participation with Defendants from implementing, instituting, maintaining, or giving effect to the Rate Cap Policy in any form with respect to University Plaintiffs and Organizational Plaintiffs' member universities."  Dkt. 87-1 at 1.

"Where a plaintiff seeks permanent injunctive relief, the test is the same [as for a preliminary injunction], except that 'the movant must show actual success on the merits of the claim, rather than a mere likelihood of such success.'"  *Caroline T. v. Hudson Sch. Dist.*, 915 F.2d 752, 755 (1st Cir. 1990) (quoting *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989)).  While the Court has found actual success on the merits, and would find for Plaintiffs as to the balance of equities and public interest, *see DOD I*, 2025 WL 2022628, at *26–27, the Court concludes that a permanent injunction is not necessary here, given the availability of vacatur and declaratory relief.[125]  The Supreme Court has cautioned that a district court, vacating an agency action under the APA, should not issue an injunction unless doing so would "have [a] meaningful

---

[125] "To be clear, a permanent injunction would be warranted, if . . . Defendants successfully contend on appeal that vacatur is not available under the APA."  *NSF*, 2025 WL 1725857, at *23 n.8.

practical effect independent of its vacatur." *Monsanto*, 561 U.S. at 165.  This is because "[a]n injunction is a drastic and extraordinary remedy, which should not be granted" where "a less drastic remedy . . . [is] sufficient to redress" the plaintiffs' injury.  *Id.*  An injunction would have no additional, "meaningful practical effect" here, where an order declaring unlawful and vacating the Policy would fully resolve the parties' dispute and prevent injury to Plaintiffs.  *See NSF*, 2025 WL 1725857, at *23 ("Enjoining Defendants from implementing or enforcing a policy that has been vacated would be duplicative.").  Accordingly, the Court will not issue a permanent injunction at this time.  *See id.* at *23–24 (rejecting request for permanent injunction and instead declaring unlawful and vacating challenged agency action); *DOE*, No. 25-cv-10912, Dkt. 71 (D. Mass. June 30, 2025) (same).

## VI.    <u>Conclusion</u>

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment, Dkt. 75, is GRANTED, and Defendants' Motion for Summary Judgment, Dkt. 81, is DENIED.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated:  October 10, 2025                 Judge, United States District Court