**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **Civil Action No.** **25-11740-BEM** |
| DEPARTMENT OF DEFENSE, et al., | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM AND ORDER ON ASSOCIATION OF AMERICAN UNIVERSITIES'S**
**MOTION FOR ATTORNEYS' FEES**

**MURPHY, J.**

Fifteen Plaintiffs[1] filed suit challenging Defendant Department of Defense's ("DOD") Rate Cap Policy,[2] which directed DOD components "not to allow indirect cost rates above 15% in all new assistance awards to IHEs" and requires components to "apply the 15% cap" on "existing assistance awards to IHEs," whether by renegotiation or by termination and reissuance.[3] The Court granted summary judgment in favor of Plaintiffs, and vacated and declared unlawful the Rate Cap Policy. Defendants voluntarily dismissed their appeal of that order, and Plaintiff Association of

---

[1] Plaintiffs are the Association of American Universities ("AAU"), the Association of Public and Land-Grant Universities ("APLU"), the American Council on Education ("ACE"), Arizona Board of Regents on Behalf of Arizona State University; Brown University; California Institute of Technology; The Regents of the University of California ; Board of Governors of the Colorado State University System Acting by and through Colorado State University; Cornell University; The Board of Trustees of the University of Illinois; The Johns Hopkins University; University of Maryland, College Park; Massachusetts Institute of Technology; University of Pittsburgh of the Commonwealth System of Higher Education; and University of Washington.

[2] The Rate Cap Policy is comprised of two DOD memoranda: the first, issued May 14, 2025, by Secretary of Defense Pete Hegseth, Dkt. 72-5 (the "Hegseth Memo"); the second, issued June 12, 2025, by Under Secretary of Defense for Research and Engineering Emil Michael, Dkt. 72-6 (the "Michael Memo").

[3] Michael Memo at 2; *see also* Hegseth Memo at 2.

American Universities ("AAU") now moves for attorneys' fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412.  For the reasons set forth below, the Court will grant AAU's motion in part, and award fees in the amount of $450,447.00.

## I.    Background

The Court has previously laid out much of the relevant factual background.  *See Ass'n of Am. Univs. v. Dep't of Def.* (*DOD I*), 792 F. Supp. 3d 143, 151–59 (D. Mass. 2025); *Ass'n of Am. Univs. v. Dep't of Def.* (*DOD II*), 806 F. Supp. 3d 79, 89 (D. Mass. 2025).[4]  In the most general terms, Plaintiffs challenged under the Administrative Procedure Act ("APA") Defendants' plan to impose a 15% cap on indirect cost rates for DOD research grants, the so-named "Rate Cap Policy." *See generally* Dkt. 1; Hegseth Memo; Michael Memo.  After issuing a preliminary injunction on July 18, 2025, enjoining "the immediately effective portions" of DOD's Rate Cap Policy as applied to new assistance awards with respect to University Plaintiffs and Organizational Plaintiffs' member universities, *DOD I*, 792 F. Supp. 3d at 182–83, on October 10, 2025, the Court granted Plaintiffs' motion for summary judgment, *DOD II*, 806 F. Supp. 3d at 120–25.[5]  On October 15, 2026, the Court entered judgment in favor of Plaintiffs, vacating and declaring unlawful the Rate Cap Policy.  Dkt. 91 at 2.  Defendants appealed the judgment on December 9, 2025, Dkt. 93, but moved to voluntarily dismiss the appeal on February 10, 2026, *Ass'n of Am. Univs. v. Dep't of Def.*, No. 25-2184 (1st Cir. Feb. 10, 2026).  The First Circuit thus dismissed the appeal on February 18, 2026. *Ass'n of Am. Univs. v. Dep't of Def.*, No. 25-2184 (1st Cir. Feb. 18, 2026); *see also* Dkt. 96.

---

[4] Capitalized and collective terms not otherwise defined have the same definitions as used in *DOD I* and *DOD II*.

[5] The Court held that the Rate Cap Policy was "contrary to binding regulations, . . . exceed[ed] Defendants' statutory authority, and its adoption was arbitrary and capricious." *DOD II*, 806 F. Supp. 3d at 89 (citations omitted); *see also id.* at 99–120.

## II.    <u>Legal Framework</u>

EAJA provides "an exception to th[e] rule" that "each party is usually required to bear its own attorneys' fees." *Castaneda-Castillo v. Holder*, 723 F.3d 48, 56 (1st Cir. 2013). Specifically, EAJA mandates that:

> [A] court shall award to a prevailing party other than the United States fees and other expenses . . . incurred by that party in any civil action . . . brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A). EAJA is "strictly construed in favor of the government," because "it effectively amounts to a partial waiver of sovereign immunity by the United States." *Castaneda-Castillo*, 723 F.3d at 57.

## III.    <u>Discussion</u>

From the statutory text, the First Circuit has derived four prerequisites to securing an EAJA award: (1) "prevailing party" status in a "civil action"; (2) a timely request for fees; (3) that the Government's position in the action "was not substantially justified"; and (4) the absence of "special circumstances" that would "make an award against the government unjust." *Id.* Additionally, any award of fees must be reasonable. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). Here, there is no dispute Plaintiffs are the prevailing party in a civil action or that the request is timely. *See generally* Dkt. 102. Instead, Defendants argue that a fee award is not warranted because Defendants' position was substantially justified, that special circumstances regarding AAU's membership and finances make an award unjust, and that the fees sought by AAU are not reasonable. *Id.* The Court addresses each in turn.

### A.    <u>Not Substantially Justified</u>

Defendants contend that they were substantially justified in their litigation position. Dkt. 102 at 9–15. The First Circuit has explained that:

> It is well-settled that the government bears the burden of establishing that its position was substantially justified. The government needs to satisfy this burden by a preponderance of the evidence, and it must justify the positions it took both during the litigation and the agency proceedings that preceded that litigation. These positions must have a reasonable basis in both law and fact.

*Castaneda-Castillo*, 723 F.3d at 73 (citations omitted). "This standard means that the government's case need not be frivolous to support an award of fees, but, on the other hand, the litigation need not be a cliffhanger to be sufficiently justified." *Dantran, Inc. v. U.S. Dep't of Lab.*, 246 F.3d 36, 41 (1st Cir. 2001) (citing *Pierce v. Underwood*, 487 U.S. 552, 566 (1988)).

The Court begins with the agency actions that preceded this litigation because, from the outset, Defendants' position did not have a "reasonable basis in . . . law and fact." *Castaneda-Castillo*, 723 F.3d at 73. Defendants relied on two similar policies as a basis for implementing the Rate Cap Policy, *see generally* Dkt. 72-3 (policy for NIH); Dkt. 72-4 (policy for DOE). Incredibly, and unreasonably, the Defendants did not acknowledge that, at the time this new policy was adopted, neither of the two policies upon which it relied were in effect as both had been enjoined by federal courts. *See DOD II*, 806 F. Supp. 3d at 108 ("[The administrative] record consists of six documents, comprising only fifteen pages: (i) NIH's version of the rate cap policy; (ii) DOE's version of the rate cap policy and accompanying press release; (iii) the Hegseth Memo; (iv) the Michael Memo; (v) a seven-line chart with calculations purporting to show how much money DOD will save; and (vi) a list of nine of the "Largest US Private Research Funding Providers" and their "Max IDC Rate[s]." (final alteration in original) (citing Dkts. 72-3–8)). "Defendants ignored these obviously relevant . . . analyses before adopting this policy," *id.* at 88; *see also id.* at 108–09 (explaining that the administrative record contained two similar rate cap policies, yet lacked "any acknowledgement (or even an apparent sign of awareness) that federal courts had already enjoined those policies, declaring each contrary to law and arbitrary and capricious" and concluding that "Defendants' failure to acknowledge the courts' prior decisions,

let alone account for their findings, is an independent breakdown all its own").[6]   It is well-established, and obvious, that agencies must consider relevant evidence. *See Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706." (first citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); and then citing *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009))).   It is axiomatically unreasonable to point to two prior policies as the basis for adopting the one at issue, while simultaneously ignoring the court decisions enjoining those two policies.[7]

Defendants argue that the Rate Cap Policy "ha[d] significant distinctions from those other policies," including "different underlying authority and the different implementation process,"

---

[6] To be clear, the agency actions were not novel in any way: when Defendants enacted the Rate Cap Policy in May and June of 2025, three other courts in this District had already held that nearly identical policies were, at a minimum, *likely* unlawful. *See Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 330 (D. Mass. 2025) [hereinafter *NIH*] (preliminarily enjoining NIH's policy on March 5, 2025), *judgment entered*, 2025 WL 1063760 (D. Mass. Apr. 4, 2025), *aff'd*, 164 F.4th 1 (1st Cir. 2026); *Ass'n of Am. Univs. v. Dep't of Energy*, 789 F. Supp. 3d 118, 153 (D. Mass. 2025) [hereinafter *DOE*] (preliminarily enjoining DOE's policy on May 15, 2025, *judgment entered*, No. 1:25-cv-10912-ADB, Dkt. 71 (D. Mass. June 30, 2025), *appeal dismissed*, No. 25-1727 (1st Cir. Mar. 16, 2026); *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106, 143–44 (D. Mass. 2025) [hereinafter *NSF*] (vacating the rate cap policy as to NSF and granting summary judgment in plaintiffs' favor on June 20, 2025), *appeal dismissed*, No. 25-1794 (Sept. 30, 2025).   Specifically, the NIH policy was preliminarily and then permanently enjoined before the Hegseth Memo was issued. *See Massachusetts v. Nat'l Insts. of Health*, 2025 WL 1063760, at *2. The DOE policy was temporarily restrained at the time the Hegseth Memo was issued, *Ass'n of Am. Univs. v. Dep't of Energy*, No. 25-cv-10912-ADB, Dkt. 34 (Apr. 16, 2025), and then enjoined before the Michael Memo was issued, *DOE*, 789 F. Supp. 3d at 153.   NSF agreed to stay its policy through the hearing on cross-motions for summary judgment. *See Ass'n of Am. Univs. v. Nat'l Sci. Found.*, No. 1:25-cv-11231-IT, Dkt. 52 (D. Mass. May 19, 2025).

[7] That the First Circuit had not yet ruled on the issues regarding similar rate cap policies is of little significance here, where three other courts had *unanimously rejected* Defendants' position.   Remarkably, and with apparent distain for these reasoned opinions, the agency made no attempt to even consider those decisions. *Cf. Michel v. Mayorkas*, 68 F.4th 74, 79 (1st Cir. 2023) ("When an issue before the court is novel and has little to no precedent, 'courts have found that an award of EAJA fees is not warranted.'" (quoting *Saysana v. Gillen*, 614 F.3d 1, 6 (1st Cir. 2010))). Moreover, Defendants' argument that the First Circuit's decision in *Michel* stands for the proposition that the Defendants are substantially justified in litigating any position upon which the First Circuit has not yet ruled, *see* Dkt. 102 at 10–11, stretches *Michel* too far.   In *Michel*, "not a single case in the country had been issued favoring [the plaintiffs'] arguments," and "the issue before the district court was novel *and* of first impression within the First Circuit." 68 F.4th at 79 (emphasis added).   Furthermore, "the only district court within the First Circuit to address the key issue agreed that the government's position on the merits is correct" and "a number of courts ha[d] issued reasoned opinions agreeing with the government." *Id.* at 79–80.   In contrast, all three courts to opine on the issues in this case had unanimously rejected Defendants' nearly identical arguments.

5

which "justified . . . both issuing its distinctive Policy and defending it before this Court." Dkt. 102 at 12–13. But an argument about the distinctions based on DOD's policy accounting for reliance interests by affording time for compliance "is either deliberate obtuseness or breathtaking obliviousness" and "is also absent from the administrative record."[8] *DOD II*, 806 F. Supp. 3d at 119. Nor does it account for Defendants' choice to ignore the prior judicial decisions entirely. *See id.* at 109 ("[H]ere, Defendants had the benefit of lengthy, reasoned opinions pointing out the relevant factors and pertinent aspects with which the prior agencies failed to grapple. Yet, Defendants instead chose to ignore these decisions entirely. . . . Defendants' failure to acknowledge the courts' prior decisions, let alone account for their findings, is an independent breakdown all its own." (citations and footnote omitted)). Defendants are free to disagree with the courts and, time and again, take a contrary position. But this Court is hard pressed to find that Defendants, in such circumstances, "ha[d] a reasonable basis in law for the theories advanced."[9] *United States v. Yoffe*, 775 F.2d 447, 450 (1st Cir. 1985). The ostrich burying his head in the sand is manifestly unreasonable.

Defendants also argue that their position was substantially justified because DOD had "itself capped reimbursement of indirect costs at 50 percent and then 20 percent in the 1940s and 1950s" and the Office of Management and Budget ("OMB") limited "aspects of indirect costs for the past 35 years." Dkt. 102 at 11. Additionally, Defendants contend that "10 U.S.C. § 4001(a)

---

[8] Post-hoc justifications cannot be the basis to uphold agency action under the APA. *See Melone v. Coit*, 100 F.4th 21, 31 (1st Cir. 2024) (explaining that a court "may consider only the agency's explanation given at the time the relevant decision was made, as opposed to [a] post hoc rationale." (citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943))); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22–23, (2020) (explaining the importance of considering only contemporaneous explanations). It would thus make little sense to consider such post-hoc justifications under EAJA.

[9] The Court again emphasized that doing so is particularly unreasonable when the Defendants did not even acknowledge the contrary court opinions, let alone attempt to distinguish those situations from the new policy they were advancing, and instead simply ignored them. *See Dkts. 72-2, 72-3, 72-4.*

6

and 41 U.S.C. § 4708 . . . both granted [DOD] broad discretionary authority to issue grants" and thus Defendants were justified to argue that such discretion permitted the Rate Cap Policy. *Id.* at 11–12. But history makes clear that DOD lacked the authority to set rate caps such as the Rate Cap Policy, both based on the plain text of the regulations and from recent Congressional action. *See, e.g.*, *DOD I*, 792 F. Supp. 3d at 156, 165–69 (concluding the Rate Cap Policy was unlawful after analyzing the statutory and regulatory framework and the history limitations on indirect cost funding); *DOD II*, 806 F. Supp. 3d at 97–107 (same). And as the Court previously explained, "the parties have not presented—nor has the Court found—any example of a grant-issuing agency, such as DOD, successfully enacting a policy that significantly limits indirect cost reimbursement or otherwise modifies OMB's cost principles."[10] *DOD I*, 792 F. Supp. 3d at 157. Given the current legal framework, *see id.* at 151–55 (describing the relevant statutory and regulatory framework, including the OMB Uniform Guidance), such arguments based on historical practice have no meaningful relevance.[11]

In sum, the only significant debate as to whether Defendants' litigation position was reasonable exists in Defendants' own minds. *See DOD II*, 806 F. Supp. 3d at 107 ("The paucity of the administrative record—consisting of two press releases announcing other agencies' policies

---

[10] "Defendants agree that DOD is bound to follow the Uniform Guidance." *DOD I*, 792 F. Supp. 3d at 165 (citations omitted).

[11] Defendants make a few additional arguments to support their position that the litigation was substantially justified. Dkt. 102 at 13. The Court does note that the issue of standing presents a closer call, *see id.* (arguing that DOD "reasonably questioned whether Plaintiffs had standing to challenge the part of the Policy that impacted only future grants that had not yet been awarded."), but ultimately rejects all of Defendants' remaining arguments as to the reasonableness of their litigation position after looking at Defendants' litigation position wholistically, *see Saysana v. Gillen*, 614 F.3d 1, 5 (1st Cir. 2010) ("EAJA—like other fee shifting statutes—favors treating a case as an inclusive whole, rather than as atomized line-items." (quoting *Comm'r, Immigr. & Naturalization Serv. v. Jean*, 496 U.S. 154, 161–62 (1990))). And specifically as to the issue of standing, any reasonableness in questioning Plaintiffs' standing does not undermine the Court's conclusion that the underlying agency action itself was not reasonable. *See supra*; *see also McDonald v. Sec'y of Health & Hum. Servs.*, 884 F.2d 1468, 1476 (1st Cir. 1989) ("In the present case we can concede that many of the government's *litigating positions* were reasonable and, hence, 'substantially justified.' The central question facing us, however, is whether the underlying *agency action* was reasonable." (emphasis in original)).

(without any acknowledgment that said policies had already been judged illegal); the Rate Cap Policy Memos; and two intern-level Excel charts—underscores the obviousness that this Policy was instituted without any real consideration of its effect.  That is the finding of this Court."). Defendants have failed to meet their burden to show that their position was substantially justified. Because the Court concludes that the underlying agency conduct was not substantially justified, the Court need not evaluate Defendants' litigation positions.

### B.       Special Circumstances

Defendants also argue that special circumstances would make a fee award in this case unjust.  Dkt. 102 at 15–18.  Defendants bear "the burden of demonstrating 'special circumstances' justifying denial of attorneys' fees under 28 U.S.C. § 2412(d)(1)(A)."  *Rodrigues v. Colvin*, 2015 WL 6157909, at *2 (D. Mass. Oct. 20, 2015) (citing *McDonald v. Bowen*, 693 F. Supp. 1298, 1302 (D. Mass. 1988), *aff'd in part, remanded in part sub nom.*, *McDonald v. Sec'y of Health & Hum. Servs.*, 884 F.2d 1468 (1st Cir. 1989)).  "The First Circuit has explained, in an analogous context, that the sorts of special circumstances that would permit the outright denial of a fee award are few and far between."  *Id.* at *2 (cleaned up) (quoting *De Jesus Nazario v. Morris Rodriguez*, 554 F.3d 196, 200 (1st Cir. 2009)).[12]  Such circumstances include "'outrageous' or 'inexcusable' conduct on the part of the plaintiff or its counsel during litigation of the case"; "bad faith or obdurate conduct"; or "an 'unjust hardship that a grant or denial of fee shifting might impose.'"  *De Jesus Nazario*, 554 F.3d at 200–01 (citations omitted).

---

[12] The parties have not identified, nor has the Court independently found, a case in which the First Circuit directly construed the "special circumstances" exception in EAJA.  But while the First Circuit in *De Jesus Nazario* construed the "special circumstances" exception under 42 U.S.C. § 1988(b), *see generally* 554 F.3d 196, the First Circuit has also explained that the same "prevailing party" standard under 42 U.S.C. § 1988(b) "is applicable to EAJA as well."  *McDonald*, 884 F.2d at 1474; *see also Manning v. Astrue*, 510 F.3d 1246, 1250 n.5 (10th Cir. 2007) ("The Supreme Court has held that legal principles from cases addressing other fee-shifting statutes, such as § 1988, apply to EAJA cases.").

None of those circumstances are present in this case. Instead, Defendants argue that because AAU trade association representing "some of the most prestigious entities in the United States, all of which have substantial endowments," and is joined in this litigation by "deep-pocketed parties that, regardless of their status as 501(c)(3) organizations, almost certainly employ more than 500 employees, thereby rendering them ineligible for EAJA fees," any fee award to AAU would be "incongruous with the EAJA's statutory purpose." Dkt. 102 at 16, 18. Defendants also argue that AAU should not be permitted to recover fees funded by supplemental dues or covered by otherwise ineligible plaintiffs.[13] Dkt. 109 at 5–7.

### 1.     AAU's Membership and Funding

Defendants' first argument—regarding the resources and finances of AAU's members—is contrary to the plain text of the statute. An eligible party is defined as "any partnership, corporation, *association*, unit of local government, or organization," which meets certain financial requirements, unless it is a 501(c)(3) organization, "and which had not more than 500 employees at the time the civil action was filed."[14] 28 U.S.C § 2412(d)(2)(B)(ii) (emphasis added). "Where the party seeking EAJA fees is an association, a majority of courts addressing the issue have held that the association's eligibility is premised upon its net worth and number of employees, regardless of the net worth or employment figures of its members, either individually or collectively." *N.H. Hosp. Ass'n v. Azar*, 2019 WL 1406631, at *5 (D.N.H. Mar. 28, 2019) (collecting cases). It is AAU's obligation to pay for its legal representation, not its members' obligation. As such, the Court finds irrelevant any argument regarding the finances and

---

[13] Because the Court rejects both arguments, *see infra*, the Court will not address whether these arguments were properly raised, *see* Dkt. 110 at 4–6 (arguing that Defendants impermissibly sought to raise new merits arguments after the conclusion of briefing).

[14] Since AAU is a 501(c)(3) organization, *see* Dkt. 98-1 ¶ 2, the financial requirements outlined in 28 U.S.C § 2412(d)(2)(B)(ii) are not relevant here.

endowments of AAU's members.[15]  *See also Atl. Fish Spotters Ass'n v. Daley*, 205 F.3d 488, 493 (1st Cir. 2000) (upholding award of attorneys' fees for trade association without any consideration of the association's membership size or funding).

Defendants also argue that because AAU received funding for the litigation through supplemental dues, which Defendants call special litigation payments, it would be contrary to EAJA's purpose and therefore unjust to award AAU fees.  Dkt. 109 at 5–7.  The Court disagrees and will not read what would effectively be an additional eligibility requirement into EAJA.  That AAU received additional funding from its U.S. members does not render AAU a mere "'front' or a 'sham' through which ineligible entities pursued litigation and recovered fees" such that "it would be appropriate to pierce the associational veil and look to the real parties in interest."  *Nat'l Ass'n of Mfrs. v. Dep't of Lab.*, 159 F.3d 597, 603 (D.C. Cir. 1998) [hereinafter *NAM*].  Just as in *NAM*, "[t]here was no agreement by any of [AAU's] members to pay the costs of this litigation."  *Id.*; *see* Dkt. 98-1 ¶ 3 ("AAU was responsible for all Plaintiffs' attorneys' fees and costs for this litigation.").  Nor is there evidence that any Plaintiff aside from AAU directed the litigation.  *See* Dkt. 113-1 ¶ 4.  Further, as the *NAM* court explained, "payment of membership dues does not render a member liable for the costs of a litigation."  *NAM*, 159 F.3d at 604.  The fact that AAU needed to levy additional dues supports an award, rather than undermines it, especially, as here, where the association could not otherwise fund the litigation.[16]  *See* Dkt. 113-1 ¶¶ 5–10.  Given

---

[15] The Court also notes that while AAU members may have large endowments and receive millions of dollars in research funding from the Government, this Court had found that there were limits to universities' ability to use endowments when rejecting Defendants' argument seeking to oppose Plaintiffs' claims of irreparable harm.  *See DOD I*, 792 F. Supp. 3d at 179.  Additionally, the Court finds unconvincing Defendants' claim that large research dollars at each institution makes an award unjust when this is the very research funding Defendants sought to reduce through the Rate Cap Policy (and other similar polices).

[16] Nor does the Court find any issue with AAU only requiring its U.S.-based members to pay these supplemental dues.

that "[t]he purpose of the EAJA is to remove economic deterrents to parties who seek review of unreasonable government action," *Schock v. United States*, 254 F.3d 1, 4 (1st Cir. 2001), the Court cannot find that these circumstances render a fee award unjust.

Finally, Defendants point to an agreement between AAU and the two other Associational Plaintiffs—American Council on Education ("ACE") and Association of Public and Land-grant Universities ("APLU"), in which those associations agreed to reimburse AAU for twenty-seven percent of AAU's incurred fees, to argue that a fee award would be unjust.[17]  Dkt. 109 at 5; *see also* Dkt. 113-1 ¶ 11.  While the Court is sympathetic to Defendants' concerns about ineligible plaintiffs creating an end-run around EAJA requirements, the specific facts of this case do not render this situation unjust.  The record is clear that "AAU was responsible for all Plaintiffs' attorneys' fees and costs for this litigation."  Dkt. 98-1 ¶ 3; *see also* Dkt. 113-1 ¶ 3.  AAU paid over $2 million in fees for this case but, consistent with EAJA's limitations, moved for $529,937.65 (or 26% of the total) in reimbursement.  Dkt. 110 at 13 n.3.  There is simply no reason to believe that an award here will result in the funneling of money to otherwise ineligible plaintiffs, rather than merely removing some of the burden AAU faced in providing upfront the full cost of litigation, just as EAJA seeks to accomplish.[18]  In this situation, the Court finds no injustice for the purposes of EAJA.

---

[17] By the Court's math, approximately $540,000.

[18] While ACE and APLU appear to be EAJA-eligible entities, *see* Dkt. 113-1 ¶ 11, they did not themselves seek any fees, and any motion for fees would now be untimely, *see* 28 U.S.C. § 2412(d)(1)(B) (requiring a party seeking an EAJA award to file "within thirty days of final judgment in the action").  ACE and APLU did not themselves move for fees because they were not responsible to the law firms for payment of those fees.  *See* Dkt. 113-1 ¶ 11.  But the fact that ACE and APLU would otherwise have been eligible entities for fees under EAJA further alleviates any concerns that similar financial arrangement would circumvent EAJA's requirements.

### 2.    **Presence of Ineligible Plaintiffs**

Defendants' remaining argument—that the presence of plaintiffs ineligible for fees under EAJA renders an award to AAU unjust, *see* Dkt. 102 at 17–18—fares only slightly better.  The Court notes that as an initial matter, Defendants rely on two out-of-circuit cases for the proposition that no fees should be awarded to AAU because twelve other plaintiffs are not themselves eligible, *see id.*, but in neither case did the court hold that the inclusion of ineligible plaintiffs would preclude *any* fee award to an otherwise eligible plaintiff.  In *Sierra Club v. United States Army Corps of Engineers*, the Second Circuit held that EAJA fees must be awarded based on the ratio of eligible plaintiffs to total plaintiffs.  776 F.2d 383, 393–94 (2d Cir. 1985) (relying on *Citizens Council v. Brinegar*, 741 F.2d 584 (3d Cir. 1984)).  In *Louisiana ex rel. Guste v. Lee*, the Fifth Circuit held that "[w]hen parties eligible for EAJA fees join parties ineligible for EAJA fees, the district court must account for the free-rider problems that will inevitably exist," but also noted that "if the ineligible party's participation is nominal or narrow, then the eligible parties should not be denied the access that Congress sought to ensure by enacting the EAJA."  853 F.2d 1219, 1225 (5th Cir. 1988).

While the First Circuit does not appear to have taken a stance, *see N.H. Hosp. Ass'n*, 2019 WL 1406631, at *6, when an eligible plaintiff is joined by ineligible plaintiffs, the predominant approach appears to be to reduce the fee award under EAJA by apportioning the fees based on the ratio of eligible to ineligible plaintiffs, *see, e.g.*, *Sierra Club*, 776 F.2d at 392–94; *Unification Church v. Immigr. & Naturalization Serv.*, 762 F.2d 1077, 1082 (D.C. Cir. 1985).[19]  However,

---

[19] *See also Citizens Council v. Brinegar*, 741 F.2d 584, 597–98 (3d Cir. 1984) (remanding for a determination of the EAJA fees allocable to two eligible plaintiffs when four total plaintiffs had agreed among themselves to apportionment).

some courts will not reduce the award where the ineligible plaintiffs are nominal.[20]  *See, e.g.,* *Louisiana ex rel. Guste*, 853 F.2d at 1225 ("[I]f the ineligible party's participation is nominal or narrow, then the eligible parties should not be denied the access that Congress sought to ensure by enacting the EAJA.").[21]

Plaintiffs focus their arguments on the issue of nominal plaintiffs.  *See* Dkt. 110 at 7.  In contrast, Defendants argue that the "real party in interest" test governs, *see, e.g.*, Dkt. 109 at 1–2 (moving to supplement the record and arguing that "AAU has not proved it is the real party in interest for fee-recovery purposes").  "To determine the real party in interest for purposes of fees, the court considers whether there is a clear arrangement among the plaintiffs regarding the responsibility for fees."  *N.H. Hosp. Ass'n*, 2019 WL 1406631, at *6.  Ultimately, the conclusion under either approach is the same.[22]  None of Defendants' cited evidence undermines the fact that: (1) AAU paid for all of the fees, over $2 million, upfront; (2) even after this fee award and any contribution from the two other Associational Plaintiffs, AAU will ultimately bear the cost of the majority of the fees for the litigation; and (3) AAU was responsible for, and directed the litigation on its own.  *See* Dkt. 98-1 ¶ 3; Dkt. 110 at 13 n.3; Dkt. 113-1 ¶ 3; *see also supra* Section III.B.1. By the same reasoning, the other plaintiffs in this case were merely nominal, and thus apportionment is not required.[23]  *See Unification Church*, 762 F.2d at 1082 ("Whatever the outcome of our consideration of fees here, then, the individual appellants will not pay the fees.  If

---

[20] Because the First Circuit has not yet ruled on this issue, the Court finds persuasive the analysis from courts in other Circuits.

[21] *But see Pollinator Stewardship Council v. EPA*, 2017 WL 3096105, at *16–17 (9th Cir. June 27, 2017) (requiring apportionment of fee award despite arguments that two plaintiffs were nominal, as the "successful . . . representation in this litigation protected their interests along with those of the eligible petitioners").

[22] As such, the Court need not resolve which test applies.

[23] The Court notes that the other plaintiffs participated in the litigation to the same level of many non-plaintiffs, by submitting declarations in support of various motions.

we deny fees, the Church will pay the fees.  If we award fees, the [government agency] will pay the fees.  The Church is the beneficiary of any award of fees, not the individual appellants, and thus the Church can fairly be characterized as the real party in interest.").  As such, the Court concludes that the presence of EAJA-ineligible plaintiffs does not render an award to AAU unjust.

### C.    Reasonableness of Fees

Having concluded that AAU is entitled to fees under EAJA, the Court must now determine what award is reasonable.  *See Hensley*, 461 U.S. at 433.  Defendants contend that "if the Court were to award fees to AAU under the EAJA, the fees should be reduced" because enhanced EAJA fees are inappropriate in APA cases, Plaintiffs fail to carry their burden when justifying requested hours, and Plaintiffs' billings record practices and staffing decisions inflated litigation hours.  Dkt. 102 at 19.  The Court addresses each argument in turn.

### 1.    Billing Rates

EAJA provides that "attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee."  28 U.S.C. § 2412(d)(2)(A)(ii).  Defendants do not oppose the rates proposed for the majority of AAU's attorneys or for AAU's paralegals, but oppose the proposed increased rates for certain of AAU's attorneys who claim to have specialized knowledge or skill.  *See* Opp. at 19–21.

### a.    Cost of Living Increase and Paralegal Rates

The First Circuit has previously approved using the Annual Consumer Price Index for all Urban Consumers ("CPI-U") to calculate cost-of-living adjustments, *see Castaneda-Castillo*, 723 F.3d at 76–77, as AAU suggests, Dkt. 99 at 18.  Accordingly, based on the 2025 CPI-U and 2026 CPI-U for the Boston region, AAU seeks rates of $266.35 per hour worked in 2025 and $267.46

14

per hour worked in 2026. Dkt. 99 at 18. Defendants do not oppose this rate, Dkt. 102 at 19–20 n.6, and the Court finds AAU's proposed rates reasonable.

With regards to paralegal work, AAU proposes an hourly rate of $95. Dkt. 99 at 20. This accords with rates approved by other courts in this District, *see, e.g.*, *Conserva v. Kijakazi*, 2023 WL 8126660 at *3 (D. Mass. June 23, 2023), and Defendants take no issue with the rate, *see* Dkt. 102 at 26. As such, the Court finds AAU's requested hourly rate for paralegals reasonable.

### b.    Special Factor Increase

Plaintiffs contend the following attorneys possess relevant knowledge and skills that justify an increased billing rate: Lindsay Harrison, Ishan Bhabha, Betsy Henthorn, Steve Englund, Anjali Motgi, Zachary Schauf, and Adam Unikowsky from Jenner & Block LLP; and Paul Clement and James Xi from Clement & Murphy, PLLC. *See* Dkt. 99 at 19. The Supreme Court has clarified that:

> [T]he exception for "limited availability of qualified attorneys for the proceedings involved" must refer to attorneys "qualified for the proceedings" in some specialized sense, rather than just in their general legal competence. We think it refers to attorneys having some distinctive knowledge or specialized skill needful for the litigation in question.

*Pierce v. Underwood*, 487 U.S. 552, 572 (1988).

Defendants argue that the record does not support enhanced fees for these attorneys based on "distinctive knowledge [and] specialized skill" regarding rate cap policy litigation. Dkt. 102 at 19. As Defendants note, in matters concerning modern administrative law, an otherwise competent lawyer can generally "learn enough about the particular controversy to litigate in the area adequately" and thus will "deploy exactly the skills taught in law school." *Id.* at 20 (quoting *Atl. Fish Spotters Ass'n*, 205 F.3d at 492). However, the First Circuit also caveated that an otherwise competent lawyer can adequately serve as counsel in such matters "albeit at the cost of *some extra time*." *Id.* (emphasis added). In this case, Plaintiffs had no extra time. The effects of the Rate Cap

Policy had already begun to be implemented, and as the Court found, risked immediate and irreparable harm. *DOD I*, 792 F. Supp. 3d at 180 ("Given the weight of the evidence that the immense harms to Plaintiffs' programs cannot be remedied by a later monetary award . . . Plaintiffs have demonstrated irreparable harm.").

Defendants argue that the need to move quickly to avoid irreparable harm cannot justify an upwards rate increase because, otherwise, "the majority of prevailing APA cases would qualify for an upwards adjustment." Dkt. 102 at 20 (emphasis removed). Thus, Defendants suggest such an award would violate the Supreme Court's principle that any upward adjustment under EAJA cannot be interpreted in such a way as to "effectively eliminate the [$125] cap." *Pierce*, 487 U.S. at 571. In this vein, the Court agrees that an upward adjustment of fees cannot be based solely on a successful showing of irreparable harm. But this case involves more than a successful preliminary injunction motion. It is specifically the *combination* of the time pressures created by the Rate Cap Policy alongside the expertise developed by AAU's attorneys after briefing "materially identical" agency rate cap policies.[24] *See DOD I*, 792 F. Supp. 3d at 150 ("The Government has, for the fourth time, purported to announce a policy that has consistently been deemed unlawful, without acknowledgment of its apparent illegality and without any attempt to structure the policy in a manner that fulfills the established requirements of law. All three prior

---

[24] The relevant attorneys litigated rate cap policy suits, initiated mere months before this case, challenging policies issued by the National Institutes of Health, Department of Energy, and National Science Foundation. *See generally NIH*, 770 F. Supp. 3d 277 (consolidating three actions against NIH's rate cap policy); *DOE*, 789 F. Supp. 118; *NSF*, 788 F. Supp. 3d 106.

16

cases in this District have enjoined or vacated similar attempts to impose a 15% cap on indirect

cost rates for federal research grants.").[25]

Together, the circumstances underlying this case created a dearth of "extra time" for an

otherwise competent lawyer to "learn enough about the particular controversy to litigate the area

adequately," *Atl. Fish Spotters Ass'n*, 205 F.3d at 492, which allowed these lawyers to handle the

case more efficiently than attorneys new to this subject matter, *see id.* ("[T]he statute does not

assign extra compensation by 'fields' but by asking the practical question whether in the case at

hand lawyers qualified to handle the case can be found for $125 or less.").[26]   Given their

unparalleled familiarity with the policy at issue and relevant legal issues, as well as the impending

"irreparable harm," *DOD I*, 792 F. Supp. 3d at 180, the Court finds these attorneys possessed

"distinctive knowledge [and] specialized skills" that were "needful" to adequately litigate the

---

[25] *See also* Dkt. 98-2 ¶¶ 5,7 ("I—along with [several other Jenner & Block attorneys]—litigated similar suits against materially similar policies issued by the [NIH], [DOE], and [NSF] . . . These attorneys . . . worked on at least two prior suits against the NIH, DOE, or NSF Rate Cap Policy."); Dkt. 98-3 ¶¶ 5,7 ("I—along with James Xi—litigated similar suits against materially similar policies issued by the [NIH], [DOE], and [NSF] . . . These attorneys . . . worked on the prior suits against the NIH, DOE, and NSF Rate Cap Policies.").

[26] The Court recognizes that the District of Columbia Circuit has adopted a more stringent interpretation on this issue than the First Circuit, holding that "while 'lawyers practicing administrative law typically develop expertise in a particular regulated industry . . . they usually gain this expertise from experience, not from the specialized training justifying fee enhancement.'" *Select Milk Producers, Inc. v. Johanns*, 400 F.3d 939, 951 (D.C. Cir. 2005) (quoting *F.J. Vollmer Co., Inc. v. Magaw*, 102 F.3d 591, 598 (D.C. Cir. 1996)).  But this Court must follow the First Circuit's approach, which does not so narrowly limit relevant knowledge or skill to fields that require specialized training. *See Atl. Fish Spotters Ass'n*, 205 F.3d at 492 ("[T]he statute does not assign extra compensation by 'fields' but by asking the practical question whether in the case at hand lawyers qualified to handle the case can be found for $125 or less.").

matter, *see Pierce*, 487 U.S. at 572.  Consequently, the Court will award an enhanced rate of $500 per hour to certain of AAU's attorneys.[27]

### 2.    Number of Hours Billed

AAU seek fees for 626.90 hours of attorney time at a rate of $500 per hour (for a total of $313,450): 752.15 hours of attorney time in 2025 at a rate of $266.35 per hour and $267.46 per hour for hours worked in 2026 (for a total of $200,337.65), and 170 hours of paralegal time at a rate of $95 per hour (for a total of $16,150).  Dkt. 99 at 21.  "District courts have broad discretion in determining reasonable fees."  *Sinclair v. Berryhill*, 284 F. Supp. 3d 111, 116 (D. Mass. 2018) (citing *Hensley*, 461 U.S. at 437).  Defendants argue that the hours sought are not reasonable, pointing to evidence of overlap in work with other cases, block billing, vague records, and that excessive time spent on correspondence indicates the team of attorneys was unnecessarily large.[28] Dkt. 102 at 21–26.

Aside from the arguments regarding correspondence, *see infra* note 30, the Court concludes that the fees sought here are slightly excessive.  While the Court notes there are significantly different circumstances between this case and *Association of American Universities v. National*

---

[27] Defendants also challenge whether the attorneys' skills were necessary to expeditiously forestall implementation of the Rate Cap Policy since their time sheets indicate they began work on the case nearly two months before the Rate Cap Policy was issued.  Dkt. 102 at 21; Dkt. 98-4 at 2.  However, preparatory work does not undermine the time-sensitive nature of Plaintiffs' initial filing, given "some degree of preparatory work is necessary for effective advocacy."  *Cano v. Saul*, 2020 WL 6945940, at *29 (D. Mass. Nov. 25, 2020); *see also Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emps.*, 571 U.S. 177, 189–90 (2014) ("Investigation, preliminary legal research, drafting of demand letters, and working on the initial complaint are standard preliminary steps towards litigation.").  Accordingly, the Court concludes that AAU's proposed billing rates are reasonable.

[28] Block billing is a "time-keeping method by which an attorney lumps together the total daily time spent working on a case, rather than itemizing the time expended on specific tasks."  *Torres-Rivera v. Espada-Cruz*, 2007 WL 906176, at *2 (D.P.R. Mar. 22, 2007), *vacated on other grounds sub nom.*, 524 F.3d 331, 340 (1st Cir. 2008).

*Science Foundation*,[29] given AAU's concession that a portion of their work was "common to all," Dkt. 105 at 12, the Court will apply a reduction to account for any duplicative work, *see, e.g.*, *Jin Hai Li v. Foolun, Inc.*, 273 F. Supp. 3d 289, 294–95 (D. Mass. 2017) (finding a ten percent across-the-board reduction reasonable for the duplication of work). With regards to block billing and vagueness, the Court concludes that a reduction is also warranted. The First Circuit has explained that a court "may discount or disallow the total hours claimed if it determines that the time is insufficiently documented," such as for block billing, because when "time records . . . are ill-suited for evaluative purposes, the court is hampered in ascertaining whether those hours are excessive, redundant or spent on irrelevant issues." *Torres-Rivera v. O'Neill-Cancel*, 524 F.3d 331, 336, 340 (1st Cir. 2008). Here, there is no dispute that AAU's time records contain numerous instances of block billing. *See generally* Dkt. 102-1; Dkt. 102-2. The Court concludes that these instances of block billing and various vague entries, *see e.g.*, Dkt. 102-5 at 6 (describing both a 6.8- and 8.8-hour entry as only "[e]dited papers and prepared for filing"); *see generally id.*; Dkt. 102-6, hampered the Court's review and thus warrant a reduction, *see, e.g.*, *EEOC v. AutoZone*, 934 F. Supp. 2d 342, 355 (D. Mass. 2013) (noting that "[t]he First Circuit has endorsed across-the-board global fee reductions as an appropriate remedy for block billing practices" and that "[g]lobal reductions of fifteen to twenty percent have been fairly common penalties for block billing in this circuit" (citing *Torres-Rivera*, 524 F.3d at 340)); *see also New Jersey v. EPA,* 703 F.3d 110, 115 (D.C. Cir. 2012) (holding entries such as "[d]raft reply brief" and "[c]ontinue draft

---

[29] Defendants argue that in *National Science Foundation*, AAU has sought 500 fewer attorney hours and 80.5 fewer paralegal hours. Dkt. 102 at 22–23. However, unlike in the instant case, the government in *National Science Foundation* voluntarily stayed the rate cap policy and the parties proceeded straight to summary judgment. 788 F. Supp. 3d at 121.

of mercury brief" inadequate when used to describe many hours (alterations in original)).[30]  To account for these various billing issues—the duplicative work, block-billing, and vague entries, the Court will apply an across-the-board reduction of 15 percent.

## IV.    Conclusion

For the foregoing reasons, Plaintiff AAU's motion for attorneys' fees is GRANTED in part.  AAU is entitled to recover attorneys' fees in the amount of $450,447.00.

**So Ordered.**

/s/ Brian E. Murphy

Brian E. Murphy

Judge, United States District Court

Dated: August 5, 2026

---

[30] Defendants also argue that "the sheer amount of time spent 'corresponding' suggests potential overstaffing inefficiencies" that warrant reducing any fee award.  Dkt. 102 at 25.  When considering fee-shifting, "[a] trial court should ordinarily greet a claim that several lawyers were required to perform a single set of tasks with healthy skepticism."  *Lipsett v. Blanco*, 975 F.2d 934, 938 (1st Cir. 1992).  That said, even abundant staffing may be reasonable "[s]ince a litigant's staffing needs often vary in direct proportion to the ferocity of her adversaries' handling of the case."  *Id.* at 939.  Additionally, "[e]ffective preparation and presentation of a case often involve the kind of collaboration that only occurs when several attorneys are working on a single issue."  *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 297 (1st Cir. 2001) (citing *Rodriguez-Hernandez v. Miranda-Velez*, 132 F.3d 848, 860 (1st Cir. 1998)).  Here, following the initial time-sensitive filings, a smaller team handled most of the work, *see* Dkt. 98-4 at 12–18, 98-5 at 2–11, leading to eight partners billing less than seven hours and six paralegals billing less than six hours, *see generally* Dkt. 98-6.  Upon review of the records, and in light of the fast-moving and high-stakes nature of this litigation, the Court finds the time spent on communications reasonable.